No. 24-1267

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

St. Mary Catholic Parish in Littleton;
St. Bernadette Catholic Parish in Lakewood;
Daniel Sheley; Lisa Sheley;
The Archdiocese of Denver,

*Plaintiffs-Appellants,*

v.

Lisa Roy, in her official capacity as Executive Director
of the Colorado Department of Early Childhood;
Dawn Odean, in her official capacity as Director
of Colorado's Universal Preschool Program,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Colorado
Case No. 1:23-cv-2079-JLK – Hon. John L. Kane

## APPELLANTS' OPENING BRIEF

Eric C. Rassbach
Mark L. Rienzi
Joseph C. Davis
Nicholas R. Reaves
Jordan T. Varberg
Amanda G. Dixon
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. N.W., Ste. 400
Washington, DC 20006
(202) 955-0095
nreaves@becketlaw.org

*Counsel for Plaintiffs-Appellants*

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iv

STATEMENT OF PRIOR OR RELATED APPEALS ............................... ix

GLOSSARY ............................................................................................... ix

INTRODUCTION ....................................................................................... 1

JURISDICTIONAL STATEMENT .......................................................... 4

STATEMENT OF ISSUES ........................................................................ 4

STATEMENT OF THE CASE .................................................................. 5

    A. The Archdiocese of Denver and its Catholic
       preschools ...................................................................................... 5

    B. The Archdiocese's religious beliefs ............................................. 6

    C. UPK Colorado ............................................................................... 9

    D. The Department grants categorical and
       discretionary exceptions from the Mandate ............................... 11

       1. Categorical exceptions ........................................................... 11

       2. Discretionary exceptions ........................................................ 13

    E. Defendants deny Plaintiffs a religious
       accommodation ............................................................................ 13

    F. Procedural background ................................................................ 15

SUMMARY OF ARGUMENT .................................................................. 17

STANDARD OF REVIEW ....................................................................... 19

ARGUMENT ............................................................................................ 19

I.  Colorado's Mandate violates the Free Exercise
    Clause. ..................................................................... 20

    A. Colorado's Mandate violates the rule of
       *Carson v. Makin*. .............................................. 20

    B. Colorado's Mandate violates the Free Exercise
       Clause because it lacks general applicability
       and neutrality. .................................................... 24

       1. Colorado permits categorical exceptions from
          the Mandate. .................................................. 25

       2. Colorado permits individualized exceptions
          from the Mandate. .......................................... 32

       3. Colorado's application of the Mandate is not
          neutral. .......................................................... 36

    C. Colorado cannot withstand strict scrutiny .............. 37

       1. Colorado's interests are not compelling. ............ 38

       2. Excluding Plaintiffs' preschools is not the
          least restrictive way of advancing Colorado's
          interests. ........................................................ 46

II. Colorado's Mandate violates Plaintiffs'
    freedom of expressive association. ............................. 48

III. The Archdiocese has standing. .................................. 51

    A. The Archdiocese has associational standing ........... 51

    B. The Archdiocese has standing in its own right ........ 57

CONCLUSION ................................................................ 58

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........... 59

CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATION ......................................... 60

CERTIFICATE OF DIGITAL SUBMISSION ....................................... 61

CERTIFICATE OF SERVICE................................................................. 62

**Attachments**

AMENDED ORDER ON DEFENDANTS' MOTION TO DISMISS (ECF NO. 38), PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 61), AND PLAIN-TIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT WITNESS TESTIMONY (ECF NO. 73)................................. A001

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR ENTRY OF JUDGMENT ......................................... A033

JUDGMENT ..................................................................................... A134

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023) ......................................................... 37, 45, 48, 51

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013) ................................................................... 49

*Aptive Env't, LLC v. Town of Castle Rock*,
    959 F.3d 961 (10th Cir. 2020) ............................................... 58

*Awad v. Ziriax*,
    670 F.3d 1111 (10th Cir. 2012) ....................................... 46, 48

*Axson-Flynn v. Johnson*,
    356 F.3d 1277 (10th Cir. 2004) ............................................ 35

*Bd. of Cnty. Comm'rs v. Umbehr*,
    518 U.S. 668 (1996) ................................................................. 49

*Boy Scouts of Am. v. Dale*,
    530 U.S. 640 (2000) ........................................................ 48, 50-51

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993) .................................................................. 24

*Brewer v. City of Albuquerque*,
    18 F.4th 1205 (10th Cir. 2021) ............................................. 46

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011) ....................................................... 37, 41, 42

*Carson v. Makin*,
    596 U.S. 767 (2022) ........................................... 20, 21, 22, 23

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ......................................... 24, 36, 43-44

iv

*Church of Scientology of Cal. v. Cazares,*
    638 F.2d 1272 (5th Cir. 1981) ............................................................ 56

*Citizens for Const. Integrity v. United States,*
    57 F.4th 750 (10th Cir. 2023) .................................................. 51-52, 56

*Citizens for Peace in Space v. City of Colorado Springs,*
    477 F.3d 1212 (10th Cir. 2007) ........................................................ 19

*Colo. Christian Univ. v. Weaver,*
    534 F.3d 1245 (10th Cir. 2008) .................................................... 39, 44

*Colo. Right to Life Comm., Inc. v. Coffman,*
    498 F.3d 1137 (10th Cir. 2007) ........................................................ 58

*Darren Patterson Christian Acad. v. Roy,*
    699 F. Supp. 3d 1163 (D. Colo. 2023) ........................ 15, 16, 22, 26, 29

*Democratic Party of U.S. v. Wisconsin,*
    450 U.S. 107 (1981) ......................................................................... 50

*Does 1-11 v. Bd. of Regents of Univ. of Colo.,*
    100 F.4th 1251 (10th Cir. 2024) ...................................... 25, 30, 31, 32

*Employment Division v. Smith,*
    494 U.S. 872 (1990) ......................................................................... 22

*Espinoza v. Mont. Dep't of Rev.,*
    591 U.S. 464 (2020) .................................................................... 20, 21

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) .................................................................... 57, 58

*Fedor v. United Healthcare, Inc.,*
    976 F.3d 1100 (10th Cir. 2020) .................................................... 19-20

*Fellowship of Christian Athletes v. District of Columbia,*
    No. 1:24-cv-1332, 2024 WL 3400104
    (D.D.C. July 11, 2024) .................................................................. 32, 39

*Fellowship of Christian Athletes v. San Diego Unified Sch.*
  *Dist. Bd. of Educ.*,
  82 F.4th 664 (9th Cir. 2024) ...................................27-29, 31-32, 35-36

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021)..............................21-22, 25, 26, 27, 29, 30, 32, 33,
  ..............................................................34, 36, 37, 38, 40, 41, 49, 56

*Gonzales v. O Centro Espírita Beneficente União*,
  546 U.S. 418 (2006) ........................................................ 41, 44

*Hansen v. Harper Excavating, Inc.*,
  641 F.3d 1216 (10th Cir. 2011) ....................................................24

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ........................................................ 53, 55

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
  515 U.S. 557 (1995) ..................................................... 38, 48, 50

*Int'l Union v. Brock*,
  477 U.S. 274 (1986) ...............................................................54

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) .................................... 24, 37, 39, 45, 46

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...............................................................57

*Maryville Baptist Church, Inc. v. Beshear*,
  957 F.3d 610 (6th Cir. 2020) .............................................31

*Masterpiece Cakeshop v. Colo. C.R. Comm'n*,
  584 U.S. 617 (2018) ...............................................................36

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ....................................................36, 37

*NAACP v. Ala. ex rel. Patterson*,
  357 U.S. 449 (1958) ...............................................................55

vi

*NCAA v. Califano*,
  622 F.2d 1382 (10th Cir. 1980) .................................................. 55, 56

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v.
  City of Jacksonville*,
  508 U.S. 656 (1993) .................................................................. 52

*Obergefell v. Hodges*,
  576 U.S. 644 (2015) .................................................................. 36

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  591 U.S. 732 (2020) .................................................................. 51

*Peck v. McCann*,
  43 F.4th 1116 (10th Cir. 2022) ........................................... 41

*Ramirez v. Collier*,
  595 U.S. 411 (2022) .................................................................. 41

*Roberts v. Winder*,
  16 F.4th 1367 (10th Cir. 2021) ........................................... 19

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ......................................................... 21, 23, 38

*Speech First, Inc. v. Shrum*,
  92 F.4th 947 (10th Cir. 2024) ............................................ 55

*Students for Fair Admissions, Inc. v. President
  & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) .................................................. 38-39, 52, 55, 56

*Tandon v. Newsom*,
  593 U.S. 61 (2021) ............................................................ 25, 29, 30, 37

*Thomas v. Review Bd.*,
  450 U.S. 707 (1981) .................................................................. 21, 23

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017) ........................................................ 20-21, 22, 52

*United States v. Guillen*,
  995 F.3d 1095 (10th Cir. 2021) .......................................................... 51

*United States v. Playboy Ent. Grp.*,
  529 U.S. 803 (2000) ............................................................................ 46

*Yellowbear v. Lampert*,
  741 F.3d 48 (10th Cir. 2014) .............................................................. 47

*Youth 71Five Ministries v. Williams*,
  No. 24-4101, 2024 WL 3749842 (9th Cir. Aug. 8, 2024) ................... 29

**Statutes**

28 U.S.C. § 1291 ....................................................................................... 4

28 U.S.C. § 1331 ....................................................................................... 4

28 U.S.C. § 1343 ....................................................................................... 4

2022 Colo. Legis. Serv. Ch. 123 ............................................................. 35

Colo. Rev. Stat. § 26.5-4-201 *et seq.* ................................. 9, 10, 13, 25, 34

**Other Authorities**

45 CFR § 1355.22 .................................................................................... 47

8 Colo. Code Regs. § 1404-1-4.109 ........................................................ 10

8 Colo. Code Regs. § 1404-1-4.110 ................................... 11, 12, 26, 33

Pope Benedict XVI, *Meeting with Catholic Educators*
  (Apr. 17, 2008) .................................................................................... 53

Lindsey Jensen, *Not enough UPK childcare providers
  for families applying again this year*, KOAA News5
  (Aug. 1, 2024) ..................................................................................... 10

33 Wright & Miller, *Federal Practice and Procedure*
  § 8345 (2d ed.) ................................................................................ 53-54

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no prior or related appeals.

## GLOSSARY

| | |
|---|---|
| "Agreement" | The contract implementing the quality standards, including the Mandate, and other requirements that providers must sign to participate in UPK Colorado. |
| "Department," or "CDEC" | The Colorado Department of Early Childhood |
| "Mandate" | The UPK Colorado requirement (included in the Agreement and in the UPK statute) that "each preschool provider provide children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or, as such characteristics and circumstances apply to the child or the child's family." Colo. Rev. Stat. § 26.5-4-205(2)(b). |
| "UPK Colorado" | Colorado's Universal Pre-Kindergarten program |
| "UPK statute" | Colo. Rev. Stat. § 26.5-4-201 *et seq.* |

## INTRODUCTION

This case is about whether Colorado can constitutionally exclude children from a "universal" preschool benefits program solely because they attend Catholic preschools. The answer to that question is no—denying kids who attend Catholic preschool this benefit violates the First Amendment.

In 2023, Colorado implemented a new universal preschool funding program called UPK Colorado. Colorado's Legislature intentionally created a "mixed delivery" system, meaning that participating preschools—public, private, religious, nonreligious—are reimbursed by the State for providing free preschool education to eligible children. In the program's first two years, however, Colorado has been unable to recruit enough participating preschools, meaning many children have missed out on this benefit.

The Catholic Church would normally be a great candidate to help fill this gap. The Archdiocese of Denver oversees thirty-six state-licensed Catholic preschools serving over 1,500 children. These Catholic preschools have operated for decades and routinely attain excellent quality ratings from the State. But Colorado has repeatedly told the Archdiocese that its preschools *can't* participate in UPK Colorado. Why? Because these preschools ask families (Catholic or not) who enroll in their programs to support the teachings of the Catholic faith in word and deed. This requirement is a sincere expression of the Archdiocese's religious

beliefs and ensures that Archdiocesan preschools can fulfill their religious mission by assisting parents in the education of their children and helping children learn the Catholic faith.

Colorado says Catholic preschools can participate only if they stop being Catholic. To justify this position, the State points to a UPK Colorado Mandate that requires "equal access" to preschools, claiming that following Catholic beliefs and practices constitutes discrimination based on religious affiliation, sexual orientation, and gender identity. As a result, not only did Colorado deny the Archdiocese's request for a religious accommodation, it went so far as to compare Catholic beliefs and practices to invidious race discrimination deserving to be stamped out.

But a trilogy of recent Supreme Court decisions—*Carson v. Makin*, *Fulton v. City of Philadelphia*, and *Tandon v. Newsom*—amply confirm that Colorado cannot create a "universal" preschool program and then bar the gate to religious preschools based on their religious exercise. In short, Colorado was not required to create a universal preschool program—but once it did, it cannot exclude just the religions it doesn't like.

Colorado defends its actions by claiming it lacks authority to grant *any* exceptions from the Mandate. This is simply false. Defendants—by their own admission—have allowed other preschools to deny "equal access" on account of disability, income, and religious affiliation. Similarly, Defendants admit that UPK Colorado preschools could limit enrollment to "gender-nonconforming children," "children of color from historically

2

underserved areas," and others. All these exceptions violate the Mandate. Defendants' only excuse is that these exceptions serve, or could serve, important interests. But religion is also important, and the Supreme Court has held time and again that value judgments favoring nonreligious over religious interests trigger strict scrutiny.

After reviewing these facts at a full trial on the merits, the district court got it half right. It agreed Defendants had created exceptions allowing providers to consider disability, income, and religious affiliation. It therefore granted Plaintiffs partial relief, enjoining the application of the "religious affiliation" "aspect" of the Mandate and allowing the Plaintiff preschools to prioritize Catholic families in the admission process consistent with the Archdiocese's religious instruction.

But the court bent over backwards—breaking with another Circuit's decision in the process—to conclude that Colorado could still enforce the Mandate's sexual-orientation and gender-identity "aspects." Therefore, Archdiocesan preschools remain unable to participate in UPK Colorado.

At bottom, Colorado says it is providing "universal" preschool funding—while excluding an entire category of schools solely because they are following their sincere religious beliefs. That violates the First Amendment. The Court should therefore direct the district court to enter an injunction that *fully* protects Plaintiffs' sincere religious exercise.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. Final judgment was entered on June 5, 2024. 1.App.0016. Plaintiffs filed a timely notice of appeal on June 21, 2024. 2.App.0549. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether excluding religious organizations from a generally available government benefit on account of their sincere religious beliefs and exercise triggers strict scrutiny under the Free Exercise Clause.

2. Whether categorical exceptions from a government policy restricting religious exercise similarly trigger strict scrutiny.

3. Whether discretion to grant individualized exceptions from a government policy restricting religious exercise triggers strict scrutiny.

4. Whether government actions showing that religious exercise is not being treated neutrally trigger strict scrutiny.

5. Whether government actions requiring an expressive association to include those who reject the organization's message trigger strict scrutiny.

6. Whether Defendants' actions can withstand strict scrutiny.

7. Whether the Archdiocese of Denver has standing.

## STATEMENT OF THE CASE

### A. The Archdiocese of Denver and its Catholic preschools

The Archdiocese of Denver is the "geographic reality" of "the Catholic Church in northern Colorado." 3.App.0611.[1] Its purpose "is to establish ministries across northern Colorado in order to communicate the message of the gospel … of Jesus Christ." 3.App.0612.

Among the Archdiocese's ministries are preschools. In particular, the Archdiocese's Office of Catholic Schools oversees thirty-six Archdiocesan preschools, including St. Mary Catholic Preschool and Wellspring Catholic Academy of St. Bernadette. 2.App.0464-65; 3.App.0612-14.[2] The central mission of these schools is to partner with families in educating and forming students in the Catholic faith. 3.App.0617, 3.App.0623; 2.App.0465. The schools therefore seek to "support[] parents and empower[] families to lead their children to encounter and be rescued by

---

[1]  "N.App.NNNN" citations are to Appellants' Appendix and indicate first the volume and then the page number. "ECF" citations are to documents filed in the district court.

[2]  Another Archdiocesan ministry, Catholic Charities, runs six Head Start programs that help those in need, including families experiencing homelessness, "by providing childcare services while parents work to get back on their feet." 1.App.0145-46. Because these programs do not seek to foster Catholic community or require program beneficiaries to support Catholic teaching, they are able to participate in UPK Colorado. These charitable ministries are not among the thirty-six Archdiocesan preschools discussed in this brief. *But see* 2.App.0465 (mistakenly including Head Start programs).

Jesus Christ and have abundant life, here on earth and in heaven, for the glory of the Father." 2.App.0381; 2.App.0465.

Plaintiffs Dan and Lisa Sheley are parishioners at St. Mary's Catholic Parish in Littleton. 3.App.0673; 2.App.0473. The Sheleys believe it is their "directive as Catholics" to provide a Catholic education for their children. 3.App.0673-76; 2.App.0473. They have a four-year-old who would have been eligible for UPK Colorado this past year, as well as a three-year-old and a one-year-old who will soon qualify. *See* 3.App.0674-75; 2.App.0473.

**B. The Archdiocese's religious beliefs**

Because Archdiocesan preschools seek to partner with parents and families to foster an intentional Catholic community, it's essential that parents not only understand and share the school's religious mission but also "desire to teach it within their family, to promote it, to defend it, and to have their children formed in a Catholic worldview." 2.App.0465 (cleaned up); 3.App.0627. Such alignment is also important because the schools seek to avoid causing conflict within a family and with what parents teach at home, lest it create confusion for the child and family. 2.App.0465; 3.App.0627; *see* 2.App.0386-87.

Accordingly, to enroll in an Archdiocesan preschool, parents must sign the Archdiocese's Statement of Community Beliefs, which makes it "clear" from the outset "what the Catholic school will teach and what the Catholic school community believes." 2.App.0465 (quoting 3.App.0620);

*see* 2.App.0386. As the Statement explains, "all Catholic school families must understand and display a positive and supportive attitude toward the Catholic Church[.]" 2.App.0465-66. And "families must refrain from public promotion or approval of any conduct or lifestyle that would discredit, disgrace, or bring scandal to the School, … or be considered a counter-witness to Catholic doctrine or morals." *Id.*

The Archdiocese promulgated this Statement and other similar policies and guidance pursuant to its role overseeing its schools' adherence to Catholic faith and morals. 3.App.0624-25; 2.App.0466; *see also* 2.App.0466-68 (discussing additional policies); 3.App.0624-27 (same); 5.App.1044 ("*Guidance for Issues Concerning the Human Person and Sexual Identity*"); 5.App.1067 ("*The Splendor of the Human Person*").

The Archdiocese provides this instruction to its schools on matters of sexuality and gender identity in accord with its sincere religious beliefs and rooted in Christian anthropology—specifically, in the belief that "[s]exual identity, [and in particular] embodiment as either a man or a woman is a gift that is given to us from the moment of creation." 2.App.0466. And since "the body is ordered towards unity with one another and the procreation of children," the Church likewise "has a particular understanding of marriage as being between a man and a woman." 3.App.0624.

Accordingly, the Archdiocese instructs that "school policies should reinforce Christian anthropology, including the reality of sexual difference

7

and its relevance in certain spheres." 5.App.1046. To that end, Archdiocesan preschools use pronouns corresponding with biological sex, enforce the dress code corresponding with biological sex, and make changing and bathroom facilities available according to a child's biological sex. 5.App.1045, 5.App.1052-55; 2.App.0467; 2.App.0383-84. Additionally, the Archdiocese teaches that enrolling a child of a same-sex couple "may cause confusion for the child" because it "would be difficult for the child to hear" one message from the school when "that's not what they hear from their parents." 3.App.0626-27. The Archdiocese therefore advises that such an enrollment "is likely to lead to intractable conflicts." 5.App.1045, 5.App.1052-55, 5.App.1058, 5.App.1059; 2.App.0467; 3.App.0627 (enrollment "not []possible"). All Archdiocesan preschools must follow this guidance. 3.App.0630; *see* 2.App.0466.

Similarly, Catholic preschools must provide the opportunity to obtain a Catholic education first to Catholic families. *See* 2.App.0468. Archdiocesan preschools therefore prioritize Catholic families in their admissions process. *Id.*

The district court found that Plaintiffs' beliefs are sincerely held. 2.App.0487 n.19. And, although many of the Archdiocese's preschools have been licensed for decades, both sides agree that none of these preschools "has any history of a complaint from an LGBTQ family or other person alleging LGBTQ-based discrimination." 1.App.0081-82 (Declaration of Dawn Odean); 3.App.0656, 3.App.0691; ECF.109 at 32, 33.

### C. UPK Colorado

In 2022, the Colorado General Assembly created by statute a system of state funding for "universal" preschool. Colo. Rev. Stat. §§ 26.5-4-201 *et seq.* ("UPK statute"). The program, which is administered by the newly created Department of Early Childhood, provides fifteen hours of "preschool services" free for all Colorado children "regardless of their economic circumstances." *Id.* §§ 26.5-4-202(1)(a)(V), 26.5-4-204(1)(a).

As a "mixed delivery" system, all licensed childcare providers—private and public—can sign up to participate in UPK Colorado. 2.App.0453; 3.App.0719; 8.App.1830-31. Families with eligible preschool-aged children can enroll in UPK Colorado via the Department's online portal. 2.App.0457. Families then rank up to five participating preschools before being "matched" with a preschool by a Department-created algorithm. 1.App.0059; ECF.109 at 20; 7.App.1527, 7.App.1531.

The Department requires preschools to admit families matched with them *unless* they receive a Department-approved exception from this matching process. 2.App.0457-61. The Department, however, has granted 1,091 preschools—over half of all the participating providers—various exceptions from the matching requirement. 2.App.0460. In addition to the matching process, families can enroll in UPK Colorado directly at a preschool through a "walk in" process. 7.App.1535-38, 7.App.1542. If a participating preschool has an open seat, it similarly must enroll a

walk-in family unless the Department grants an exception. 2.App.0539; *see also* 7.App.1541-42.

In each of its two years, UPK Colorado has suffered from a shortage of licensed preschool providers, meaning the Department could not match every interested family with an available preschool seat. *E.g.*, Lindsey Jensen, *Not enough UPK childcare providers for families applying again this year*, KOAA News5 (Aug. 1, 2024), https://perma.cc/T8YJ-UL28 ("We had about 8,000 applicants in year one for UPK and we had less than 6,000 [families] match and be able to utilize the match.").

The UPK statute also requires the Department to adopt "quality standards." Colo. Rev. Stat. § 26.5-4-205(1)(a), (2); 2.App.0450. These include a requirement (the "Mandate") that "each preschool provider provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family." Colo. Rev. Stat. § 26.5-4-205(2)(b). Identical language is included in the Department's regulations and in the Program Service Agreement providers must sign. *See* 8 Colo. Code Regs. § 1404-1-4.109; 2.App.0451 n.4, 2.App.0455; 5.App.1167.

## D. The Department grants categorical and discretionary exceptions from the Mandate

The Department both permits categorical exceptions from the Mandate and retains discretion to grant case-by-case exceptions from the Mandate.

### 1. Categorical exceptions

Colorado has created via regulation ten distinct categories of exceptions from the matching process, several of which also allow providers to consider characteristics covered by the Mandate. *See* 8 Colo. Code Regs. § 1404-1-4.110 (listing "programmatic preferences" providers "may utilize" to depart from mandatory matching process); *see also* 4.App.0793-0802.

*First*, Colorado allows some providers to deny families an equal opportunity to enroll and receive services based on *disability* and *income level*. As the district court explained, the Mandate has "exceptions for children in low-income families … as well as those with disabilities." 2.App.0510. These two exceptions are included in the Department's regulations, which allow UPK providers to reserve seats for children with individualized education plans and allow some providers (Head Start programs) to consider a family's income when determining eligibility for enrollment. 8 Colo. Code Regs. § 1404-1-4.110(A)(4)-(5). And the operation of these exceptions was confirmed by Defendants both at trial and in their briefing. 4.App.0856 (acknowledging the Department has "preferences

allowing providers to prioritize low-income children or children with disabilities."); ECF.109 at 44 ("preferences permit providers to prioritize low-income children and children with disabilities"); *see also* 4.App.0795:16-17, 4.App.0796:22-25 (confirming regulations allow providers to reject families based on "disability" and "income").

*Second*, Colorado, through its "congregation preference," allows providers to deny families an equal opportunity to enroll and receive services on account of *religious affiliation*. 2.App.0458, 2.App.0461, 2.App.0514 (district court: "congregation preference permitted by Defendants is a clear exception" from the Mandate). This is also confirmed in the Department's regulations. 8 Colo. Code Regs. § 1404-1-4.110(A)(1) ("Faith-based providers granting preference to members of their congregation."). Under this exception, Defendant Odean testified, a Lutheran provider "wouldn't have to provide an opportunity to enroll" to Catholics. 4.App.0815-16.

*Third*, on the second day of trial, 4.App.0817, Colorado announced a new categorical exception which allows providers to "grant preference to an eligible child based: on the child and/or family being a part of a specific community; having specific competencies or interests; having a specific relationship to the provider, provider's employees, students, or their families; receiving specific public assistance benefits; or participating in a specific activity." 8.App.1833-34; 8 Colo. Code Regs. § 1404-1-4.110(A)(10). Odean testified that this broadly worded preference would, among other things, allow providers to serve only "gender-nonconforming

children" and "children of color from historically underserved areas," and to prioritize serving "the LGBTQ community." 4.App.0820-22.

## 2. Discretionary exceptions

In addition to categorical exceptions, the Department has discretion to grant case-by-case exceptions from the Mandate in two ways.

*First*, the Department has an online form, 7.App.1701, by which providers can request an exception from the mandatory matching requirement even if the requested exception conflicts with the Mandate and even if the exception is not among those categories of exceptions included in the Department's regulations. 4.App.0832; *see also* 2.App.0463-64. The form itself offers examples of exceptions providers might request (regarding disability, for example). 7.App.1701; *see* 2.App.0503; ECF.109 at 25.

*Second*, the UPK statute includes an express grant of discretion: "the department may allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II); *see id.* § 26.5-4-205(2). The statute, however, does not permit exceptions from "quality standards relating to health and safety." *Id.* § 26.5-4-205(1)(b)(II).

## E. Defendants deny Plaintiffs a religious accommodation

When UPK Colorado was first announced, Archdiocesan preschools planned to participate. 3.App.0632, 3.App.0665, 3.App.0696. As more details emerged, however, the Archdiocese learned that compliance with

the Mandate, as the Department understood it, would conflict with the Archdiocese's long-held religious beliefs and exercise. 2.App.0469.

Specifically, the Mandate's requirement of equal access regardless of "religious affiliation" conflicted with the Archdiocese's religious belief that its schools must first be available to Catholic families. Moreover, while the Archdiocese's religious exercise does not discriminate against anyone because of status (*e.g.*, as a person who experiences attraction to persons of the same sex), *see, e.g.*, 5.App.1046, 5.App.1048-50, 5.App.1057-59, the Archdiocese feared that Colorado would interpret the Mandate to forbid its preschools' practices regarding sexuality and gender identity, *supra* pp. 6-8. That fear would prove well-founded, as the Department later told the district court that abiding by Plaintiffs' religious beliefs constituted "discriminat[ion] against LGBTQ families and children." 1.App.0055.

Given these concerns, on January 14, 2023, the Archdiocese instructed its preschools not to participate in UPK Colorado for the time being because portions of the Mandate "clearly run counter to Church teaching and the guidance we have provided to Catholic schools … with respect to sexual and gender identity," and because "the statutes do not provide any type of exemption … for religiously held beliefs." 5.App.1161.

Then, on February 17, 2023, the Archdiocese, along with a coalition of other religious organizations, sent a letter to the State requesting a religious accommodation from the Mandate so its preschools could

participate in UPK Colorado. 5.App.1162. The Department responded that no religious accommodation would be provided because it lacked "authority" to grant one. 5.App.1164-65.

Soon after, another religious preschool sought an accommodation, similarly identifying a conflict between the Mandate and its religious "policies on bathroom and locker room usage, pronoun usage, and dress codes." *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1172 (D. Colo. 2023). In response, the Department again explained that the Mandate was "mandated in state statute," and the Department lacked authority to create exceptions. *Id.*

Because the Department denied the Archdiocese an accommodation, none of the Archdiocese's preschools are able to participate in UPK Colorado. 3.App.0635-36.

**F. Procedural background**

Plaintiffs filed suit on August 18, 2023, 1.App.0005, and filed their amended complaint on September 13, 2023. 1.App.0008. Although another case, *Darren Patterson*, 699 F. Supp. 3d 1163, already involved a challenge to the Mandate by a religious preschool on similar grounds, the district court here declined to treat the cases as "sufficiently related to warrant special assignment or transfer." ECF.28.

On September 13, 2023, Plaintiffs asked for a preliminary injunction to participate in UPK Colorado for the 2023-24 school year. 1.App.0008. The court instead set a discovery and briefing schedule to resolve the

entire case on the merits "by the first of the year." 2.App.0560. On October 20, 2023, the *Darren Patterson* court granted a preliminary injunction to Darren Patterson Christian Academy, allowing it to participate in UPK Colorado consistent with its religious exercise. 699 F. Supp. 3d at 1189. Defendants did not appeal that ruling.

Meanwhile, the parties here engaged in extensive discovery and briefing on Plaintiffs' motion for summary judgment and Defendants' motion to dismiss. In resolving these motions, the court held that the Plaintiff preschools and parents had standing and that the case was ripe. 2.App.0320-29 (amended order). But it dismissed the Archdiocese for lack of standing and denied summary judgment. 2.App.0329-32. It also set the case for a bench trial starting January 2, 2024. 1.App.0171-72.

Following a three-day trial with ten witnesses, the parties submitted simultaneous proposed findings of fact and conclusions of law. 1.App.0015-16. On June 4, 2024, the district court issued its opinion. Citing *Employment Division v. Smith*, the district court declined to apply strict scrutiny to what it called the "sexual-orientation and gender-identity aspects of the equal-opportunity requirement," holding they were "neutral and generally applicable." 2.App.0486-514. But it applied strict scrutiny to "the religious affiliation aspect" and concluded that the Department's actions failed this heightened scrutiny. 2.App.0514-17, 2.App.0527-28. The court therefore entered an injunction forbidding Defendants "from requiring, as a condition for participation in" UPK, that

16

the Plaintiff preschools "agree to provide or provide … an equal opportunity to enroll and receive preschool services regardless of religious affiliation," but entering judgment for Defendants "[o]n all other issues and claims." 2.App.0544-45.

In light of Defendants' position that Plaintiffs' religious exercise constitutes sexual-orientation and gender-identity discrimination, Plaintiffs timely appealed. 2.App.0549.

## SUMMARY OF ARGUMENT

The Free Exercise Clause protects the right of religious organizations to participate in public-benefits programs without abandoning their faith. Here, Colorado has burdened Plaintiffs' religious exercise by conditioning participation in UPK Colorado on their agreeing to forgo it—effectively imposing a special tax on Catholic preschools and penalizing families who would benefit from UPK Colorado but for their religious beliefs and exercise.

Colorado's actions violate the Free Exercise Clause in five independent ways. *First*, the Department has created a generally available funding program that excludes Plaintiffs' preschools because of their religious exercise. This, as *Carson* makes clear, triggers strict scrutiny.

*Second*, the Department allows for—as the district court found—at least *three* categorical exceptions from the Mandate: for religious affiliation, disability, and income. These acknowledged exceptions (and several others apparent from the trial evidence) trigger strict scrutiny.

*Third*, the Department has two mechanisms for considering, on a case-by-case basis, whether the Mandate should be enforced against a particular provider's conduct. This similarly triggers strict scrutiny.

*Fourth*, the Department's actions—including thrice amending the definition of "congregation" to try and evade Plaintiffs' claims—show that the Department did not treat Plaintiffs' request for a religious accommodation neutrally. This triggers strict scrutiny.

*Fifth*, Plaintiffs are, as the district court recognized, an expressive association. And trial testimony confirmed that forcing Plaintiffs' preschools to accept and affirm those who espouse views in conflict with what the schools teach would significantly interfere with Plaintiffs' message. This also triggers strict scrutiny.

Defendants do not come close to satisfying strict scrutiny. For starters, their alleged government interests—equal access and removing discriminatory barriers—are neither measurable nor genuine. Worse, keeping Plaintiffs' preschools out of the program doesn't advance these interests. As the Court reasoned in *Fulton*—a case in which Philadelphia asserted an *identical* interest in an effort to exclude another Catholic service provider—having more providers will create more opportunities for families to find the best fit for them. Defendants' interests are  also not compelling because they have not identified an actual problem in need of solving and admit that any future harm is speculative. And there are numerous ways to help LGBTQ families find affirming UPK providers—like through the

Department's own matching process—that are less restrictive than categorically excluding Plaintiffs.

The district court further erred when it concluded that the Archdiocese lacked standing. St. Mary's and Wellspring, as the court found, have standing. What's more, there is no question that protecting its preschools' ability to participate in UPK Colorado is germane to the Archdiocese's purposes, or that participation of each individual preschool is not necessary to resolve the primarily legal issues involved in this case.

## STANDARD OF REVIEW

While this Court typically reviews factual findings for clear error, "[i]n a First Amendment case … we review the district court's findings of fact and its conclusions of law de novo." *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1219 (10th Cir. 2007) ("We conduct our review 'without deference to the trial court.'") (citation omitted); *Roberts v. Winder*, 16 F.4th 1367, 1374 (10th Cir. 2021) ("Where activity is arguably protected by the First Amendment, the court has 'an obligation to make an independent examination of the whole record'" (citation omitted)).

## ARGUMENT

Plaintiffs appeal both the district court's (1) denial of a permanent injunction with respect to the sexual orientation and gender identity "aspects" of the Mandate; and (2) dismissal of the Archdiocese for lack of standing. Defendants did not cross-appeal the district court's injunction

protecting the ability of Plaintiff preschools to consider religious affiliation in their admissions and operations, so that issue is not before this Court. *Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1107 (10th Cir. 2020).

## I.   Colorado's Mandate violates the Free Exercise Clause.

By excluding Archdiocesan preschools from UPK Colorado based on their sincere religious beliefs and exercise, Defendants have burdened Plaintiffs' religious exercise. This is not in dispute. Indeed, the existence of this burden was a prerequisite for granting Plaintiffs the permanent injunction that Defendants have not appealed. 2.App.0544-45; *see also* 2.App.0447 & n.2 (noting the narrow issue before the court). This burden on Plaintiffs' religious exercise, in turn, triggers strict scrutiny under the First Amendment in five separate ways—and fails that stringent test.

### A. Colorado's Mandate violates the rule of *Carson v. Makin*.

If a government chooses to create a generally available benefit program, it cannot exclude religious organizations on account of their religious beliefs or exercise. Supreme Court precedent makes that abundantly clear—including in the specific context of school-funding programs like UPK Colorado.

Thrice in the last seven years, the Court has considered Free Exercise Clause challenges to government-funding programs that excluded religious schools. *Carson v. Makin*, 596 U.S. 767 (2022); *Espinoza v. Mont. Dep't of Rev.*, 591 U.S. 464 (2020); *Trinity Lutheran Church of Columbia,*

*Inc. v. Comer*, 582 U.S. 449 (2017). In all three cases, the Court ruled for the challengers. In *Espinoza* and *Trinity Lutheran*, the Court held that "disqualifying otherwise eligible recipients from a public benefit 'solely because of their religious character'"—*i.e.*, because they *are religious*— "imposes 'a penalty on the free exercise of religion that triggers the most exacting scrutiny.'" *Espinoza*, 591 U.S. at 475 (quoting *Trinity Lutheran*, 582 U.S. at 462). And in *Carson*, the Court confirmed that "denying the benefit based on a recipient's religious *exercise*"—*i.e.*, because of the religiously motivated *things they do*—triggers the same strict scrutiny. 596 U.S. at 785 (emphasis added).

*Carson* didn't break new ground, but rather reaffirmed a longstanding rule: conditioning "a benefit or privilege" on a person's "willingness to violate" her faith triggers strict scrutiny. *Sherbert v. Verner*, 374 U.S. 398, 404-06 (1963); *see Carson*, 596 U.S. at 778 (citing *Sherbert*; *Thomas v. Review Bd.*, 450 U.S. 707 (1981); and *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1 (1947)). And this rule makes good sense—"[a]fter all," the Free Exercise Clause "guarantees the free *exercise* of religion, not just the right to inward belief (or status)." *Trinity Lutheran*, 582 U.S. at 469 (Gorsuch, J., concurring in part).

Nor does *Employment Division v. Smith* provide an excuse to ignore this precedent. *Cf.* 2.App.0490. *Smith*, of course, has been vigorously criticized by five sitting Justices. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 543 (2021) (Barrett, J., concurring); *id.* at 545 (Alito, J., concurring

in judgment). More importantly, of the recent trilogy of Supreme Court cases arising in a factual context analogous to this one, neither *Carson* nor *Espinoza* invokes *Smith*'s rule, and *Trinity Lutheran* cites *Smith* only to distinguish it—relying instead on *Sherbert* when analyzing the plaintiff's claim. *See Trinity Lutheran*, 582 U.S. at 463-65; *cf. Employment Division v. Smith*, 494 U.S. 872, 884 (1990) (addressing an "across-the-board criminal prohibition" unlike anything at issue in this case).

*Carson* governs here. The district court correctly recognized that UPK Colorado is a government-benefit program just like the school funding programs in *Espinoza* and *Carson*. 2.App.0489. And there's no dispute either that Plaintiffs' admissions and operations policies are sincerely religious, 2.App.0487 n.19, or that the Department is excluding Plaintiffs' preschools because of them, 2.App.0468-70, 2.App.0492. Because Plaintiffs are excluded from UPK Colorado based on their sincere religious exercise, strict scrutiny is triggered under *Carson*, *Espinoza*, and *Trinity Lutheran*. *Darren Patterson*, 699 F. Supp. 3d at 1185 (same).

The district court purported to distinguish this precedent, saying that "each" of Plaintiffs' cases "involved a program that 'specifically carved out' religious organizations from those eligible to receive funding." 2.App.0491. Not so. The Supreme Court has repeatedly held that even laws facially neutral to religion can trigger heightened scrutiny when, as here, they impose a burden "based on a recipient's religious exercise." *Carson*, 596 U.S. at 785.

In *Thomas*, for example, the law did not specifically carve out religious entities but rather was a facially neutral requirement that claimants for unemployment benefits have "good cause" for leaving work. 450 U.S. at 712-13. But when Indiana denied benefits to a claimant who left work for religious reasons, the Court applied strict scrutiny. *Id.* at 716-18. "[A] person may not be compelled to choose between [religious] exercise" and "participation in an otherwise available public program," the Court explained—*even if* the relevant "regulation" is "neutral on its face." *Id.*; *accord Sherbert*, 374 U.S. at 404 (similar).

Likewise, in *Carson* itself, Maine insisted that while its law as written excluded "sectarian" schools, it actually applied only to those schools that failed to provide the "rough equivalent of [a] public school education" because they "present[ed] academic material through the lens of" a particular faith. 596 U.S. at 775, 777, 787-89. But the Court rejected this "distinction" as immaterial. *Id.* at 786-87. As the Court put it, "our holding in *Espinoza* turned on the substance of free exercise protections, not on the presence or absence of magic words." *Id.* at 785. So even if the denial of benefits were indeed "based on a recipient's religious exercise," and not the recipient's religious *status*, it wouldn't matter—the First Amendment "prohibit[s] … denying the benefit" on that basis, too. *Id.*

Unsurprisingly, the district court's focus on facial neutrality also papers over reality: Defendant Odean has acknowledged that *all* the preschools barred from UPK Colorado by the Mandate are religiously

23

affiliated. Ex. 21 to Pls.' Mot. Summ. J. at 77:5-19, *Darren Patterson Christian Acad. v. Roy*, No. 1:23-cv-1557 (D. Colo. June 21, 2024), ECF No. 78-21.[3] But the First Amendment isn't so easily fooled. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993) ("the effect of a law in its real operation is strong evidence of its object"); *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews."). Because the Archdiocese's preschools are excluded from UPK Colorado solely because of their religious exercise, *Carson* requires strict scrutiny.

### B. Colorado's Mandate violates the Free Exercise Clause because it lacks general applicability and neutrality.

*Carson* aside, Colorado's actions also trigger strict scrutiny under *Smith*. Under *Smith*, strict scrutiny applies when the government "burden[s] [the plaintiff's] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022).[4] The Mandate fails this requirement in three distinct ways: it lacks general applicability because it has categorical exceptions, it lacks general applicability because it has individualized

---

[3]   This Court can take notice of Defendant Odean's sworn testimony in a parallel proceeding. *See, e.g.*, *Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1219 n.2 (10th Cir. 2011); *see also* Defs.' Mot. for Partial Summ. J. at 4, *Darren Patterson*, No. 1:23-cv-01557 (D. Colo. June 21, 2024), ECF No. 77 (citing trial evidence from this case).

[4]   Plaintiffs, for purposes of Supreme Court review, preserve the argument that *Smith* was wrongly decided.

exceptions, and it lacks neutrality because it reflects hostility to religious beliefs.

### 1. Colorado permits categorical exceptions from the Mandate.

A law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. This rule is strict: A law isn't generally applicable if it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). And the comparability of "two activities" is "judged against" the "government interest that justifies the regulation at issue." *Id.* at 62. Once a plaintiff shows that any comparable secular conduct is treated more favorably, strict scrutiny is triggered. *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1277 (10th Cir. 2024) (having "lower bar" for secular over religious exceptions triggers strict scrutiny by making a "value judgment in favor of secular motivations").

Here, the Mandate's purpose (and thus the government's interest in enforcing it), is plain from the UPK statute's text: to "provide eligible children an equal opportunity to enroll and receive preschool services regardless" of the characteristics enumerated in the Mandate. Colo. Rev. Stat. § 26.5-4-205(2)(b); 2.App.0446 n.1. Colorado, however, has granted numerous categorical exceptions from the Mandate that undermine this

interest "in a similar way" to the religious accommodation Plaintiffs requested. *Fulton*, 593 U.S. at 534.

**Disability and Income Level.** First, it's undisputed that Colorado allows some UPK providers to deny families an equal opportunity to enroll and receive services based on disability and income level—even though these characteristics are covered by the Mandate. *Supra* pp. 11-12; *see also* 2.App.0446-47, 2.App.0510 (finding "exceptions" from Mandate for "low-income families … as well as those with disabilities."); ECF.109 at 44; 8 Colo. Code Regs. § 1404-1-4.110(A) (confirmed in regulations).

**Religious Affiliation.** Second, there's also no dispute that Colorado, through its "congregation preference," allows providers to deny families an equal opportunity to enroll on account of their religious affiliation—even though this characteristic, too, is covered by the Mandate. *Supra* p. 12; *see also* 2.App.0458, 2.App.0461, 2.App.0514-15 (finding that congregation preference violates the Mandate). As Odean testified, under this preference, a Lutheran provider "wouldn't have to provide an opportunity to enroll" to Catholics. 4.App.0815-16. *See also Darren Patterson*, 699 F. Supp. 3d at 1185 (same).

**Sexual Orientation, Gender Identity, and Race.** Third, Defendants admitted that the categorical preference allowing providers to prioritize serving a "specific community" would allow preschools that serve only "gender-nonconforming children," "children of color from historically

underserved areas," or that prioritize "the LGBTQ community" to partic-
ipate in UPK Colorado. 4.App.0820-22; *supra* pp. 12-13. Yet sexual ori-
entation, gender identity, and race are all likewise covered by the Man-
date. And while Defendant Odean later testified that these providers
"would be accepted" only "[a]s long as there wasn't discrimination that
was aligned to the antidiscrimination provision," *id.*, her unequivocal tes-
timony was that the Department views some preferences based on sexual
orientation, race, and gender identity (like preferences for those who
have historically faced discrimination) to be consistent with their appli-
cation of the Mandate. 4.App.0854-56.

In other words, Defendants' position is that policies like these are per-
missible because they don't "discriminate[] against" children "who his-
torically have been" discriminated against. 4.App.0821-22; *accord*
3.App.0600; ECF.109 at 24-25. But the text of the Mandate does not dis-
tinguish between types of discrimination the Department does and
doesn't like.

Under *Tandon*, *Fulton*, and *Kennedy*, each of these categorical excep-
tions—for disability, income, religious affiliation, sexual orientation,
race, and gender identity—is "comparable" to the religious exception
sought by Plaintiffs because each undermines the government's interest
in enforcing the Mandate "in a similar way." *Fulton*, 593 U.S. at 534. By
permitting providers to exclude families based on a status covered by the
Mandate, each exception "pose[s] an identical risk to the [Department's]

stated interest," "render[ing] its decision" to exclude Plaintiff preschools "subject to strict scrutiny." *Fellowship of Christian Athletes v. San Diego Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 689-90 (9th Cir. 2024) (en banc) ("*FCA*").

The en banc Ninth Circuit in *FCA* reached the same result on analogous facts. There, school-district policies forbade "discrimination on the basis of race, sex, sexual orientation, religion, and other criteria." *Id.* at 687.[5] Citing these policies, the district excluded a religious student group that limited its leadership to students sharing its traditional beliefs on sexuality. *Id.* at 671. The district's actions violated the Free Exercise Clause because other groups "were allowed to discriminate expressly— even on otherwise protected grounds." *Id.* at 689-90.

Notably, the comparator student groups in *FCA* were allowed to discriminate based on *different* protected characteristics ("race and gender") than the ones relevant for the plaintiff student group (sexual orientation and religion). *Id.* at 689. Nevertheless, these secular exceptions triggered strict scrutiny: "there is no meaningful constitutionally acceptable distinction between the types of exclusions at play here. Whether they are based on gender, race, or faith, each group's exclusionary membership requirements pose an identical risk to the District's stated interest in

---

[5] The district court misread *FCA*, mistakenly stating that the policies there "did not specify the characteristics that could be or were prohibited from being considered." 2.App.0510.

ensuring equal access for all student to all programs." *Id.*; *see also Darren Patterson*, 699 F. Supp. 3d at 1186 (categorical exception for religious affiliation triggered strict scrutiny of entire Mandate); *Youth 71Five Ministries v. Williams*, No. 24-4101, 2024 WL 3749842, at *4 (9th Cir. Aug. 8, 2024) (secular exceptions for race and gender triggered strict scrutiny of entire non-discrimination policy).

By contrast, the district court here thought that only exceptions from the *same* protected characteristic (religious affiliation, sexual orientation, etc.) triggered strict scrutiny. 2.App.0508, 2.App.0514. But Free Exercise analysis turns on whether secular and religious exceptions similarly undermine the *government's interest*, *Fulton*, 593 U.S. at 534—not whether they involve *conduct* that is inherently similar. In *Tandon*, for example, the question wasn't whether going to the hair salon is similar to "at-home religious exercise"; what mattered was that the same government interest (public health during COVID) was implicated for each. *Tandon*, 593 U.S. at 62-63. So too here: it does not matter whether the secular exceptions involve disability, income, or sexual orientation; the government's interest in equal access is, by definition, undermined by *un*equal access based on any of the seven characteristics covered by the Mandate.

Instead of following this straightforward analysis, the court essentially treated the Mandate's seven protected categories as seven separate laws, each justified by a distinct government interest. 2.App.508.

Nothing in the Mandate supports that kind of dissection. *Supra* p. 10. And Defendants offered no evidence that some categories are more protected than others. Rather, Odean testified to the opposite in parallel litigation: "Q. Does the Department view some [of] those characteristics [in the Mandate] as being more important than others? A. No. … Q. Is the [Department's] interest the same? A. It is the same." Ex. 21 to Pls.' Mot. Summ. J. at 15:10-16:16, *Darren Patterson*, ECF No. 78-21. If the interest is "the same," the result follows ineluctably: denying equal access based on *any* characteristic protected by the Mandate undermines the Department's interest in the same (or, at a minimum, a "similar") way and thus triggers strict scrutiny. *Fulton*, 593 U.S. at 534.

The district court and Defendants also suggest that *some* differential treatment shouldn't trigger strict scrutiny because it advances important government interests, like helping children with disabilities and low-income families. 2.App.0511-12 ("These, and other laws, reflect the nuanced realities of education, permitting special programming in specific cases for specific children."). But the comparability analysis is not concerned with the *justification for* or the *importance of* the secular exceptions; that is a question for strict scrutiny. *Tandon*, 593 U.S. at 63; *see also Fulton*, 593 U.S. at 542. All that matters for the strict-scrutiny *trigger* is whether the government has favored other interests over religious interests, thus "devalu[ing] religious reasons … by judging them to be of lesser import than nonreligious reasons." *Does 1-11*, 100 F.4th at 1277. If

the government makes such a "value judgment," strict scrutiny applies. *Id.* at 1277-78.

Pivoting, Defendants next claim that on a creative reading of the UPK statute, their secular exceptions are actually consistent with the Mandate after all. *See* ECF.109 at 24-25 (Department "understands the statute to mean" that prioritizing low-income families is permitted by the UPK statute). But this is a red herring. Whether framed as an exception from the Mandate or an exclusion from its coverage, the bottom line is the same: the Department invokes the Mandate to prohibit Plaintiffs' religious conduct while allowing secular conduct implicating the same interests in equal treatment based on protected characteristics. As another Circuit has persuasively explained, it doesn't matter if the government *claims* there are "no exceptions" from a policy because it interprets its policy to hive off from coverage the secular conduct it favors. "[T]hat is word play." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614 (6th Cir. 2020). What matters is the real operation of the law. *Id.*

Here too, *FCA* is instructive. The school district there sought to "justify" the exceptions it granted for groups like the Senior Women Club "by asserting that they benefit 'individuals who need specific support from the school system' and align with the District's 'equity policy.'" 82 F.4th at 688. But this didn't change the result. "While inclusiveness is a worthy pursuit," the court held, "the District's alleged good intentions do not change the fact that it is treating comparable secular activity more

31

favorably than religious exercise." *Id.* at 687-88; *see also id.* at 693 (no exceptions "for 'benign' discriminatory membership rules."); *see also Fellowship of Christian Athletes v. District of Columbia*, No. 1:24-cv-1332, 2024 WL 3400104, at *13 (D.D.C. July 11, 2024) (same). So too here.

In short, Defendants would not and have not completely excluded from UPK Colorado preschools that prioritize (1) low-income families, (2) children with disabilities, (3) Lutherans, (4) LGBTQ children and families, or (5) Black children and families—but they have barred Plaintiffs' preschools from UPK Colorado based on their religious exercise. This triggers strict scrutiny.

### 2. Colorado permits individualized exceptions from the Mandate.

As both this Court and the Supreme Court have explained, governmental discretion to consider individualized exceptions means a law is not "generally applicable," triggering strict scrutiny. *Does 1-11*, 100 F.4th at 1272; *Fulton*, 593 U.S. at 533-34. Here, Defendants have two separate forms of discretion to consider case-by-case exceptions from the Mandate—so their exclusion of Catholic preschools triggers strict scrutiny.

***The individualized-exception form***. First, the Department has an explicit mechanism for requesting an individualized exception. 4.App.0819-20. To use it, preschools fill out an online form identifying their "Exception Requested." 7.App.1702. Defendants then consider these requests on a "case-by-case" basis. 4.App.0833. And they have granted

several—including requests to serve only "fully Vaccinated Children," "church members," and "Fort Lewis College student families and staff/faculty." 7.App.1729-30; *see also, e.g.*, 7.App.1582, 7.App.1583-84, 7.App.1587 (describing process); ECF.109 at 25.

Moreover, the individualized-exemption process allows the Department to consider requests that would implicate characteristics covered by the Mandate. Indeed, the form itself includes an example of a potential request—"My location only serves children with specific disabilities"—that conflict with the Mandate. 4.App.1702; *see also* 2.App.0503.

In response, Defendants argue that the Department doesn't have this discretion because certain regulations forbid granting exceptions that violate other statutory or regulatory requirements. ECF.109 at 42-44. But that didn't stop them from issuing the "congregation" preference, which the district court agreed allows UPK providers to consider "religious affiliation." *Compare id.* at 46 *with* 2.App.0514-16.

More importantly, the vague regulatory language Defendants cite states only that providers can't use an exception if it would "conflict with any other provision" of the UPK statute. 8 Colo. Code Regs. § 1404-1-4.110(A)(10)(b); *see also id.* § 1404-1-4.110(B) ("must still comply with" other regulatory provisions). Such broadly worded, don't-break-the-law statements can't insulate Defendants from the plain import of the exceptions they've offered, "lest" those exceptions be rendered "a nullity." *Fulton*, 593 U.S. at 537. What would it even mean to tell a provider *both* that

it can serve "only" "children with specific disabilities" *and* that it can use this exception only if it provides an equal opportunity to enroll regardless of "disability"?

In any event, if this regulatory language means Defendants don't have to worry about consistency with the Mandate when granting exceptions, there's no reason they couldn't have granted an exception to Plaintiffs, too. Yet they refused—determining that Plaintiffs' religious reasons for seeking an exception (unlike others') were not "worthy of solicitude." *Id.* at 537. That requires strict scrutiny.

***Statutory discretion.*** The UPK statute also expressly grants discretion, stating "the department may allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). These "quality standards" include the Mandate. *Id.* § 26.5-4-205(2). The statute also explains that the Department cannot grant exceptions from the "quality standards relating to health and safety." *Id.* § 26.5-4-205(1)(b)(II).

This discretion similarly triggers strict scrutiny. Having retained the ability to grant exceptions from the Mandate, the State "may not refuse to extend that system to cases of religious hardship without a compelling reason." *Fulton*, 593 U.S. at 523. This remains true even though the Department's discretion is time-limited: even temporary exceptions require

a "compelling reason." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297-99 (10th Cir. 2004) (one-day exception could trigger strict scrutiny).

In response, the district court and Defendants suggest the Mandate is a non-waivable "health and safety" provision. 2.App.0501-02; ECF.109 at 40-41. But Defendants never understood the Mandate to be a "health and safety" provision until this litigation and haven't even come up with a clear standard to determine whether any other quality standards also qualify. *See* 4.App.0823-25 (interpretation new at trial). And for good reason: the suggestion that a provision primarily regulating *admissions to* a preschool is a "health and safety" regulation strains credulity well past the breaking point.

This also explains why the Department's own Agreement lists the Mandate *separate* from the "[q]uality standards relating to health and safety" in a list of "Program Requirements." 5.App.1166-67. And other uses of "health and safety" in the same bill that created UPK Colorado confirm that the Legislature intended the term to describe the physical health and safety of students *in the classroom environment. See* 2022 Colo. Legis. Serv. Ch. 123 (H.B. 22-1295) (using "health and safety" in regulating "care setting" and "preschool classrooms").

If anything, the Department's last-minute scramble toward this "health and safety" explanation is a tell: it underscores the lack of general applicability of its actions. Like the policies adopted during litigation in *FCA*, this "appears to be the type of post hoc justification" for excluding

35

religious exercise "that is incompatible with the protections of the First Amendment." 82 F.4th at 693.

### 3. Colorado's application of the Mandate is not neutral.

Separate from general applicability, Defendants' exclusion of Plaintiffs from UPK Colorado also "transgressed th[e] neutrality standard." *Fulton*, 593 U.S. at 533. This neutrality requirement bars government actions that, in their effects, evidence religious hostility. *See Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 639 (2018); *Lukumi*, 508 U.S. at 535 ("religious gerrymander"). As the Sixth Circuit has explained, "various irregularities in [the government's] investigation and adjudication processes also permit an inference of non-neutrality." *Meriwether v. Hartop*, 992 F.3d 492, 514 (6th Cir. 2021). For example, "repeated changes in position" can show that the government was "using an evolving policy as pretext for targeting" a plaintiff's beliefs. *Id.* at 515.

Here, there is evidence of both religious hostility and manipulation of the Department's policies to exclude religious providers. As for overt hostility, Defendants have compared Plaintiffs' preschools to 1970s segregation academies in the South and characterized Plaintiffs' millennia-old religious beliefs as stigmatization and bullying. ECF.77 at 23-26, 29-31; 4.App.0836-39. *But see Obergefell v. Hodges*, 576 U.S. 644, 671-72, 679-80 (2015) ("emphasiz[ing]" religious organizations must be "given proper protection as they seek to teach" their "decent and honorable" traditional views on marriage).

And as for manipulation, Defendants have repeatedly recalibrated their policies in a manifest attempt to gerrymander around Plaintiffs' claims—not only expanding the definition of "health and safety" (as explained above), but also repeatedly tweaking the scope of the congregation preference in response to Plaintiffs' legal arguments made during this litigation. ECF.110 ¶3 (revised congregation preference); 1.App.0187 (describing the prior proposed regulatory definition); 1.App.0117-18 (describing the Department's pre-regulation understanding of "congregation").

These targeted actions confirm that far from neutrally applying the law, Defendants have instead created a "moving target" to avoid accountability while reaching a foregone conclusion. *Meriwether*, 992 F.3d at 515.

### C. Colorado cannot withstand strict scrutiny.

With strict scrutiny triggered, Defendants must prove that excluding Plaintiffs' preschools "serve[s] a compelling interest and [is] narrowly tailored to that end." *Kennedy*, 597 U.S. at 532. "That is a demanding standard." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). Strict scrutiny for free-exercise claims "is not watered down; it really means what it says." *Tandon*, 593 U.S. at 65 (internal quotation marks omitted). And in applying it, the Supreme Court has repeatedly ruled in favor of First Amendment claimants in cases like this one. *See, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 602 (2023) (website designer couldn't be forced to design for same-sex weddings); *Fulton*, 593 U.S. at 533 (Catholic foster-

care agency couldn't be forced to certify same-sex couples); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 578-79 (1995) (parade couldn't be forced to include LGBT pride group). Defendants fare no better.

### 1. Colorado's interests are not compelling.

Under strict scrutiny, "[o]nly the gravest abuses, endangering paramount interest," can "give occasion for [a] permissible limitation" on free exercise. *Sherbert*, 374 U.S. at 406. And whether an interest is compelling must be judged by scrutinizing "the asserted harm of granting specific exemptions to particular religious claimants." *Fulton*, 593 U.S. at 541. "The question, then, is not whether [Colorado] has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to [the Archdiocese]." *Id.*

Here, the district court and Defendants describe the government's interest as two-fold: "(1) ensuring eligible children and their families do not face discriminatory barriers to publicly funded preschool and (2) protecting children from discrimination." 2.App.0476, 2.App.0452; ECF.109 at 52. These interests fail to satisfy strict scrutiny for numerous reasons.

***Not meaningfully reviewable.*** First, "amorphous" goals don't count as compelling government interests, because they "cannot be subjected to meaningful judicial review." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 214 (2023) ("*SFFA*"). As *SFFA* explained, goals like "achiev[ing] the educational benefits of

diversity" may be "commendable," but "they are not sufficiently coherent for purposes of strict scrutiny" because it's "unclear how courts are supposed to measure" them or reliably determine "when they have been reached." *Id.* at 214, 215-16. So too here, where Defendants' position plainly "is not one of *no*" discrimination but one "of degree." *Id.* at 215-16 (emphasis in original); *see also Fellowship of Christian Athletes v. District of Columbia,* 2024 WL 3400104, at *8 (applying *SFFA* in free-exercise case; finding government's "claimed interest in maintaining an 'equitable environment free of discrimination'" insufficient for strict scrutiny).

**Raised** post hoc. Second, these alleged interests were not raised until litigation. Such belated justifications are not compelling as a matter of law. *Kennedy*, 597 U.S. at 543 n.8 ("Government 'justification[s]' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented *post hoc* in response to litigation.'" (alteration in original)); *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1268 (10th Cir. 2008) ("*CCU*") ("governmental interest found nowhere but in the defendants' litigating papers" not compelling).

Before this case was filed, the Department claimed Plaintiffs could not receive an exception because the UPK statute didn't allow for exceptions. 5.App.1164 ("I do not have the authority to create an exemption."). This, as Defendants admitted at trial, was the reason they denied Plaintiffs an accommodation. 3.App.0735-36, 3.App.0749. No other reason was proffered or considered at the time. *Id.* It was only once Defendants were

forced to confront in court the many secular exceptions they had already granted from the Mandate that their story changed from "no exceptions" to "only those exceptions that 'align' with our goals." This *post hoc* attempt to rationalize a naked policy preference is—as a matter of law— not compelling.

***Excluding Plaintiffs doesn't advance claimed interest.*** Third, even if Defendants' interests were compelling in the abstract, Defendants' actions here wouldn't advance them. Indeed, excluding Plaintiffs' preschools from UPK Colorado doesn't remove any "discriminatory barriers" to preschool access. Nearly 2,000 UPK providers have agreed to the Mandate and participate in UPK Colorado today. 4.App.0805. Allowing Plaintiffs' preschools to participate would not take away a *single one* of those nearly 2,000 options from LGBTQ families. *See* 4.App.0813 (new providers "participate alongside" current providers). Rather, it would *add* to the list of UPK providers—permitting Catholic families who feel obliged to send their kids to Catholic schools to participate too and *increasing* overall UPK program capacity so more families can participate. 3.App.0675-77; *see Fulton*, 593 U.S. at 541-42 ("Maximizing the number of foster families" is an "important goal[]," but "[i]f anything, including" a Catholic foster agency "seems likely to increase, not reduce, the number of available foster parents"). Put simply, if the goal is to—in Defendants' words—prevent "children and families" from "hav[ing] fewer options available to them because of who they are," ECF.77 at 22-23, Defendants

40

have "fail[ed] to show that granting [Plaintiff preschools] an exception will put th[at] goal[] at risk," *Fulton*, 593 U.S. at 541-42.

Even the district court agreed: "Plaintiffs are correct that none of the expert testimony presented by Defendants spoke directly to whether Plaintiff Preschools' participation in the UPK Program *would increase or decrease the ability of LGBTQ+ families to access preschool services* in Denver and the surrounding area." 2.App.0481 (emphasis added). Without being able to show *any effect* on the ability of LGBTQ families to access preschool services, Colorado's interest cannot possibly be compelling. This alone is dispositive.

***No evidence of "actual problem."*** Fourth, for an interest to be compelling, Defendants must identify an "'actual problem' in need of solving," *Brown*, 564 U.S. at 799, and an actual harm that would be caused by granting Plaintiffs an accommodation. *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006) (Courts must "look[] beyond broadly formulated interests" and instead "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants."); *see Ramirez v. Collier*, 595 U.S. 411, 427 (2022) (same). Mere "speculation is insufficient." *Fulton*, 593 U.S. at 542; *see also Peck v. McCann*, 43 F.4th 1116, 1136 (10th Cir. 2022) (same).

Here, Defendants assert an interest in protecting children from discrimination, but Defendants can't point to any evidence of actual harms that have occurred or would occur to justify this exclusion. Defendants

acknowledge that they have not received a single complaint regarding LGBTQ discrimination against any Archdiocesan preschool. 4.App.0840-41; 8.App.1811-12. And Defendants concede that future harm to LGBTQ families is speculative. *See* 1.App.0065.

In addition, Plaintiffs' preschools already take steps to mitigate the speculative harm Defendants float. As Plaintiffs have said from the start, they too want to avoid creating conflicts for families who might have beliefs or views on sexuality that diverge from what their schools teach. *E.g.*, 1.App.039. And they share the Department's goal of helping families find the preschool that is the best fit for them. That is why Plaintiffs have the enrollment policies they do. *Cf.* 3.App.0690 (declining to enroll fifth-grade child of same-sex parents to avoid "caus[ing] great conflict within their own family"); *see also* 3.App.0626-30.

Given the Archdiocese's enrollment policies, Defendants are forced to concede that their concerns about "discrimination" would arise at Plaintiffs' preschools only *if* a child doesn't "identify as gender diverse until after enrollment." ECF.109 at 53. But despite having the burdens of proof and persuasion on their strict-scrutiny affirmative defense, Defendants put on no evidence suggesting there are a significant number of four-year-olds deciding to socially transition *during the nine months of UPK-funded preschool*. There is thus simply no record evidence that Defendants' exclusion of Plaintiffs is addressing an "'actual problem' in need of solving," *Brown*, 564 U.S. at 799.

***Experts confirm interest is speculative.*** Fifth, Defendants' experts undermine Defendants' claimed interest. The testimony of Defendants' two experts—Drs. Goldberg and Tishelman—conclusively established that there is *no* research demonstrating that excluding licensed preschools (much less excluding Catholic preschools specifically) from universal preschool programs would advance the Department's alleged interest in removing discriminatory barriers to preschool access. *E.g.*, 4.App.0876 (no evidence regarding the effect of enrollment policies on LGBTQ families), 4.App.0878 (similar), 4.App.0881 (agreeing there is no "evidence showing that LGBTQ families in Denver are unable to access cost-effective early childhood education through the UPK program"); 5.App.0953-54 (not "aware of studies specific to preschool on LGBTQ bullying").

Moreover, neither expert could explain how LGBTQ families would benefit from the exclusion of Catholic preschools from UPK Colorado. 5.App.0972 ("I don't know that I can answer that question"); *see also* 4.App.0880-81 (unable to opine on UPK Colorado accessibility). And even more fundamentally, neither expert could point to studies attesting to the alleged critical importance of affirming a child's sex-diverging gender identity at the *preschool* level in particular—all the studies cited involved preteens and teens. *E.g.*, 5.App.0953-54.

***Defendants haven't treated these interests as compelling.*** Sixth, "a law cannot be regarded as protecting an interest of the highest order

43

when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi,* 508 U.S. at 547 (cleaned up); *accord*, *e.g.*, *O Centro*, 546 U.S. at 433. As *Fulton* explained, an interest in "equal treatment" may be "weighty," but "[t]he creation of a system of exceptions … undermines" the claim that the government's interest in equal access "can brook no departures." 593 U.S. at 542.

Here, Defendants have granted (and have the discretion to grant) countless exceptions from the Mandate, for all sorts of secular reasons. *Supra* pp. 25-34. As in *Fulton*, this confirms that the government's interest in denying an exception to Plaintiffs, "while making them available to others," is not compelling. 593 U.S. at 542.

Moreover, Defendants' own evidence shows there are still other ways they are not treating these government interests as compelling. For example, according to Defendants' experts, an "affirming" preschool curriculum is critical to LGBTQ student and family wellbeing, and failure to have such a curriculum can cause harm. 4.App.0872, 4.App.0889; 8.App.1820-21. Yet Defendants have *disclaimed* any intention to regulate religious preschool curricula. ECF.109 at 56; 4.App.0808-09. This "underinclusiveness undermines" any effort to satisfy strict scrutiny. *CCU*, 534 F.3d at 1268.

***The district court's invented interest.*** Perhaps recognizing the weaknesses in Defendants' interests, the district court fashioned one of its own: ensuring that LGBTQ families have access to preschool

programs "of their choosing" that are the "best fit their family's needs." 2.App.0523. According to the district court, this means that families who reject Plaintiffs' beliefs must be able to enroll not just in *a* UPK participating preschool, but in *Plaintiffs'* Catholic preschools—an interest it deemed "even more significant" because these schools might "provide the best academic experience." 2.App.0523-33.

But again, compelling interests can't be "invented *post hoc*" even by defendants, *Kennedy*, 597 U.S. at 543 n.8—much less by the court. And this interest isn't just different from Defendants' arguments, it's at odds with them—for example, Defendants' (erroneous) claim that Plaintiffs' preschools could be harmful to LGBTQ children. ECF.109 at 51. The Department can't have an interest in ensuring children can attend preschools it believes are harmful to them.

Nor could one square the circle by saying UPK funding should induce Catholic preschools to *change* their religious practices to suit secular mores—that simply rejects the Free Exercise Clause altogether. And indeed, in the speech context, *303 Creative* rejected an argument precisely analogous to the district court's—that because a website designer's services were "'unique,'" she could be forced to design wedding websites for same-sex couples. 600 U.S. at 592. As in *303 Creative*, the fact that Plaintiffs' schools are high-quality "hardly means a State may coopt [them] for its own purposes." *Id.* "That would not respect the First Amendment; more nearly, it would spell its demise." *Id.*

45

### 2. Excluding Plaintiffs' preschools is not the least restrictive way of advancing Colorado's interests.

Defendants not only have failed to assert a compelling interest—they also haven't shown that their means of advancing these alleged interests are "narrowly tailored." *Kennedy*, 597 U.S. at 525. Strict scrutiny requires that "[i]f a less restrictive alternative would serve the Government's purpose, [it] must use that alternative." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000). And there must be a close "fit" between the "means" Defendants have chosen and the "ends" they seek to accomplish. *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1226 (10th Cir. 2021); *see also Awad v. Ziriax*, 670 F.3d 1111, 1130-31 (10th Cir. 2012). Defendants fail narrow tailoring in at least two ways.

***Less restrictive alternatives.*** First, Defendants have failed to use less restrictive alternatives to advance their interests. The Department has an online portal that provides families with detailed information about potential matches. This portal already includes disclaimers for numerous secular providers, including bolded statements like: "This is a Head Start grantee and families may need to meet additional factors to enroll"; and "This provider may require families to be a part of their congregation." 6.App.1442-46. *See* 4.App.0839 (information provided "[s]o that families understand and are making an informed choice about the provider that they've listed"). Moreover, the Department can (and has)

asked families questions through the portal to determine whether they meet a provider's enrollment requirements. 3.App.0743-44.

During the matching process, then, the Department could use a family's profile, the disclaimers, and targeted questions to ensure that LGBTQ families are matched with a preschool that best meets their needs. 2.App.0457. The Department could also—as the federal government does for families in foster care, 45 CFR § 1355.22(b)(2)—alert families to the existence of preschools that affirm and support LGBTQ families and youth, ensuring that they know they do *not* face a barrier to access.

Rather than embrace these alternatives, Defendants have categorically barred Plaintiffs' preschools. Worse, Defendants have offered *no evidence* as to why these less restrictive alternatives wouldn't similarly advance their interests. This evidentiary failure alone confirms the Department can't satisfy strict scrutiny. *Yellowbear v. Lampert*, 741 F.3d 48, 63 (10th Cir. 2014) ("[T]he government's burden here isn't to *mull* the claimant's proposed alternatives, it is to *demonstrate* the claimant's alternatives are ineffective.").

**Means-ends analysis.** Second, Defendants also fail narrow tailoring because the "means" they have chosen does not "fit" their asserted interests. Defendants seek to increase access to UPK Colorado for LGBTQ families, but, as explained above, barring Plaintiffs' preschools emphatically fails to advance that interest. *Supra* pp. 40-41. This mismatch

between Defendants' means and asserted ends also defeats narrow tailoring. *Awad*, 670 F.3d at 1131 ("[T]he amendment's complete ban … is hardly an exercise of narrow tailoring.").

## II. Colorado's Mandate violates Plaintiffs' freedom of expressive association.

"[T]he First Amendment protects acts of expressive association." *303 Creative*, 600 U.S. at 586. That includes the decision "not to associate" with others if the forced association would "affect[] in a significant way the group's ability to advocate" its "viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Applying this doctrine, the Supreme Court has held that notwithstanding state antidiscrimination laws, the Boy Scouts could dismiss an assistant scoutmaster whose beliefs and actions failed to reflect their opposition to homosexual conduct, *id.* at 647-48, and veterans groups could exclude an LGBT group from a St. Patrick's Day parade, *Hurley*, 515 U.S. at 572-73. That doctrine applies here, protecting the Archdiocese's preschools from being forced to enroll families who reject the beliefs they seek to pass on to the next generation.

As the district court found, there is no question Plaintiffs engage in expressive activity. 2.App.0530. Nor is there any question that requiring Plaintiffs' preschools to include those who oppose their sincere religious beliefs in their faith community and to affirm in word and deed a message contrary to their faith would interfere with the schools' religious message. *Supra* pp. 6-8. Indeed, Defendants' expert *agreed* that the Plaintiffs'

religiously informed policies send a "consequential" message. 4.App.0886-87. Under *Dale*, this is more than enough to show a violation of the right to expressive association. Yet, despite conceding that "Plaintiff Preschools engage in substantially the same activity as in *Dale*," 2.App.0531, the district court attempted to distinguish *Dale* in four ways; none are persuasive.

*First*, the district court noted that *Dale* dealt with the direct application of a public accommodations law rather than, as here, a condition on state funding. But both direct regulations and "a funding condition can result in an unconstitutional burden on First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). Indeed, the Supreme Court has made clear that a condition on funding is unconstitutional if the government could not directly impose that condition without violating constitutional rights. *Fulton*, 593 U.S. at 536 ("We have never suggested that the government may discriminate against religion when acting in its managerial role."); *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) ("[t]he government 'may not deny a benefit … on a basis that infringes [plaintiff's] constitutionally protected [interests]' … even if he has no entitlement to that benefit.").[6]

---

[6]  The district court's analysis confuses things further by relying on cases in which private parties are paid to engage in *government speech*. 2.App.0537. But Defendants have never suggested that UPK Colorado converts private preschools into government speakers, and their decision

49

*Second*, the court suggested that *Dale* was distinguishable because membership in the Boy Scouts "is entirely elective"—but the district court then admitted that preschool is voluntary. 2.App.0531-32, 2.App.0532 n.47.

*Third*, the court suggested that "associating with LGBTQ+ children and the children of LGBTQ+ parents is not likely to send the same message as 'an avowed homosexual and gay rights activist in an assistant scoutmaster's uniform' in *Dale*." 2.App.0534; *see also* 2.App.0535 (similar). And it claimed Plaintiffs are mistaken about what would "contravene the[ir] preferred messages." *See* 2.App.0535. But *Dale* rejected this argument: the Court held it could not second guess whether a gay scoutmaster would impair the Boy Scouts' message; instead, it gave "deference" to the Boy Scouts' account of "what would impair its expression." 530 U.S. at 653. That is because "a [s]tate, or a court, may not constitutionally substitute its own judgment for that of" the expressive association. *Democratic Party of U.S. v. Wisconsin*, 450 U.S. 107, 123-24 (1981); *see also Hurley*, 515 U.S. at 575 (same).

*Fourth*, the district court minimized *Dale* because of greater "social acceptance for LGBTQ+ rights" today. 2.App.0533 & n.49. But *Dale* itself recognized that the growing "societal acceptance" of LGBTQ rights was "all the more reason to protect the First Amendment rights of those who

---

to disclaim control over religious schools' curricula confirms it has done nothing of the sort.

wish to voice a different view." *Dale*, 530 U.S. at 660. Regardless, Supreme Court decisions don't have expiration dates. *United States v. Guillen*, 995 F.3d 1095, 1114 (10th Cir. 2021); *see 303 Creative*, 600 U.S. at 584-87, 589-90, 592 (applying *Dale* in 2023).

Both the district court and Defendants also attempt to conjure a slippery slope if *Dale* is applied here. ECF.109 at 58 ("no limiting principle"). But the facts of this case—as the district court recognized, 2.App.0531 n.46—so closely align with existing precedent (like *Dale* and *Hurley*) that slippery slope arguments have little purchase. And the context in which *this case* arises further confirms such fears are unfounded—it is hard to imagine an environment *more sensitive* to the witness of those in the community than early-childhood education. *See generally Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 756 (2020).

## III.   The Archdiocese has standing.

Despite finding standing for the Plaintiff preschools and parents, the court dismissed the Archdiocese for lack of standing. 2.App.0313. But the Archdiocese has standing both to represent its preschools and in its own right.

### A. The Archdiocese has associational standing.

Associational standing permits an organization to sue on behalf of its members whenever (1) "at least one of" the organization's "members would otherwise have standing," (2) "the interests" it "seeks to protect are germane to the organization's purpose," and (3) "neither the claim

asserted nor the relief requested requires the participation of individual members in the lawsuit." *Citizens for Const. Integrity v. United States*, 57 F.4th 750, 759 (10th Cir. 2023) (cleaned up); *SFFA*, 600 U.S. at 199. All three requirements are met here.

*First*, as the district court held, at least two of the Archdiocese's members have standing in their own right—St. Mary's and St. Bernadette's. 2.App.0324-28, 2.App.0540, 2.App.0544. These preschools, like the other thirty-four overseen by the Archdiocese's Office of Catholic Schools, are "part of" the Archdiocese, 5.App.0989; *see* ECF.32-1 at 2-3; they exercise the Archbishop's delegated teaching authority, 2.App.0381; and the Archdiocese speaks for and advances their interests in public affairs. *See*, *e.g.*, 5.App.1160-61 (Archdiocese's instruction to preschools not to participate in UPK Colorado); 5.App.1162-63 (Archdiocese's request for accommodation). And they have suffered justiciable harm: their "inability to participate in and benefit from" UPK Colorado. 3.App.0324 & n.5; *see also*, *e.g.*, *Trinity Lutheran*, 582 U.S. at 463 (justiciable injury where religious school was denied "right to participate in a government benefit program without having to disavow its religious character"); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("[t]he 'injury in fact' … is the denial of equal treatment resulting from the imposition of the barrier"). That harm is caused by Defendants' challenged policies and would be redressed by a ruling in Plaintiffs' favor. 2.App.0325-27 (district court so concluding).

*Second*, the interest the Archdiocese seeks to protect—its preschools' ability to participate in UPK consistent with their Catholic convictions—is germane to its purpose. "Education is critically important to the mission of the Archdiocese." 3.App.0612; *see also* 5.App.0999. And pursuing that mission involves ensuring parents have the financial ability to choose Catholic schools for their families. 3.App.0636; *see also, e.g.,* Pope Benedict XVI, *Meeting with Catholic Educators* (Apr. 17, 2008), https://perma.cc/W8TR-P6RV ("[E]verything possible must be done, in cooperation with the wider community, to ensure that [Catholic schools] are accessible to people of all social and economic strata."). Moreover, for the Archdiocese to provide that Catholic education, its schools "need to implement policies that are consonant with Christian anthropology's view of the person." 5.App.1047; *see also* 2.App.0465; 5.App.1073. That is what this case is about—Defendants' effort to force the Archdiocese's preschools to abandon those policies to participate in an otherwise available funding program. Protecting its schools from that unconstitutional choice could hardly be more germane to the Archdiocese's mission.

*Third*, neither the claim asserted nor the relief requested requires the participation of the other thirty-four preschools. As for relief, "a declaration, injunction, or some other form of prospective relief" are classic forms of relief that can be sought by organizations without the need for participation by individual members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also* 33 Wright & Miller, *Federal*

*Practice and Procedure* § 8345 (2d ed.) ("Generally speaking, the third [prong] is satisfied where an association seeks just injunctive or declaratory relief[.]"). That is the relief the Archdiocese seeks here. 1.App.0052-53.

And as for the claim asserted, the Archdiocese raises an essentially legal question: whether the First Amendment permits the Department to condition UPK participation on its preschools' abandoning the Archdiocese's religious policies governing enrollment and operations. This "question of law" does not require individual participation. *Int'l Union v. Brock*, 477 U.S. 274, 287 (1986). The UPK conditions, of course, do not vary by preschool. And the Archdiocese's admissions and enrollment policies likewise apply to all thirty-six preschools. *See* 2.App.0382; 2.App.0469; ECF.109 at 34.

Yet it was here the district court went astray. The court declined to address the first two elements of associational standing. *Cf.* 2.App.0330-31. On the third, however, it reasoned that the participation of the non-Plaintiff preschools was "indispensable" because they are separate legal entities that the Archdiocese, in response to Defendants' efforts to seek wide-ranging discovery from each of them, had asserted were beyond its "legal 'control.'" 2.App.0331-32.[7]

---

[7] Defendants, among other things, sought to depose representatives of all thirty-four non-Plaintiff preschools, 1.App.0156-57.

That reasoning is mistaken. Members in associational-standing cases are frequently separate entities over which the organization exercises no legal control. *See, e.g., SFFA*, 600 U.S. at 201 (organization representing individual students); *Hunt*, 432 U.S. at 344-45 (government agency representing private apple growers and apple dealers). And an association doesn't have to offer up each of its members to intrusive discovery as the price for obtaining associational standing. Indeed, this Court has held that an organization does not even need to *give the real name* of its affected members. *Speech First, Inc. v. Shrum*, 92 F.4th 947, 949-52 (10th Cir. 2024). And one of the seminal associational-standing cases was precisely about an association asserting its members' interest in *resisting discovery. NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 458-59 (1958).

Of course, the result might be different had Defendants raised legitimate "questions about the existence or bona fides of the" non-Plaintiff preschools. *Speech First*, 92 F.4th at 950. But the record on this point is clear, and Defendants disputed nothing of the sort. Meanwhile, the court didn't cite a single case supporting its novel "separate legal entities" theory, and Plaintiffs know of none.

The district court also suggested that the non-Plaintiff preschools' participation was required because Plaintiffs assert as-applied challenges. But associations can bring as-applied challenges on behalf of their members. *See, e.g.*, *NAACP*, 357 U.S. at 458-59. And although the court suggested that perhaps not every Archdiocesan preschool would "desire[] to

participate in UPK," 2.App.0331, that doesn't change the analysis: again, associational standing requires only that "at least one" member would have standing in its own right, not that *all* of them would. *Citizens for Const. Integrity*, 57 F.4th at 759; *see also*, *e.g.*, *NCAA v. Califano*, 622 F.2d 1382, 1391-92 (10th Cir. 1980) (associational standing not precluded even in the extreme case where some members are o*n the other side* of the litigation, provided "one or more of the members" support it).

Likewise, nothing about the application of strict scrutiny forecloses associational standing. Indeed, the Supreme Court itself recently found associational standing in a case applying strict scrutiny. *SFFA*, 600 U.S. at 213-218. To be sure, strict scrutiny is properly analyzed with respect to the "specific exemptions" sought by the "particular religious claimant." *Fulton*, 593 U.S. at 541. But here, the particular religious claimant is the Archdiocese, suing on behalf of members who are identically situated by virtue of being bound by identical religious policies. *See Church of Scientology of Cal. v. Cazares*, 638 F.2d 1272, 1280 (5th Cir. 1981) ("[B]ecause the religious activity of the members was inherently intertwined with the services and facilities of the Church," "the claims could properly be presented by the Church on behalf of its members."). And all of Plaintiffs' strict-scrutiny arguments detailed above apply equally to all Archdiocesan preschools. *Supra* pp. 37-47. Indeed, while the district court (incorrectly) ruled against Plaintiffs on strict scrutiny, none of *its* reasoning turned on any preschool-specific factor. *See* 2.App.0528-35.

56

In short, the Archdiocese is the party that determined the religious admissions and operations policies at issue in this case, the Archdiocese is the party responsible for ensuring that its preschools abide by those policies, and the Archdiocese is the party that determined its preschools could not participate in UPK Colorado given Defendants' efforts to condition participation on their abandoning those policies. The Archdiocese thus has associational standing.

**B. The Archdiocese has standing in its own right.**

Because the Mandate impairs the Archdiocese's ability to carry out its mission and chills its religious exercise, the Archdiocese also has standing in its own right. Under Article III, a plaintiff must have suffered an injury in fact that is fairly traceable to the defendant's challenged conduct and likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

As discussed, the Archdiocese fulfills its mission and duty to provide Catholic education through its schools. And, as the district court recognized, the "effect of the equal-opportunity requirement" is a "special tax on religious preschools," 2.App.0492. Thus, the Department's discriminatory application of the Mandate has "directly affected and interfered with" the Archdiocese's "core" religious ministry. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

Moreover, the discriminatory barrier created by the selective application of the Mandate also chills the Archdiocese's religious exercise. It is

the Archdiocese's policies and teachings that the Mandate conflicts with and it was the Archdiocese that had to instruct its schools not to join UPK Colorado. 3.App.0613, 3.App.0623-24, 3.App.0632-36. The Archdiocese's "instruct[ion to] its" preschools not to sign the provider agreement is "the precise sort of 'chilling effect' and 'self-censorship'" that standing doctrine recognizes as cognizable. *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 976-77 (10th Cir. 2020) (cleaned up) (instructions to subcontractors not to engage in speech due to government regulation was First Amendment injury); *see Colo. Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137, 1145 n.6 (10th Cir. 2007) ("[S]elf-censorship through the chilling of protected First Amendment activity" is a "constitutionally sufficient injury."). This First Amendment chill and interference with the Archdiocese's core activities are both directly traceable to the Mandate, and the injunction the Archdiocese seeks would redress those injuries. Due to both the chill on Archdiocese's religious exercise and impairment of a "critically important" component of its mission, the Archdiocese undoubtedly is more than "a mere bystander, but instead [has] a personal stake in the dispute." *Hippocratic Med.*, 602 U.S. at 379 (cleaned up).

## CONCLUSION

This Court should reverse the district court's dismissal of the Archdiocese of Denver for lack of standing; reverse the district court's entry of judgment for Defendants on the remaining Plaintiffs' claims; and remand

this case for entry of an injunction permitting Archdiocesan preschools to participate in UPK Colorado consistent with their religious exercise.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Counsel believes that oral argument may be helpful to the Court given the importance and complexity of the issues this First Amendment case presents.

Respectfully submitted,

/s/ Nicholas R. Reaves
Eric C. Rassbach
Mark L. Rienzi
Joseph C. Davis
Nicholas R. Reaves
Jordan T. Varberg
Amanda G. Dixon
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
  Suite 400
Washington, D.C. 20006
(202) 955-0095
nreaves@becketlaw.org

*Counsel for Plaintiffs-Appellants*

August 14, 2024

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,989 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2021 in 14-point font.

Dated: August 14, 2024          /s/ Nicholas R. Reaves
                                Nicholas R. Reaves

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

1. All required privacy redactions have been made;

2. The hard copies submitted to the clerk are exact copies of the ECF submission;

3. The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender Antivirus, and according to the program is free of viruses.

Dated: August 14, 2024          /s/ Nicholas R. Reaves
                                Nicholas R. Reaves

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: August 14, 2024          /s/ Nicholas R. Reaves
                                Nicholas R. Reaves

# Attachments

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02079-JLK

ST. MARY CATHOLIC PARISH IN LITTLETON;
ST. BERNADETTE CATHOLIC PARISH IN LAKEWOOD;
DANIEL SHELEY;
LISA SHELEY; and
THE ARCHDIOCESE OF DENVER,

      Plaintiffs,

v.

LISA ROY, in her official capacity as Executive Director
of the Colorado Department of Early Childhood; and
DAWN ODEAN, in her official capacity as Director
of Colorado's Universal Preschool Program,

      Defendants.

---

**AMENDED ORDER ON DEFENDANTS' MOTION TO DISMISS (ECF NO. 38),
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 61),
AND PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS'
EXPERT WITNESS TESTIMONY (ECF NO. 73)**

---

Kane, J.

      This case is set for a bench trial beginning January 2, 2024. This Order resolves three pending motions in preparation for that trial: Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 38); Plaintiffs' Motion for Summary Judgment, or in the Alternative, for a Preliminary Injunction (ECF No. 61); and Plaintiffs' Motion to Exclude Defendants' Expert Witness Testimony (ECF No. 73).

      At issue in this case is whether the nondiscrimination requirements of the State of Colorado's newly implemented Universal Preschool Program ("UPK Colorado") violate Plaintiffs' rights guaranteed by the First Amendment to the U.S. Constitution. Presently, UPK

1

Colorado provides 15 hours of free preschool per week for each eligible child in the state. Odean Decl. ¶ 5, ECF No. 38-1. The Program is administered by the Colorado Department of Early Childhood (the "Department") and uses a "mixed-delivery system of preschool providers," that is "a combination of school- and community-based preschool providers . . . funded by a combination of public and private money." Colo. Rev. Stat. §§ 26.5-4-202(1); 26.5-4-203(12). Participating preschool providers are prohibited from discriminating on the basis of religious affiliation, sexual orientation, and gender identity, among other statuses. *See id.* § 26.5-4-205(2)(b).

The five Plaintiffs in this case can be divided into three categories: two Catholic parishes operating preschools that wish to enroll as UPK Colorado providers (the "Named Preschools"); the Archdiocese of Colorado, which "speaks for and advances the interests of all of [its] Catholic Schools and their preschool programs," Moo Decl. ¶ 15, ECF No. 32-1; and two parents who desire to benefit from UPK Colorado while their preschool-age child attends the Catholic school of their choice ("Parent Plaintiffs"). The Named Preschools and the Archdiocese bring five claims under the Free Exercise Clause, a free-speech claim based on compelled speech and expressive association, and a claim under the Establishment Clause for "denominational favoritism." Parent Plaintiffs assert a single Free-Exercise claim. The Amended Complaint names as Defendants Lisa Roy, the Executive Director of the Department, and Dawn Odean, the Director of UPK Colorado. Plaintiffs seek "preliminary and permanent injunctive relief prohibiting Defendants from denying [their] participation in Colorado's UPK program based on [their] religious beliefs, character, and exercise, including [their] religious exercise of:

  (i)     prioritizing Catholic families in admission;

  (ii)    requiring preschool teachers, staff, and administrators to abide by and uphold Catholic teachings on life, marriage, gender, and human sexuality;

2

**A002**

(iii)    considering for purposes of admission or retention whether a family or child seeking placement in their schools has identified as LGBTQ, is in a same-sex relationship, or has adopted a gender identity different from his or her biological sex; and

(iv)    declining to grant students and staff access to the restroom or changing facilities of the opposite sex, to permit them to wear the opposite sex's uniform, or to insist on the use of a preferred pronoun."

Am. Compl. at 36, ECF No. 30.[1]

In their Motion to Dismiss, Defendants contend Plaintiffs lack standing to bring any of the claims asserted and that their claims are not ripe. Plaintiffs filed a Response to the Motion to Dismiss (ECF No. 42), Defendants submitted a Reply in Support of the Motion (ECF No. 47), and Plaintiffs were granted leave to file a Surreply (ECF No. 51). Plaintiffs also filed a Notice of Supplemental Authority (ECF No. 44), and Defendants responded to that Notice (ECF No. 53). Despite those many filings, the parties' arguments lacked specificity, so I ordered them to submit supplemental briefing on whether the Archdiocese in particular has standing to bring the claims it asserts. After reviewing the recent submissions, I conclude the Named Preschools and Parent Plaintiffs have standing to assert their claims and that those claims are ripe, but the Archdiocese does not have standing. Thus, I grant Defendants' Motion to Dismiss in part and deny it in part.

Before Defendants filed their Response to Plaintiffs' Motion for Summary Judgment, I indicated that I intended to conduct a bench trial since at least some material facts are in dispute and that I would rule as a matter of law in the final order, as appropriate. *See* Order on the Parties' Joint Status Report at 8, ECF No. 65. Defendants have now filed their Response to Plaintiffs' Motion (ECF No. 77), and Plaintiffs have submitted their Reply in Support of their

---

[1] The Amended Complaint also requests declaratory judgment and nominal damages of $1.00. *See* Am. Compl. at 35-36. Plaintiffs' Motion for Summary Judgment does not address either of these forms of relief, and so I do not elaborate on them here.

A003

Motion (ECF No. 94). My assessment of Plaintiffs' Motion remains unchanged. Consequently, I deny it to the extent it seeks to avoid the upcoming bench trial.

Plaintiffs have also filed a Motion to Exclude the testimony of Defendants' retained experts and to prevent current and former State employees who will testify on behalf of Defendants (the "employee-witnesses") from being qualified as experts. I find the expert testimony proposed by Defendants is relevant and helpful for deciding the issues in this case. And, because this case will be tried to the Court, I see no reason to order at this time that Defendants' employee-witnesses may not be qualified as experts. I, therefore, deny Plaintiffs' Motion without prejudice.

I expound on each of these rulings below.

## I. RELEVANT FACTS AND ALLEGATIONS

In 2020, Colorado voters approved Proposition EE to create a dedicated source of funding for voluntary, universal preschool. The Colorado General Assembly passed House Bill 21-1304 to begin implementation of that program. H.B. 21-1304, 73rd Gen. Assemb. (Colo. 2021). That legislation created the Colorado Department of Early Childhood. Additional legislation enacted in 2022 officially created UPK Colorado and directed the Department to develop "quality standards that each preschool provider must meet to receive funding through [UPK Colorado]." H.B. 22-1295, 73rd Gen. Assemb. (Colo. 2021); Colo. Rev. Stat. § 26.5-4-205(1)(a). The quality standards established by the Department must include "[a] requirement that each preschool provider provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances

A004

apply to the child or the child's family." *Id.* § 26.5-4-205(2)(b). Plaintiffs' claims in this case take issue with this provision, which I will call the "statutory nondiscrimination requirement." The quality standards developed by the Department must also "reflect national and community-informed best practices with regard to school readiness, academic and cognitive development, healthy environments, social-emotional learning, and child and family outcomes." *Id.* § 26.5-4-205(1)(a).[2] The implementing legislation authorizes the Department:

> if necessary to ensure the availability of a mixed delivery system within a community, . . . [to] allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the quality standards; except that each preschool provider must meet all quality standards relating to health and safety as a condition of participating in the preschool program.

*Id.* § 26.5-4-205(1)(b)(II).[3]

For a school to participate in UPK Colorado, it must sign the Program Service Agreement (the "Agreement"). In addition to the statutory nondiscrimination requirement, Plaintiffs' claims challenge two provisions of the Agreement: its incorporation of the statutory nondiscrimination requirement and a more expansive nondiscrimination provision found in Paragraph 18(B).

---

[2] The Department is in the process of rulemaking for the requisite quality standards. Odean Decl. ¶ 13; Odean Suppl. Decl. ¶¶ 8-13, ECF No. 47-1. Once the rules are promulgated, they will not take effect until the 2024-2025 school year. Odean Decl. ¶ 14.

[3] Defendants represent that the Department interprets the statutory nondiscrimination requirement as "'relating to health and safety' because it ensures, among other things, that children have access to a safe educational environment free from harmful discrimination." Resp. to Pls.' Mot. for Summ. J. at 21, ECF No. 77. Under that interpretation, the Department is not authorized to permit a temporary waiver of compliance with the statutory nondiscrimination requirement. Other than their representation to the Court, Defendants do not point to any evidence (i.e., materials from the Department, a declaration, or deposition transcript) that this is the interpretation of the Department. Plaintiffs cite deposition testimony from M. Michael Cooke, the Department's former Transition Director, claiming that she "said the opposite." Reply in Supp. of Pls.' Mot. for Summ. J. at 15, ECF No. 94. From the testimony provided, however, it does not appear she addressed that specific question at all. *See* Cooke Dep. 15:14-22, ECF No. 94-1 (being asked, "in your opinion, what makes a provider safe?" and responding regarding licensing requirements).

Agreement, ECF No. 32-15 at 3 ("Provider agrees to adhere to the quality standards identified in §26.5-4-205, C.R.S., [including] . . . [the r]equirement that each preschool provider provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family."); *id.*, ECF No. 32-15 at 28. Paragraph 18(B) reads: "Provider shall not . . . discriminate against any person on the basis of gender, race, ethnicity, religion, national origin, age, sexual orientation, gender identity, citizenship status, education, disability, socio-economic status, or any other identity." *Id.* The Department interprets and applies this provision "to permit religious organizations to hire co-religionists in accordance with federal law and to protect religious organizations' employment decisions about their ministerial employees in accordance with federal law." Odean Decl. ¶ 16. I will refer to the statutory nondiscrimination requirement together with the two challenged provisions of the Agreement as the "UPK Colorado nondiscrimination requirements."

Generally, families apply for UPK Colorado, rank their preferred participating preschool providers, and then are matched with one of their ranked providers. Odean Dep. 18:5-14, ECF No. 61-4. Participating preschool providers may select from nine different preferences that are departures from the default matching process. As stated in the Departments' proposed rules, those options are:

1. Faith-based providers granting preference to members of their congregation;

2. Cooperative preschool providers requiring participation in the cooperative;

3. School districts maintaining enrollment consistent with their established boundaries;

4. Withholding of placements or availability of seats by an enrolling preschool

provider of a student(s) with an Individualized Education Program (IEP) to ensure conformity with obligations incurred pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. section 1400 (2004), or the Exceptional Children's Education Act, Article 20 of Title 22, C.R.S.;

5. Head Start programs' adhering to any applicable federal law requirements including eligibility requirements;

6. Participating preschool providers granting preference to an eligible child of one of their employees;

7. Participating preschool providers granting preference to an eligible child in order to ensure continuity-of-care for that child;

8. Participating preschool providers granting preference to an eligible child in order to keep siblings similarly located; and

9. Participating preschool providers granting preference to an eligible child who is multilingual in order to ensure the proper delivery of services to that child.

UPK Proposed Rules and Regulations, ECF No. 61-12 at 7; *see also* UPK Colorado Provider Guide, ECF No. 61-15 at 38. These departures from the standard matching process allow faith-based providers to give preference to families who are part of their congregation "by reserving all or a portion of their preschool seats for their congregation members" and to "decline a match from a family that is not part of their congregation." Odean Decl. ¶ 8.

In addition to these enumerated preferences, providers may request individualized departures from the default matching process. *See* Table of Requested Departures, ECF No. 61-6 at 83-88. The form permitting providers to make such a request includes as an example: "My location only serves children with specific disabilities." Odean Dep. 98:8-99:23; Ex. 5 to Odean Dep., ECF No. 61-4 at 172. Defendant Odean testified that UPK Colorado does have school-district-based providers that offer specific programs for individuals with disabilities, either at one location of multiple locations or in a particular classroom within a location. Odean Dep. 98:25-99:23. The Department has granted a number of other individualized requests, including for a

A007

provider only accepting fully vaccinated children, a location that serves teen mothers and their children, and a preschool that must prioritize subdivision residents. Table of Requested Departures, ECF No. 61-6 at 83-84.

The Archdiocese of Denver's Office of Catholic Schools oversees 36 preschools, Moo Decl. ¶ 4, including the Named Preschools and other preschools within the Archdiocese (the "Unnamed Preschools"). The Named and Unnamed Preschools are subject to the Archdiocese's guidance on matters of faith and morals. *Id.* ¶¶ 5-6. The Archdiocese "speaks for and advances the interests of all of [its] Catholic Schools and their preschool programs." *Id.* ¶ 15. However, each parish or regional school within the Archdiocese "is a separately incorporated legal entity distinct from the Archdiocese," and "each preschool is subject to the direct control of the pastor of that specific parish." Moo Suppl. Decl. ¶¶ 4, 6, ECF No. 62-1; Joint Status Report II at 4, ECF No. 62.

The Named Preschools and the Archdiocese "believe that Archdiocesan preschools must carefully consider whether admitting students or families who oppose Catholic teachings in word or deed will create intractable conflicts that hinder the school's mission." Pls.' Mot. for Summ. J. at 15, ECF No. 61 (citing Moo Decl. ¶ 27); The Archdiocese's Guidance for Issues Concerning the Human Person and Sexual Identity, ECF No. 32-6 at 15-16. According to guidance from the Archdiocese, "[a] Catholic school cannot treat a same-sex couple as a family equivalent to the natural family without compromising its mission and Catholic identity and causing confusion about the nature of marriage for all students enrolled." *Id.*, ECF No. 32-6 at 16 (emphasis removed). Archdiocesan schools are instructed to use pronouns that correspond with biological sex, to enforce their dress code that corresponds with an individual's biological sex, and to make changing and bathroom facilities available only as they correspond with an individual's

A008

biological sex. *See id.*, ECF No. 32-6 at 3, 11-13. The Archdiocese further "requires that those who teach and pass on the Catholic faith, including all preschool teachers, strive to uphold Catholicism's tenets in both word and deed and meet the requirements of provisional catechetical certification." Pls.' Mot. for Summ. J. at 14 (citing Moo Decl. ¶¶ 24-26; Seul Decl. ¶ 17, ECF No. 32-14).

If Archdiocesan preschools participated in UPK Colorado, Plaintiffs believe the statutory nondiscrimination requirement and Paragraph 18(B) of the Agreement would "prevent [them] from preferencing Catholic families who are not members of their congregation." *Id.* at 23. Plaintiffs also believe those provisions would "prohibit Archdiocesan preschools from taking into consideration whether a child or family is open to and supportive of the Catholic Church's teachings—including its teachings on human sexuality—or whether personal circumstances or actions would create intractable conflicts with what is being taught in the schools." *Id.* at 24. Additionally, Plaintiffs claim Paragraph 18(B) would "forbid[] Archdiocesan preschools from requiring that those who teach the faith agree to live out those teachings in both word and deed." *Id.*

For those reasons, the Archdiocese of Denver, as part of a coalition of other religious preschool providers, requested an exemption from the statutory nondiscrimination requirement. Feb. 17, 2023 Letter to Polis, ECF No. 32-12 at 2. The Department denied that request. Feb. 28, 2023 Roy Letter, ECF No. 32-13 at 1-2. The Department's position is that it does not have the authority to create an exemption from the statutory nondiscrimination requirement. *Id.*, ECF No. 32-13 at 1; Odean Dep. 122:1-122:3; Roy Dep. 16:11-19, 23:10-15, ECF No. 61-5.

The Archdiocese later "determined that its preschools could not in good conscience sign the Program Service Agreement or operate their preschools consistent with the requirements of

the Agreement." Pls.' Mot. for Summ. J. at 23 (citing Moo Decl. ¶ 32; Jan. 14, 2023 Dollins

Email, ECF No. 32-11 at 2-3). The Archdiocese thus communicated to its preschools that they

were not to enter into any agreement with the State for UPK Colorado. Jan. 14, 2023 Dollins

Email ECF No. 32-11 at 2-3. The Named Preschools assert that they "would immediately seek to

participate in UPK Colorado if granted an accommodation that would allow them to do so

consistent with their faith." Pls.' Mot. for Summ. J. at 26 (citing Coats Decl. ¶ 35, ECF No. 32-

16; Seul Decl. ¶ 50). If the Named Preschools were UPK Colorado providers, they would qualify

for provider bonuses that give direct financial assistance to participating preschools. *See* Seul

Decl. ¶ 43.

Families continue to be matched with participating UPK Colorado providers on a weekly

basis. Odean Dep. 35:12-20; UPK Colorado Website Materials, ECF No. 61-13 at 2. Preschools

can complete the UPK enrollment process at any time to begin being matched with students.

Odean Dep. 33:14-34:24. Direct enrollment with some providers is now available as an option to

families as well. *Id.* 33:6-13.

## II. DEFENDANTS' MOTION TO DISMISS

Defendants' Motion to Dismiss seeks dismissal of the Amended Complaint under Federal

Rule of Civil Procedure 12(b)(1) and 12(b)(6), arguing that jurisdiction is not proper because

Plaintiffs lack standing and their claims are not ripe. I agree with Plaintiffs that Defendants view

this case through the wrong lens. Defendants advocate that Plaintiffs' circumstances are self-

inflicted and that an attenuated series of events would need to occur for Plaintiffs to experience

any injury. But Plaintiffs' alleged injury is not the potential for some future enforcement of the

State's nondiscrimination requirements against them.[4] Plaintiffs' claimed injury is their present perceived inability to participate in UPK Colorado based on the nondiscrimination conditions imposed by the State and the Department's denial of an exemption from those conditions.

## A. Legal Standards for Standing and Ripeness

The U.S. Constitution requires that federal courts exercise limited jurisdiction so as not to invade the province of other branches of government or the rights of the people. Federal courts may only operate with regard to an established case or controversy. For such a case or controversy to exist, a plaintiff must have standing to bring the claims asserted. This requirement is so integral that, should a plaintiff fail to establish standing, the presiding court must dismiss the case before it. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-561 (1992). Constitutional standing has three components: an injury in fact, a causal connection between a defendant's conduct and the injury, and the ability of the court to redress the injury should the plaintiff prevail. As to the former, the alleged injury "must affect the plaintiff in a personal and individual way," *id.* at 560 n.1, and be "actual or imminent, not conjectural or hypothetical," *id.* at 560 (citation and quotation marks omitted). Concerning causation, the injury must be attributable to a defendant's actions and not "the result of the independent action of some third party not before the court." *Id.* (citation and alteration omitted). Lastly, the relief that plaintiff seeks from the court must be capable of remedying the injury incurred. *Id.* at 561.

---

[4] Much of Defendants' Motion to Dismiss is spent analyzing Plaintiffs' standing under the pre-enforcement framework. Plaintiffs urge the Court not to apply that framework, and I agree that it does not fit this case. As a result, I accept Defendants' invitation and simply address the traditional standing questions raised. *See* Reply in Supp. of Mot. to Dismiss at 6, ECF No. 47.

**A011**

A "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). "The Art[icle] III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally." *Id.* However, an organization may assert standing to bring suit on behalf of its members, known as "representational" or "associational" standing, when: (1) any one of its members would have standing to bring the claim on its own, (2) the interests it seeks to protect are germane to its purpose, and (3) "the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to the proper resolution of the cause." *Id.* at 511; *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

If any of the requirements for standing are absent, Federal Rule of Civil Procedure 12(b)(1) provides that a party may move to dismiss the suit for lack of subject matter jurisdiction. When a party makes a factual attack under Rule 12(b)(1), as Defendants do here, the party may go beyond the allegations in the complaint and present evidence in support of its challenge. *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001); *Rural Water Dist. No. 2 v. City of Glenpool*, 698 F.3d 1270, 1272 n.1 (10th Cir. 2012). The court has wide discretion to consider these materials. *Id.*; *Stuart*, 271 F.3d at 1225.

Ripeness relates to the injury-in-fact element of standing. Under the doctrine of ripeness, a "claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)). Ripeness is a temporal constraint "drawn both from Article III limitations on judicial power and from

12

**A012**

prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). Defendants assert Plaintiffs' claims are unripe based on Article III limitations and for prudential reasons. Article III ripeness implicates subject matter jurisdiction and is therefore analyzed under Rule 12(b)(1). Prudential ripeness, on the other hand, is evaluated under Rule 12(b)(6), considering and accepting as true the well-pleaded allegations in the complaint. *See North Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1230 (10th Cir. 2021); *Hill v. Warsewa*, 947 F.3d 1305, 1308 (10th Cir. 2020).

For Article III ripeness, "[i]f a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *American C.L. Union v. Johnson*, 194 F.3d 1149, 1155 (10th Cir. 1999) (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996)). In contrast, "[i]njury to a party's interest for the purposes of constitutional standing does not automatically confer prudential standing." *Hill*, 947 F.3d at 1310 (internal quotation marks omitted). For prudential ripeness, courts "balance the fitness of the issue for judicial review with the hardship to the parties from withholding review." *United States v. Bennett*, 823 F.3d 1316, 1326 (10th Cir. 2016). In determining the fitness of the issue for review, courts focus on "whether determination of the merits turns upon strictly legal issues or requires facts that may not yet be sufficiently developed." *Id.* (quoting *Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1119 (10th Cir. 2008)). Then, to assess the hardship from withholding judicial review, courts consider "whether the parties face 'a direct and immediate dilemma.'" *Id.* (quoting *Stout*, 519 F.3d at 1118).

**B. Analysis**

    1. The Parishes

    I begin the analysis of Plaintiffs' standing with the Catholic Parishes that are named as Plaintiffs, St. Mary Catholic Parish in Littleton ("St. Mary's") and St. Bernadette Catholic Parish in Lakewood ("St. Bernadette's") (together, the "Parishes"). I find they satisfy all three components of standing: an injury in fact, causation, and redressability. *See Lujan*, 504 U.S. at 560-61. Defendants assert the Parishes have failed to demonstrate the first two. Defendants portray the Parishes' injury as hypothetical and self-inflicted.

    The Parishes claim that, because of UPK Colorado's nondiscrimination requirements, their preschools are unable to participate in the Program without compromising their sincerely held religious beliefs. Thus, their alleged injury is their perceived inability to participate in and benefit from the Program. This is a sufficiently concrete injury.[5]

    Defendants do not seem to genuinely question that the Parishes would receive some benefit from their preschools' participation in UPK Colorado. And nothing in the record indicates the preschools would be otherwise ineligible to participate. Instead, Defendants contend that the Parishes' alleged injury is conjectural or hypothetical and not concrete and particularized or actual or imminent. Defendants list out "a very lengthy and speculative chain of circumstances [that] would have to occur" for the Department to take an enforcement action against the Named Preschools, what Defendants assert is required for Plaintiffs to have standing. Mot. to Dismiss at 11, ECF No. 38. This argument is based on Defendants' flawed view of the

---

[5] Plaintiffs claim they are "forced to choose between following their religious beliefs and participating in UPK Colorado." Resp. to Mot. to Dismiss at 15, ECF No. 42. They call this an "unconstitutional choice." *Id.* That is a merits determination, but for the purposes of standing, the perceived inability to participate in UPK Colorado constitutes an injury in fact.

case. The injury to the Parishes is not some future potential for enforcement against them. It is a present perceived conflict with government policy that prevents them from receiving benefits. They have requested an exemption from that policy, and Defendants have acted to deny it. Defendants argue that the mere existence of the UPK Colorado nondiscrimination requirements cannot create standing. But the alleged injury is not the existence of an unconstitutional law, it is the loss of benefits tied to a government policy. As such, I am not persuaded by Defendants' citation to cases that do not involve government benefits.

Defendants further advocate that the Named Preschools should, in a sense, game the UPK Colorado system to avoid the feared conflicts concerning their religious beliefs. Specifically, Defendants suggest the Named Preschools could take advantage of the optional preferences by reserving all their preschool seats for Catholic parishioners and prioritizing siblings of current students. Defendants presume doing so would alleviate any injury experienced by the Parishes. Plaintiffs represent, however, that the Named Preschools regularly enroll students whose families are not parishioners and who do not have siblings at the school. Surreply to Mot. to Dismiss at 1-2, ECF No. 51. The available departures from the standard matching process do not eliminate the Parishes' alleged injury.

With respect to the causation component of standing, Defendants insist that the Parishes' injury is self-inflicted and manufactured. Defendants blame the Parishes' decision not to participate, rather than the challenged government policy, for the Named Preschools missing out on the benefits of UPK Colorado.

In support of their contention, Defendants submitted evidence that the Named Preschools have participated in other State programs that have required them to agree to nondiscrimination provisions. In the past, Wellspring Catholic Academy, the school operated by St. Bernadette's,

15

**A015**

has been a provider for the Denver Preschool Program, which offers tuition credits to Denver families for preschool education. Holguín Decl. ¶¶ 3, 9, ECF No. 38-5. The contract for the Denver Preschool Program contains a nondiscrimination provision. *See* Denver Preschool Program Provider Agreement, ECF No. 38-7 at 26. However, as Plaintiffs stress, the contract also includes a provision protecting religious providers, which states: "Nothing in this Agreement shall be construed to affect the Provider's right to engage in privately funded, inherently religious activity or affect the independence of Providers, including any rights protected by the Colorado and U.S. Constitutions and applicable law." *Id.*, ECF No. 38-7 at 16. Plaintiffs have interpreted this language to exempt Archdiocesan preschools from the nondiscrimination requirement in the contract. *See* Pls.' Suppl. Resp. to Mot. to Dismiss at 11-12, ECF No. 75. Considering that reasoning, it is not inconsistent for the Parishes to find the UPK Colorado requirements conflict with their beliefs but those of the Denver Preschool Program do not.

St. Mary's preschool currently participates in the Colorado Child Care Assistance Program ("CCCAP"), which "helps families that are homeless, working, searching for work or in school find low-income child care assistance." Burne Decl. ¶¶ 3, 13, ECF No. 38-2. CCCAP requires providers to "[a]ccept referrals for child care without discrimination with regard to race, color, national origin, age, sex, religion, marital status, sexual orientation or physical, intellectual or mental health disability." CCCAP Fiscal Agreement, ECF No. 38-3 at 5. Plaintiffs note that, unlike the UPK Colorado provisions, the CCCAP requirement does not appear to cover students' families and does not reference gender identity. Plaintiffs assert that they believe sexual orientation is not relevant for preschool students. Pls.' Suppl. Resp. to Mot. to Dismiss at 12. Plaintiffs have also "understood [CCCAP] to permit them to follow their ordinary enrollment

16

**A016**

process," in which they evaluate applicants before enrollment. *Id.*; Resp. to Mot. to Dismiss at 23. Here, too, it is not inconsistent for the Parishes to find injury from the UPK Colorado Agreement but not from the CCCAP provision.

Defendants' theory of standing encourages the Parishes to set aside their potential conflicts with the nondiscrimination requirements, participate in UPK Colorado, and assume that enforcement of the requirements for a specific act of discrimination will never occur. But the Named Preschools cannot be blamed for foregoing enrollment in a program they understand to conflict with their beliefs. Their loss of benefits and the Department's denial of an exemption are sufficient to establish standing.

Because I find the Parishes have alleged an injury that satisfies the requirements for standing, I conclude their claims are ripe for Article III purposes. *See Johnson*, 194 F.3d at 1155. Under the prudential ripeness analysis, I likewise find their claims should be adjudicated. The issues presented are fit for review, and the Parishes would likely experience hardship if consideration of their claims is withheld. Defendants argue that the Parishes' claims depend on facts that have not yet occurred. But government actions have been taken—a statute has been passed, the Agreement has been finalized, and the Archdiocese's request for an exemption has been denied. Even though the agency has yet to promulgate the rules mandated by the statute, the nondiscrimination requirements are in effect, and UPK Colorado is presently being administered. If the Department's rulemaking and the anticipated updates and amendments to the Agreement moot any aspect of the Parishes' claims, Defendants may file appropriate motions at that time. By withholding judicial review, the Parishes would either be unable to have their claims heard or the Named Preschools would be forced to sign the Agreement, which they have determined conflicts with their religious beliefs.

A017

The Parishes have, therefore, established standing and their claims are ripe.

2. Parent Plaintiffs

The analysis for Parent Plaintiffs is similar. Parent Plaintiffs are parishioners of St. Mary's and their four-year-old attends preschool there. Sheley Decl. ¶ 6, ECF No. 32-18. They believe they are "commanded by [their] faith to provide [their] children with a Catholic education." *Id.* ¶ 5. Because their child attends preschool at St. Mary's, they are not currently receiving benefits through UPK Colorado. *Id.* ¶ 6. Consequently, their claimed injury is clear: a loss of benefits.[6]

Defendants argue, however, that their injury is caused not by the State but by the failure of St. Mary's preschool to enroll as a provider in UPK Colorado and the Archdiocese's decision to prohibit its preschools from participating in the Program. This argument fails for the same reasons explained above. The alleged injury is not self-inflicted; it is the result of government policy and action.

Perhaps Defendants could question whether granting an injunction in this case would remedy Parent Plaintiffs' injury since St. Mary's preschool would still need to enroll in UPK Colorado for Parent Plaintiffs to benefit. However, there is evidence in the record that St. Mary's would immediately seek to participate in UPK Colorado if it "were not prevented from participating . . . because of [its] sincere religious beliefs." Seul Decl. ¶ 50. Parent Plaintiffs have

---

[6] The amount of the benefit Parent Plaintiffs would receive is not clear from the evidence presented because they already receive a discount on tuition for one of the parents being a school employee. *See, e.g.*, Defs.' Suppl. Br. in Supp. of Mot. to Dismiss at 13; Reply in Supp. of Pls.' Mot. for Summ. J. at 9. Nevertheless, the present record supports that Parent Plaintiffs are not receiving at least some monetary benefit that they would if St. Mary's preschool were participating in UPK Colorado.

established the three requirements for standing.

The prudential ripeness analysis is the same for Parent Plaintiffs as for the Parishes. It is proper for this Court to exercise jurisdiction over those parties and their claims.

### 3. The Archdiocese

In contrast, the Archdiocese has failed to allege a sufficient injury to have standing in its own right and has not established it has standing as a representative of the Archdiocesan preschools.

The Amended Complaint does not allege any particularized injury to the Archdiocese. After I ordered supplemental briefing on the issue, Plaintiffs advanced the argument that the Archdiocese "has had to chill its own religious exercise (making Catholic education broadly accessible, including through its preschools' participation in UPK) in response to an objectively justified threat of real consequences imposed by the State (the requirement that its preschools abandon their religious exercise in order to participate)." Pls.' Suppl. Resp. to Mot. to Dismiss at 2, ECF No. 75. First, nothing is preventing the Archdiocese from providing the same support to Catholic education as it has in the past. And, second, the cases the Archdiocese cites in support of its "chilling" argument, such as *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082 (10th Cir. 2006), do not involve the Free Exercise Clause and relate to pre-enforcement challenges.

Additionally, as the Archdiocese acknowledges, it promotes Catholic education through its legally independent preschools. *Id.* at 3; Joint Status Report II at 5. The Archdiocese itself does not seek to participate in UPK Colorado and would not be subject to the nondiscrimination

A019

requirements.[7] The Archdiocese preschools may have empty seats because of UPK Colorado, and the schools may have lost out on provider bonuses offered through the Program. Moo Dep. 111:6-112:5, 212:14-19, ECF No. 75-1; Coats Dep. 77:3-10, ECF No. 75-2; Seul Dep. 108:24-109:9, ECF No. 75-3; Seul Decl. ¶¶ 38, 41; Coats Decl. ¶¶ 31-32. At most, however, the Archdiocese alleges a vicarious or indirect injury, and it has failed to substantiate that injury.

In any event, the Archdiocese has not shown that its purported individual injury would be redressed by any relief granted in this case, i.e., that there would be increased access to a Catholic education. *See* Pls.' Suppl. Resp. to Mot. to Dismiss at 3 (asserting that "[t]he Archdiocese seeks to engage in a specific religious exercise: providing . . . increased access to a Catholic education."). Plaintiffs make no allegations and there is no evidence in the record regarding the desire of the Unnamed Preschools to participate in UPK Colorado nor the impact participation would have on student enrollment or education. *See, e.g.*, Moo Dep. 111:20-112:5.

Again, after I ordered supplemental briefing on the issue, the Archdiocese asserted that it has representational or associational standing to sue on behalf of the Archdiocesan preschools. This cannot be. The Archdiocese has emphasized that its parishes are separate legal entities with distinct interests and injuries, and the Archdiocese has made clear that the participation of the Unnamed Preschools is necessary for the fair resolution of this case.

To demonstrate associational or representational standing, the Archdiocese must show:

---

[7] Citing *Aptive Environmental, LLC v. Town of Castle Rock*, 959 F.3d 961, 977 (10th Cir. 2020), Plaintiffs claim it does not "matter that it is the preschools, and not the Archdiocese, who would be signing the provider agreement and directly subject to Defendants' enforcement authority." Pls.' Suppl. Resp. to Mot. to Dismiss at 5. *Aptive* dealt with a free-speech, pre-enforcement claim. *Id.* at 974-75, 979. And it is further distinguishable because the business there showed it incurred a concrete, independent injury in the form of decreased sales. *Id.* at 975. Moreover, the case involved a business that hired "independent contractors" as salespeople, *id.* at 977, and there is no evidence here that the relationship between the Archdiocese and the preschools is equivalent.

"(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. The Archdiocese fails to carry its burden on the last requirement, so I do not address the others.

The individual participation of the Archdiocesan preschools is indispensable in this as-applied challenge brought primarily under the Free Exercise Clause. The Archdiocese seeks to procure an injunction applicable to its 36 schools' individual dealings with the Department. Yet, the Unnamed Preschools are separate legal entities over which the Archdiocese does not exercise legal or practical control. *See* Joint Status Report II at 5. "[E]ach preschool is subject to the direct control of the pastor of that specific parish." Moo Suppl. Decl. ¶ 6. There is no evidence in the record that the Archdiocese has the authority to represent each school's specific legal interests nor that each preschool desires to participate in UPK Colorado. *See* Moo Dep. 140:13-20, ECF No. 77-5 (testifying that at least one school determined it did not want to participate in UPK Colorado). Because this is an as-applied challenge, the individual facts of the injured parties are significant. Plaintiffs even argue that the UPK Colorado nondiscrimination requirements trigger strict scrutiny, requiring an analysis of "whether harms would result from granting the 'specific exemption[]' sought by the 'particular religious claimant[.]'" Reply in Supp. of Pls.' Mot. for Summ. J. at 16 (quoting *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1881 (2021)). Under these circumstances, the individual participation of the Unnamed Preschools is necessary to adjudicate the claims asserted.

In addition, since the claims warrant consideration of the individual facts, discovery related to each injured party is relevant. The Archdiocese has argued, however, that it is not

required to produce the requisite discovery on behalf of the Unnamed Preschools, as it "do[es] not have legal 'control' over the documents of the 34 nonparty preschools." Joint Status Report II at 4. More directly, it has stated: "[T]he Archdiocese's religious authority and responsibilities under Catholic canon law do not change the fact that the Archdiocese and its preschools are otherwise distinct and separate legal entities—or that the Archdiocese does not exercise legal or practical control over the operations of each separately incorporated preschool." *Id.* at 5. When a third party's interests are asserted and the representative party refuses to cooperate with the production of relevant discovery related to that third party, the participation of the third party becomes necessary for the just resolution of the case.

Consequently, the Archdiocese has not established that it has standing to bring its claims in its own right or on behalf of any members. Defendants' Motion to Dismiss is, therefore, granted in part in that the Archdiocese is dismissed from this case. The Motion is denied with respect to the Parishes and Parent Plaintiffs.

### III. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs' Motion for Summary Judgment argues that Plaintiffs are entitled as a matter of law to the permanent injunctive relief requested in their Amended Complaint. Summary judgment is only appropriate if the moving party "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if a reasonable factfinder could return a verdict for the nonmoving parties. *See id.* In determining whether such genuine disputes of material fact exist, courts view the evidence in the light most favorable to the

**A022**

non-moving parties and resolve all disputed facts in their favor. *McCoy v. Meyers*, 887 F.3d

1034, 1044 (10th Cir. 2018).

Plaintiffs' Motion sets out 104 "Undisputed Material Facts." *See* Pls.' Mot. for Summ. J.

at 11-26. I do not disagree with Plaintiffs' description of this dispute as "largely legal." *See* Joint

Status Report II at 2. Still, the table Defendants submitted containing their response to each of

Plaintiffs' "Undisputed Material Facts" confirms that the facts necessary to resolve this dispute

are not all settled. *See, e.g.*, Resp. to Pls.' Undisputed Material Facts at 20, ECF No. 77-6

(disputing the difference between a matching "preference" and an "exception" to the

nondiscrimination requirements); *id.* at 22 (disputing whether preschools may exclude applicants

on the basis of disability); *id.* at 24 (disputing whether the Department permits exceptions to the

statutory nondiscrimination requirement on a case-by-case basis).

The first, fourth, and fifth claims in the Amended Complaint are brought under the Free

Exercise Clause of the First Amendment, a violation of which occurs "when [a state] excludes

religious observers from otherwise available public benefits." *Carson v. Makin*, 596 U.S. 767,

778 (2022). The right of free exercise does not, however, "relieve an individual of the obligation

to comply with a 'valid and neutral law of general applicability on the ground that the law

proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Employment Div.,*

*Dep't of Human Resources of Ore. v. Smith*, 494 U.S. 872, 879 (1990) (quoting *United States v.*

*Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in judgment)). "[A] law that is neutral

and of general applicability need not be justified by a compelling governmental interest even if

the law has the incidental effect of burdening a particular religious practice." *Church of Lukumi*

*Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). In contrast, a law that is not

neutral or generally applicable "must be justified by a compelling governmental interest and

must be narrowly tailored to advance that interest." *Id.* at 531-32.

Here, Plaintiffs contend UPK Colorado's nondiscrimination requirements are neither neutral nor generally applicable and thus are subject to strict scrutiny. Defendants, on the other hand, maintain that the requirements are both neutral and generally applicable and pass the associated rational basis test. In deciding the merits of Plaintiffs' first, fourth, and fifth claims, key questions, then, are whether UPK Colorado's nondiscrimination requirements are neutral and whether they are generally applicable.

"[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Id.* at 533. Plaintiffs contend the State's actions in denying its request for a religious exception to the nondiscrimination requirements "reflected hostility to Plaintiffs' sincere religious beliefs." Pls.' Mot. for Summ. J. at 36-37. Whether such an inference is warranted is a question of fact that is intensely disputed in this case. For example, as evidence of the State's alleged hostility toward Plaintiffs' religious beliefs, Plaintiffs highlight Defendant Roy's testimony that the Department cannot allow participants to knowingly discriminate against children. *Id.* at 37; Roy Dep. 22:10-20, 29:19-31:11 ("We don't want any child to be harmed by being in a situation where they would be discriminated against. . . . The law is there to protect, and thank goodness it does."). Defendants, in turn, emphasize their efforts to engage with religious providers through the creation of the interfaith working group "to problem solve issues as they arise from within the faith-based community and facilitate participation." Feb. 28, 2023 Roy Letter, ECF No. 32-13 at 2; Resp. to Pls.' Mot. for Summ. J. at 13. This evidence must be weighed and a determination must be made regarding the "object" of UPK Colorado's

nondiscrimination requirements.[8]

Likewise, determining whether the nondiscrimination requirements are generally applicable involves genuine disputes of material facts. "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. 1868, 1877 (2021) (quoting *Smith*, 494 U.S. at 884). "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* Defendants contend UPK Colorado "does not exempt any provider, secular or faith-based from its antidiscrimination requirements, nor does it permit secular conduct that undermines its antidiscrimination interests." Resp. to Pls.' Mot. for Summ. J. at 14, ECF No. 77. Plaintiffs argue aspects of the Program do just that, highlighting the statutory provision permitting a temporary waiver of some quality standards and the general and individualized provider preferences that permit departures from the standard matching process.

The statutory provision authorizing the Department to temporarily waive a UPK Colorado provider's compliance with some quality standards does not permit a waiver for those standards relating to health and safety. *See* Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). The statutory framework is not clear on which of the quality standards relate to health and safety. As noted above, Defendants represent that the Department interprets the statutory nondiscrimination requirement as relating to health and safety, meaning the Department cannot grant a temporary waiver for noncompliance with that requirement. *See* note 3, *supra*. The Department is charged

---

[8] Plaintiffs insist that *Carson v. Makin* "alone is enough to decide [their] motion." Pls.' Mot. for Summ. J. at 9. But *Carson* likewise requires a finding that the Named Preschools are "disqualified from th[e] generally available benefit 'solely because of their religious character,'" i.e., a finding of non-neutrality. 596 U.S. at 780 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017)).

with promulgating the requisite regulations, and its interpretation of its authority to grant temporary waivers may control. Nonetheless, the evidence presented on this issue is not satisfactory—Defendants offer their representation to the Court without evidence, and Defendants cite less than persuasive testimony in response. *See id.* More factual development on this issue is necessary.[9]

Plaintiffs argue that the preferences providers may select as departures from the standard UPK Colorado matching process constitute exceptions to the nondiscrimination requirements such that the requirements are not generally applicable. Plaintiffs assert: "[E]specially with regard to disability, religion, and income—the permitted categorical exceptions directly contradict the [statutory] nondiscrimination requirement." Pls.' Mot. for Summ. J. at 33 n.2. While none of the optional preferences on their face exempt compliance with the nondiscrimination requirements, it is difficult to decipher from the evidence—as the parties have presented it—whether discrimination contrary to each aspect of the nondiscrimination requirements is permitted by the Department's implementation of the optional preferences. To illustrate, one of the optional preferences allows faith-based providers to reserve seats for children from their congregation. If that preference allows providers to discriminate on the basis of a particular status enumerated in the nondiscrimination requirements, that would support a finding that the associated nondiscrimination requirements are not generally applicable. Conversely, if the preference is based on some other attribute and not a status protected by the

---

[9] Additionally, Defendants argue that, even if the temporary-waiver provision applied to the nondiscrimination requirement, it would be available to all providers meeting the specifications. *See* Colo. Rev. Stat. § 26.5-4-205(1)(b)(II) (permitting a waiver when "necessary to ensure the availability of a mixed delivery system within a community" if the provider is "working toward compliance"). Under those circumstances, the parties would need to address how the provision compares to the fully discretionary exception in *Fulton v. City of Philadelphia*, 141 S. Ct. at 1878-79.

A026

nondiscrimination requirements and if any lesser opportunity for students to enroll does not undermine the asserted interests, a finding that the requirements are generally applicable may be appropriate. The factual issues surrounding the optional preferences and particular statuses must be resolved to determine whether the UPK Colorado nondiscrimination requirements are generally applicable. Plaintiffs argue that whether the preferences constitute exceptions to general applicability "in the relevant sense is a question of Free Exercise Clause law, not a fact dispute." Reply in Supp. of Pls.' Mot. for Summ. at 9. In this case, where the contours and impacts of the alleged exceptions are disputed, I disagree.

Plaintiffs further contend that, by allowing individual provider preferences, the Department has "even granted exception requests that directly violated the [statutory nondiscrimination requirement]—including by allowing providers to take into account a child's disability." Pls.' Mot. for Summ. J. at 35-36. Defendant Odean clarified that UPK Colorado includes school-district-based providers that have specific programs for individuals with disabilities, either at one location of multiple locations or in a particular classroom within a location. Odean Dep. 98:25-99:23. The statutory nondiscrimination requirement mandates that providers "provide eligible children an equal opportunity to enroll and receive preschool services regardless of . . . disability, as such characteristics and circumstances apply to the child or the child's family." Colo. Rev. Stat. § 26.5-4-205(2)(b). At the trial, the parties will need to address whether serving only individuals with specific disabilities or reserving spots for those individuals is equivalent to failing to provide children an equal opportunity to enroll and receive services regardless of their disability. I am doubtful that it is. I also am not certain that allowing discrimination based on certain statuses negates efforts to prevent it based on other statuses.

Because genuine disputes of material fact linger, I find a trial on the merits is warranted

**A027**

and deny Plaintiffs' Motion for Summary Judgment. The second, third, sixth, and seventh claims asserted in the Amended Complaint may be more appropriate for judgment as a matter of law.[10] However, it does not seem that evidence specific to those claims alone will be presented at the trial, and so I find it prudent to hold the trial and then rule on all the claims asserted in a final order.[11]

## IV. PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT WITNESS TESTIMONY

Also pending is Plaintiffs' Motion to Exclude the testimony of Defendants' retained expert witnesses—Drs. Abbie Goldberg and Amy Tishelman—and to limit four current or former State employees—Dawn Odean, Jesse Burne, Elsa Holguín, and M. Michael Cooke—to testifying only as fact and lay witnesses.

### A. Retained Expert Witnesses

Defendants intend to present the testimony of their retained experts to "place sexual

---

[10] I question whether a stipulation resolving the second and third claims in the Amended Complaint might be appropriate based on Defendants' apparent submission to the Court that Paragraph 18(b) of the Agreement will be interpreted "to permit religious organizations to hire co-religionists in accordance with federal law and to protect religious organizations' employment decisions about their ministerial employees in accordance with federal law," and thus, as it relates to Plaintiffs' second and third claims, requires no more and no less from the Named Preschools as employers. Odean Decl. ¶ 16. Plaintiffs claim Defendants' "disavowal" of that provision is insufficient, *see* Pls.' Mot. for Summ. J. at 43 n.3; Resp. to Mot. to Dismiss at 23, and it may be for standing purposes and for the other claims asserted. But the Amended Complaint's second and third claims pertain only to the impact of the provision on the Named Preschools' ability to ensure that their employees abide by standards of religious conduct, specifically in relation to marriage, human sexuality, and gender. *See* Am. Compl. ¶¶ 189-92, 196-97.

[11] Plaintiffs request, in the alternative, that I issue a preliminary injunction. The imminent trial obviates the need for the preliminary injunction, and thus that alternative request is likewise denied.

orientation and gender identity protections in their proper context" and to "unpack[] the State's interest in preventing the pain and loss and long-term trauma suffered by families when schools (or governments) intrude into this sensitive space." Joint Status Report II at 10-11. The offered experts are highly qualified and have performed extensive research in the relevant areas. Dr. Goldberg is a clinical psychologist and psychology professor at Clark University in Massachusetts, where she is the Director of Women's and Gender Studies. Goldberg Report, ECF No. 73-1 at 2. One of her areas of expertise and research is LGBTQ+ parent families, and she is the author of over 150 peer-reviewed articles, 25 book chapters, and four books. *Id.*, ECF No. 73-1 at 3. Dr. Tishelman is a clinical and research psychologist and currently a Research Associate Professor at Boston College in Massachusetts. Tishelman Report, ECF No. 73-2 at 1. She has received funding from the National Institutes of Health for her research, which has focused on gender diverse and transgender youth. *Id.*, ECF No. 73-2 at 2. She has developed best practices for caring for and assessing gender diverse prepubescent children and has served as an expert witness approximately 40 times. *Id.*, ECF No. 73-2 at 2-4.

For good reason, Plaintiffs challenge neither the qualifications of these experts nor the reliability of their opinions. Instead, Plaintiffs contend their testimony is not relevant to the resolution of this case because "(1) *post hoc* justifications for a government action cannot, as a matter of law, supply the necessary compelling interest to satisfy the government's burden under strict scrutiny and (2) the proffered testimony fails to address the specific questions before this Court." Pls.' Mot. to Exclude at 1, ECF No. 73. Under Federal Rule of Evidence 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

First, Plaintiffs argue that "there is no evidence that the Colorado Legislature or the

Department of Early Childhood reviewed and considered any of the studies or research relied on by either expert—or even that they considered the same topics—in making the decisions to exclude Plaintiffs [from UPK Colorado]." *Id.* at 3. But there is no requirement that, in evaluating the relevant governmental interest, courts may only review the evidence that was openly considered by the government when it took the challenged action. Here, as Defendants explain, "the circumstances surrounding the enactment of the statute, including but not limited to the objectives expressly identified in the statute, make clear the state's commitment to a publicly funded preschool program free from harmful discrimination." Resp. to Pls.' Mot. to Exclude at 3, ECF No. 83. The inclusion of the statutory nondiscrimination requirement and the focus on healthy environments and child and family outcomes demonstrate that the experts' research and opinions do not constitute impermissible, post hoc justifications. *See, e.g.*, Colo. Rev. Stat. § 26.5-4-205(1)(a) & (2)(b). The cases cited by Plaintiffs—*Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), and *Colorado Christian University v. Weaver*, 534 F.3d 1245 (10th Cir. 2008)—are distinguishable and do not support a contrary conclusion.

Second, Plaintiffs point to *Fulton v. City of Philadelphia* to support their argument that Defendants' expert testimony is irrelevant. Plaintiffs claim *Fulton* requires the Court to consider the State's specific interest in denying the Named Preschools an exception and not the overall objective of the State's nondiscrimination policies. So, according to Plaintiffs, "the question this Court must answer is whether the State has a compelling interest in denying [the Named Preschools] a religious accommodation which would allow these preschools to participate" in UPK Colorado. Pls.' Mot. to Exclude at 4. Plaintiffs maintain that neither of Defendants' experts offers opinions that would assist with answering that question. However, as Defendants note, Plaintiffs' argument presupposes that the nondiscrimination requirements are not generally

30

**A030**

applicable and neutral. I have just found that factual disputes pertaining to these issues remain and thus the question cannot be resolved until trial. As a result, I find the proposed testimony of Drs. Goldberg and Tishelman to be relevant.

## B. Defendants' Employee-Witnesses

Plaintiffs also seek to prevent Defendants' employee-witnesses from being qualified as experts because doing so "would prejudice Plaintiffs by potentially allowing Defendants' fact witnesses to offer opinions beyond what is otherwise permitted by [Federal Rule of Evidence] 701." Pls.' Mot. to Exclude at 5. Plaintiffs do not identify any specific opinions these witnesses might offer that are beyond what is permitted by Rule 701. Additionally, because the trial is to the Court, the risk for prejudice is minimal.[12] I consequently deny this aspect of Plaintiffs' Motion. But Plaintiffs may object to particular opinions from Defendants' employee-witnesses during the trial, if appropriate.

## V. CONCLUSION

Accordingly, Defendants' Motion to Dismiss (ECF No. 38) is GRANTED IN PART in that the Archdiocese of Denver is DISMISSED as a party to this case. Plaintiffs' Motion for Summary Judgment is DENIED (ECF No. 61). Defendants' corresponding request pursuant to Federal Rule of Civil Procedure 56(d) is likewise DENIED. And Plaintiffs' Motion to Exclude Defendants' Expert Witness Testimony (ECF No. 73) is DENIED as indicated above.

---

[12] Defendants represent that their endorsement of their employee-witnesses as experts was out "an abundance of caution" in case Plaintiffs argued that the testimony exceeds lay bounds because it is beyond the scope of what a lay person on the street could testify to. Resp. to Pls.' Mot. to Exclude at 7. For this reason as well, the risk of any prejudice is minimal.

DATED this 30th day of December, 2023, nunc pro tunc.

_____

JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-02079-JLK

ST. MARY CATHOLIC PARISH IN LITTLETON;
ST. BERNADETTE CATHOLIC PARISH IN LAKEWOOD;
DANIEL SHELEY; and
LISA SHELEY,

      Plaintiffs,

v.

LISA ROY, in her official capacity as Executive Director
of the Colorado Department of Early Childhood; and
DAWN ODEAN, in her official capacity as Director
of Colorado's Universal Preschool Program,

      Defendants.

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER FOR ENTRY OF JUDGMENT**

---

Kane, J.

      Plaintiffs in this case are two Catholic parishes that operate preschools—St. Mary

Catholic Parish in Littleton and St. Bernadette Catholic Parish in Lakewood—and the parents of

a preschool-aged child—Daniel and Lisa Sheley. They bring their claims against Dr. Lisa Roy,

the Executive Director of the Colorado Department of Early Childhood, and Dawn Odean, the

Director of the Colorado Universal Preschool Program, in their official capacities. Plaintiffs'

claims allege the equity-related requirements of Colorado's newly implemented Universal

Preschool Program ("UPK" or the "UPK Program"), as the requirements are applied to them,

violate their rights guaranteed by the Free Exercise, Free Speech, and Establishment Clauses of

the First Amendment to the U.S. Constitution.

**A033**

Presently, in its inaugural year, the UPK Program provides at least 15 hours of free preschool per week for each eligible child in the state. The Program is administered by the Colorado Department of Early Childhood (the "Department") and uses a "mixed-delivery system of preschool providers," that is "a combination of school- and community-based preschool providers . . . funded by a combination of public and private money." Colo. Rev. Stat. § 26.5-4-203(12). In accordance with the implementing statute, the Department must require participating "preschool provider[s to] provide eligible children an equal opportunity to enroll and receive services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family." *Id.* § 26.5-4-205(2)(b). Plaintiffs contend that, by conditioning participation in the UPK Program on compliance with this "equal-opportunity requirement,"[1] namely the religious-affiliation, sexual-orientation, and gender-identity aspects of the requirement, the Department has excluded Plaintiffs from receiving a generally available public benefit.

While it is settled at this point that states may not generally decline to fund religious schools as part of an educational benefits program, the weight of the relevant precedent supports that states administering such programs are not obligated to subsidize discrimination using taxpayer dollars, even when that discrimination is based on religious beliefs. This case involves a statute that requires preschool providers receiving funding through the UPK Program to give students with certain characteristics—those prioritized by the State of Colorado—an equal opportunity to enroll and receive services. Although the equal-opportunity requirement allows

---

[1] Previously, I referred to it as the "statutory nondiscrimination requirement." However, Plaintiffs are correct that this provision is more appropriately framed as an equal-opportunity requirement.

A034

providers to specifically serve low-income families and children with disabilities, it does not

grant the Department the authority or discretion to exempt providers from complying with the

requirement. The key question in this case is whether the Department, in administering the UPK

Program, has nevertheless created exceptions to the equal-opportunity requirement that warrant

granting Plaintiff Preschools similar exemptions.[2]

In January of this year, I held a three-day trial and now issue the Findings of Fact and

Conclusions of Law below. I dismiss as moot Plaintiffs' claims based on a contractual provision

that is separate from the equal-opportunity requirement. I then find the Department has applied

the equal-opportunity requirement in a neutral and generally applicable manner, as dictated by

the statute, with one exception. The Department has allowed faith-based providers to deny

children and families equal opportunity based on their religious affiliation, or lack thereof, and

has cited no compelling interest for permitting that discrimination while denying Plaintiffs'

request for a related exemption. On that narrow basis, I conclude Defendants have violated

Plaintiffs' free-exercise rights and that judgment in favor of Plaintiffs is warranted. I

consequently grant Plaintiffs relief in the form of a limited permanent injunction, declaratory

judgment, and nominal damages. Because I grant that relief, I decline to address the additional

declaratory relief sought under the Establishment Clause. Finally, I conclude Plaintiffs' free-

speech claim is entirely without merit, as Plaintiffs ignore applicable doctrines and attempt to

stretch precedent beyond recognizability.

---

[2] I note at the outset that I must confine my rulings to the case as it has been presented to me. The issues in dispute do not include, for example, permissibility of the UPK Program under the Establishment Clause or the Colorado Constitution, application of the religious nondelegation doctrine, consideration of this case as one involving hybrid rights, whether the UPK Program policies impose a *substantial* burden on Plaintiffs' religious exercise, or any potential violations of the rights of other eligible children and/or their parents as a result of the UPK policies.

**A035**

## I.  Findings of Fact

### A. The Universal Preschool Program

#### 1.  History and Statutory Framework

In 2020, Colorado voters approved Proposition EE by nearly a two-to-one margin, creating a dedicated source of funding for voluntary, universal preschool in the State. *See* Colo. Rev. Stat. § 26.5-4-202(1)(a)(V). At the trial in this case, M. Michael Cooke, the former Early Childhood Transition Director of the Colorado State Governor's Office, and Defendant Dawn Odean testified about the development and implementation of the UPK Program. In 2021, the Colorado General Assembly passed House Bill 21-1304 (the "Early Childhood Act") to begin organizing the Program. *See* H.B. 21-1304, 73rd Gen. Assemb. (Colo. 2021) (enacted). That legislation created the Colorado Department of Early Childhood, using the last executive department permitted by the Colorado Constitution. *Id.*; Trial Tr. (Cooke) 136:12-21. As relevant here, the Early Childhood Act specifies that it is the intent of the General Assembly for the Department to "work with other state and local agencies, public and private early childhood providers, head start agencies, nonprofit organizations, and parents and families to:

(a)  Provide high-quality, voluntary, affordable early childhood opportunities for all children in Colorado;

(b)  Coordinate the availability of early childhood programs and services in Colorado to meet the needs of all families;

(c)  Establish state and community partnerships that provide for a mixed delivery of child care and early childhood programs through school-based and community-based providers; . . .

(f)  Prioritize the equitable delivery of resources and supports for early childhood; . . . [and]

(h)  Improve outcomes for children and families through: . . .

    (II)   Implementation of evidence- and practice-based best practices in

4

**A036**

> education, family support, and child development with a focus on
> continuous improvement and innovation; . . . [and]
>
> (IV) Alignment with state and federal requirements under the state
> "Exceptional Children's Educational Act", part 1 of article 20 of title
> 22, and part B and part C of the federal "Individuals with Disabilities
> Education Act", 20 U.S.C. sec. 1400 et seq., as amended . . . .

Colo. Rev. Stat. § 26.5-1-102(1).

Following the passage of the Early Childhood Act, there "was a very robust stakeholder process that was led by the Early Childhood Leadership Commission to talk about what [the D]epartment should look like." Trial Tr. (Cooke) 136:20-24. Monthly town halls were held and "were open to all Coloradans: providers, parents, advocates,[ and] anyone with an interest in the work around the establishment of the new [D]epartment and Universal Preschool." *Id.* 137:12-16. The stakeholder process resulted in two reports from the Early Childhood Leadership Commission that became the foundation for House Bill 22-1295, which officially created the UPK Program when it was enacted. *Id.* at 142:1-7; *see* H.B. 22-1295, 73rd Gen. Assemb. (Colo. 2021) (enacted).

> Among other obligations, this legislation directs the Department to:
>
> Promote child physical, oral, and behavioral health and use multigenerational and culturally and linguistically appropriate strategies to support child and parent outcomes that improve overall family well-being; [and] . . .
>
> Promote access to quality early childhood care and education, including monitoring and increasing the capacity of quality early childhood care and education programs to support the availability of said programs for children throughout the state . . . .

Colo. Rev. Stat. § 26.5-1-109(1)(a).

**A037**

Colorado Revised Statutes §§ 26.5-4-201 to 26.5-4-210[3] (the "UPK Statute") are the codified portions of House Bill 22-1295 that contain provisions specific to the UPK Program. The UPK Statute obligates the Department to "develop and the executive director [to] establish by rule the quality standards that each preschool provider must meet to receive funding through the [Program]." *Id.* § 26.5-4-205(1)(a). Those standards "must reflect national and community-informed best practices with regard to school readiness, academic and cognitive development, healthy environments, social-emotional learning, and child and family outcomes." *Id.* Ms. Odean testified that this focus acknowledges the importance of "whole child" development, which ensures "that children have access to . . . cognitive development, but also inclusive of physical development, as well as social-emotional development." Trial Tr. (Cooke) 194:1-17. The statute further emphasizes "healthy environments," so the Department must be "thoughtful about the actual environment that a child is in." *Id.* 194:21-25. According to Ms. Cooke, the quality standards were intended to go beyond licensure requirements to ensure that a "high-quality preschool program" was created. Trial Tr. (Cooke) 143:24-144:7.

### i. Equal Opportunity

As highlighted above, one of the specific quality standards the Department must establish is:

> A requirement that each preschool provider provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family . . . .

---

[3] Section 26.5-4-211, creating the bonus payment program to incentivize preschool providers to participate in the UPK Program, was added with additional legislation in June 2023. *See* Act of June 2, 2023, 2023 Colo. Legis. Serv. 336.

A038

Colo. Rev. Stat. § 26.5-4-205(2)(b).[4] I will refer to this provision of the UPK Statute as the "statutory equal-opportunity requirement." The UPK Statute defines an "eligible child" as "a child who is eligible to receive preschool services as provided in section 26.5-4-204(3)." Colo. Rev. Stat. § 26.5-4-203(7). Section 26.5-4-204(3) covers every child in the state in the year preceding the school year in which he or she is eligible to enroll in kindergarten, and in particular, that subsection includes children three or four years of age who may receive additional preschool services because they are in low-income families or meet at least one qualifying factor[5] as well as three- and four-year-olds with disabilities who "must be offered preschool services in accordance with the child's individualized education program" under the Individuals with Disabilities Education Act and Exceptional Children's Educational Act. The incorporation of § 26.5-4-204(3) into the definition of eligible child makes clear that the equal-opportunity requirement contemplates allowing additional services for children with disabilities, those in low-income families, and those who meet qualifying factors.

Both Ms. Cooke and Ms. Odean were involved in the drafting of House Bill 22-1295. *See* Trial Tr. (Cooke) 143:11-13; Trial Tr. (Odean) 197:23-24. Ms. Cooke testified that one of the Early Childhood Leadership Commission's reports that was provided to the General Assembly stated that the UPK Program "should be a program that was equitable and grounded in equity" and HB 22-1295 "carried that forward by putting the equity statement[, i.e., the equal-

---

[4] On April 25, 2024, the Department finalized its rules for the UPK Program. In accordance with this provision, the rules state: "Eligible preschool providers must ensure that children receive an equal opportunity to enroll and receive universal preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family." 8 Colo. Code Reg. 1404-1:4.109(B).

[5] Under the statute, "qualifying factors must include identification as a dual-language learner or a child with disabilities and may include such other factors as the department may identify." Colo. Rev. Stat. § 26.5-4-204(4)(a)(II).

A039

opportunity requirement,] into th[e] legislation." Trial Tr. (Cooke) 142:13-18. Additionally, she understood that Colorado voters, in approving Proposition EE, "intended th[e] program to be available to all families, and equitably delivered to all families," which "carried through the stakeholder process into [House Bill 22-]1295." *Id.* 142:20-25. According to Ms. Cooke, the legislation was developed and enacted with the recognition that it was important "that all families had equal access, equitable access to preschool programs of their choosing, and [that they] would not be discriminated against based on any of the factors that are included in the legislation and now in statute." *Id.* 142:25-143:3.

Ms. Odean testified that, among other reasons, the statutory equal-opportunity requirement was included in the UPK Act to "be thoughtful about not putting children in an unsafe or unhealthy environment" and "to be really intentional about children having [a safe and healthy] environment so that they can grow to their maximum ability." Trial Tr. (Odean) 197:17-198:9. Her understanding is that the requirement was placed within the quality standards section of the statute because they not only "want children around the state to be able to access programming that best fits their family's needs" but also want to ensure that, once children are in a preschool setting, "they have equitable access to learning and growth." *Id.* 199:15-24. Ms. Odean explained that universal, and not targeted or limited, preschool is "important so that all [preschool-aged] children can have access to [a] high-quality environment and get to the learning outcomes that we know come from a high-quality program" and because "it also allows for families to have opportunity and options, all families." *Id.* 190:10-14.

A040

### ii.  Mixed Delivery

Mixed delivery, meaning the inclusion of school- and community-based preschool providers, is another foundational aspect of the UPK Program. *See* Colo. Rev. Stat. §§ 26.5-4-202(1)(b); 26.5-4-203(12). The UPK Statute specifically lists in the definition of "mixed delivery system" "family child care homes, child care centers, and head start agencies." *Id.* § 26.5-4-203(12). Ms. Cooke testified that the Department's "goal in the mixed delivery program was to recruit and engage providers . . . of all types, school districts, center-based, home-based, faith-based, that could provide a safe, nurturing, inclusive, nondiscriminatory environment for children." Trial Tr. (Cooke) 147:23-148:2. Through Local Coordinating Organizations ("LCOs"), the Department conducted outreach and encouraged qualified providers to participate. *Id.* 150:17-151:5. The Department also organized separate working groups with school district, Head Start, in-home family childcare, corporate, and faith-based providers. Trial Tr. (Odean) 215:10-13.

The working group for faith-based providers benefited from the participation of a diverse array of religious organizations, including the Efshar Project, an umbrella organization for Jewish preschools; Lutheran, Presbyterian, and nondenominational representatives; the Colorado Council of Churches; and the Interfaith Task Force. Trial Tr. (Cooke) 152:8-20. The faith-based working group initially met on a weekly basis and, over time, decreased their meetings to biweekly and then monthly. *Id.* 152:22-153:1. Ms. Cooke explained at the trial that faith-based providers were always "envisioned to be part of the mixed-delivery model." *Id.* 160:16-17. The Department "wanted to certainly give families every opportunity to seek a provider of their choosing, and that includes faith-based providers." *Id.* 160:19-22.

A041

### iii. Temporary Waiver of Quality Standards

Ms. Odean testified that the UPK Statute directs the Department to "ensure that families have choice through this mixed-delivery model, and that families have confidence that those are safe and healthy environments, and that they're in place not only for supervision, but so that their child can grow and begin a positive journey for learning." Trial Tr. (Odean) 197:11-16. In line with that testimony, the UPK Statute permits a temporary waiver of some of the quality standards if it is "necessary to ensure the availability of a mixed delivery system within a community." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). Under those circumstances, "the [D]epartment may allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the quality standards." *Id.* However, "each preschool provider must meet all quality standards relating to health and safety." *Id.* The Department interprets the statutory equal-opportunity requirement to be among the exempted quality standards related to health and safety. Trial Tr. (Odean) 210:10-12; Trial Tr. (Cooke) 147:21-23. The Department believes the statutory equal-opportunity requirement implicates the health and safety of preschool children. *See id.* 147:21-148:2. Its interpretation is also based on the fact that the equal-opportunity requirement is set out in the statute and not a Department-created obligation. Trial Tr. (Odean) 210:5-9.

### 2. Current UPK Program

For the 2023-24 school year, UPK providers are reimbursed by the State for at least 15 hours of preschool per eligible child they enroll. UPK Application Website at 1, Trial Ex. 22; UPK Colorado Provider Guide at 2, 21-22, Trial Ex. 24; Odean Dep. 18:15-25, Trial Ex. 26. There are roughly 1,900 preschool providers participating in the UPK Program this year. Odean

**A042**

Decl. ¶ 9, Trial Ex. 39.[6] Almost 40,000 children are enrolled in the Program, which is about 60

percent of eligible 4-year-olds in the State. Trial Tr. (Odean) 210:14-19. These numbers include

forty faith-based preschools with over 900 preschoolers in the UPK Program. *Id.* 234:8, 23-25.


   **i. Program Service Agreement**

   To participate in the UPK Program, a preschool must register in the UPK portal and sign

the Department's Program Service Agreement (the "Agreement"). Trial Tr. (Cooke) 149:4-11,

164:24-165:1; *see* Agreement, Trial Ex. 13. But there is no requirement for preschool providers

to participate in UPK Colorado. Odean Dep. 71:20-72:2, Trial. Ex. 26. Plaintiffs' claims in this

case challenge two provisions of the UPK Agreement: its incorporation of the statutory equal-

opportunity requirement and a more expansive nondiscrimination provision found in Paragraph

18(B) of Exhibit A to the Agreement. Under the heading "Quality Assurance," the Agreement

recites word for word the statutory equal-opportunity requirement. *See* Agreement at 2, Trial Ex.

13 ("Provider agrees to adhere to the quality standards identified in §26.5-4-205, C.R.S.,

[including] . . . [the r]equirement that each preschool provider provide eligible children an equal

opportunity to enroll and receive preschool services regardless of race, ethnicity, religious

affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as

such characteristics and circumstances apply to the child or the child's family."). Because this

---

[6] Plaintiffs offered for admission 13 exhibits to which Defendants did not stipulate: Exhibit Nos. 2, 3, 4, 5, 6, 7, 8, 9, 10, 23, 33, 38, and 39. I reviewed these exhibits and find Nos. 2, 5, 6, 7, 10, and 39 to be admissible and have relied on those exhibits in my Findings of Fact. The other exhibits were either not necessary or not relevant for my Findings of Fact. I note that, although Defendants objected to Exhibit No. 39—Ms. Odean's October 26, 2023 Declaration filed in this case, Defendants cited to that Declaration in their Proposed Findings of Fact and Conclusions of Law. And I specifically find that Exhibit 23—the news article that reported a quote from Colorado Governor Jared Polis—is irrelevant. His off-hand comment does not represent nor dictate the interest of the State or the Department.

A043

provision is identical to the statutory requirement, I refer to the two together as simply "the equal-opportunity requirement." Paragraph 18(B) reads: "Provider shall not . . . discriminate against any person on the basis of gender, race, ethnicity, religion, national origin, age, sexual orientation, gender identity, citizenship status, education, disability, socio-economic status, or any other identity." *Id.* at 28.

Plaintiffs claim that Paragraph 18(B) would inappropriately permit the Department to dictate the hiring decisions of faith-based providers. In pretrial filings in this case, Ms. Odean disclosed that the Department interpreted Paragraph 18(B) to permit religious organizations to make hiring decisions in accordance with federal law, and on behalf of the Department, she disavowed enforcement of Paragraph 18(B) with respect to religious providers' employment practices that were consistent with federal law. Odean Decl. ¶ 16, Trial Ex. 39. At trial, Ms. Odean testified that the Department never intended to analyze providers' employment decisions under Paragraph 18(B). Trial Tr. (Odean) 231:25-232:2. While Ms. Cooke drafted the Agreement, the exhibits to the Agreement were put together by the contracts and procurement offices for the Department of Human Services. Trial Tr. (Cooke) 148:7-12. Exhibit A—the Terms and Conditions for the UPK Program, including Paragraph 18(B), came from a template written by the Colorado Department of Human Services. Trial Tr. (Odean) 231:8-24. Ms. Odean testified that Paragraph 18(B) has been removed from the 2024-25 contract, and it will not apply to providers going forward. Trial Tr. (Odean) 232:16-22. She explained that the purpose of the Department's previous disavowal was to give assurances that, beyond licensing credentials, the Department would not have or exercise authority related to providers' hiring practices. *Id.* 232:5-15. Similarly, Ms. Odean indicated that the Department does not have any intention of interfering with the curriculum of faith-based providers. *Id.* 232:25-233:3.

**A044**

### ii. Family Enrollment

Once a preschool has registered as a participating UPK provider and has signed the Agreement, it appears in the Department's Family Search and Application portal, allowing families to apply and match with that preschool. UPK Colorado Provider Guide at 4, 23-60, Trial Ex. 24. Ordinarily, the family of an eligible child uses the portal to select up to five providers and ranks them in order of preference. Odean Decl. ¶ 9, Trial Ex. 39.[7] The child is then matched with one of the family's selected preschools. Odean Dep. 18:10-12, Trial Ex. 26. If none of the family's choices is available, the family may select additional providers for their child. Odean Decl. ¶ 9, Trial Ex. 39.

### iii. Algorithm Preferences

For the UPK portal and to match children with providers, the Department uses BridgeCare software, which was not designed specifically for the UPK Program but is customizable. Trial Tr. (Cooke) 149:5-6, 156:1-9. The software relies on a deferred acceptance algorithm for lottery matching. Trial Tr. (Odean) 212:9-11, 277:2-4. Through testing and development of the system, the Department heard from Local Coordinating Organizations, providers, and families that some important considerations were being overlooked. *Id.* 212:13-20; Odean Dep. 79:17-22, Trial Ex. 26. Consequently, the Department added to the system the option for providers to select applicable preferences that enable the matching process to take into account various unique provider characteristics. Trial Tr. (Cooke) 155:17-23; Trial Tr. (Odean)

---

[7] After the UPK Program's initial enrollment for the 2023-24 school year, the Department started allowing "direct placement," meaning families may select a participating provider by showing up at that school and being directly registered there by the Local Coordinating Organization. Odean Dep. 27:12-22, Trial. Ex. 26.

A045

217:1-9, 277:2-10. Over the course of this case, the Department has continued to evaluate and refine these preferences.

The following preferences are listed in the UPK Colorado Provider Guide as "exception criteria" that providers were able to select for the 2023-24 school year:

☐ I am a faith-based provider and may require families to be a part of my congregation.

☐ I am a co-op and will require family participation as a part of my programming.

☐ I am an immersive or dual language provider and children may need to be screened to participate in my program.

☐ I am a school district provider and will require families to live in my school district or boundary AND/OR I support children with Individualized Education Plans (IEP).

☐ I am a Head Start grantee and families may need to meet additional factors to enroll with me.

☐ I am a provider that prioritizes placement for the children of my employees.

UPK Colorado Provider Guide at 37, Trial Ex. 24. As the Department went through the rulemaking process for the UPK Program, it filled in the details and recognized additional preferences. *See, e.g.*, Proposed Rules at 6, Trial Ex. 21.

Ultimately, the Department's final rules for the UPK Program permit providers to "utilize the following programmatic preferences to the deferred acceptance algorithm component of the matching process:

1. Faith-based providers granting preference to members of their congregation;

2. Cooperative preschool providers requiring participation in the cooperative;

3. School districts maintaining enrollment consistent with their established boundaries;

**A046**

4.  Participating preschool providers reserving placements for a student(s) with an Individualized Education Program (IEP) to ensure conformity with obligations incurred pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. section 1400 (2004), or the Exceptional Children's Education Act, Article 20 of Title 22, C.R.S.;

5.  Head Start programs' adhering to any applicable federal law requirements including eligibility requirements;

6.  Participating preschool providers granting preference to an eligible child of one (1) of their employees;

7.  Participating preschool providers granting preference to an eligible child to ensure continuity-of-care for that child;

8.  Participating preschool providers granting preference to an eligible child to keep siblings similarly located; [and]

9.  Participating preschool providers granting preference to an eligible child who is multilingual, to ensure proper delivery of services to that child.

10. Participating preschool providers may grant preference to an eligible child based: on the child and/or family being a part of a specific community; having specific competencies or interests; having a specific relationship to the provider, provider's employees, students, or their families; receiving specific public assistance benefits; or participating in a specific activity. Participating preschool providers seeking to utilize this preference, must ensure:

    a.  That the specific community, competencies or interests, relationship, public assistance benefit, or activity being required of children and/or families who attend, is a requirement of all participating children and/or families.

    b.  That implementation of requiring the specific community, competencies or interests, relationship, public assistance benefit, or activity does not conflict with any other provision of the Colorado Universal Preschool Program statutes at sections 26.5-4-201 through 26.5-4-211, C.R.S., nor with any other applicable law or regulation.

    c.  Examples of approved preferences include, but are not limited to: participating preschool providers who require a focus in a certain knowledge area (such as science, technology, engineering, and math ("STEM")); providers who serve families with a family member who works or attends school at a specific site(s) or location(s); providers who serve families within a specific geographical catchment area; providers who require a certain amount of volunteering or participation by the participating family; providers who require certain vaccinations for the health and safety of its staff and

15

**A047**

students; and providers who serve families who are receiving a specific public assistance benefit(s) such as housing assistance."

8 Colo. Code Reg. 1404-1:4.110. The final rules specify that, "[i]n utilizing these programmatic preferences, eligible preschool providers must still comply with" the equal-opportunity requirement. *Id.* 1404-1:4.110(B).

While using the UPK portal, a family can either see what preferences providers have or will be asked questions to determine if the family qualifies for a particular provider, considering any applicable preference. Trial Tr. (Odean) 263:20-22; Trial Tr. (Cooke) 167:11-168:2. If a provider has selected a preference and a child who does not fit that preference is matched to that provider, the provider may decline the match. *Id.* 156:19-157:2. When a provider declines a match, the Department reviews that decision to make sure it was accurate for the provider to exercise it. *Id.* 157:3-6. Of the approximately 1,900 UPK providers, the Department has permitted 1,091 preschools to select at least one preference. Trial Tr. (Odean) 255:19-25.

The so-called "congregation preference" allowed by the Department is particularly relevant to Plaintiffs' claims. The Department created the congregation preference in response to conversations with providers, bill sponsors, and community members who questioned whether members of a church family might lose their seats based on the algorithm. Trial Tr. (Cooke) 154:21-25, 157:17-24. Ms. Cooke testified that she shared the development of the congregation preference with the faith-based working group when members of that group raised concerns about the inclusion of sexual orientation in the equal-opportunity requirement. *Id.* 154:19-155:5. The congregation preference permits faith-based providers to reserve for members of their church community all or a portion of the seats for which they are licensed. *Id.* 157:3-10; *see also* Odean Decl. ¶ 8, Trial Ex. 39. The Department considers a provider to be faith-based for the purposes of the congregation preference from the provider's self-identification alone. Trial Tr.

**A048**

(Odean) 275:23-276:6. The Department has intended to use the word "congregation" as expansively as possible so that faith-based providers could define their own community. *Id.*; *see also* 8 Colo. Code Reg. 8 Colo. Code Reg. 1404-1:4.103(L) (defining "congregation" in the final rules for the UPK Program as "members of the community that the faith-based provider serves as the faith-based provider defines that community").

Testimony at trial established that providers who select the congregation preference may designate seats for preschoolers from families that adhere to a specific faith and may decline children from other families. For example, Ms. Odean testified that a Catholic provider could reserve seats for Catholics, and a Lutheran provider could reserve seats for Lutherans. Trial Tr. (Odean) 239:18-22. Similarly, she indicated that a Catholic provider could limit its seats to members of its congregation only and would not have to provide an opportunity to enroll Lutherans. *Id.* 239:23-240:1. Ms. Odean insisted, however, that no faith-based provider is allowed to discriminate on the basis of religion or religious affiliation, and if the Department learned that a provider was utilizing the congregation preference in a discriminatory way, it would investigate. *Id.* 276:7-9, 16-19. The Department does not consider the congregation preference to act as a workaround for the equal-opportunity requirement because the preference is intended to support inclusive community and "ensure that providers can continue to serve the communities that they have served, and families can continue to participate." *Id.* 276:10-15.

Plaintiffs also highlight as pertinent to their claims the algorithm preferences involving Head Start programs and children with Individualized Education Programs ("IEPs"). Head Start programs prioritize low-income families and are permitted to participate in the UPK program. Trial Tr. (Odean) 237:14-238:5; *see also* Trial Tr. (Cooke) 171:7-10. It was intentionally written into the UPK Statute that Head Start providers be "prioritized as participants and that the

children they serve [be] prioritized as participants." Trial Tr. (Odean) 221:16-18. The algorithm

preference involving children with IEPs applies only to school districts and their contracted

partners and allows them to place children with specific special needs in a particular classroom

consistent with the child's IEP. Trial Tr. (Cooke) 171:11-172:3; Trial Tr. (Odean) 219:24-220:1.

The preference was created because it was highlighted in the UPK Statute as a priority. *Id.*

219:18-20. The Department heard from school district providers and the Colorado Department of

Education that it was critical for them to be able to participate and satisfy their obligation under

the federal mandate associated with the Individuals with Disabilities Education Act, and not

every preschool setting can accommodate children with various special needs. *Id.* (Odean) 219:8-

23; Trial Tr. (Cooke) 171:14-17.

The tenth preference included in the final rules promulgated by the Department permits

participating providers to prioritize a child based on "the child and/or family being a part of a

specific community" or "having specific competencies or interests." 8 Colo. Code Reg. 1404-

1:4.110. Considering that preference, Ms. Odean initially testified that a participating school

could be just for "gender-nonconforming children," could prioritize "children of color from

historically underserved areas," or could grant preference to a child based on the child or family

being part of the LGBTQ[8] community. Trial Tr. (Odean) 244:15-25, 245:25-246:8. Ms. Odean

attempted to qualify her responses by explaining that the equal-opportunity requirement takes

precedence and there would need to be a conversation about the appropriateness of such

preferences. *Id.* 245:3-10, 19-24. She later clarified that, upon receiving such a request from a

provider, she would have a conversation with the leadership team, and likely the attorneys, to

---

[8] LGBTQ is an acronym for lesbian, gay, bisexual, transgender, and queer (or questioning).
Throughout this Order, I also use the term LGBTQ+ to refer to all individuals who identify as
part of that community.

A050

determine what the next steps would be, but they would not allow a provider to utilize a preference to violate the law. *Id.* 278:2-8, 279:18-280:5.

Ms. Cooke testified that the algorithm preferences the Department created "were meant to really identify and acknowledge certain relationships . . . that existed between the provider and the community the provider served or families the provider served" and were designed to protect "the seats in a particular provider setting from the unintended consequences of [the] computer algorithm which manage[s] matching." Trial Tr. (Cooke) 153:22-25, 154:9-12. Ms. Odean acknowledged that, because of the variety of programming and settings providers offer in the mixed-delivery program, it would be "really difficult" for providers to be able to participate if they had to accept every child who could be matched to them. Trial Tr. (Odean) 214:7-17. Despite the Department's implementation of the algorithm preferences, though, Ms. Cooke, Ms. Odean, and Dr. Roy have been unwavering in their assertions that the Department cannot permit a participating provider to violate the equal-opportunity requirement. *See, e.g.*, Trial Tr. (Cooke) 160:4-8; Trial Tr. (Odean) 206:22-207:6, 210:5-9, 268:21-24; Roy Dep. 23:10-15, Trial Ex. 27.

### iv.  Individual Provider Preferences

In addition to the defined algorithm preferences, the Department allows providers to request other individual preferences through an online form.[9] Trial Tr. (Odean) 256:1-14; UPK Individual Preference Form at 2, Trial Ex. 31. The form provides as examples[10] of individual

---

[9] In their filings, Plaintiffs addressed these individual preferences as a separate type of "exception" permitted by the Department, and I do the same in this Order. However, the tenth preference included in the final rules subsumes these individualized requests into one of the Department's defined categories of algorithm preferences. *See* Trial Tr. (Odean) 228:22-229:2.
[10] The form uses "i.e." before its "teen moms" example. UPK Individual Preference Form at 2, Trial Ex. 31. In context, I believe "e.g." is intended.

A051

preferences that may be permitted: "My location only serves teen moms enrolled at a neighboring high school; [and] My location only serves children with specific disabilities." *Id.* The Department has granted many individual preferences, including requests to admit only "fully vaccinated children" and to prioritize subdivision residents. UPK Individual Preference Response Data at 82-83, Trial Ex. 34; Trial Tr. (Odean) 257:9-23. The process for individual preferences was created in response to input from providers with circumstances that had not been considered, and the preferences were permitted "to honor mixed delivery and family choice and be inclusive of [different types of] communities." *Id.* 229:4-20.

## B. Plaintiffs

As identified above, the plaintiffs in this case are St. Mary Catholic Parish in Littleton ("St. Mary's"), St. Bernadette Catholic Parish in Lakewood ("St. Bernadette's"), and Daniel and Lisa Sheley. St. Mary's and St. Bernadette's operate Catholic schools—St. Mary's Catholic School and Wellspring Catholic Academy—that include preschools ("Plaintiff Preschools"). At the trial, Plaintiffs presented testimony from Tracy Seul, the Director of Preschool and Development for St. Mary's; Avery Coats, Principal and Head of School for Wellspring Catholic Academy; Abriana Chilelli, the Acting Superintendent of Catholic Schools for the Archdiocese of Denver (the "Archdiocese"); and Ms. Sheley.

### 1. Plaintiff Preschools

### i. Operation and Religious Doctrine

Plaintiff Preschools are subject to the religious authority of the Archdiocese and are overseen by its Office of Catholic Schools. Trial Tr. (Seul) 73:13-15; Trial Tr. (Coats) 105:9-12;

A052

Trial Tr. (Chilelli) 36:24-37:5. In total, the Archdiocese oversees 36 Catholic preschools,

including Catholic Charities preschools that currently participate in the UPK Program. Trial Tr.

(Chilelli) 37:1, 65:18-19, 67:21-22; Trial Tr. (Odean) 234:9-13, 235:1-4. The mission of the

Archdiocese's schools is to be "'sanctuaries of education' supporting parents and empowering

families to lead their children to encounter and be rescued by Jesus Christ and have abundant

life, here on earth and in heaven, for the glory of the Father." Mission and Charter of Catholic

Schools at 1, Trial Ex. 3; Trial Tr. (Chilelli) 40:24-41:20. Ms. Chilelli, from the Archdiocese's

Office of Catholic Schools, clarified that this mission is viewed as "serv[ing] the family [and] . . .

parents in their duties as primary educators or principal educators of their children." Trial Tr.

(Chilelli) 55:15-18. She explained that, for schools to fulfill their mission, parents must therefore

understand that mission and "desire to teach it within their family, to promote it, to defend it, and

[to] have their children formed in . . . a Catholic worldview." *Id.* at 55:21-25; *see also* Trial Tr.

(Seul) 78:18-21, 82:15-17; Trial Tr. (Coats) 116:14-18. Ms. Chilelli further testified that, with

their focus on serving parents, the schools "would never want to . . . cause conflict with what the

parents are teaching in their home" as it would create confusion for the child and the family.

Trial Tr. (Chilelli) 51:13-20; see also Trial Tr. (Seul) 79:9-10; Trial Tr. (Coats) 126:2-5.

Consistent with that perspective, parents of children enrolling in the Archdiocese's

schools  are required to sign the Statement of Community Beliefs "so that it's abundantly clear

what the Catholic school will teach and what the Catholic school community believes." Trial Tr.

(Chilelli) 44:18-23; *see also* Statement of Community Beliefs at 7-8, Trial Ex. 2; Trial Tr. (Seul)

79:11-24; Trial Tr. (Coats) 111:12-112:12. The Statement of Community Beliefs for parents and

guardians of students informs:

> For our school to properly support you as the primary educators of your children
> and partner with you in the formation and education of your children, all Catholic

> school families must understand and display a positive and supportive attitude
> toward the Catholic Church, her teachings, her work, and the mission of the
> Catholic school. . . . [F]amilies must refrain from public promotion or approval of
> any conduct or lifestyle that would discredit, disgrace, or bring scandal to the
> School, and the Church in the Archdiocese of Denver, or be considered a counter-
> witness to Catholic doctrine or morals.

Statement of Community Beliefs at 8, Trial Ex. 2. Even baptized Catholics are required to sign

the Statement of Community Beliefs to enroll a child at an Archdiocesan preschool, and some

may not desire to sign the Statement. Trial Tr. (Chilelli) 68:13-22.

The Archdiocese's oversight of its schools "includes standard operating procedures . . .

and adherence to Catholic faith [and] morals [and] the building up of Catholic culture within the

school, all ordered towards the formation of the human person, the student, [and] all in service to

the family." *Id.* 38:4-11. The Archbishop of the Archdiocese "promulgates policies, directives,

[and] guidance" that "are expected to be implemented at the school level." *Id.* 37:22-38:1.

Particularly relevant to this case, the Archdiocese has produced guidance on sexual

orientation and gender identity. In a document titled the *Splendor of the Human Person: A

Catholic Vision of the Person and Sexuality*, the Archbishop provided a "basic outline for

addressing issues of the human person, sexuality and gender for use within parishes and schools

in the Archdiocese of Denver." Splendor of the Human Person at 5, Trial Ex. 7; Trial Tr.

(Chilelli) 48:20-49:5. The document explains that "[i]t is essential that Catholics, particularly

those working for the Church in parishes and schools, as well as the young people to whom the

Church ministers in [its] parishes and schools, receive formation in the Church's teaching on the

human person and sexuality." Splendor of the Human Person at 6, Trial Ex. 7. In pertinent part,

the document states: "Sexual identity, embodiment as either a man or a woman is a gift that is

given to us from the moment of creation." *Id.* at 7. It reasons that "same-sex relationships,

A054

including those in which one partner identifies as transgender, distort the truth and meaning of sexual identity by suggesting that mothers and fathers are interchangeable." *Id.* at 8.

The Office of Catholic Schools has also provided concrete direction for schools in the document *Guidance for Issues Concerning the Human Person and Sexual Identity*. Guidance on the Human Person and Sexual Identity, Trial Ex. 5; Trial Tr. (Chilelli) 49:6-18. The document instructs Archdiocesan schools to use pronouns that correspond with biological sex, to enforce their dress code that corresponds with an individual's biological sex, and to make changing and bathroom facilities available only as they correspond with an individual's biological sex. Guidance on the Human Person and Sexual Identity at 2, 9-12, Trial Ex. 5. Additionally, the document advises that enrolling a child of a same-sex couple "is likely to lead to intractable conflicts. *Id.* at 16. And it warns that "[a] Catholic school cannot treat a same-sex couple as a family equivalent to the natural family without compromising its mission and Catholic identity and causing confusion about the nature of marriage for all students enrolled." *Id.* (emphasis removed). If a family is seeking to enroll their child in an Archdiocesan school and there is a conflict between what the school teaches and what same-sex parents are teaching their child regarding human sexuality or parents of a transgender child are teaching their child regarding "the body's biological reality" and identity, then "out of abundant respect for the family and the child," school leaders are not to enroll the student. Trial Tr. (Chilelli) 50:18-53:2. If a child who is a student at one of the Archdiocesan schools "begins asserting an identity that's at odds with his or her biological sex," school leaders are to explain that the school is unable to make accommodations relating to dress, pronoun use, and bathroom access. *Id.* 53:10-54:12. In that circumstance, if the parents decide "they would like those accommodations or they would like their child's identity that they're sharing with us to be affirmed," the school is to "explain that

A055

maintaining the relationship with the family with the child's enrollment would not be possible." *Id.* 54:13-20. Plaintiff Preschools are expected to and do follow this guidance. Trial Tr. (Chilelli) 54: 21-23; Trial Tr. (Seul) 80:6-15; Trial Tr. (Coats) 112:20-114:13. In fact, last year, Wellspring Catholic Academy declined to enroll a fifth grader with same-sex parents. *Id.* 113:5-114:13, 125:25-126:10.

In making general admissions decisions, Plaintiff Preschools prioritize siblings of current students, parishioners of their own parish, and Catholic families affiliated with other parishes. Trial Tr. (Seul) 81:8-17; Tr. (Day 1, Coats) 115:17-116:20. A "parishioner," as defined by the Archdiocese, is any Catholic living within the geographic boundaries of a particular parish; the individual does not have to be formally enrolled at the parish. Trial Tr. (Chilelli) 67:9-15. Plaintiff Preschools are obligated to serve their parishioners first because they are a ministry of their parishes. Trial Tr. (Seul) 81:18-20; Trial Tr. (Coats) 116:1-3. Ms. Seul of St. Mary's testified that the school must then prioritize providing a Catholic education for Catholic parents who want that for their children. Trial Tr. (Seul) 81:20-22. And Ms. Coats from Wellspring Catholic Academy clarified that Catholic families are prioritized because they "share a foundational mission in life." Trial Tr. (Coats) 116:3-5. Archdiocesan preschools also enroll students of non-Catholic families as an act of evangelization. Trial Tr. (Chilelli) 68:4-11.

### ii. Potential Conflicts with the UPK Requirements and Request for Accommodation

The equal-opportunity requirement demands that participating preschools "provide eligible children an equal opportunity to enroll and receive preschool services regardless of . . . religious affiliation, sexual orientation, [or] gender identity . . . , as such characteristics and circumstances apply to the child or the child's family." Agreement at 2, Trial Ex. 13; Colo. Rev.

24

Stat. § 26.5-4-205(2)(b). Plaintiffs Preschools contend this requirement prevents them from making enrollment decisions in accordance with their religious beliefs, as it prohibits them from preferencing Catholic families in enrollment and from considering whether a child or family is supportive of the Catholic Church's teachings, in particular its teachings on human sexuality.

Considering these potential conflicts, the Archdiocese determined its schools should not participate in the UPK Program until religious exemptions can be guaranteed and the Archdiocese could "have the confidence that [its] parishes and schools [would] not be placed into a compromising situation that jeopardizes [their] Catholic mission." Dollins Email at 2, Trial Ex. 10. The Archdiocese believed that, if its schools participated in the UPK Program, it "would be in non-compliance for upholding Church teaching in [its] employment and admission practices and programs." *Id.* And it warned that participation "would be to cooperate with an ideology and agenda contrary to [its] beliefs on the human person, which would ultimately compromise the integrity of [its] Catholic schools' mission." *Id.* The Archdiocese directed its parishes and their preschool programs not to enter into any agreements with the State related to the UPK Program. *Id.*; Trial Tr. (Chilelli) 56:8-10, 57:1-5; Trial Tr. (Seul) 90:2-15; Trial Tr. (Coats) 120:23-121:8. As a result, neither of the Plaintiff Preschools participates in UPK Colorado. Trial Tr. (Seul) 89:25-90:7; Trial Tr. (Coats) 120:12-13, 120:23-121:1.

Citing the potential conflicts between school policies and the equal-opportunity requirement, the Archdiocese, along with a coalition of religious preschool providers, sent a letter to the Governor of Colorado in February 2023. Trial Tr. (Chilelli) 59:1-4. The letter asserted that "providing exemptions for faith-based religious providers from aspects of the UPK Program that those providers believe run counter to their sincerely held beliefs will maintain the legal and constitutional integrity of the program while enhancing the number and variety of

A057

preschools from which Colorado parents can choose." Coalition Letter at 2, Trial Ex. 11. Dr.
Roy, the Department's Executive Director, responded to the letter, stating that she lacked "the
authority to create an exemption that excludes faith-based providers from the statute." Roy Letter
at 1, Trial Ex. 12. She advised that faith-based providers participating in the Program may give
preference to members of their congregation, explaining that they could "reserve all or a portion
of their seats for their members, and [could] decline a match from a family that is not part of the
congregation." *Id.* at 2. The Archdiocese did not regard the congregation exception permitted by
the Department as a sufficient accommodation because of how the Archdiocese defines and
prioritizes parishioners and because all families—Catholic and non-Catholic—enrolling students
in Archdiocesan preschools must sign the Statement of Community Beliefs. Trial Tr. (Chilelli)
67:2-69:2.

Pursuing another route for its schools to participate in the UPK Program, the Archdiocese
advised its interested schools to sign up as providers but send back the Agreement unsigned with
a letter explaining why they were unable to sign it. Trial Tr. (Chilelli) 59:9-15; Trial Tr. (Seul)
95:25-96:5; Trial Tr. (Coats) 121:12-16. The Department did not respond to this effort to
participate. Trial Tr. (Chilelli) 59:21-60:3.

### iii. Participation in Other Preschool Programs

Plaintiff Preschools have signed agreements for other government-funded, tuition-
assistance programs, including the Denver Preschool Program and the Colorado Child Care
Assistance Program ("CCCAP"). Trial Tr. (Chilelli) 60:25-61:4; Trial Tr. (Seul) 88:3-4; Trial Tr.
(Coats) 117:1-20. Elisa Holguín, the President and CEO of the Denver Preschool Program, and

**A058**

Jesse Burne, who oversees CCCAP as the Division Director for Early Learning Access and

Quality at the Department, testified at the trial about those programs and their requirements.

The Denver Preschool Program provides tuition support for children in Denver to attend

preschool. Trial Tr. (Holguín) 422:21-23. The Program requires providers to complete an

application to participate in the program. *Id.* 424:2-3, 433:5-11. The Provider Agreement for the

2022-23 school year, which Wellspring Catholic Academy signed, prohibits providers from

"discriminat[ing] against any person on the basis of race, color, religion, national origin, gender,

age (except as to the age of children qualifying for Tuition Credits), military status, sexual

orientation, gender variance, marital status, or physical or mental disability (except as such

disability may materially and adversely affect proper administration of the preschool program)."

2022-23 DPP Renewal Agreement at 26, Trial Ex. 43. The application also has language reading:

"Nothing in this agreement shall be construed to affect the Provider's right to engage in privately

funded, inherently religious activity or affect the independence of Providers, including any rights

protected by the Colorado and U.S. Constitutions and applicable law." *Id.* at 16. Ms. Holguín

testified that this latter language does not exempt a program from complying with the

nondiscrimination requirement and does not allow a faith-based provider to refuse to enroll an

LGBTQ child or to discriminate against LGBTQ families. Trial Tr. (Holguín) 439:1-3; 440:1-7.

CCCAP supports low-income children and families in Colorado by offsetting the cost of

child care. Trial Tr. (Burne) 399:14-16. The Program provides assistance for children from birth

through age 13. *Id.* 399:18-19. To participate in CCCAP, a provider must sign a fiscal agreement

with the local county. *Id.* 401:4-17. On August 24, 2023, Ms. Seul, on behalf of St. Mary's,

signed a CCCAP fiscal agreement with the Jefferson County Human Services Department that is

effective until July 2026. *Id.* 403:12-404:2, 404:10-12. The fiscal agreement requires providers to

A059

"[a]ccept referrals for child care without discrimination with regard to race, color, national origin, age, sex, religion, marital status, sexual orientation or physical, intellectual or mental health disability." 2023 CCCAP Fiscal Agreement at 5, Trial Ex. 42. Mr. Burne testified that CCCAP interprets that provision to mean that a provider is not allowed to discriminate against a child or a family in accepting referrals of children to their program. Trial Tr. (Burne) 404:25-405:2. According to Mr. Burne, CCCAP is based on a family's choice, and if a family chooses a registered CCCAP provider, that provider must accept the family without discrimination. *Id.* 406:8-15.

I previously found, in evaluating whether Plaintiff Preschools' alleged injury was sufficient to meet the requirements for standing, that it was not inconsistent for Plaintiff Preschools to simultaneously believe that the UPK Program requirements conflict with their beliefs but that those of the Denver Preschool Program and the CCCAP provision do not. Order on Defs.' Mot. to Dismiss, Pls.' Mot. for Summ. J., and Pls' Mot. to Exclude ("Order in Preparation for Trial") at 16-17, ECF No. 99. This ruling did not determine how the Denver Preschool Program and CCCAP agreements should be interpreted. It merely concluded that Plaintiff Preschools were not prevented from bringing this suit because they had signed the other agreements.

### iv. Harm Experienced by Plaintiff Preschools

The evidence at trial established that Plaintiff Preschools have experienced harm from not participating in the UPK Program. Most definitively, Plaintiff Preschools have not received bonuses given to providers participating in the UPK Program. Trial Tr. (Seul) 91:12-17; Trial Tr. (Coats) 121:19-22. Ms. Seul testified that St. Mary's lack of participation also affected the

**A060**

preschools' ability to recruit families and compete with preschools participating in the Program. Trial Tr. (Seul) 90:23-91:11. Ms. Seul and Ms. Coats had prospective families ask if Plaintiff Preschools are participating in the UPK Program, and Ms. Seul reported that a lot of families did not complete the enrollment process after finding out the preschool was not participating. *Id.* 91:22-92:5; Trial Tr. (Coats) 121:23-122:1, 122:10-12. If the Archdiocese confirmed that participating in the UPK Program was consistent with Catholic teaching, Plaintiff Preschools would immediately seek to participate in the Program. Trial Tr. (Seul) 92:22-25; Trial Tr. (Coats) 122:13-16.

### 2. Plaintiff Parents

Plaintiffs Daniel and Lisa Sheley are parishioners of St. Mary's. Trial Tr. (Sheley) 98:4-8. They have a four-year-old and a three-year-old enrolled at St. Mary's preschool, as well as a one-year-old they plan to send to St. Mary's once she is old enough. *Id.* 98:4-8, 98:13-20, 99:4-6, 99:10-14. The Sheleys believe that it is their "directive as Catholics" to provide a Catholic education for their children. *Id.* 98:25-99:3, 100:3-7. Because they send their four-year-old to St. Mary's, the Sheleys do not benefit from the UPK Program and are missing out on approximately $4,700 in tuition assistance for the 2023-24 school year. *Id.* at 100:10-101:3.

### 3. Plaintiffs' Claims

In their Amended Complaint, Plaintiffs assert seven claims that are as-applied constitutional challenges to Defendants' implementation of the equal-opportunity requirement. The first, fourth, and fifth claims are brought by Plaintiff Preschools and the Sheleys under the Free Exercise Clause of the First Amendment. The first claim alleges that the equal-opportunity

**A061**

requirement and Paragraph 18(B) of the UPK Agreement disqualify Plaintiff Preschools from the UPK Program based on the schools' religious character and exercise. Plaintiffs' fourth claim asserts that the Department's "discretionary exemptions" to the equal-opportunity requirement— what I refer to as the individual provider preferences—confirm the Department has the discretion to grant exemptions and demonstrate that its policies are not generally applicable. Plaintiffs' fifth claim contends that the Department's "categorical exemptions"—what I call the algorithm preferences—prevent the equal-opportunity requirement from being neutral or generally applicable. Based on those arguments, Plaintiffs' fourth and fifth claims contend the equal-opportunity requirement is unconstitutional because it cannot be justified under strict scrutiny. The second and third claims are brought by Plaintiff Preschools and allege Paragraph 18(B) of the UPK Agreement violates the ministerial exception (Claim Two) and the church autonomy doctrine (Claim Three), which originate from the Free Exercise Clause. With the sixth claim, Plaintiff Preschools assert that the at-issue provisions of the UPK Agreement infringe their rights guaranteed by the Free Speech Clause of the First Amendment. Lastly, the seventh claim is brought by Plaintiff Preschools under the Establishment Clause of the First Amendment, alleging the Department's creation of the congregation preference has resulted in unlawful denominational favoritism.

Plaintiffs seek declaratory judgment, declaring that "exclusion of the preschools at Plaintiffs St. Mary Catholic Parish in Littleton and St. Bernadette Catholic Parish in Lakewood from Colorado's Universal Preschool Program on account of their sincere religious exercise, including: (i) prioritizing Catholic students and families in admissions decisions; (ii) requiring employees to adhere to and support the schools' religious beliefs, including on marriage and sexuality; (iii) considering for purposes of student admission or retention whether a family or

A062

child adheres to and supports the schools' religious beliefs, including on marriage and sexuality; and (iv) operating their schools in accordance with their religious beliefs, violates the First Amendment to the United States Constitution." Pls.' Proposed Findings of Fact and Conclusions of Law ("FOFCOL") at 69.

Plaintiffs also contend they are entitled to permanent injunctive relief prohibiting "Defendants Lisa Roy and Dawn Odean from conditioning participation in the Colorado Universal Preschool Program, Colo. Rev. Stat. §§ 26.5-4-201, et seq., by Plaintiffs St. Mary Catholic Parish in Littleton, St. Bernadette Catholic Parish in Lakewood, Daniel Sheley, and Lisa Sheley on their:

i.   agreeing to provide, or providing, eligible children an equal opportunity to enroll and receive preschool services regardless of religious affiliation, sexual orientation, or gender identity;

ii.  agreeing not to discriminate against any person on the basis of religion, sexual orientation, or gender identity; or

iii. otherwise agreeing to violate, or violating, their religious beliefs, character, and exercise, including:

    a.   prioritizing Catholic students and families in admissions decisions;

    b.   requiring employees to adhere to and support the schools' religious beliefs, including on marriage and sexuality;

    c.   considering for purposes of student admission or retention whether a family or child adheres to and supports the schools' religious beliefs, including on marriage and sexuality; and

    d.   maintaining operational policies in accordance with their religious beliefs on marriage and sexuality, including with respect to dress codes, pronoun usage, and restroom usage.

*Id.* at 69-70. Plaintiffs further request an order requiring "that Defendants immediately permit Plaintiffs St. Mary Catholic Parish in Littleton, St. Bernadette Catholic Parish in Lakewood, Daniel Sheley, and Lisa Sheley to begin participating in UPK Colorado, including for the 2023-

24 school year, notwithstanding their sincere religious exercise described above." *Id.* at 70.

Additionally, Plaintiffs claim $1 in nominal damages. Am. Compl. at 36, ECF No. 30.

A brief was filed by the Jewish Coalition for Religious Liberty, the Rocky Mountain District Lutheran Church Missouri Synod, and the Colorado Association of Private Schools, as amici curiae. *See* Br. of Amici Curiae, ECF No. 71-1. Amici support the relief sought by Plaintiffs and advocate for "permitting religious preschools to freely participate in the [UPK] Program." *Id.* at 19.

### C.  Expert Testimony

Defendants presented the testimony of expert witnesses at trial to establish the State's interest in enacting and enforcing the equal-opportunity requirement. Defendants offer two State interests they contend are compelling: (1) ensuring eligible children and their families do not face discriminatory barriers to publicly funded preschool and (2) protecting children from discrimination, i.e., "ensuring that, once enrolled, they receive publicly-funded [sic] preschool services that are safe, healthy, and free from discrimination." Defs.' Resp. to Mot. for Summ. J. at 22, ECF No. 77; Defs.' Proposed FOFCOL at 50. Ms. Holguín from the Denver Preschool Program provided testimony on the importance and impact of preschool. Dr. Abbie Goldberg, a clinical psychologist and psychology professor, testified as an expert about families with

LGBTQ+ parents. And Dr. Amy Tishelman, a clinical and research psychologist, provided her

opinions as an expert on variations in sex traits[11] and gender diverse and transgender[12] children.

### 1. Elsa Holguín[13]

Ms. Holguín testified that "[p]reschool is very important to ensure that children have

equal access and equal support to be ready to access school, to be ready for school, but also to be

ready for life." Trial Tr. (Holguín) 427:12-14. In terms of school readiness, she explained that it

includes "readiness for math, readiness for learning, readiness for reading," and also being

"emotionally ready to perform in the classrooms." *Id.* 431:16-21. Children who attend preschool

"are less likely to repeat a grade," "more likely to graduate," and "more likely to access college

or higher education." *Id.* 430:4-10. Attending preschool "has a multiplying effect, and . . . the

children of the children [who] attend preschool are also benefiting." *Id.* 430:11-15. Ultimately,

preschool "is a key element for children to be able to succeed, and an equalizer for many

children [who] don't have the opportunity to be in a place where they can acquire those skills."

---

[11] Variations in sex characteristics or sex traits are "congenital biological conditions whereby there's an atypicality in reproductive or sex anatomical or hormonal expressions." Trial Tr. (Tishelman) 336:12-14.

[12] "[T]ransgender' is an umbrella term to refer to somebody whose gender identity differs from what their gender identity was assumed to be at birth." Trial Tr. (Tichelman) 336:24-337:1. "'[G]ender diversity' is a broader term . . . [t]hat can refer to diverse gender expressions that maybe aren't expected in [a] particular community, and not necessarily gender identity differences.'" *Id.* 337:1-4.

[13] Plaintiffs challenged Defendants' designation of Ms. Holguín as a non-retained expert on the ground that her testimony should relate only to facts and not her opinions. *See* Pls.' Motion to Exclude at 6, ECF No. 73. I denied that Motion but advised that Plaintiffs may object to a particular opinion provided by a witness during the trial. *See* Order in Preparation for Trial at 31. Other than the testimony summarized here, Ms. Holguín's testimony was limited to the facts as she experienced them. Plaintiffs did not object to this background information on the importance of preschool, and I find Ms. Holguín is qualified to provide these opinions, they are reliable, and they satisfy Federal Rule of Evidence 702.

*Id.* 430:15-18. Ms. Holguín made clear that, to achieve these "quality" results, the providers must also be of quality. *Id.* 449:6-9.

In contrast, not having access to quality early childhood education, "impacts the children's readiness to succeed." *Id.* 430:22-23. Ms. Holguín testified:

> [F]or many children, it's detrimental in that . . . they are held behind, more likely to be in special education, and less likely to succeed academically and socially and emotionally as well. So, the impact is profound, particularly for some of our communities that don't have access to those resources.

*Id.* 430:25-431:5.

### 2.  Dr. Goldberg

Dr. Goldberg is a clinical psychologist and psychology professor at Clark University in Massachusetts, where she is the Director of Women's and Gender Studies. Goldberg Report at 1, Trial Ex. 45. One of her areas of expertise and research is LGBTQ+ parent families, and she is the author of over 150 peer-reviewed articles, 25 book chapters, and four books. *Id.* at 2.

According to Dr. Goldberg, "LGBT[14] parents are about twice as likely to live in poverty as compared to heterosexual cisgender parents." Trial Tr. (Goldberg) 287:15-17. Poverty may affect the reliability of parents' transportation or may require them to use public transportation, and consequently, transportation will often be a factor they consider when looking for an early childhood program. *Id.* 324:4-17. There is also "a disproportionate number of LGBTQ parents parenting in rural areas, meaning when you look at same-sex couples in rural areas, a greater percentage of them will be parents than . . . in urban areas." *Id.* 287:4-9. In rural areas, there are

---

[14] Dr. Goldberg used the term LGBT, but she clarified that she did not intend to exclude queer individuals and was using the term with "an implicit asterisk or plus sign." Trial Tr. (Goldberg) 294:23-295:6.

A066

fewer early childhood education environments, and they are more spread out. *Id.* 325:3-8. For those reasons, LGBTQ+ families often have fewer options when looking for early childhood education. *Id.* 287:19-25, 289:21-23, 324:25-325:2. For LGBTQ+ parents in rural environments, sometimes the only option available for early childhood education is a religious provider. *Id.* 325:9-14. "[I]f there is a group that is more likely to live in poverty and more likely to have fewer options in terms of preschools and accessible early childhood education, . . . those families may be at risk for . . . inadequate . . . outcomes . . . ." *Id.* 288:10-14.

Children are impacted by the environments they spend the most time in, which usually includes school. *Id.* 296:5-7, 297:1-4. If a child "is being implicitly or explicitly told that there is something wrong with them or their family, this can create negative self-views." *Id.* 297:11-13. The struggles faced by youth who are raised by LGBTQ+ parents stem not from their parents' sexual orientation or gender identity but from other people's perceptions or reactions to their families. *Id.* 299:2-9. Likewise, "if a child is getting messages that their identity or presentation is non-normative, not accepted, [or] equated with negative qualities or attributes, they will internalize those qualities as applying to themselves." *Id.* 297:17-20.

### 3. Dr. Tishelman

Dr. Tishelman is a clinical and research psychologist and currently a Research Associate Professor at Boston College in Massachusetts. Tishelman Report at 1, Trial Ex. 47. She has received funding from the National Institutes of Health for her research, which has focused on gender diverse and transgender youth. *Id.* at 2. She has developed best practices for caring for and assessing gender diverse prepubescent children and has served as an expert witness approximately 40 times. *Id.* at 2-4.

Dr. Tishelman provided testimony on early life adversities and adverse childhood experiences, known as "ACEs." Trial Tr. (Tishelman) 339:19-21, 346:15. "Early life adversities can be child maltreatment" and "can also constitute other kinds of stressors." *Id.* 340:5-10. In basic terms, ACEs are "experiences that have the potential to cause trauma for a child, and they can be single incidents or . . . chronic extreme stress." *Id.* 340:10-13. ACEs "have been demonstrated to be extremely important in terms of development." *Id.* 339: 23-24. Discrimination is a form of an ACE, as is significant bullying, which can emanate from adults. Trial Tr. (Tishelman) 340:14-18, 348:1-4, 369:10, 369:16-370:6. Generally, there are "a lot of different kinds of ways for children to be different, and if they're treated poorly because of that difference, it can create a lot of anxiety and low self-esteem." *Id.* 348:10-13. "[T]he way that it works for other children is the way that it works for gender-diverse and transgender children in the sense that if they're rejected for something that they can't change about themselves, that can be very hard, because they didn't have a way to be different." *Id.* 348:14-18. "[B]eing isolated and excluded [at school] can be very hard for children as well." *Id.* 369:5-6.

Dr. Tishelman reflected on this case as one that is about access to religious institutions for people who do, or who may start to while they're enrolled, identify as transgender, gender diverse, or in the LGBTQ community. *Id.* 382:15-18. In her experience and research, individuals often draw on religion as a source of solace and to help sustain them, and some families may want to not be excluded from religious institutions because it "could be a terrible loss of community and faith that's important to them." *Id.* 382:18-24. Dr. Tishelman specifically indicated that a child could enroll at a school as cisgender and later be revealed as gender diverse. Trial Tr. (Tishelman) 390:16-19. Switching schools for the child could be "really stressful." *Id.* 391:1-2, 383:5-10 ("[I]f children are already at a school and start to identify as

A068

within a LGBTQ community and need to be then excluded from a community that they . . . . support and a community that means something to them, that can be a significant adversity and loss."). Dr. Tishelman clarified:

> "[It] is hard to explain to a child that they need to leave a school because of who they are, including something that they can't change . . . . And even more, if a child has been schooled in a particular religion and taught faith, losing and not understanding why they're not able to be part of a community of faith that is important to their family can be really hard as well." *Id.* 391:5-12.

Extreme stress and chronic stress can affect a child's neurodevelopment and ability to learn and interact with others. *Id.* 342:15-19. "Youth who are exposed to early adversities have a higher likelihood of diseases as adults, for instance heart diseases and cancers." *Id.* 343:17-19. These adversities can also cause "higher addiction, higher trauma, . . . PTSD in adulthood, [and] higher suicidality." *Id.* 343:23-24. Transgender children are often affected by chronic stress. *Id.* 345:21-23. And "transgender youth who have been exposed to stressors have a higher likelihood of anxiety, depression, and suicidality." *Id.* 368:3-6.

Plaintiffs are correct that none of the expert testimony presented by Defendants spoke directly to whether Plaintiff Preschools' participation in the UPK Program would increase or decrease the ability of LGBTQ+ families to access preschool services in Denver and the surrounding area. *See* Pls.' Proposed FOFCOL at 29. Nevertheless, I find the expert testimony described here to be reliable and persuasive, and it guides my analysis of Plaintiffs' claims.

## II. Conclusions of Law

Now, to apply the law to the facts above, I first address Defendants' disavowal of Paragraph 18(B) of the Agreement and its impact on Plaintiffs' claims. Then, I consider

A069

Plaintiffs' first, fourth, and fifth claims brought under the Free Exercise Clause. I move on to Plaintiffs' sixth claim based on the Free Speech Clause and seventh claim implicating the Establishment Clause. After assessing the merits, I evaluate the other permanent-injunction factors and the appropriateness of the additional relief requested.

## A. Paragraph 18(B): Claims Two and Three and Part of Claims One, Four, and Six

In Claims One, Two, Three, Four, and Six, Plaintiffs allege that, through the UPK Agreement, the Department is unconstitutionally interfering in the internal operations of religious institutions. These concerns are predicated on the application of Paragraph 18(B) of the Agreement. *See* Agreement at 28, Trial Ex. 13. After this litigation commenced, Defendants submitted a declaration indicating that they construe this provision such that it does not conflict with federal law and the related protections afforded religious organizations in making employment decisions. *See* Odean Decl. ¶ 16, Trial Ex. 39.[15] Additionally, Ms. Odean testified at trial that Paragraph 18(B) would not be applied as presently written in the Agreement and removed in future drafts. *See* Trial Tr. (Odean) 232:16-22. She and Ms. Cooke explained that Paragraph 18(B) came from a template written by the Colorado Department of Human Services and that the Department did not intend to analyze providers' employment decisions under that

---

[15] In my Order Denying Summary Judgment, I suggested a stipulation resolving these claims might be appropriate because, according to Defendants, Paragraph 18(B) would not place any additional burdens on Plaintiff Preschools as employers. *See* Order in Preparation for Trial at 27 n.10. At trial, the parties indicated that a written stipulation would be presented to the Court. Trial Tr. 30:10-17 (Defendants' counsel: "We believe that the parties are going to be able to enter into a stipulation as to counts two and three, with the expectation that the contractual provision 18B will be removed from the contract in year two. And to the extent that the plaintiff preschools, or any of the Archdiocese's preschools, for that matter, intend to sign on to the UPK program in year one, that that provision would not apply to them."). No such stipulation has been provided.

provision. Trial Tr. (Odean) 231:8-232:2; Trial Tr. (Cooke) 148:7-13. Defendants argue that their disavowal of Paragraph 18(B) moots any analysis of whether it would, as Plaintiffs allege, impermissibly interfere with Plaintiff Preschools' religious hiring policies for their ministerial employees and their other internal decisions based on religious doctrine.[16]

"Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1110 (10th Cir. 2010) (quoting *Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005). Unless there is a live controversy, I "lack jurisdiction to consider claims no matter how meritorious." *Id.* (quoting *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1223 (10th Cir. 2008)). "A case or controversy becomes moot 'when it is impossible for the court to grant any effectual relief whatsoever to a prevailing party.'" *Church v. Polis*, No. 20-1391, 2022 WL 200661, at *3 (10th Cir. Jan. 24, 2022) (unpublished) (quoting *Colo. Off-Highway Vehicle Coal. v. U.S. Forest Serv.*, 357 F.3d 1130, 1133 (10th Cir. 2004)). A case is live and not moot only if "granting a present determination of the issues offered will have some effect in the real world." *Fleming v. Gutierrez*, 785 F.3d 442, 444–45 (10th Cir. 2015) (quoting *Rio Grande*, 601 F.3d at 1110); *see also Polis*, 2022 WL 200661, at *4 ("[A] claim for injunctive relief is moot if there is no reasonable likelihood that the injunction would result in any changes.").

With their claims, Plaintiffs request that I prevent the alleged harm Paragraph 18(B) will cause them if they participate in the UPK Program. *See, e.g.*, Am. Compl. at 27-30, 34 (alleging

---

[16] Plaintiffs assert that Paragraph 18(B), in addition to the equal-opportunity requirement, infringes their free-exercise and free-speech rights. *See* Am. Compl. at 26-27, 30-31, 34. There is no argument that Claims One, Four, or Six are wholly moot. Here, I evaluate only the aspect of those claims based on Paragraph 18(B). I consider the rest of those claims and their allegations related to the equal-opportunity requirement below.

Paragraph 18(B) interferes with Plaintiff Preschools' "selection of preschool teachers and administrators by prohibiting them from selecting employees based on the employee's religious beliefs or willingness to abide by the Catholic Church's beliefs regarding marriage, human sexuality, and gender" and "right to frame policies and doctrine, govern their own internal affairs, and maintain a school environment faithful to their religious beliefs"). In the chain of causation connecting Defendants' actions to this subset of Plaintiffs' alleged injuries, the application of Paragraph 18(B) is an essential step. If Defendants' representations that Paragraph 18(B) would not be applied and would be absent in the next year's draft are genuine, no effectual relief could be granted. Any analysis of Paragraph 18(B)'s constitutionality would, therefore, be advisory and violative of my role under Article III of the U.S. Constitution.

Plaintiffs argue that Paragraph 18(B) remains a threat to their religious autonomy because Defendants' disavowal was made voluntarily and belatedly. Plaintiffs argue that Defendants' "11th-hour decision to drop Paragraph 18(B)" should not be effective because "Defendants likely will seek the freedom" to "engage in unlawful conduct . . . once the claim is dismissed." Pls.' Proposed FOFCOL at 61 (relying on *United States v. Sanchez-Gomez*, 584 U.S. 381, 386 n.* (2018)). "One exception to a claim of mootness is a defendant's voluntary cessation of an alleged illegal practice which the defendant is free to resume at any time." *Rio Grande*, 601 F.3d at 1115 (quoting *Chihuahuan Grasslands All. v. Kempthorne*, 545 F.3d 884, 892 (10th Cir. 2008)).[17] "[T]his exception exists to counteract the possibility of a defendant ceasing illegal action long

---

[17] Plaintiffs quote *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982), for the principle that "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." Pls.' Proposed FOFCOL at 61. However, the Tenth Circuit has made clear that *Aladdin's Castle* is not applicable when there is no evidence in the record to indicate that the defendant intends to resume the challenged practice. *See, e.g.*, *Camfield v. City of Okla. City*, 248 F.3d 1214, 1223-24 (10th Cir. 2001).

enough to render a lawsuit moot and then resuming the illegal conduct." *Id.* (quoting *Chihuahuan Grasslands All.*, 545 F.3d at 892). "[V]oluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction." *Id.* (quoting *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1329, 1333 (11th Cir. 2005) (per curiam)). "The party asserting mootness bears the '"heavy burden of persua[ding]" the court that the challenged conduct cannot reasonably be expected to start up again.'" *Id.* at 1116 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

Defendants must provide more than "a mere informal promise or assurance on the part of the [government] defendants that the challenged practice will cease." *Id.* at 1118 (quoting *Burbank v. Twomey*, 520 F.2d 774, 748 (7th Cir. 1975)). Generally, mootness is not established "follow[ing an] announcement of an intention to change or adoption of a plan to work toward lawful behavior." 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3533.7 (3d ed. 2024). Here, Defendants have not just set out their plan to remove Paragraph 18(B) from future drafts, they have presented uncontroverted evidence that Paragraph 18(B) was not included with the intent to engage in the challenged conduct, explained that they believed the policy imposed no additional burdens on Plaintiffs,[18] and committed that

---

[18] Originally, Plaintiffs represented that the Department interpreted Paragraph 18(B) consistent with the federal-law protections for religious organizations' employment decisions. *See* Odean Decl. ¶ 16, Trial Ex. 39. In a footnote in their Motion to Dismiss, Defendants indicated that, if a specific complaint were to arise, "the Department will of course need facts to determine whether a provider's employment decisions regarding its co-religionist employees and ministerial employees are protected by federal law." *See* Mot. to Dismiss at 16 n. 5, ECF No. 38. Plaintiffs claim it makes no sense for the Department to be able to investigate providers' employment decisions if it lacks the authority to enforce Paragraph 18(B). I am not persuaded that the Department would lack any investigatory authority. Regardless, however, related testimony was not elicited at trial, and the only evidence that was presented made clear that there would be no application or enforcement of Paragraph 18(B).

the provision would not be applied to providers going forward. The possibility of Defendants implementing the same or a substantially similar policy to Paragraph 18(B) in the future is a speculative contingency, and any determination regarding that speculative policy would necessarily be advisory. *See Rio Grande*, 601 F.3d at 1117.

Plaintiffs also take issue with the timing of Defendants' complete disavowal of Paragraph 18(B), highlighting the opportunities Defendants had to recognize their error and correct it even before this lawsuit was filed. *See* Pls.' Proposed FOFCOL at 60 n.13. While the timing of Defendants' representations is inconvenient, to put it mildly, such changes in governmental policy are not uncommon and can legitimately moot controversies. *See, e.g.*, 13C Federal Practice & Procedure § 3533.7 ("[S]elf-correction . . . provides a secure foundation for mootness so long as it seems genuine."). Without further corroboration, I am unwilling to accept a naked assertion of Defendants' bad faith or that the timing indicates an intent to rely on Paragraph 18(B) in the future.

Consequently, I treat Defendants' disavowal of Paragraph 18(B) as complete and sincere. Since Plaintiffs can point to no source of their alleged harm, determining the validity of Paragraph 18(B) will have no effect in the real world. *See Fleming*, 785 F.3d at 444–45. As a result, Plaintiffs' Claims Two and Three are found to be moot, as are the parts of Claims One, Four, and Six that rely on the application of Paragraph 18(B).

## B.  Claims One, Four, and Five

The First Amendment to the U.S. Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech . . . ." U.S. Const. Amend. I. The Amendment references "Congress," but "the

A074

Fourteenth Amendment—which references the entire 'State,' not just a legislature—makes the rights protected by the Amendment applicable to the States." *Fulton v. City of Phila.*, 593 U.S. 552, 565 n.27 (2021). Plaintiffs first, fourth, and fifth claims are brought under the Free Exercise Clause and allege that Defendants have precluded Plaintiffs from participating in the UPK Program because of Plaintiffs' religious beliefs. "The Free Exercise Clause 'protect[s] religious observers against unequal treatment' . . . ." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993) (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 148 (1987) (Stevens, J., concurring in judgment)).[19] In addition to outright prohibitions, the Free Exercise Clause "protects against 'indirect coercion or penalties on the free exercise of religion." *Carson v. Makin*, 596 U.S. 767, 778 (2022) (quoting *Lyng v. Northwest Indian Cemetery Protective Assn.*, 485 U.S. 439, 450 (1988)). For this reason, the Supreme Court has "repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Id.*[20]

In *Employment Division, Department of Human Resources of Oregon v. Smith*, the Supreme Court explained that "the right of free exercise does not relieve an individual of the

---

[19] I conclude Plaintiffs' beliefs as set forth in the Findings of Fact above are their sincerely held religious beliefs, *see Frazee v. Illinois Dep't of Employment Sec.*, 489 U.S. 829, 834 (1989), as "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds," *Employment Div., Dep't of Hum. Resources of Or. v. Smith*, 494 U.S. 872, 887 (1990) (quoting *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989)).

[20] *But see Lyng*, 485 U.S. at 450–51 ("This does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions. The crucial word in the constitutional text is 'prohibit': 'For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.'" (quoting *Sherbert v. Verner*, 374 U.S. 398, 412 (1963) (Douglas, J., concurring))).

**A075**

obligation to comply with a "valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." 494 U.S. at 879.[21]  In *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, the Court more specifically articulated the standard for reviewing claims brought under the Free Exercise Clause, stating: "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." 508 U.S. at 531. In contrast, as the Court in *Lukumi* instructed, a law that is not neutral or generally applicable must pass strict scrutiny, meaning it "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.* at 531-32.

Plaintiffs contend their inability to participate in the UPK Program triggers strict scrutiny under the Free Exercise Clause for at least four reasons:

> *[F]irst*, because the exclusion is based solely on Plaintiff preschools' religious character and exercise in violation of the rule in *Carson* [*v. Makin*]; *second*, because the Department recognizes categorical exceptions permitting other preschool providers to engage in similar conduct for secular reasons, violating the rule in *Tandon* [*v. Newsom*, 593 U.S. 61 (2021),] and *Kennedy* [*v. Bremerton School District*, 597 U.S. 507 (2022),]; *third*, because the Department has reserved the authority to carve out, and has carved out, individualized exceptions from the [equal-opportunity requirement] in violation of the rule in *Fulton* [*v. City of Philadelphia*]; and *fourth*, because the Department's implementation of UPK Colorado is not neutral, violating the rule in *Lukumi* and *Masterpiece* [*Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018)].

Pls.' Proposed FOFCOL at 31.[22]

---

[21] Although there has been a steady push to overturn *Smith*, in *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021), the Court recently declined to revisit the decision. *See also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022).

[22] Reviewing recent Supreme Court jurisprudence, it is unclear the extent to which courts must rely on the Nation's history and tradition in considering claims brought under the Free Exercise Clause. *See, e.g.*, *Kennedy*, 597 U.S. at 535-36 (explaining that, in interpreting the Establishment Clause, "'[t]he line' that courts and governments 'must draw between the permissible and the impermissible' has to 'accor[d] with history and faithfully reflec[t] the understanding of the

**A076**

### 1. *Carson v. Makin*:  Claim One

Plaintiffs' first claim relies primarily on *Carson*. That case involved Maine's tuition-assistance program for parents who live in school districts that do not operate a secondary school. 596 U.S. at 771-73. Like the UPK Program challenged here, parents in those school districts designated the school they would like their child to attend, and the school received payments to help defray the costs of tuition. *Id.* at 772-74. Unlike the UPK Program, however, Maine's program explicitly allowed only "nonsectarian" schools to receive the payments. *Id.* at 773-75. Citing two other recently decided cases—*Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020), and *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), the Supreme Court found that strict scrutiny applied because Maine "'effectively penalize[d] the free exercise' of religion" by "'disqualify[ing] some private schools' from funding 'solely because they are religious.'" *Carson*, 596 U.S. at 780 (first quoting *Trinity Lutheran*, 582 U.S. at 462; then quoting *Espinoza*, 591 U.S. at 487). The Court went on to hold that Maine could not satisfy strict scrutiny because its "interest in separating church and state more fiercely than the Federal Constitution [requires] . . . cannot qualify as compelling in the face of the infringement of free exercise." *Id.* at 781 (quoting *Espinoza*, 591 U.S. at 484-85).

---

Founding Fathers'" (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014))). Neither party presented related arguments, but to the extent the early understanding of the Free Exercise Clause must be taken into account, it seems free exercise rights did not require the granting of an exemption when the rights of others were involved. *See, e.g.*, Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harvard L. Rev. 1409, 1464 (May 1990) ("[A] believer has no license to invade the private rights of others or to disturb public peace and order, no matter how conscientious the belief or how trivial the private right on the other side. . . . Where the rights of others are not involved, however, the free exercise right prevails."). Here, there is a strong argument that children have the right not to face discriminatory barriers in using a government benefit and seeking a quality education.

Plaintiffs assert that the holding in *Carson* dictates the outcome here and that any consideration of *Smith* is unnecessary. Plaintiffs highlight that *Carson* relies on pre-*Smith* cases and contend that *Carson* is based on the "longstanding Free Exercise rule distinct from *Smith*" that "exclusion from a public benefit on account of one's religious exercise 'violates the Free Exercise Clause.'" Pls.' Proposed FOFCOL at 32 (rewording and quoting *Carson*, 596 U.S. at 778). I am not persuaded that *Carson* articulates a distinct rule. Although *Smith* considered the constitutionality of an Oregon statute criminalizing the use of peyote, it ultimately determined that "Oregon may, consistent with the Free Exercise Clause, deny respondents unemployment compensation when their dismissal results from use of the drug." 494 U.S. at 890. Thus, *Smith* itself was a public-benefits case. As I previously noted, *Carson* fits into the *Smith* framework because it finds that Maine's tuition-assistance program was not neutral and then subjects the program to strict scrutiny. *See Carson*, 596 U.S. at 781 ("[T]here is nothing neutral about Maine's program."). While *Carson* does not cite *Smith* specifically, it cites *Trinity Lutheran* throughout, which contains a full analysis of *Smith*. *See Trinity Lutheran*, 582 U.S. at 460-61. Any breadcrumbs that may or may not have been dropped in *Carson* are insufficient to slice public-benefits cases from the *Smith* framework.

Nonetheless, for the purposes of this case, whether *Carson* expounds on a distinct rule is not consequential. The rule gleaned from *Carson* is that a law that operates to "'disqualify some private schools' from funding 'solely because they are religious' . . . must be subjected to 'the strictest scrutiny.'" 596 U.S. at 780. Plaintiffs would like this rule to embrace what has been termed "substantive neutrality." In his concurrence in *Lukumi*, Justice Souter discussed the difference between "formal neutrality and substantive neutrality." *Lukumi*, 508 U.S. at 561-62 (Souter, J., concurring). "[F]ormal neutrality . . . would only bar laws with an object to

46

discriminate against religion," while "substantive neutrality, . . . in addition to demanding a
secular object, would generally require government to accommodate religious differences by
exempting religious practices from formally neutral laws."[23] Justice Souter explained that the
dissent in *Smith* embraced substantive neutrality by "requir[ing] the government to justify *any*
substantial burden on religiously motivated conduct by a compelling state interest and by means
narrowly tailored to achieve that interest." *Id.* at 562-63 (quoting *Smith*, 494 U.S. at 894). But the
majority in *Carson* did not go so far. The Court's language in *Carson* made clear that Maine's
program was not formally neutral since schools were excluded from the public benefit "solely
because of" their religious character. 596 U.S. at 780-81.[24]

  As discussed further below in analyzing Plaintiffs' fifth claim, the equal-opportunity
requirement does not exclude Plaintiffs from the UPK Program solely because of their religious
status or exercise. The requirement applies to UPK providers, regardless of their religious or
non-religious character. The purpose of the requirement is not to invade religious freedom but to
further the implementation of a strongly embraced public value. *Carson*, *Espinoza*, and *Trinity
Lutheran* are all distinguishable because each involved a program that "specifically carved out"
religious organizations from those eligible to receive funding. *See Carson*, 596 U.S. at 780.

---

[23] It is noteworthy that Plaintiffs cite to Justice Souter for his discussion of substantive neutrality
since he dissented in *Zelman v. Simmons-Harris*, insisting that the use of tax money as vouchers
to support religious schools and their missions violates the Establishment Clause. 536 U.S. 639,
686 (2002) (Souter, J. dissenting).

[24] One sentence in *Carson* leaves out "solely" in "solely because of," reading: "A State's
antiestablishment interest does not justify enactments that exclude some members of the
community from an otherwise generally available public benefit because of their religious
exercise." 596 U.S. at 781. The Court, however, emphasized that its holding was based on *Trinity
Lutheran* and *Espinoza*, which both used the language "solely because of." *See id.* at 779
(quoting *Trinity Lutheran*, 582 U.S. at 462, and *Espinoza*, 591 U.S. at 476, 487).

**A079**

Plaintiffs assert that "[t]he Department has effectively imposed a special tax on religious preschools, whereby families who send their children to Catholic preschools continue to pay full freight, while families who send their children to over 2,000 other Colorado preschools receive 15 hours of free instruction per week." Pls.' Proposed FOFCOL at 34. That may well be the effect of the equal-opportunity requirement, but that is not its purpose. And, again, the Supreme Court, in *Carson*, did not hold that strict scrutiny is triggered by any condition on a government benefit that affects religious exercise.[25] Plaintiffs have failed to show that *Carson* applies to the equal-opportunity requirement, and thus, I conclude that their first claim lacks merit.

### 2. Neutral:  Claim Five

Plaintiffs' fifth claim alleges the equal-opportunity requirement, as applied by Defendants, is not neutral under the *Smith* framework. If the requirement is not neutral, strict scrutiny would apply, and Plaintiffs contend Defendants cannot satisfy that stringent test.

A law is not neutral "if the object of [the] law is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. In analyzing neutrality, I look at the relevant government action from multiple angles. First, I review the text of the equal-opportunity requirement as well as the historical background of its adoption and Defendants' decision in denying Plaintiff Preschools' an exemption from the requirement. *See id.* at 533 ("To

---

[25] Plaintiffs note that I have previously written: "The government may not deny a benefit to a person on a basis that infringes his constitutionally protected interests . . . [,] even though the person has no right to the valuable government benefit[.]" Pls.' Proposed FOFCOL at 34 (quoting *Pryor v. School Dist. No. 1*, No. 22-cv-02886-JLK, 2022 WL 18145414, at *1 (D. Colo. Dec. 23, 2022)). The full quote includes the additional caveat that "the government may deny him the benefit for any number of reasons." *Pryor*, 2022 WL 18145414, at *1 (quoting *Seamons v. Snow*, 84 F.3d 1226, 1236 (10th Cir. 1996)). The point is that Plaintiffs must show their rights have been infringed, not just burdened. Otherwise, the benefit may be denied.

**A080**

determine the object of a law, we must begin with its text."); *id.* at 540 (instructing that the object may be determined from evidence of "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body"). I investigate specifically whether Defendants have "proceed[ed] in a manner intolerant of religious beliefs." *Fulton*, 593 U.S. at 533. Then, I assess the real-world operation of the equal-opportunity requirement, asking whether it targets religion. *See Lukumi*, 508 U.S. at 535 ("[T]he effect of a law in its real operation is strong evidence of its object."). After moving through each of these considerations, I conclude, in accordance with my findings of fact, that the equal-opportunity requirement is neutral and has been applied to Plaintiffs in a neutral manner.

### i. Text and Background

Nothing in the text of the statutory equal-opportunity requirement, or its inclusion in the UPK Agreement, indicates that religious discrimination is its object. Plaintiffs do not argue the contrary, nor do they present evidence that the requirement was adopted with the object of targeting religious beliefs or conduct. *Cf. id.*, 508 U.S. at 541 ("The minutes and taped excerpts of the . . . session [when enactments were initially passed], both of which are in the record, evidence significant hostility exhibited by residents, members of the city council, and other city officials toward the Santeria religion and its practice of animal sacrifice."). Instead, Plaintiffs argue that Defendants, in denying their request for an exemption and litigating this case, have exhibited offensive and hostile opinions. I see nothing of the sort and may neither assume nor

A081

manufacture facts. As such, I do not infer the existence of hostility where there is none. *See* Pls.'
Mot. for Summ. J. at 36-37, ECF No. 61; Pls.' Proposed FOFCOL at 46-47.

"[T]he government, if it is to respect the Constitution's guarantee of free exercise, cannot
impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a
manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and
practices." *Masterpiece Cakeshop*, 584 U.S. at 638. "[E]ven 'subtle departures from neutrality'
on matters of religion" are impermissible. *Id.* (citing *Lukumi*, 508 U.S. at 534).

First, Plaintiffs point to Dr. Roy's deposition testimony. When asked whether it would
constitute discrimination against children if a faith-based provider were to give notice that a
transgender child is not allowed to use the bathroom of the gender the child identifies with and
the school will not use the requested pronouns, Dr. Roy responded "it would prove best to have a
conversation with the family and decide what's best for the child based on the environment that
the child was exposed to." Roy Dep. 29:20-30:9, Trial Ex. 27.[26] She emphasized that the
Department does not "want any child to be harmed by being in a situation where they would be
discriminated against" and commented that "[t]he law is there to protect, and thank goodness it
does." *Id.* 30:9-13. Dr. Roy clarified that she was responding from a child development
perspective. *Id.* 30:3-5. With the plentiful evidence in the record of the harm that children may
suffer when in environments that do not accept them or affirm their experiences, *see, e.g.*, Trial
Tr. (Goldberg) 297:11-20 (explaining that, if children receive messages that something is wrong
with them or their families, that can lead to negative self-views); Trial Tr. (Tishelman) 340:14-
18, 342:15-19, 343:17-19, 343:23-24, 345:21-23, 386:3-6, 48:10-18 (informing that

---

[26] To the extent Defendants object to this testimony as speculation and for lack of foundation, *see*
Defs.' Objections to Pls.' Designated Dep. Testimony at 2, ECF No. 93, their objections are
overruled.

A082

discrimination is an adverse childhood experience that can lead to negative physical and mental health impacts and, if children are rejected or treated poorly because of their difference, it can create anxiety and low self-esteem), Dr. Roy's statements cannot be viewed as hostile.

Second, Plaintiffs take issue with the arguments made by Defendants' counsel analogizing the differential treatment of LGBTQ+ children and families to race discrimination. Plaintiffs also believe it is improper for Defendants' attorneys to characterize their "millennia-old religious beliefs as stigmatization and bullying." Pls.' Proposed FOFCOL at 46.[27] Defendants have pursued only fair and reasonable legal arguments.

Starting with the comparison between race discrimination in education and denying LGBTQ+ children and families equal access to publicly funded preschool, the law is predicated on the application of general principles to the varying facts of individual cases. *See* Dan Hunter, *Reason is Too Large: Analogy and Precedent in the Law*, 50 Emory L.J. 1197, 1202 (2001); Lloyd L. Weinreb, *Legal Reason: The Use of Analogy in Legal Argument* 4 (2d ed. 2016). Our Nation's history has produced countless landmark cases involving race discrimination. While the

---

[27] Plaintiffs' citations to Ms. Odean's testimony for these contentions are entirely misleading. Ms. Odean testified that she was aware that her lawyers had compared the lawsuit to academies in the 1970s that were segregated based on race and that they had cited studies about the impacts of bullying and stigmatization in LGBTQ children. Trial Tr. (Odean) 260:5-9, 263:7-14. When asked specifically if she thought Plaintiff Preschools' enrollment policies were similar to segregationist academies in the 1970s, she stated:

> "[W]e need to consider what we have in the law that we're implementing, including the antidiscrimination provision, and ensure that if a child is in a preschool setting of a participating provider, that it's safe and healthy for them to be able to engage, and that it isn't—that safe and healthy isn't compromised by discrimination.

*Id.* 261:21-262:12.

51

facts of those cases are not equivalent to the ones here,[28] the legal principles and considerations are similar. *See* Serena Mayeri, *"A Common Fate of Discrimination": Race-Gender Analogies in Legal and Historical Perspective*, 110 Yale L.J. 1045, 1053 (2001) ("Analogical reasoning may go beyond direct parallels between various forms of inequality to engage in more nuanced comparisons that recognize differences as well as similarities and attempt to determine their moral and legal significance."). The effects of differential treatment in education—along with the invocation of the Free Exercise Clause to justify such treatment—are similarities making comparisons in this case apt. Drawing attention in legal briefing to these similarities does not evince animus to religion. To suggest that it does fundamentally misunderstands the role of analogy in legal reasoning.[29]

The arguments advanced by Defendants' attorneys are wholly distinguishable from the facts in *Masterpiece Cakeshop*, where the Supreme Court found the initial decisionmaking body exhibited hostility to religion because members of it "endorsed the view that religious beliefs cannot legitimately be carried into the public sphere or commercial domain," mentioned the religious justifications for slavery and the Holocaust, and referred to religious beliefs as "one of

---

[28] It undoubtedly does a disservice to all historically subaltern groups to literally equate their struggles. The history of race-based discrimination and the means in which it has been and is perpetrated are distinct. That recognition, however, should not imply that members of the LGBTQ+ community have not been and are not the victims of invidious prejudice nor that they do not deserve the dignity and protections the laws ensure. *See, e.g., Griffith v. El Paso Cnty., Colorado*, No. 21-cv-00387-CMA-NRN, 2023 WL 2242503, at *10 (D. Colo. Feb. 27, 2023), *report and recommendation adopted*, No. 21-cv-00387-CMA-NRN, 2023 WL 3099625 (D. Colo. Mar. 27, 2023) ("[O]ne would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgender people.") (quoting *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018))).

[29] Indeed, the very essence of common law analytic methodology is analogical inference to precedent which differs from the continental law's analytic basis in deduction from code principles.

the most despicable pieces of rhetoric that people can use . . . to hurt others." 584 U.S. at 634-635. Defendants' legal arguments are limited to relevant and applicable precedent and venture nowhere near attempts to divorce religion from early childhood education or denigrate religious beliefs.

Defendants' attorneys have not vilified Plaintiffs nor accused them of having actually caused harm to children. Counsel have presented persuasive evidence from qualified experts on the harm that children experience when they encounter environments that do not accept them or affirm their experiences. Although Plaintiffs may disagree with the science or may view any impact as minimal or hypothetical, they did not present any contrary evidence, and expert testimony is often framed in hypotheticals.[30]

The record contains no evidence that Defendants have passed judgment on or presupposed the illegitimacy of Plaintiffs' religious beliefs and practices. The evidence instead shows the Department committed to the idea of mixed delivery and engaged with representatives

---

[30] Plaintiffs filed a Notice of Supplemental Authority (ECF No. 114), submitting the recently issued Tenth Circuit opinion in *Does 1-11 v. Board of Regents of University of Colorado*, No. 21-1414, 2024 WL 2012317 (10th Cir. May 7, 2024). In that case, the court held that "the specific series of events leading to" the later-adopted policy "demonstrated that the [p]olicy was not neutral toward religion." *Id.* at *18. Plaintiffs contend the same is true here, where Defendants' latest definition of "congregation" for the congregation preference "appears to be an (unsuccessful) effort to respond to Plaintiffs' litigation arguments and fortify their exclusion of Plaintiffs from [the UPK Program]" and "confirms non-neutrality." Notice of Suppl. Authority at 3, ECF No. 114. Plaintiffs' argument is hyperbole, based on assumptions that are not supported by the record. If anything, by broadening the definition of congregation, Defendants have worked to include more faith-based providers. The comparison to *Does 1-11* is not fitting. There, the Administration adopted a new policy after the litigation was filed, but it did not reevaluate all employees' requests for an exemption under the new policy for almost three months. *Id.* at *18. When the Administration did reevaluate the employees, it used similar criteria as it did under its prior, problematic policy and reached the same results. *Id.* at *18-19. Defendants here have ostensibly extended the congregation preference to, as I conclude below, permit faith-based providers, including Plaintiff Preschools, to discriminate on the basis of religious affiliation even more flexibly, as Plaintiff Preschools have sought to do.

from faith-based providers. The result is that forty faith-based preschools currently participate in

the UPK Program, including the Catholic Charities schools overseen by the Archdiocese. Trial

Tr. (Odean) 234:8, 23-25. Neither the text of the equal-opportunity requirement nor the

circumstances surrounding its enactment and implementation reveal any basis for finding that the

requirement is not neutral.

### ii.  Real-World Operation

The operation of the equal-opportunity requirement similarly does not show that its

object is to restrict practices because of their religious motivation. "[An] adverse impact will not

always lead to a finding of impermissible targeting." *Lukumi*, 508 U.S. at 535; *see also Tingley v.*

*Ferguson*, 47 F.4th 1055, 1087 (9th Cir. 2022) (explaining "that a particular group, motivated by

religion, may be more likely to engage in the proscribed conduct does not amount to a free

exercise violation" (internal quotation marks and citation omitted)). "[A] social harm may [be] a

legitimate concern of government for reasons quite apart from [religious] discrimination."

*Lukumi*, 508 U.S. at 535 (citing *McGowan v. Maryland*, 366 U.S. 420, 442 (1961)).

Plaintiffs argue that "Defendants cannot rewrite unambiguous state-law commands to

gerrymander Plaintiffs out." Pls.' Proposed FOFCOL at 42. With the enactment of the UPK Act

the State prioritized the inclusion of diverse preschool providers, *see* Colo. Rev. Stat. §§ 26.5-4-

202(1)(b) & (1)(a)(VI), 26.5-4-203(12), and faith-based providers were always "envisioned to be

part of the mixed-delivery model." Trial Tr. (Cooke) 160:16-17. The Department's "goal in the

mixed delivery program was to recruit and engage providers . . . of all types, school districts,

center-based, home-based, [and] faith-based . . . ." *Id.* 147:23-148:2. Defendants worked with

religious providers to accommodate them, establishing a task force and developing the

**A086**

congregation exception. *Id.* 152:8-20, 154:21-25, 157:17-24. The participation of the Catholic Charities preschools in the UPK Program substantiates that Defendants have not excluded Catholic providers. Defendants have not gerrymandered Plaintiffs out of the UPK Program, intentionally or otherwise. They apply the equal-opportunity requirement "in spite of" Plaintiffs' religious beliefs, not because of them. *Cf. Lukumi*, 508 U.S. at 540.

In sum, Plaintiffs have not established that the equal-opportunity requirement, on its face or as applied by Defendants, is not neutral.

### 3. Generally Applicable:  Claims Four and Five

Plaintiffs' fourth and fifth claims allege that the algorithm preferences and individual provider preferences permitted by Defendants demonstrate that the equal-opportunity requirement is not generally applicable as applied to Plaintiffs. "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 593 U.S. at 533 (quoting *Smith*, 494 U.S. at 884). Additionally, a law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534; *see also Lukumi*, 508 U.S. at 543 ("A law is not generally applicable if it, 'in a selective manner [,] impose[s] burdens only on conduct motivated by religious belief.'"). I begin by examining whether there is a mechanism for individualized exemptions to the equal-opportunity requirement such that the Department is invited to consider the particular reasons for providers' conduct. After that analysis, I consider whether the application of the equal-opportunity requirement selectively imposes burdens on religious conduct.

### i. Any Mechanism for Granting Individualized Exceptions to the Equal-Opportunity Requirement

Plaintiffs put forward three theories to establish the existence of a mechanism for individualized exemptions to the equal-opportunity requirement. First, Plaintiffs argue the temporary waiver provision in the UPK Statute authorizes the Department to grant exemptions to the requirement in its discretion. Second, Plaintiffs contend the individual provider preferences permitted by the Department substantiate that the Department has sufficient discretion to grant individual exemptions to the equal-opportunity requirement. And, third, they contend that Defendants have exhibited such discretion by permitting Darren Patterson Christian Academy, a provider with similar beliefs, to participate in the Program.

Statutory Waiver Provision

The temporary waiver provision of the UPK Statute does not authorize a waiver of any aspect of the equal-opportunity requirement. The provision states: "if necessary to ensure the availability of a mixed delivery system within a community, the [D]epartment may allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the quality standards." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). Significantly, however, the statute requires "each preschool provider [to] meet all quality standards relating to health and safety." *Id.* Defendants contend the statutory equal-opportunity requirement cannot be waived under this provision because it is a quality standard that relates to health and safety. Plaintiffs respond that "this interpretation flies in the face of common sense, contradicts the text of the Department's own contracts, and appears to have been invented during this litigation." Pls.' Proposed FOFCOL at 6. I conclude

56

**A088**

Defendants' view of the waiver provision is consistent with the plain language and the purpose of the statute.

The terms "health" and "safety" are broad and general concepts. Health is defined as "the condition of being sound in body, mind, or spirit." *Health*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/health (last visited June 1, 2024). Similarly, safety is "the condition of being safe from undergoing or causing hurt, injury, or loss." *Safety*, https://www.merriam-webster.com/dictionary/safety (last visited June 1, 2024). From these definitions, it is clear the General Assembly did not intend to allow the Department to waive any standard that would have potentially caused physical or mental harm to preschool children.

The evidence in this case establishes that the statutory equal-opportunity requirement was included in the UPK Statute so that eligible children would not experience discrimination on the bases identified in the statute and so that they can grow to their maximum ability and not be placed in an unsafe or unhealthy environment. *See* Trial Tr. (Cooke) 142:25-143:3; Trial Tr. (Odean) 197:17-198:9, 199:15-24. The expert testimony Defendants presented at trial supports that discrimination can be harmful, both mentally and physically, for LGBTQ+ children and children from LGBTQ+ families. *See, e.g.*, Trial Tr. (Goldberg) 297:11-20; Trial Tr. (Tishelman) 340:14-18, 342:15-19, 343:17-19, 343:23-24, 345:21-23, 386:3-6, 48:10-18. Plaintiffs argue that, "in ordinary usage, 'health and safety' surely refers to regulations of the *conditions at the preschool* for students who are already there, rather than regulations that limit a school's discretion to decide who can become part of the school community." Pls.' Proposed FOFCOL at 45. Plaintiffs miss the point that the regulations limit a school's discretion to deny equal access to eligible children because doing so potentially threatens the health and safety of preschoolers. Furthermore, there is no basis for speculating that the General Assembly envisioned the

temporary waiver provision as applying to the equal-opportunity requirement given that it is unlikely any provider would need to violate the requirement for a limited time while working toward compliance.

Since the Department's interpretation of the equal-opportunity requirement and waiver provision is "consistent with the statute's purpose, language, structure, and legislative history," it weighs in favor of my conclusion. *Nieto v. Clark's Market*, 488 P.3d 1140, 1149 (Colo. 2021). Plaintiffs suspect that the Department must have originally interpreted the statute differently since, in the UPK Agreement, it listed the equal-opportunity requirement and "[q]uality standards relating to health and safety" as two different types of "quality standards." Pls.' Proposed FOFCOL at 45 (quoting Agreement at 2, Trial Ex. 13). This redundancy is easily explained by the significance of the equal-opportunity requirement. It was set out in the UPK Statute, and the Department is obligated to ensure providers comply with it. *See* Colo. Rev. Stat. § 26.5-4-205(1)(b)(I) & (2). There is no reason to believe the Department's present interpretation of the equal-opportunity requirement and temporary waiver is a post-hoc justification. The Department has not yet had to apply the temporary waiver provision and so cannot be expected to have previously articulated and documented its interpretation. The equal-opportunity requirement is a quality standard related to health and safety that cannot be waived under the UPK Statute.

Consequently, I conclude that the UPK Statute does not give the Department any discretion to grant exemptions from the equal-opportunity requirement—the Department must adopt the equal-opportunity requirement as part of its quality standards and must ensure that each preschool provider that participates in the UPK Program meets that standard. Colo. Rev. Stat. § 26.5-4-205(1)(b)(I) & (2). The Department has no discretion to deviate from this directive. *See* Roy Letter at 1 (explaining that the Department lacked the authority to create an exemption and

A090

avoiding any consideration of the particular reasons for the exemption request). Accordingly, the

statutory equal-opportunity requirement itself is neutral and generally applicable.[31]


Individual Provider Preferences

The Department allows providers to request individual preferences through an online

form and has let providers exercise many of the requested preferences such that the providers

have not been required to admit all children who match with them. Trial Tr. (Odean) 256:1-14;

257:9-23. Examples of individual preferences the Department has approved are requests to admit

only fully vaccinated children and to prioritize subdivision residents. UPK Individual Preference

Response Data at 82-83, Trial Ex. 34. The online form also includes as illustrative preferences

providers that only serve teen moms enrolled at a neighboring high school or that only serve

children with specific disabilities. UPK Process for Preferences at 55, Trial Ex. 31.

Plaintiffs claim "it is undisputed that Defendants have discretion to make individualized

exceptions from the requirement that providers accept the children [who] are matched with

them." Pls.' Proposed FOFCOL at 43. There is no requirement that providers accept all children

who are matched with them. The at-issue requirement demands that participating preschools

provide equal opportunity regardless of certain characteristics of a child or family. Plaintiffs

assert that "the mere discretion to grant these exceptions . . .—even if not exercised—triggers

strict scrutiny." *Id.* at 44. That would be true if there were evidence in the record that Defendants

had the discretion to grant any individual preferences that would exempt providers from the

equal-opportunity requirement, but there is none. The Department's case-by-case determinations

---

[31] I note that this theory of Plaintiffs' claims resembles a facial challenge to the statute, and for
that reason, I reach this conclusion.

A091

relate to how it can include providers in the UPK Program, not whether it should grant providers an exemption from the equal-opportunity requirement. The Department may consider whether a request would violate the requirement, and if it concludes that a request would, the request would not be granted. *See, e.g.*, Trial Tr. (Odean) 278:23-280:5. Plaintiffs contend the example given by the Department of a provider serving only teen moms shows Defendants could grant an exemption permitting a provider to deny equal opportunity to families on the basis of sex. *See* Pls.' Proposed FOFCOL at 44. It is not clear that such an admissions preference would violate the equal-opportunity requirement. And, again, if the requested preference did deny equal opportunity based on one of the characteristics enumerated in the equal-opportunity requirement, the evidence shows the Department would have no authority to grant and has not granted such an individual preference to a provider.

Plaintiffs rely primarily on the Supreme Court's analysis in *Fulton* to support their argument that the equal-opportunity requirement is not generally applicable because the Department has "reserved the authority to carve out, and has carved out, individualized exceptions from the [equal-opportunity requirement]." *Id.* at 31. In *Fulton*, the City of Philadelphia stopped referring children to a Catholic foster care agency after the City discovered that the agency would not certify same-sex couples to be foster parents, and the agency sued alleging, as relevant here, violations of the Free Exercise Clause. 593 U.S. at 526-28, 530-531. The City's decision to discontinue its referrals to the foster care agency was based on its foster care contract, which included a nondiscrimination provision. *Id.* at 530-31, 534-35. The Supreme Court found that the provision was not generally applicable because it "incorporate[d] a system of individual exemptions, made available . . . at the 'sole discretion' of the Commissioner [of the Department of Human Services]." *Id.* at 534-35. Consequently, the Court applied strict scrutiny

and held that "the refusal of [the City] to contract with [the foster care agency] for the provision of foster care services unless it agree[d] to certify same-sex couples as foster parents [could ]not survive strict scrutiny, and violate[d] the First Amendment." *Id.* at 540-42.

*Fulton* is fully distinguished from this case throughout the rest of the analysis of Plaintiffs' fourth and fifth claims. For now, I resolve that Defendants' exercise of discretion differs from the City's in *Fulton* because Defendants are bound by a statutory requirement which does not authorize them to grant any exemptions. The contract at issue in *Fulton*, in contrast, specifically authorized the Commissioner of the Department of Human Services to grant individual exemptions *to the nondiscrimination provision* in his or her sole discretion. 593 U.S. at 534-35. Here, there is no mechanism of individualized exemptions to the equal-opportunity requirement.

Darren Patterson Christian Academy

Plaintiffs' last argument regarding a mechanism of individualized exemptions pertains to a case currently pending before my colleague Judge Domenico—*Darren Patterson Christian Academy v. Roy*, in which the constitutionality of the UPK Program's equal-opportunity requirement and Paragraph 18(B) of the Agreement are similarly challenged. No. 23-cv-1557-DDD-STV, 2023 WL 7270874 (D. Colo. Oct. 20, 2023). The plaintiff in that case, Darren Patterson Christian Academy ("Darren Patterson"), has signed the UPK Agreement and has participated in the Program, *id.* at *3, unlike Plaintiff Preschools in this case.[32] Darren Patterson

---

[32] Notably, Darren Patterson does not seek to exclude children and families from its school but, instead, intends to "limit[] employment to those who share its beliefs and to align[] its policies about bathroom usage, dress codes, pronouns, and student lodging with its religious beliefs about sexuality and gender." Mot. for Prelim. Inj. at 2, *Darren Patterson*, No. 23-cv-01557-DDD-STV, ECF No. 14. As such, the policies and conduct at issue in the two cases differ materially.

moved for a preliminary injunction, and the defendants in that case, the same ones as here, moved to dismiss Darren Patterson's claims for lack of jurisdiction. *Id.* at *4. The defendants filed a response to Darren Patterson's preliminary-injunction motion but did not respond to its merits. *Id.* at *1, *4, *13-14. Without the benefit of the defendants' merits arguments, Judge Domenico granted a narrow preliminary injunction prohibiting the defendants from "expelling, punishing, withholding funds from, or otherwise disciplining" Darren Patterson under the UPK Program based on the school's policies violating the "statutory or contractual antidiscrimination provisions." *Id.* at *19. The defendants chose not to appeal that decision. As a result, Darren Patterson currently is participating in the UPK Program without having to conform its policies to Paragraph 18(B) of the Agreement or the equal-opportunity requirement.

Plaintiffs here argue that, by allowing Darren Patterson to participate in the UPK Program, Defendants have permitted the same exemption from the equal-opportunity requirement that they seek such that the requirement cannot be generally applicable. First, while Defendants permitted Darren Patterson to sign the UPK Agreement, that action, in and of itself, did not grant an exception to the equal-opportunity requirement. A school's discriminatory policies do not on their own necessarily violate the equal-opportunity requirement because, unless and until they are implemented, they do not prevent eligible children from having an equal opportunity to enroll and receive preschool services. *Cf. id.* at *6 ("The terms of the statute and contract [including Paragraph 18(B)] 'arguably' cover merely having discriminatory policies even if there are no instances of those policies being applied to someone who would feel aggrieved."). Or at least, Defendants may view the equal-opportunity requirement in such a way when reviewing and approving UPK providers. Second, Defendants' strategy in another case is irrelevant here and is not evidence that Defendants have granted an exemption from the equal-

**A094**

opportunity requirement, especially when they continue to litigate Darren Patterson's claims on the merits and are bound by a court order.

### ii.  Any Prohibition of Religious Conduct While Permitting Secular Conduct

In determining whether the equal-opportunity requirement is generally applicable, I must also consider whether it "treats *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). If it does, strict scrutiny is triggered. *Id.* "[W]hether two activities are comparable for the purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* "Comparability is concerned with the risks various activities pose . . . ." *Id.*

The equal-opportunity requirement mandates that participating preschools provide eligible children with an equal opportunity "regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability." Colo. Rev. Stat. § 26.5-4-205(2)(b). Plaintiffs' claims target three of these protected characteristics: religious affiliation, sexual orientation, and gender identity.

As explained above, the asserted State interests are eliminating discriminatory barriers to publicly funded preschool education and protecting the well-being of children. Plaintiffs claim that Defendants permit providers to select algorithm preferences that pose a risk to Defendants' asserted interests that are identical to the one posed by granting Plaintiffs their requested exemption. Specifically, Plaintiffs allege that, despite the equal-opportunity requirement, the algorithm preferences Defendants have developed allow:

- Head Start providers to screen applicants based on "income level";

- Providers to serve only children with disabilities or to have related programs for specific needs;

**A095**

- Providers to limit enrollment to children of color from historically underserved areas;

- Providers to limit enrollment to gender-nonconforming children or the LGBTQ community; and

- Faith-based providers to reserve seats for members of their congregation.

Pls.' Proposed FOFCOL at 37.

Although Plaintiffs assert—without support—that it "is *not* legally required," *id.* at 38, each of the characteristics enumerated in the equal-opportunity requirement must be analyzed independently. I understand Plaintiffs' suggestion that, if Defendants have the discretion to grant any exception allowing discrimination in contravention of a single aspect of the equal-opportunity requirement, they necessarily have discretion to grant any exception to the requirement. I have touched on that argument in discussing the individual provider preferences the Department permits and address it below in relation to the algorithm preferences. First, however, I consider the alleged exceptions to each of the characteristics covered by the equal-opportunity requirement separately. This is because, instead of enacting a generic nondiscrimination provision, the General Assembly specifically enumerated each characteristic. In *Fulton*, the formal mechanism for providing exceptions was universal, relating to the entire nondiscrimination provision. 593 U.S. at 534-37 (determining that the nondiscrimination provision in the contract, which included the language: "unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion," was not generally applicable). Here, no universal discretion has been authorized or exercised.

Moreover, the specific State interests in eliminating discriminatory barriers for children and families and protecting children from discrimination are distinct depending on the basis for the discrimination. For instance, there was significant testimony in this case on the specific

**A096**

barriers LGBTQ+ children and families face in obtaining preschool services. These circumstances would differ for barriers based on religious affiliation, disability, sex, or race.[33] And, if exemptions from the equal-opportunity requirement are permitted, there would be separate considerations for allowing the exceptions with respect to each characteristic. In other words, all discrimination is not the same. Plaintiffs make this point in arguing that treating members of the LGBTQ+ community differently is not equivalent to race discrimination. *See* Pls.' Proposed FOFCOL at 46, 63.[34]

In arguing that Defendants treat secular conduct more favorably than religious exercise, Plaintiffs rely on *Fellowship of Christian Athletes v. San Jose Unified School District*, a case in which a divided Ninth Circuit held that a school district's revocation of a religious student organization's status as an official student club likely violated the organization's free exercise rights. 82 F.4th 664, 671-72, 695-96 (9th Cir. 2023) (en banc). The school district adopted an "All-Comers Policy" that prevented student clubs from enacting discriminatory membership and leadership criteria but "carved out several exceptions." *Id.* at 678. The majority found that "[d]espite the All-Comers-Policy, schools in the District were allowed to maintain—or even themselves sponsor—clubs with facially discriminatory membership requirements," including a club for "seniors who identify as female" and a club "prioritiz[ing] acceptance of [S]outh Asian students." *Id.* at 678, 688. As a result, the majority concluded that the policies were not generally applicable and thus were subject to strict scrutiny. *Id.* 689-90. This case is neither binding nor

---

[33] While I independently consider most of the characteristics covered by the equal-opportunity requirement, much of my analysis regarding sexual orientation and gender identity overlaps on account of Plaintiffs' related arguments and the evidence presented in this case.

[34] Furthermore, it would be illogical to find that, if Defendants violate Plaintiffs' constitutional rights with the implementation of a single aspect of the equal-opportunity requirement, then Plaintiffs automatically should not be bound by any aspect of the requirement, leaving children and families with the other characteristics less protected.

A097

applicable. The policy at issue there required clubs "to permit any student to become a member or leader, if they meet nondiscriminatory criteria." *Id.* at 678. It did not specify the characteristics that could be or were prohibited from being considered. *See id.* ("[T]he guidelines do not define what constitutes "non-discriminatory criteria."). And the majority assumed that, by permitting discrimination based on any characteristic, the school district was allowing secular activity that was comparable to the differential treatment of LGBTQ+ individuals by the religious student organization. The facts in this case, including the discretion involved, are dissimilar, and consequently the analysis is different.

Preferences Involving Disability, Income, and Race

The disability and income aspects of the equal-opportunity requirement are unique and warrant independent consideration. As I already concluded, the UPK Statute does not authorize the Department to grant any exception to the equal-opportunity requirement. Now, I further conclude that the equal-opportunity requirement incorporates its own exceptions for children in low-income families or who meet at least one qualifying factor as well as those with disabilities who "must be offered preschool services in accordance with the child's individualized education program" under the Individuals with Disabilities Education Act and Exceptional Children's Educational Act. Colo. Rev. Stat. §§ 26.5-4-204(3).[35] Thus, the allowance for special programming to serve the identified children with disabilities and those in low-income families

---

[35] This understanding of the UPK Statute is bolstered by the statute's specific naming of these providers and identification as purposes of the program to provide access to preschool services for children with disabilities and those in low-income families. Colo. Rev. Stat. § 26.5-4-202(1) & (4).

**A098**

does not violate the equal-opportunity requirement,[36] and the Department's treatment of related programs is not discretionary and does not involve favoring secular activity over religious exercise.[37]

---

[36] I continue to question whether the equal-opportunity requirement, on its face, applies to individuals without a disability, as the language obligates participating preschools to provide an equal opportunity "regardless of . . . disability." Colo. Rev. Stat. § 26.5-4-205(2)(b). It does not guarantee individuals without a disability equal opportunity. Additionally, as Ms. Odean described the special programs for specific needs, school-district based providers have such programs aligned to their federal mandate" at one location within multiple in a school district and would still provide services to other children apart from that program. Odean Dep. 99:4-7, 19-23, Trial Ex. 26.

[37] Plaintiffs argue, in passing and for the first time in their Proposed Findings of Fact and Conclusions of Law, that "there is simply no neutral, compelling basis to distinguish between children and families whose need for a unique educational environment is driven by their (say) disability and those for whom it is driven by their faith." Pls.' Proposed FOFCOL at 41. It is unnecessary to explain all the reasons this argument fails, but suffice it to say, there are statutory imperatives that necessitate certain special treatment on the basis of disability, imperatives that go beyond what is required by the Free Exercise Clause. *See, e.g.*, 20 U.S.C. § 1400 *et seq.*; 42 U.S.C. § 12132. These, and other laws, reflect the nuanced realities of education, permitting special programming in specific cases for specific children. Yet, "[t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(A). In arguing that there is no basis for funding distinct education programs for children with a disability but not for religiously adherent children, Plaintiffs cite *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, in which the Third Circuit held that the Newark Police Department's no-beard policy violated the Free Exercise Clause because the Department made exemptions for medical reasons and offered no substantial justification for refusing to provide similar exemptions for officers who are required to wear beards for religious reasons. 170 F.3d 359, 360 (3d Cir. 1999). In that case, however, the permitted medical exemptions and denied religious exemptions were to the same no-beard policy, and the difference in outcomes was a result of the City's belief that it needed to comply with the Americans with Disabilities Act while it ignored the required accommodation for religion in Title VII of the Civil Rights Act of 1964. *Id.* at 365. Here, there are no analogous obligations for the State to fund separate education for religiously adherent children.

Just as importantly, even if the existence of specific programs that serve children with disabilities and those in low-income families violated the equal-opportunity requirement and even if Defendants were conferred the discretion to grant exceptions to the requirement to allow for those programs, that discretion would not lead to the conclusion that Defendants could also grant exceptions that would permit providers to deny equal access to LGBTQ+ children and families. There are distinct reasons, including statutory mandates, that Defendants might be authorized to permit special access for children with disabilities and those in low-income families. These same justifications likely would not apply to denying equal access on the basis of sexual orientation or gender identity. Accordingly, any differential treatment of children based on disability or income is not indicative that the equal-opportunity requirement, in its entirety or any other aspect of it, is not generally applicable.

Plaintiffs claim that "while Defendants are willing to interpret the [equal-opportunity requirement] flexibly to accommodate . . . providers [serving low-income children and those with disabilities], they insist on a rigid interpretation of that [requirement] to exclude Plaintiff preschools." Pls.' Proposed FOFCOL at 40. Not only is prioritizing low-income children and children with disabilities permissible under the equal-opportunity requirement, there is no evidence that it implicates the State's interest in protecting children from the harm they might suffer from discrimination.

Plaintiffs also claim that the Department could grant an exception to the equal-opportunity requirement that would permit a provider to limit enrollment to children of color from historically underserved areas. Plaintiffs cite to Ms. Odean's testimony at trial. Trial Tr. (Odean) 245:25-246:3 ("Could a school under this preference prioritize children of color from historically underserved areas? Yes."). However, later in her testimony, Ms. Odean clarified that

**A100**

she had never received such a request to limit enrollment to children of color and had not thought about the possibility of such a request. *Id.* 277:23-25, 278:23-279:2, 279:13-15. She indicated that she does not have sole authority to approve such a request, and the Department would carefully review any request for a preference with the advice of legal counsel and would not grant any request if the preference violated the equal-opportunity requirement. *Id.* at 245:3-24, 278:1-8, 279:16-280:5. Ms. Odean's testimony confirms that the Department does not have the authority to grant any exemption from the equal-opportunity requirement.

Preferences Involving Sexual Orientation and Gender Identity

Similar to their arguments regarding the equal-opportunity requirement and race, Plaintiffs point to Ms. Odean's testimony as proof the Department could grant an exception allowing a preschool to limit enrollment to gender-nonconforming children or members of the LGBTQ community. *See id.* 244:15-25, 245:13-24, 246:4-8. Here, too, Ms. Odean qualified her testimony, responding that the Department would look into a school for gender-nonconforming children and would accept the request as long as there was no discrimination under the equal-opportunity requirement. *Id.* 245:19-24; *see also id.* 278:1-8, 279:16-280:5. Apart from this testimony, Plaintiffs identify no evidence that Defendants have been given or have exercised the authority to grant an exemption from the sexual-orientation and gender-identity aspects of the equal-opportunity requirement. I cannot conclude that Defendants have the discretion to grant such exemptions based merely on hypotheticals and speculation when nothing in the UPK Statute or official documents from the Department supports that it does.

The Department has made decisions to promote mixed-delivery that do not run afoul of the equal-opportunity requirement. These decisions do not devalue religious beliefs or make such

**A101**

beliefs any less important than nonreligious justifications. The differential treatment of children and families on the basis of disability and income is permitted by the UPK Statute, and specifically the equal-opportunity requirement. Defendants do not have the discretion to grant any exemptions to the equal-opportunity requirement. At most, they would be authorized to grant exemptions to the disability and income aspects of the equal-opportunity requirement, and in that case, it would not lead to the conclusion that they have similar discretion to grant exemptions to the sexual-orientation and gender-identity aspects of the requirement. Defendants have not exercised discretion to grant exemptions to the disability, income, race, sexual-orientation, or gender-identity aspects of the requirement. *Cf. Fellowship of Christian Athletes*, 82 F.4th at 688 (finding that the school district exercised discretion to allow discrimination in violation of the at-issue policy). The algorithm preferences the Department allows providers to exercise do not pose a similar risk to the asserted interests as would permitting Plaintiff Preschools to deny LGBTQ+ children and families equal access to publicly funded preschool services. Therefore, Plaintiffs have failed to show Defendants treat any comparable secular activity violating the sexual-orientation and gender-identity aspects—as well as the disability, income, and race aspects—of the equal-opportunity requirement more favorably than Plaintiffs' religious exercise.

Preferences Involving Religious Affiliation

For the religious affiliation aspect of the equal-opportunity requirement, the conclusion is the opposite. The congregation preference permitted by Defendants is a clear exception to that aspect of the requirement, as it unequivocally permits faith-based providers to prioritize access to their services for members of their congregation, however they choose to define that term. Thus, a preschool that exercises the preference does not have to provide an equal opportunity to

A102

children and families "regardless of . . . religious affiliation." Colo. Rev. Stat. § 26.5-4-205(2)(b).

The testimony here from Ms. Odean is explicit:  the congregation preference would allow a

Catholic provider to reserve seats for "Catholics" and allow a Lutheran provider to reserve seats

for "Lutherans", and the Catholic provider "wouldn't have to provide an opportunity to enroll

Lutherans." Trial Tr. (Odean) 239:3-240:17. Ms. Odean did not later qualify this testimony. This

exception to the religious-affiliation aspect of the equal-opportunity requirement mandates the

conclusion that the particular aspect is not generally applicable.

Defendants disagree with this conclusion and insist that the congregation preference does

not allow providers to discriminate on the basis of religious affiliation. *Id.* 276:7-22; Trial Tr.

(Cook) 154:14-18. Ms. Odean testified that the Department would investigate if it learned that a

provider was utilizing the congregation preference to discriminate. Trial Tr. (Odean) 276:7-22.

Defendants justify the congregation preference by explaining that its purpose is to sustain

ongoing relationships with specific provider communities. *Id.* 276:10-15 ("It is about an

inclusive community, and being able to ensure that providers can continue to serve the

communities they have served, and families can continue to participate."). According to

Defendants, the term congregation does not need to be understood in religious terms. But the

preference is specifically available to "faith-based providers." Defendants claim providers could

define congregation to include individuals who attend services and activities but do not share the

same religion. Defs.' Proposed FOFCOL at 47. Applied in this way, the preference would still be

based on affiliation with the faith-based provider, i.e., religious affiliation.

Defendants' most salient argument is that "even if the congregation preference were

understood to permit faith-based providers to discriminate on the basis of religion, that need not

trigger strict scrutiny for Free Exercise Clause purposes because such a preference does not

'prohibit religious conduct while permitting *secular* conduct that undermines the government's asserted interests in a similar way.'" *Id.* at 48 (quoting *Fulton*, 593 U.S. at 534 (emphasis added)). Defendants cannot have it both ways, though. They cannot contend that the congregation preference does not apply to conduct that is necessarily religious, *see id.* at 47, while also arguing that the preference "is available only to religious providers," *see id.* at 49. Under their own theory, Defendants allow discrimination on the basis of religious affiliation for secular reasons (e.g., maintaining community relationships) but not religious ones (e.g., sharing the same faith). Defendants, in effect, contend the latter would violate the equal-opportunity requirement, while the former would not. This amounts to favoring secular activity over religious exercise.

Additionally, under these unique circumstances, the congregation preference singles out faith-based providers and requires them to navigate an untenable situation. The congregation preference invites them to reserve seats for members of their "congregation" such that they are, in effect, denying equal access on the basis of religious affiliation. Faith-based providers cannot tread carefully enough to both take advantage of that preference and also be confident that they will not be investigated for discriminating on the basis of religious affiliation. *See* Trial Tr. (Odean) 276:7-22 (advising that providers may be investigated if they use the congregation preference to discriminate).

In the end, Plaintiffs have established that the religious-affiliation aspect of the equal-opportunity requirement is not generally applicable as the Department has applied it and thus that strict scrutiny is triggered for that government policy. As for the other challenged aspects of the equal-opportunity requirement—those related to sexual orientation and gender identity, I conclude that they are neutral and generally applicable and that Defendants must only show that

they are rationally related to a legitimate government end. *See United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002).


### 4. Strict Scrutiny

Although I have concluded the sexual-orientation and gender-identity aspects of the equal-opportunity requirement should not be subjected to strict scrutiny, I find that even if strict scrutiny applied, it would be satisfied. With that considerably higher threshold met, Defendants easily overcome rational basis review. On the other hand, regardless of whether it could satisfy rational basis review, the religious-affiliation aspect of the equal-opportunity requirement triggers strict scrutiny. For this specific aspect of the equal-opportunity requirement, and based on the record before me, Defendants' conduct is not justified under such an exacting review.

To satisfy strict scrutiny, Defendants must demonstrate their "course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy*, 597 U.S. at 525 (citing *Lukumi*, 508 U.S. at 546). "Rather than rely on 'broadly formulated interests,' courts must 'scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants.'" *Fulton*, 593 U.S. at 541 (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006)). "A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546.

Defendants have consistently claimed that the UPK Statute does not permit them to grant any exemption from the equal-opportunity requirement. *See* Trial Tr. (Cooke) 159:23-160:7, 173:18-20; Roy Letter at 1, Trial Ex. 12. I have already determined that Defendants are correct—under the UPK Statute, the Department lacks the authority to grant any exemption from the

**A105**

equal-opportunity requirement. Because that is the case, it is appropriate to consider the State's underlying interests and whether Defendants' actions further those interests. Defendants assert that their conduct—in denying Plaintiff Preschools an exemption from the equal-opportunity requirement—is justified by two compelling State interests: (1) ensuring eligible children and their families do not face discriminatory barriers to publicly funded preschool and (2) protecting children from discrimination.

Plaintiffs contend the interests Defendants assert are "after-the-fact justifications" and cannot be attributed to the Legislature. Pls.' Proposed FOFCOL at 49. Uncontroverted testimony at trial, however, established that the statutory equal-opportunity requirement was included in the UPK Statute so that eligible children would have access to preschool programs of their choosing and that best fit their family's needs without experiencing discrimination on the bases identified in the statute and so that eligible children can grow to their maximum ability and are not put in an unsafe or unhealthy environment. *See* Trial Tr. (Cooke) 142:25-143:3; Trial Tr. (Odean) 197:17-198:9, 199:15-25. The asserted State interests are not factitious, hypothesized, or invented post hoc. *Cf. Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008) (finding that the legislative history and state court interpretation were contrary to the asserted interest); *Kennedy*, 597 U.S. at 543 n.8 (noting that the school district did not raise concerns related to the state interest in its correspondence with the plaintiff and the interest was not addressed by the lower courts).

### i. Sexual Orientation and Gender Identity

I consider first whether the asserted State interests are compelling and narrowly tailored as they relate to Defendants' denial of an exemption from the sexual-orientation and gender-

identity aspects of the equal-opportunity requirement. Because I find that the first State interest Defendants identify—ensuring eligible children and their families do not face discriminatory barriers—is compelling and that Defendants' conduct was narrowly tailored in pursuit of that interest, I do not assess whether the second State interest—protecting children from discrimination—likewise satisfies strict scrutiny.

Plaintiffs argue that Defendants must establish there is an "actual problem" in need of solving and have failed to do so. Pls.' Proposed FOFCOL at 51 (quoting *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011)). The case Plaintiffs cite for that requirement, *Brown v. Entertainment Merchants Association*, involved content-based restrictions on speech, which are not at issue in this case. In *Brown*, the Court found that the State of California could not show that the challenged legislation's labeling requirements and prohibition on the sale or rental of video games to minors met "a substantial need of parents who wish to restrict their children's access to violent video games but cannot do so." 546 U.S. at 789, 803. As I detail below, Defendants here have shown that there is a substantial need for LGBTQ+ children and families in Colorado to have equal access to publicly funded, quality preschool services. *Cf. Awad v. Ziriax*, 670 F.3d 1111, 1129-30 (10th Cir. 2012) (in a challenge to an amendment to the Oklahoma Constitution that would have prevented state courts from considering or using Sharia law, finding that Oklahoma officials could not show an actual problem the amendment sought to address when they admitted they were unaware of "a single instance where an Oklahoma court had applied Sharia law or used the legal precepts of other nations or cultures"). Plaintiffs point out that, although Plaintiff Preschools are licensed by the State and have participated in other government-funded preschool programs, no formal complaints have previously been filed with the State alleging that they have engaged in discrimination against LGBTQ+ children or families.

Trial Tr. (Odean) 264:1-265:3. Plaintiffs believe this shows that any potential harm to LGBTQ+ students or families is merely speculative and insufficient to establish a compelling interest. *See* Pls.' Proposed FOFCOL at 50-51. I disagree. The scope of the UPK program is much more extensive than the prior preschool programs, and it provides opportunities for students who may not have sought out religious preschool services before. It cannot be assumed that a lack of formal complaints in the past equates to discrimination not having occurred or evinces it is unlikely to occur in the future.[38]

The compelling nature of the State's interest in ensuring LGBTQ+ children and their families do not face discriminatory barriers is supported by the evidence in the record. The testimony at trial established the positive impact preschool attendance, and in particular quality preschool services, can have on students and their families. Preschool prepares children for school, educationally and emotionally. Trial Tr. (Holguín) 427:12-14, 431:16-21. Preschool attendance is associated with positive outcomes, such as access to college or higher education, whereas non-attendance corresponds with negative outcomes, such as a lack of success

---

[38] Both sides have played fast and loose in claiming that Catholic schools in Denver have not historically denied access to LGBTQ+ children and families. For example, Plaintiffs' counsel argued to the Court that "not one of the Archdiocese's 36 preschools has any history of a complaint from a LGBTQ family or other person alleging LGBTQ-based discrimination." Trial Tr. (Openings) 9:21-25. I give counsel the benefit of the doubt that, technically speaking, perhaps no formal complaint with the State or in court has been filed against any of the Archdiocese's preschools. Although not part of the evidentiary record, however, it cannot be said that there is no history of any of the Archdiocese's preschools denying equal access to a family based on sexual orientation. *See, e.g.*, Archbishop Charles J. Chaput, *Catholic schools: Partners in faith with parents*, Denver Catholic Register (Mar. 10, 2010), *accessed at* https://web.archive.org/web/20110119221141/http://www.archden.org/index.cfm/ID/3560 (describing how one of the Archdiocese's schools had decided that a lesbian couple's child who was enrolled in preschool would be able to finish out that year but not continue at the school to kindergarten). Regardless, Ms. Coats testified that, just last year, Wellspring Catholic Academy declined to enroll a fifth grader with same-sex parents. Trial Tr. (Coats) 113:5-114:13, 125:25-126:10. There is no reason to believe that same-sex parents of preschoolers would not likewise seek to enroll their children in Plaintiff Preschools.

A108

academically, socially, and emotionally. *Id.* 430:4-10, 430:19-431:5. Preschool "is a key element for children to be able to succeed, and an equalizer for many children that don't have the opportunity to be in a place where they can acquire those skills." *Id.* 430:15-18.

The testimony likewise established that LGBTQ+ families often have fewer options when looking for early childhood education. Trial Tr. (Goldberg) 287:19-25, 289:18-23, 324:25-325:2. LGBTQ+ parents are about twice as likely to live in poverty, which may affect a family's options for transportation. Trial Tr. (Goldberg) 287:15-17, 324:4-17. The fact that LGBTQ+ families are more likely to live in poverty and have fewer options for preschools ultimately puts them at risk for inadequate outcomes. *Id.* 288:10-14. This evidence substantiates that the State's interest in ensuring LGBTQ+ children and families do not experience discriminatory barriers to publicly funded preschool is compelling.

Plaintiffs contend that denying Plaintiff Preschools an exemption does not advance the State's interest because "[a]llowing Plaintiff preschools to participate would not take away a single . . . option[] for LGBTQ families" and instead would add to the list of providers. Pls.' Proposed FOFCOL at 48 (emphasis removed). Plaintiffs misunderstand the State's interest. If Defendants claimed the State's interest were simply increasing the number of available preschool spots, Plaintiffs' argument might have merit. But Defendants identify the State's interest as ensuring that children and families do not face discriminatory barriers when enrolling and receiving publicly funded preschool services. The purpose is to avoid these children and families being denied access to the publicly funded preschool programs that best fit their family's needs and to avoid putting them at risk for inadequate outcomes. Simply adding to the list of UPK providers does not address this purpose.

A109

The State's interest here differs significantly from the City's in *Fulton*. There, the City's relevant asserted interests were "maximizing the number of foster parents . . . and ensuring equal treatment of prospective foster parents and foster children." *Fulton*, 593 U.S. at 541. The Court observed that including the Catholic foster care agency "seem[ed] likely to increase, not reduce, the number of available foster parents." *Id.* at 542. And, it found that, while equal treatment was a weighty interest, the City's "creation of a system of exceptions under the contract undermine[d] [its] contention that its non-discrimination policies [could] brook no departures." *Id.* As I just explained, the State's interest identified by Defendants is not simply to increase the number of preschool spots available. Moreover, as I have already found, the Department has not created a formal mechanism for exceptions to the sexual-orientation and gender-identity aspects of the equal-opportunity requirement.[39]

Plaintiffs insist Defendants' evidence in actuality confirms that a compelling interest is lacking. Plaintiffs note that Defendants' experts could not point to any research "demonstrating that excluding preschools (much less Catholic preschools specifically) from UPK Colorado would advance the Department's alleged interests in removing discriminatory barriers to preschool." Pls.' Proposed FOFCOL at 51. And, specifically, Plaintiffs highlight that Dr. Goldberg provided "no evidence lesbian or gay families in Denver would be unable to access affirming preschools as a result of Plaintiff[ Preschools'] policies." *Id.* at 52.

Once again, Plaintiffs skew the identified State interest. The interest is not that LGBTQ+ children and their families are able to access some preschool services somewhere. It is clear from

---

[39] Using the same type of logic the Court employed in *Fulton*, it seems that if public money is not being disbursed to schools that discriminate in a manner contrary to the equal-opportunity requirement, then more money should be available for schools that do not discriminate in such a way, perhaps creating additional opportunities for children and families that might experience discrimination on the bases specified in the requirement.

**A110**

the evidence that such a limited interest would not constitute equity or equal opportunity as envisioned. The asserted State interest is in removing discriminatory barriers so that these children and families may have access to the publicly funded, quality preschool programs of their choosing and that best fit their family's needs. As the expert testimony illustrated, removing discriminatory barriers prevents the burden of discrimination from continuing to be placed on these children and families by, for example, requiring them to find another preschool provider or to travel a greater distance to receive preschool services.

Additionally, the State's interest is focused on ensuring access to publicly funded, *quality* preschool services so that eligible children can grow to their maximum potential. The Brief of Amici Curiae informs that "religious schools often provide the best academic experience for students." Br. of Amici Curiae at 6. The Brief cites to a meta-analysis that ostensibly concludes "students who attend religious schools perform better than their counterparts who are in public schools[,] . . . both in terms of academic and behavioral outcomes." William H. Jeynes, *A Meta-Analysis on the Effects and Contributions of Public, Public Charter, and Religious Schools on Student Outcomes*, 87 Peabody J. of Educ. 305, 324 (2012).[40] On Colorado's rating system for early childhood education providers, both Plaintiff Preschools have earned four out of five stars. Trial Tr. (Seul) 71:19-72:1; Trial Tr. (Coats) 104:22-23; *see also* Trial Tr. (Holguín) 428:11-15. If religious schools in fact provide the best academic experience, the State's interest in removing discriminatory barriers for publicly funded preschool education is even more significant. The children who could be denied preschool services if Plaintiff Preschools were granted an exemption would lose out not only on receiving services from their preferred preschool but

---

[40] Amici also emphasize the value of the mixed-delivery program and its ability to offer students and families options. *See, e.g.*, Br. of Amici Curiae at 1. They miss, however, the irony in valuing choice for religious schools and their students—but not for LGBTQ+ children and families.

perhaps would also be forced to forgo "the best academic experience." When the State is footing

the bill, it has a compelling interest in deciding that children may not be denied this experience

based on specified discriminatory factors. "[E]ducation provides the basic tools by which

individuals might lead economically productive lives to the benefit of us all." *Plyler v. Doe*, 457

U.S. 202, 221 (1982). If LGBTQ+ children and their families do not have access to the best

academic experience, they may be denied the opportunity to achieve their maximum potential, to

the detriment of all.

More generally, it would be unreasonable to require Defendants to present the evidence

Plaintiffs claim is necessary. Defendants cannot be expected to determine which preschool

programs best fit each family's needs and then to evaluate how each child or family might be

subject to inappropriate discrimination under the equal-opportunity requirement. Nor can courts

demand research that addresses the exact circumstances.[41] Inferences based on reliable,

circumstantial evidence and the exercise of common sense suffice.

Defendants have established a compelling interest in denying an exemption from the

sexual-orientation and gender-identity aspects of the equal-opportunity requirement for Plaintiff

Preschools specifically. I note as well, however, that the Department's interest goes beyond

---

[41] Undoubtedly, if such research were presented, Plaintiffs would contend it is irrelevant because it was not considered by the General Assembly in enacting the UPK Act. *See, e.g.*, Pls.' Mot. to Exclude Expert Testimony at 3, ECF No. 73 ("[T]here is no evidence that the Colorado Legislature or the Department of Early Childhood reviewed and considered *any* of the studies or research relied on by either expert . . . in making the decisions to exclude Plaintiffs."). In effect, Plaintiffs argue that, for evidence to be relevant, it must be related only to the decision to deny Plaintiff Preschools an exemption and also that it must have been considered by the General Assembly and the Department before denying the exemption. Under these circumstances, it would be impossible to provide any such research. The Department did not seek out or review any research because it believed it did not—and in reality did not—have the authority to grant Plaintiff Preschools an exemption. And the General Assembly could not have predicted each provider that might request an exemption and commissioned research related to that provider. Plaintiffs' arguments, viewed together, are unreasonable.

denying the exemption for Plaintiff Preschools. If Defendants granted Plaintiff Preschools an exemption, they would likely have to grant exemptions to many other religious providers. In this case, the Archdiocese sought an exemption for its 34 other preschools in addition to Plaintiff Preschools, and Amici advocate on behalf of numerous other religious preschools desiring similar exemptions. Upon the granting of an exemption from any preschool, other religious providers would surely argue that the Department has permitted its interests to be undermined and, consequently, that its interests are not compelling. Indeed, Plaintiffs make this exact argument regarding Defendants' decision not to appeal the preliminary injunction granted in *Darren Patterson*. *See, e.g.*, Pls.' Mot. for Summ. J. at 39, ECF No. 61 ("[I]f the Department is fine with the *Darren Patterson* school's participation . . . then it's difficult to see why the Department here has a 'compelling' interest in stopping the Archdiocese from doing the same."). If one exemption is granted, others would necessarily follow and the number of preschools denying equal access to LGBTQ+ children and families would quickly grow.[42] The State's interest in eliminating discriminatory barriers, therefore, relates not just to the consequences that would result from granting Plaintiff Preschools an exemption.

"Ensuring equal opportunity for students to attend publicly supported schools . . . comports with public policy that has been widely adopted in the United States for the last thirty years or more." Ira C. Lupu & Robert W. Tuttle, *Zelman's Future: Vouchers, Sectarian Providers, and the Next Round of Constitutional Battles*, 78 Notre Dame L. Rev. 917, 977 (2003)

---

[42] If religious preschools across the State must be permitted to deny LGBTQ+ children and families equal access, those children and families in rural areas will be impacted to an even greater extent and could be denied access to preschool services altogether. *See* Trial Tr. (Goldberg) 287:4-9, 325:3-14 (discussing how options for early childhood education are fewer in number and more spread out in rural areas and how sometimes the only option available for LGBTQ parents is a religious provider).

(writing twenty years ago). The Supreme Court has recognized the prerogative of states to refuse to fund private discrimination.[43] And granting even one exemption undermines this public policy.

For Defendants to satisfy strict scrutiny, they must show the means of pursuing the compelling interest they have demonstrated are narrowly tailored, or in other words that the means are "closely fitted" to that compelling interest. *See Kennedy*, 597 U.S. at 525; *Awad*, 670 F.3d at 1129. Plaintiffs contend the "means" Defendants have chosen do not "fit" their asserted interest because there is no connection between excluding Plaintiff Preschools and the State interest in removing discriminatory barriers to publicly funded preschool. *See* Pls.' Proposed FOFCOL at 57. I addressed this argument above and restate that adding preschools does not remove the discriminatory barriers the General Assembly chose to prioritize and does not provide equal access to the children and families who might be subjected to the discriminatory treatment.

Plaintiffs suggest that, instead of applying the equal-opportunity requirement, Defendants could include a disclaimer for Plaintiff Preschools in the UPK portal, informing that they do not provide services to LGBTQ+ students or families. In no way would such a disclaimer achieve the State's interest in removing discriminatory barriers. On the contrary, it would appear to reenforce those barriers, even if an added disclaimer is provided to explain the "obvious point" that the schools' positions are not attributable to the Department. *See id.* at 56 n.12.

I conclude, therefore, that the State interest in removing discriminatory barriers for LGBTQ+ children and families is compelling and the means for pursuing that interest are

---

[43] *See, e.g.*, *Norwood v. Harrison*, 413 U.S. 455, 468–69 (1973) ("There is no reason to discriminate against students for reasons wholly unrelated to individual merit unless the artificial barriers are considered an essential part of the educational message to be communicated to the students who are admitted. Such private bias is not barred by the Constitution, nor does it invoke any sanction of laws, but neither can it call on the Constitution for material aid from the State.").

**A114**

narrowly tailored. If strict scrutiny were triggered for Plaintiffs' first, fourth, or fifth claim in

relation to the sexual-orientation or gender-identity aspects of the equal-opportunity requirement,

Defendants would have overcome it.[44]


### ii. Religious Affiliation

In sharp contrast to the evidence Defendants presented to establish a compelling interest

with respect to the sexual-orientation and gender-identity aspects of the equal-opportunity

requirement, Defendants did not offer any evidence relating to discrimination on the basis of

religious affiliation. The evidence in the record supports the determination that quality preschool

services are beneficial for children and thus that children should not be denied equal access to

such publicly funded preschool services based on factors unrelated to the needs of the children or

their families. This evidence is insufficient to find Defendants' conduct in denying Plaintiffs an

exemption from the religious-affiliation aspect of the equal-opportunity requirement is justified

by a compelling interest. Moreover, any State interest in ensuring children and families do not

experience discrimination because of their religious affiliation, or lack thereof, is undermined by

Defendants' creation of the congregation exception, which unquestionably permits such

discrimination. Defendants have failed to establish a compelling interest justifying their denial of

an exemption from the religious-affiliation aspect of the equal-opportunity requirement for

---

[44] This conclusion does not contradict the application of strict scrutiny in *Darren Patterson* because, at the time the limited preliminary injunction was issued in that case, "the state ha[d] not really attempted to proffer a compelling interest of the highest order, nor ha[d] it shown that it narrowly tailored its policies to pursue any interest." 2023 WL 7270874, at *16. Here, Defendants asserted and argued the State interests in multiple filings and at the trial, where relevant expert testimony was presented.

**A115**

Plaintiff Preschools. Thus, because strict scrutiny was triggered and is not satisfied, Plaintiffs' free exercise rights have been violated in this regard.

The UPK Program is an innovative endeavor, and the Department's implementation is occurring as the relationship between church and state continues to undergo a legal transformation. "[T]hose who must make practical decisions about how and where we educate our children . . . and how we care for the least fortunate among us, do not enjoy [the luxury of watching and waiting as new principles emerge and work themselves pure]. They face formidable challenges in reconciling those concerns with appropriate limits on state power in dealing with religious entities." Lupu & Tuttle, *supra*, at 994. In their attempts to include and accommodate faith-based providers, Defendants have created an unworkable scheme that breaches the appropriate limits on state power. Defendants enable faith-based providers to effectively discriminate on the basis of religious affiliation in their admission of preschoolers but, at the same time, deny Plaintiff Preschools an explicit exemption from the related aspect of the equal-opportunity requirement. Defendants have provided no compelling interest for their course of conduct. As a result, Plaintiff Preschools succeed on the merits of their fifth claim with respect to the religious-affiliation aspect of the equal-opportunity requirement. Plaintiffs otherwise fall short on their first, fourth, and fifth claims.

## C.  Claim Seven

Plaintiffs' seventh claim is brought under the Establishment Clause for "denominational favoritism." Plaintiffs allege Defendants' policies favor other religious denominations because they allow faith-based preschools to prioritize their congregation members, but Plaintiff Preschools would like to give admissions preference to the children of all members of the

Catholic Church and believe they are unable to do so. I concluded above that Defendants'

creation and implementation of the congregation exception violates Plaintiffs' free-exercise

rights. Since I grant a related preliminary injunction and award nominal damages below, the only

additional relief Plaintiffs seek under this claim is a declaration, which I need not provide.

Though I am doubtful of Plaintiffs' expansive reading of *Larson v. Valente*, 456 U.S. 228, 245

(1982), *see, e.g.*, *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008)

("[W]hen the state passes laws that facially regulate religious issues, it must treat individual

religions and religious institutions 'without discrimination or preference' . . . ." (quoting New

York Constitution of 1777, art. XXXVIII, reprinted in 5 The Founders' Constitution, at 75)), I

decline to exercise my discretion to consider whether Defendants have violated the

Establishment Clause.


**D.  Claim Six**

       Plaintiff Preschools' sixth claim asserts a violation of their free-speech rights based on

two theories: that the Universal Preschool Program forces them to accept members who oppose

the purposes of their group (expressive association) and thus compels them to speak messages

against their will (compelled speech). While similar and both grounded in the First

Amendment—and some consider compelled speech a corollate to the right to expressive

association—their analyses are slightly different. Because the determination regarding expressive

association generally is more complex, I begin there.

**A117**

### 1. Plaintiffs' Arguments

The U.S. Supreme Court has determined that expressive association is an indispensable right, which secures other speech rights. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed."). Plaintiff Preschools maintain that, like the Boy Scouts of America in *Boy Scouts of America v. Dale*,[45] their association is expressive, and Defendants should not be able to require them to admit LGBTQ+ children and families as a condition of participating in the UPK Program because the presence of those children and families would undermine the expressive message Plaintiffs intend to convey. *See* 530 U.S. 640 (2000). I agree with Plaintiffs that, based on Supreme Court precedent, their association likely is expressive. *See id.* at 641 (observing that plaintiff organization engages in expressive association "when its adult leaders inculcate its youth members with its value system"). But my agreement ends there. The rest of Plaintiff Preschools' argument poses significant problems, including that the facts and laws implicated in *Dale* do not align with those in the instant litigation.

In *Dale*, the Boy Scouts of America revoked the membership of a former Eagle Scout and an assistant scoutmaster, James Dale, after he publicly disclosed his sexual orientation as

---

[45] Plaintiffs also refer to *Slattery v. Hochul*, which held that a crisis pregnancy center stated a plausible claim that a New York "statute unconstitutionally burdens its right to freedom of expressive association—as guaranteed by the First and Fourteenth Amendments—by preventing it from disassociating itself from employees who, among other things, seek abortions." 61 F.4th 278, 283 (2d Cir. 2023). Even if this precedent were binding, it is inapposite for at least one of the same reasons as *Dale*, which is that no benefit is being conditionally offered by the government. Second and relatedly, *Slattery* did not involve a non-discrimination policy that, among other things, was engineered to ensure equal opportunity regardless of membership in certain protected classes.

homosexual and promoted gay rights. *Id.* at 644. The Boy Scouts justified Dale's expulsion on the grounds that it "is a private, not-for-profit organization engaged in instilling its system of values in young people" and "homosexual conduct is inconsistent with the values it seeks to instill." *Id.* James Dale filed suit, seeking readmission to the Boy Scouts of America under the theory that his removal violated New Jersey's public accommodation laws. The Boy Scouts of America petitioned for certiorari after the New Jersey Supreme Court held that the organization had to readmit Dale. The United States Supreme Court accepted the case and reversed, holding that compelling Dale's admission violated the expressive associational rights guaranteed by the First Amendment to the Constitution. *Id.* at 656.

The circumstances here are entirely different.[46] First and most importantly, the state of New Jersey sought only to enforce its public accommodations law in *Dale*, 530 U.S. at 644. Here, the government is conferring a benefit on the schools themselves and attaching conditions for receipt of that benefit.

Second, admission to private clubs, such as the Boy Scouts of America is entirely elective with no encouragement of participation from the state. Education of Colorado's youth, by

---

[46] Initially, I question whether the equal-opportunity requirement targets expressive activity at all. Precedent prescribes a case-specific assessment of the regulated activity in determining whether the implicated regulation affects speech or affects conduct that, in turn, indirectly impacts speech. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706–07 (1986) (determining whether speech rights apply first requires finding whether the conduct with a "significant expressive element" drew the legal remedy or the regulation "has the inevitable effect of singling out those engaged in expressive activity"). Were it not the case that Plaintiff Preschools engage in substantially the same activity as in *Dale* —youth instruction involving organizational value, I likely would find the equal-opportunity requirement does not target expressive activity at all. Indeed, the legal analysis in *Dale* is so brief and all-encompassing, "[i]t is hard to imagine an association that is not expressive under Dale's criteria." Andrew Koppelman, *Signs of the Times: Dale v. Boy Scouts of America and the Changing Meaning of Nondiscrimination*, 23 Cardozo L. Rev. 1819, 1822 (2002). When a bar on discrimination is a restriction that predominantly targets conduct, speech rights are not relevant unless the conduct itself is inherently expressive. *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62, 65-66 (2006).

contrast, is strongly promoted by the State at the preschool stage—the program is literally intended to be "universal"—and thereafter is compulsory.[47]

Third, the Boy Scouts of America sought to determine who would be providing instruction to youth members.[48] James Dale was "the copresident of a gay and lesbian organization at college and remains a gay rights activist." *See id.* at 653. Here, the members the organization seeks to exclude, people whose presence allegedly would impair Plaintiffs' associative expression, are children. Preschool children are not (yet) group leaders, holding authority within the organization itself, and the First Amendment does not apply the same for children as for adults generally, particularly "in light of the special characteristics of the school environment." *See Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 187 (2021) (quoting *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266, (1988)). While Plaintiff Preschools may also associate with parents in educating their children, parents' conduct or beliefs cannot be attributed to the children Plaintiff Preschools seek to exclude. To withhold a benefit for children on a parent's status (or even the parent's actions) is typically offensive to the Constitution. *Cf. Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972) (holding, in the context of equal protection jurisprudence, "[t]he status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage[, b]ut visiting this condemnation on the head of an infant is illogical and unjust").

---

[47] Colorado mandates school attendance, but only for children above the age of six. *See* Colo. Rev. Stat. § 22-33-104.

[48] As explained above, the only policy that would impact Plaintiff schools' employment decisions for teachers and other staff is contained in Paragraph 18(B), which Defendants have indicated was included by accident and would not be enforced. *See* Trial Tr. (Odean) 231:8-232:2; Trial Tr. (Cooke) 148:7-12. Thus, I have found this portion of Plaintiffs' sixth claim to be moot.

**A120**

Fourth, the rights of gender diverse individuals were not considered in *Dale*. It has become clearer that transgender members of the LGBTQ+ community constitute a "discrete and insular minority," warranting basic protections. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ("We agree with the Seventh and now Eleventh Circuits that when a 'School District decides which bathroom a student may use based upon the sex listed on the student's birth certificate,' the policy necessarily rests on a sex classification.") (quoting *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017)); *Griffith*, 2023 WL 2242503, at *9 ("This Court has little trouble stating that the Tenth Circuit needs to revisit its holding in *Brown v. Zavaras*[, 63 F.3d 967 (10th Cir. 1995)]," which, after applying rational basis review, rejected a transgender female inmate's claim that, by withholding estrogen treatment, her equal protection rights were violated.).[49] Based on these distinctions it is clear *Dale* cannot and should not be extended to the facts of this case.

---

[49] Another point that should be considered is the changing legal landscape and social acceptance for LGBTQ+ rights. The recognition and acceptance of same sex relationships alluded to in the *Dale* dissent has been more fully realized than Justice Stevens could have predicted in the year 2000. *Dale*, 530 U.S. at 699-700 (listing examples of acceptance of homosexual people and disapproval of discrimination against them) (Stevens, J., dissenting). Indeed, the present-day Boy Scouts of America "welcome all eligible youth, regardless of race, ethnic background, *gender or orientation*, who are willing to accept Scouting's values and meet any other requirements of membership" and declare "[p]rejudice, intolerance and unlawful discrimination are unacceptable within the ranks of the Boy Scouts of America." Membership Policy, About the BSA, THE BOY SCOUTS OF AMERICA, https://www.scouting.org/about/membership-policy/. This was not the case when *Bowers v. Hardwick* was good law. 478 U.S. 186, 192 (1986) (upholding criminal statute outlawing sodomy because a "fundamental right to homosexuals to engage in acts of consensual sodomy" was neither "implicit in the concept of ordered liberty" nor "deeply rooted in this Nation's history and traditions"), *overruled by Lawrence v. Texas*, 539 U.S. 558 (2003). Eventually, however, our jurisprudence acknowledged the legitimacy of same sex marriage and that "[w]ithout the recognition, stability, and predictability marriage offers, . . . children [of same-sex couples] suffer the stigma of knowing their families are somehow lesser." *Obergefell v. Hodges*, 576 U.S. 644, 668 (2015).

**A121**

Plaintiffs second and related argument—that the limitation on their ability to associate with whom they please forces them to convey a particular message with which they disagree—ties in another factually dissimilar case, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023). Like *Dale*, *303 Creative* evaluated the application of a public accommodations law, not the extension of material state benefits. Additionally, the regulation at issue in *303 Creative* was determined to restrict "pure speech," a position the Tenth Circuit Court of Appeals found the State of Colorado had conceded. 600 U.S. at 583. Assuming the preschool admissions process implicates speech, the equal-opportunity requirement still cannot reasonably be said to apply to "pure speech," as in *303 Creative*.

I distinguished the expressive association at issue in *Dale* on the grounds that associating with LGBTQ+ children and the children of LGBTQ+ parents is not likely to send the same message as "an avowed homosexual and gay rights activist in an assistant scoutmaster's uniform" in *Dale*. 530 U.S. at 655-56. This case is similarly distinguishable from *303 Creative* with regard to compelled speech because it is not clear here how Plaintiff Preschools' preferred message would be impaired. To the extent that any message is being forcibly expressed, it does not conflict with the preschools' preferred message.[50] Having these children at the school, even if the school has ideological or otherwise substantive criticisms of the status of the children or their parents, does not, in and of itself, convey agreement with that particular status. This is very different from the circumstances of the plaintiff in *303 Creative*, who sought to make websites to celebrate the marriages of only couples whose union she personally endorsed. *303 Creative*, 600

---

[50] I recognize that religious dogma is inscrutable within our courts, and it is beyond the role and ability of the federal judiciary to interpret religious doctrine or determine its legitimacy or centrality to religious exercise. *See supra* note 19. Accordingly, I focus my analysis on the contours of the potential message sent by agreeing to and complying with the equal-opportunity requirement.

**A122**

U.S. at 581. If providing a service to someone can express endorsement of that person's views, in terms of the message and degree of implicit support of that message conveyed via association, the plaintiff in *303 Creative* is in a fundamentally different position than the Plaintiff Preschools. One cannot reasonably dispute that a website made by a sole member-owned LLC that exists only to positively describe a union between a woman and another woman is much more likely to express a message of LGBTQ+ acceptance than having a preschool child present on a school campus who may or may not be a member of the LGBTQ+ community or *be a part of a family with a member in that community*.

This point is further supported by the fact that the implicit message conveyed here is not that Plaintiff Preschools support tolerance of the LGBTQ+ community, but rather that participating provider schools receive money under a program that supports giving every child "an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability." Colo. Rev. Stat. § 26.5-4-205(2)(b). Again, the message is not that Plaintiff Preschools necessarily endorse this policy. There are a number of reasons why a school may opt to accept the benefit and any one of those offer a competing message that, per Plaintiffs' expansive theory of compelled speech, could be reasonably understood by someone else to be the transmitted message. Plaintiff Preschools' signing of the UPK Agreement and compliance with the equal-opportunity requirement would not directly conflict or otherwise contravene the Plaintiffs' preferred messages.

**A123**

### 2.  The Equal-Opportunity Requirement as a Condition on Benefits

Properly viewed, the equal-opportunity requirement is a constitutionally permissible condition on a State benefit.[51] Ordinarily, the state is granted tremendous leeway to determine how to allot funding or other assistance and, to further the promotion of specific values, may choose to fund one project over another. *See, e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 192, 196-200 (1991) (explaining that "the Government 'may make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds'" (quoting *Maher v. Roe*, 432 U.S. 464, 474 (1977))). It may similarly condition receipt of benefits on a recipient's willingness to comply with certain regulations. *See Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 800 (1985) (recognizing the state's right "to preserve the property under its control for the use to which it is lawfully dedicated"). These regulations may restrict First Amendment freedoms. *See Healy v. James*, 408 U.S. 169, 189 (1972) (noting that a club at a state college may access facilities and other resources to engage in "[a]ssociational activities [except] where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education"); *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights.").

---

[51] As discussed above, recent Supreme Court precedent applying the Free Exercise Clause has shown that denying benefits to organizations that are religious in nature while providing such benefits to their secular counterparts, does not pass muster without a state interest of the "highest order." *See Trinity Lutheran*, 582 U.S. at 458 (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)); *see also Carson*, 596 U.S. at 789; *Espinoza*, 591 U.S. at 484. The Court in these cases did not assess whether a condition like the equal-opportunity requirement on a state benefit constitutes an improper restriction on the right to expressive association.

**A124**

However, such regulations may at times prove unduly restrictive or otherwise run afoul of the Constitution. *See, e.g., Speiser v. Randall*, 357 U.S. 513, 518 (1958) (holding that a California regulation conditioning a property tax exemption on the recipient affirming not to advocate for forcibly overthrowing the government was an unconstitutional restriction on speech since "[t]o deny [a tax] exemption to claimants who engage in speech is in effect to penalize them for such speech"). Conditions tied to government benefits are reviewed more critically if the conditions restrict speech as opposed to general conduct not otherwise shielded by the Constitution. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("[R]estrictions on protected expression are distinct from restrictions . . . on nonexpressive conduct. . . . [T]he First Amendment does not prevent restrictions directed at . . . conduct from imposing incidental burdens on speech.").

 "Compelled speech" generally may be anathema to the First Amendment, but the government may "regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995). "[T]he distinction that has emerged from [the Supreme Court's] cases is between conditions that define the limits of the Government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *See Agency for Int'l Dev.*, 570 U.S. at 214-15.

Assuming that the equal-opportunity requirement is a restriction that limits speech or inherently expressive conduct, *see supra* note 46, I must assess how this restrictive condition relates to the purpose and function of the program at issue. As I explained above, the UPK program was implemented in furtherance of the Department's aim to "[p]rovide high-quality,

**A125**

voluntary, affordable early childhood opportunities for all children in Colorado." Colo. Rev. Stat. § 26.5-1-102(1)(d). The UPK statute was developed and enacted with the recognition that it was important "that all families had . . . equitable access to preschool programs of their choosing, and [that they] would not be discriminated against based on any of the factors" in the equal-opportunity requirement. Trial Tr. (Cooke) 142:25-143:3. The requirement serves Defendants' interests of ensuring eligible children and their families do not face discriminatory barriers to publicly funded preschool education and protecting children from discrimination.

The equal-opportunity requirement is tied logically and closely to the interests the UPK Program serves. It is limited to preschool services only and does not seek to impact participating providers' admissions policies outside of the preschool context. Defendants even put on evidence that the Department does not have any intention of interfering with the curriculum of faith-based providers. *See* Trial Tr. (Odean) 232:25-233:3. Significantly, the equal-opportunity requirement was neither contemplated nor implemented because Plaintiff Preschools engage in speech. Far from suggesting Defendants harbored religious animus toward Plaintiff, there is no indication in the record that the equal-opportunity requirement was intended to suppress any ideas or speech generally.

This case bears some similarities to (and key differences from) a recent case involving a Maryland school voucher program, *Bethel Ministries, Inc. v. Salmon*. No. CV SAG-19-1853, 2022 WL 111164, at *7 (D. Md. Jan. 12, 2022). There, when the plaintiff school reapplied for the voucher program, its application was denied because its handbook was found to violate the program's nondiscrimination requirement against LGBTQ+ students. *Id.* The court found the defendants' actions constituted an unconstitutional viewpoint-based restriction on speech. *Id.* Here, while Plaintiff Preschools possess a handbook that expresses its views regarding marriage

**A126**

and gender identity, Defendants' implementation and enforcement of the equal-opportunity

requirement is not responsive to any of Plaintiff Preschools' speech. Even if speech from schools

somehow did inform the incorporation of the equal-opportunity requirement, the equal-

opportunity requirement has not been applied to Plaintiff Preschools for their specific speech,

making the regulation viewpoint neutral. Consequently, Plaintiff Preschools' related activity is

subject to regulation. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992) ("Where the [State]

does not target conduct on the basis of its expressive content, acts are not shielded from

regulation merely because they express a discriminatory idea or philosophy.")

 I conclude Plaintiffs' arguments that the equal-opportunity requirement unconstitutionally

interferes with their expressive association and compels them to send a disfavored message are

without merit. When a community, via government, elects to confer a benefit on a school, the

values that community holds, such as preventing the exclusion of certain historically disfavored

groups, may—and in some cases must—be placed as a limited condition on receiving the related

benefit. The equal-opportunity requirement, including Defendants' implementation of it, does not

seek to limit speech whatsoever and is confined to the UPK program itself. Under the Free

Speech Clause, the requirement constitutes a constitutional condition on a government benefit.

## E.  Relief

 As described above, Plaintiffs seek three types of relief: declaratory judgment, a

permanent injunction, and nominal damages. I find all three, including a limited permanent

injunction, are warranted based on Plaintiffs' partial success on their fifth claim.

### 1.  Declaratory Judgment

**A127**

Pursuant to 28 U.S.C. § 2201(a), this Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Plaintiffs are entitled to a declaration that Defendants' application of the religious-affiliation aspect of the equal-opportunity requirement has violated their rights guaranteed by the Free Exercise Clause of the First Amendment.

### 2. Injunctive Relief

"For a party to obtain a permanent injunction, it must prove: '(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.'" *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (quoting *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1180 (10th Cir. 2003)). Although the permanent injunction sought by Plaintiffs mentions the Sheleys, it relates only to demands Defendants may not place on Plaintiff Preschools. *See* Pls.' Proposed FOFCOL at 69-70 (prohibiting Defendants from conditioning participation on agreeing to provide or providing an equal opportunity for children to enroll and receive preschool services, agreeing not to discriminate, and agreeing not to violate or violating their religious exercise in student admission and retention decisions and school operations). Because the proposed injunction involves Defendants' actions targeted at Plaintiff Preschools, I review these factors as they apply to Plaintiff Preschools principally.

I have concluded that Plaintiffs have succeeded on their fifth claim in part—they have established that the religious-affiliation aspect of the equal-opportunity requirement is not generally applicable and does not satisfy strict scrutiny. I have also concluded that Plaintiffs have

not succeeded on any other aspect of their claims. "In the First Amendment context, 'success on the merits will often be the determinative factor' because of the seminal importance of the interests at stake." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (quoting *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013)).[52] And that is the case here.

### i. Irreparable Harm

Generally, "[a] plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Awad*, 670 F.3d at 1131 (quoting *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001)). Plaintiffs contend that, since the inception of the UPK Program, they have suffered and continue to suffer irreparable injury because they have been unable "to participate in an otherwise-available government program without having to forswear their religious exercise." Pls.' Proposed FOFCOL at 66-67. I have found Defendants violated Plaintiffs' constitutional rights by exercising discretion to grant exemptions from the religious-affiliation aspect of the equal-opportunity requirement but refusing to grant Plaintiff Preschools a similar exemption. The record indicates that, if an injunction is not granted, Plaintiff Preschools will not participate in the UPK Program and will not receive the associated benefits.[53] The benefits that Plaintiff Preschools will lose could be estimated, but it would be difficult to ascertain an adequate amount, as there was evidence that

---

[52] The Tenth Circuit has articulated this parallel as part of the standard for preliminary injunctions. In this case, however, I see no reason why the analysis would differ for a permanent injunction.

[53] While it is not clear whether the limited injunction I grant here will result in Plaintiff Preschools' participation in the UPK Program, the injunction remedies the specific constitutional violation found and eliminates at least one barrier to Plaintiff Preschools' participation.

**A129**

their nonparticipation in the UPK Program has dissuaded additional children from enrolling and prevents the preschools from competing with other providers. Consequently, Plaintiff Preschools have shown they are likely to suffer irreparable injury from their nonparticipation in the Program if an injunction is not granted.[54]

Defendants contend Plaintiff Preschools cannot show irreparable harm because they "are unaware of ever having enrolled an LGBTQ+ preschooler, of ever having received an inquiry about preschool enrollment from an LGBTQ+ family, or of ever having been the subject of a complaint from an LGBTQ+ student or family." Defs.' Proposed FOFCOL at 62. But the harm established by Plaintiff Preschools—for their fifth claim at least—is their nonparticipation in the UPK Program, not that they may potentially face some future enforcement action by the Department. That they will miss out on the benefit of participating in the UPK Program is sufficient to establish irreparable injury in this case.

### ii.  Balance of Harms and Public Interest

The last two factors to be considered in determining whether a permanent injunction should issue are the threatened injury to the Plaintiff Preschools weighed against the harm the injunction might cause Defendants and any adverse effect the injunction might cause to the

---

[54] Because the harm at issue here involves a monetary government benefit, I am not convinced the determination that Plaintiffs' rights have been violated mandates a finding of irreparable harm. Similarly, I am not certain irreparable harm should be a given conclusion when there is no evidence that Plaintiffs experienced any coercive effect on their religious exercise. I recognize, however, that the Tenth Circuit has, in recent history, used broad language presuming irreparable harm when any constitutional violation is found. *See Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) ("What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial. Any deprivation of any constitutional right fits that bill." (citing *Awad*, 670 F.3d at 1131)). I do not analyze how this language would or should apply here because I find Plaintiff Preschools have otherwise shown irreparable injury.

public interest. When the government is a party in the case and opposes the injunction, the government's interest and the public interest are assumed to align such that the third and fourth permanent-injunction factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

As discussed above, Defendants did not present any evidence of the harm the Department or the public would experience if Plaintiff Preschools are not obligated to comply with the religious-affiliation aspect of the equal-opportunity requirement. Considering Defendants' failure and the corresponding violation of Plaintiffs' free exercise rights, the last two permanent-injunction factors weigh in favor of issuing a limited injunction exempting Plaintiffs from the religious-affiliation aspect of the equal-opportunity requirement. *See Free the Nipple*, 916 F.3d at 807 ("[I]t's always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation marks and citation omitted)). Plaintiffs' lack of success on their remaining theories and claims prevents the full injunction they seek from being granted, as does the fact that the public policy backed by the State would be undermined and the State's compelling interest would suffer.

While I generally agree with Defendants that "the legislature and voters are in a better position than Plaintiffs or this Court to determine the public interest," Resp. to Mot. for Summ. J. at 37, ECF No. 77 (citing *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016)), the constitutional violation found here involves unelected government employees misconstruing a generally applicable statute. This is to say that, whatever democratic support might ordinarily bolster the perception that the government's actions reflect public sentiment, such support is diluted in this specific context. Consequently, I conclude it is appropriate to issue the permanent injunction set out in the final section of this Order.

**A131**

### 3. Nominal Damages

The Tenth Circuit also requires an award of nominal damages upon a finding of a constitutional violation. *Searles v. Van Bebber*, 251 F.3d 869, 879 (10th Cir. 2001) ("[T]he rule seems to be that an award of nominal damages is mandatory upon a finding of a constitutional violation . . . ."). Plaintiffs are, therefore, entitled to nominal damages in the amount of $1.

### III. Order

Based on the foregoing Findings of Fact and Conclusions of Law, IT IS ORDERED:

- Plaintiffs' Claims Two and Three and the part of Claims One, Four, and Six that rely on the application of Paragraph 18(B) are DISMISSED AS MOOT.

- Judgment SHALL ENTER in favor of Plaintiffs and against Defendants on Plaintiffs' fifth claim with respect to only the religious-affiliation aspect of the equal-opportunity requirement.

- It is DECLARED that:

    The application by Defendants Lisa Roy and Dawn Odean, acting in their official capacities on behalf of the Colorado Department of Early Childhood, of the religious affiliation aspect of the equal-opportunity requirement set out in Colorado Revised Statute § 26.5-4-205(2)(b) and in the Colorado Universal Preschool Program Service Agreement violates Plaintiffs' rights secured by the Free Exercise Clause of the First Amendment to the U.S. Constitution.

- Additionally, the following permanent injunction is ISSUED:

    The Court immediately and permanently enjoins Defendants Lisa Roy and Dawn Odean, acting in their official capacities on behalf of the Colorado Department of

Early Childhood, from requiring, as a condition for participation in the Colorado

Universal Preschool Program, that the preschools operated by Plaintiffs St. Mary

Catholic Parish in Littleton and St. Bernadette Catholic Parish in Lakewood agree

to provide or provide eligible children an equal opportunity to enroll and receive

preschool services regardless of religious affiliation for as long as Defendants

allow exceptions from the religious affiliation aspect of the equal-opportunity

requirement set out in Colorado Revised Statute § 26.5-4-205(2)(b) and in the

Colorado Universal Preschool Program Service Agreement.

- Defendants SHALL PAY Plaintiffs $1 in nominal damages.

- On all other issues and claims brought in this case, Judgment SHALL ENTER in favor of

  Defendants and against Plaintiffs.


DATED this 4th day of June, 2024.


_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE

**A133**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-02079-JLK

ST. MARY CATHOLIC PARISH IN LITTLETON; ST. BERNADETTE
CATHOLIC PARISH IN LAKEWOOD; LISA SHELEY; and DANIEL SHELEY,

     Plaintiffs,

v.

LISA ROY, in her official capacity as Executive Director of the Colorado
Department of Early Childhood; and
DAWN ODEAN, in her official capacity as Director of Colorado's Universal
Preschool Program,

     Defendants.

---

**FINAL JUDGMENT**

---

The matter was tried on January 2, 2024, through January 4, 2024, before the Honorable John L. Kane, Judge, presiding.

The Bench Trial proceeded to conclusion and in accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

Pursuant to the Findings of Fact, Conclusion of Law, and Order For Entry of Judgment, (Doc. No 116) of Judge John L. Kane entered on June 4, 2024, it is

ORDERED that Judgment shall enter in favor of Plaintiffs and against Defendants on Plaintiffs' fifth claim with respect to only the religious-affiliation aspect of the equal-opportunity requirement.   It is

**A134**

FURTHER ORDERED that Plaintiff's claims two and three and the part of claims one, four, and six that rely on the application of Paragraph 18(B) are DISMISSED AS MOOT.   It is

FURTHER DECLARED that the application by Defendants Lisa Roy and Dawn Odean, acting in their official capacities on behalf of the Colorado Department of Early Childhood, of the religious affiliation aspect of the equal-opportunity requirement set out in Colorado Revised Statute § 26.5-4-205(2)(b) and in the Colorado Universal Preschool Program Service Agreement violates Plaintiffs' rights secured by the Free Exercise Clause of the First Amendment to the U.S. Constitution. It is

FURTHER ORDERED that the following permanent injunction is issued:

The Court immediately and permanently enjoins Defendants Lisa Roy and Dawn Odean, acting in their official capacities on behalf of the Colorado Department of Early Childhood, from requiring, as a condition for participation in the Colorado Universal Preschool Program, that the preschools operated by Plaintiffs St. Mary Catholic Parish in Littleton and St. Bernadette Catholic Parish in Lakewood agree to provide or provide eligible children an equal opportunity to enroll and receive preschool services regardless of religious affiliation for as long as Defendants allow exceptions from the religious affiliation aspect of the equal-opportunity requirement set out in Colorado Revised Statute § 26.5-4-205(2)(b) and in the Colorado Universal Preschool Program Service Agreement.   It is

FURTHER ORDERED that Defendants shall pay Plaintiffs $1 in nominal damages.   It is

**A135**

FURTHER ORDERED that on all other issues and claims brought in this case,

Judgment shall enter in favor of Defendants and against Plaintiffs.   It is

FURTHER ORDERED the post-judgment interest shall accrue on the amount

awarded in this matter at the legal rate of 5.20% per annum from the date of entry

of Judgment.   It is

FURTHER ORDERED that this case is closed.

Dated at Denver, Colorado this 5th day of June, 2024.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK


By:   s/   *B. Abiakam*
_____

B. Abiakam
Deputy Clerk

**A136**