No. 24-1267

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

ST. MARY CATHOLIC PARISH IN LITTLETON;
ST. BERNADETTE CATHOLIC PARISH IN LAKEWOOD;
DANIEL SHELEY; LISA SHELEY;
THE ARCHDIOCESE OF DENVER,

*Plaintiffs-Appellants,*

v.

LISA ROY, IN HER OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE
COLORADO DEPARTMENT OF EARLY CHILDHOOD;
DAWN ODEAN, IN HER OFFICIAL CAPACITY AS DIRECTOR OF COLORADO'S
UNIVERSAL PRESCHOOL PROGRAM,

*Defendants-Appellees.*

On Appeal from the United States District Court, District of Colorado
The Honorable John L. Kane
Senior District Judge

District Court Case No. 1:23-cv-02079-JLK

## DEFENDANTS-APPELLEES' ANSWER BRIEF

PHILIP J. WEISER
Attorney General
HELEN NORTON*
Deputy Solicitor General
VIRGINIA R. CARRENO*
Second Assistant Attorney General
JANNA K. FISCHER*
Senior Assistant Attorney General II
*Counsel for Defendants-Appellees

1300 Broadway 10th Fl.
Denver, CO 80203
Tel.: (720) 508-6513
Tel.: (720) 508-6601
Tel.: (720) 508-6374
Email: helen.norton@coag.gov
Email: virginia.carreno@coag.gov
Email: janna.fischer@coag.gov

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................... i

TABLE OF AUTHORITIES ...................................................... v

STATEMENT OF RELATED CASES .................................... xii

GLOSSARY .............................................................................. xii

INTRODUCTION ....................................................................... 1

QUESTIONS PRESENTED ....................................................... 2

STATEMENT OF THE CASE .................................................... 2

    A. UPK's Creation and Objectives. ...................................... 2

    B. UPK's Ambitious Timeline. ............................................. 4

    C. UPK's Preferences Cure the Matching Algorithm's
       Unintended Consequences. ............................................... 5

    D. Procedural Background. ................................................... 8

SUMMARY OF THE ARGUMENT ......................................... 11

STANDARD OF REVIEW ....................................................... 14

ARGUMENT ........................................................................... 15

I. Because UPK includes religious providers, it doesn't
   categorically exclude religious actors in violation of the Free
   Exercise Clause. ................................................................... 15

II. Because UPK's gender-identity and sexual-orientation
    provisions are neutral and generally applicable, they trigger
    only rational-basis scrutiny—and they satisfy this (and any
    other level of) review. ......................................................... 18

A. Because their object isn't to suppress religious practice, UPK's equal-opportunity requirements are neutral towards religion. ....... 19

   1. Changes in the congregation preference's definition during rulemaking reflect CDEC's good-faith efforts to welcome faith-based providers. .................................................................. 20

   2. CDEC's discussion of relevant precedent reflects responsible lawyering, not religious hostility. ............................. 22

B. UPK's equal-opportunity requirements permit no individualized exceptions. ................................................................ 23

   1. UPK's programmatic preference doesn't permit individualized exemptions from the equal-opportunity requirements. ................................................................................. 23

   2. UPK's temporary-waiver provision doesn't permit individualized exceptions from the equal-opportunity requirements. ................................................................................. 25

C. UPK's equal-opportunity requirements are generally applicable because they don't prohibit religious conduct while permitting secular conduct that undermines the government's interest in a similar way. ................................................................ 30

   1. UPK permits no exceptions to the provisions ensuring equal opportunity regardless of disability or income. ........................... 31

   2. UPK permits no exceptions from the provisions requiring equal opportunity regardless of race, sexual orientation, and gender identity. .................................................................. 36

   3. Because it favors religious providers over secular providers, the congregation preference doesn't trigger strict scrutiny of any of the other equal-opportunity requirements. ...................... 38

a. The congregation preference doesn't trigger Free Exercise Clause suspicion because it treats religious entities more favorably than secular entities. ................................................. 39

b. The congregation preference doesn't trigger Free Exercise Clause suspicion because it doesn't undermine the interests underlying UPK's other equal-opportunity provisions. ................................................. 41

D. CDEC satisfied rational-basis—indeed, any level of scrutiny—in denying permission to exclude and expel gender-diverse children, and the children of LGBTQ+ parents, from publicly-funded preschool services. ................................................. 44

1. Colorado has a compelling interest in ensuring children have equal access—free from discriminatory barriers—to publicly-funded preschools. ................................................. 45

2. Colorado also has a compelling interest in ensuring that, once enrolled, children have an equal opportunity to receive publicly-funded preschool services that are safe, healthy, and free from discrimination. ................................................. 48

3. Plaintiffs' arguments to the contrary are unavailing. ................................................. 51

a. Colorado's interests are meaningfully reviewable. ................................................. 51

b. Colorado's compelling interests are not post hoc justifications. ................................................. 52

c. The expert witnesses' testimony and Plaintiffs' own testimony confirm that Colorado's compelling interests seek to solve actual problems. ................................................. 53

d. Colorado has consistently treated its interests as compelling. ................................................. 57

    4. Denying permission to discriminate against four-year-olds and their families is narrowly tailored to achieve Colorado's compelling interests. ...................................................... 58

III. Because the equal-opportunity requirements don't significantly burden Plaintiffs' expressive association, they trigger only rational-basis review—and they satisfy this and any other level of scrutiny .................................................................... 61

  A. The presence of LGBTQ+ children in publicly-funded preschools doesn't significantly burden those schools' ability to communicate their views. ........................................... 62

  B. UPK doesn't significantly burden expression when it conditions public funding on recipients' adherence to equal-opportunity requirements. .............................................. 64

  C. Prohibiting preschools' discriminatory exclusion of students regulates conduct, not expression. ................................... 68

  D. Plaintiffs invoke distinguishable precedent to propose an unworkable new rule with no limiting principle. ............... 71

  E. UPK's equal-opportunity requirements satisfy rational-basis and, indeed, any level of scrutiny. ................................... 74

IV. The Archdiocese does not have standing. ......................... 75

  A. The Archdiocese doesn't have standing in its own right. ............... 76

  B. The Archdiocese doesn't have associational standing. .................... 77

CONCLUSION ..................................................................... 79

STATEMENT CONCERNING ORAL ARGUMENT ........................... 79

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .... 81

# TABLE OF AUTHORITIES

## CASES

*303 Creative, LLC v. Elenis,*
  600 U.S. 570 (2023) ............................................................ 71, 72, 73

*Agency for Int'l Dev. v. All. for Open Soc'y,*
  570 U.S. 205 (2013) ............................................................ 66

*Aptive Env't, LLC v. Town of Castle Rock, Colo.,*
  959 F.3d 961 (10th Cir. 2020) ............................................ 76

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr,*
  518 U.S. 668 (1996) ............................................................ 67

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000) ........................................ 61, 62, 63, 64, 65, 66, 71

*Carpenter v. James,*
  107 F.4th 92 (2nd Cir. 2024) ............................................. 72

*Carson v. Makin,*
  596 U.S. 767 (2022) ........................................................ 15, 16, 17, 18

*Cath. Charities of Diocese of Albany v. Serio,*
  7 N.Y.3d 510 (2006) .......................................................... 41

*Christian Legal Soc'y v. Martinez,*
  561 U.S. 661 (2010) ............................................................ 66

*Church v. Polis,*
  2022 WL 200661 (10th Cir. Jan. 24, 2022) (unpublished case) ......... 25

*Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) ............................................................ 35

*Colo. Right to Life Comm., Inc. v. Coffman,* 498 F.3d 1137 (10th
  Cir. 2007) ........................................................................ 77

*Craig v. Boren,*
    429 U.S. 190 (1976) ............................................................ 35

*Crosspoint Church v. Makin,*
    No. 1:23-cv-00146-JAW, 2024 WL 810033 (D. Me. Feb. 27,
    2024) ............................................................................... 18, 70

*Doe v. Boyertown Area Sch. Dist.,*
    897 F.3d 518 (3d Cir. 2018) .............................................. 45

*Does 1-11 v. Bd. of Regents of Univ. of Colo.,*
    100 F.4th 1251 (10th Cir. 2024) ....................................... 40

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*
    494 U.S. 872 (1990) ..................................................... 17, 18

*Espinoza v. Mont. Dep't of Revenue,*
    591 U.S. 464 (2020) .......................................................... 15

*Evans v. City of Berkeley,*
    38 Cal.4th 1 (2006) .......................................................... 64

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd.
of Educ.,*
    82 F.4th 664 (9th Cir. 2024) ......................... 28, 29, 35, 43

*Fish v. Schwab,*
    957 F.3d 1105 (10th Cir. 2020) ........................................ 78

*Fulton v. City of Phila.,*
    593 U.S. 522 (2021) ....................... 23, 29, 39, 41, 45, 48, 67

*Grace United Methodist Church v. City of Cheyenne,*
    451 F.3d 643 (10th Cir. 2006) .......................................... 19

*Green v. Haskell Cnty. Bd. of Comm'rs,*
    568 F.3d 784 (10th Cir. 2009) .......................................... 15

*Harris v. McRae,*
448 U.S. 297 (1980) ........................................................... 36

*Hunt v. Wash. State Apple Advert. Comm'n,*
432 U.S. 333 (1977) ........................................................... 77

*Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Bos.,*
515 U.S. 557 (1995) ........................................................... 73

*Kan. Healthcare Ass'n, Inc. v. Kan. Dep't of Soc. and Rehab.*
*Servs.,*
958 F.2d 1018 (10th Cir. 1992) ........................................ 77

*Kennedy v. Bremerton Sch. Dist.,*
597 U.S. 507 (2022) ........................................................... 18

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ........................................................... 76

*McBride v. People,*
2022 CO 30 ......................................................................... 33

*McCrary v. Runyon,*
515 F.2d 1082 (4th Cir. 1975) .......................................... 69

*Obergefell v. Hodges,*
576 U.S. 644 (2015) ........................................................... 22

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992)) .................................................... 58, 74

*Regan v. Tax'n With Representation of Wash.,*
461 U.S. 540 (1983) ........................................................... 67

*Revo v. Disciplinary Bd. of the Sup. Ct. for N.M.,*
106 F.3d 929 (10th Cir. 1997) .......................................... 15

*Rumsfeld v. F. for Acad. and Institutional Rts., Inc.,*
547 U.S. 47 (2006) ....................................... 63, 64, 69, 70

*Runyon v. McCrary,*
  427 U.S. 160 (1976) ................................................................ 22, 69

*Sherbert v. Verner,*
  374 U.S. 398 (1963) ...................................................................... 17

*Speech First, Inc. v. Shrum,*
  92 F.4th 947 (10th Cir. 2024) ...................................................... 79

*St. Dominic Acad. v. Makin,*
  No. 2:23-cv-00246-JAW, 2024 WL 3718386 (D. Me. Aug. 8,
  2024) ................................................................................................ 45

*Students for Fair Admissions, Inc. v. President & Fellows of
  Harvard Coll.,*
  600 U.S. 181 (2023) ........................................... 35, 51, 52, 78

*Tandon v. Newsom,*
  593 U.S. 61 (2021) ................................................................... 40, 41

*Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.,*
  450 U.S. 707 (1981) ................................................................. 17, 74

*Tran v. Trs. of State Coll. in Colo.,*
  355 F.3d 1263 (10th Cir. 2004) ................................................... 11

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
  582 U.S. 449 (2017) ...................................................................... 15

*United States v. Albertini,*
  472 U.S. 675 (1985) ...................................................................... 75

*United States v. Brown,*
  974 F.3d 1137 (10th Cir. 2020) ................................................... 33

*United States v. O'Brien,*
  391 U.S. 367 (1968) ...................................................................... 75

*United States v. Quaintance,*
608 F.3d 717 (10th Cir. 2010) ............................................. 38

*United States v. Virginia,*
518 U.S. 515 (1996) ........................................................... 59

*Warth v. Seldin,*
422 U.S. 490 (1975) ........................................................... 75

*Williams-Yulee v. Fla. Bar,*
575 U.S. 433 (2015) ........................................................... 58

*Youth 71Five Ministries v. Williams,*
No. 24-4101, 2024 WL 3749842 (9th Cir. Aug. 8, 2024) ................... 43

**STATUTES**

15 U.S.C. § 1691(a)(2) .......................................................... 35

7 U.S.C. § 2011 ................................................................. 35

Colo. Rev. Stat. § 2-4-201(1)(b) (2024) ...................................... 32

Colo. Rev. Stat. § 26.5-1-109(1)(a) (2024) .................................. 3, 48, 53

Colo. Rev. Stat. § 26.5-1-113(1)(a) (2024) ............................... 3, 26, 48, 53

Colo. Rev. Stat. § 26.5-4-202 (2024) ........................................ 31, 33

Colo. Rev. Stat. § 26.5-4-202(1)(a)(V) (2024) ............................... 2

Colo. Rev. Stat. § 26.5-4-202(1)(b) (2024) ................................. 3, 27

Colo. Rev. Stat. § 26.5-4-202(3)(a) (2024) ................................. 31

Colo. Rev. Stat. § 26.5-4-202(4) (2024) ..................................... 32

Colo. Rev. Stat. § 26.5-4-203(3) (2024) ..................................... 31

Colo. Rev. Stat. § 26.5-4-203(12) (2024) ................................... 3, 27

Colo. Rev. Stat. § 26.5-4-203(14)(e) (2024)..............................................33

Colo. Rev. Stat. § 26.5-4-204(1) (2024)......................................31, 32, 45

Colo. Rev. Stat. § 26.5-4-204(1)(b) (2024) ..............................................33

Colo. Rev. Stat. § 26.5-4-204(2) (2024)......................................... 3, 4, 27

Colo. Rev. Stat. § 26.5-4-204(3) (2024)...................................................53

Colo. Rev. Stat. § 26.5-4-204(3)(a) (2024) ..............................................33

Colo. Rev. Stat. § 26.5-4-204(3)(a)(III) (2024).......................................32

Colo. Rev. Stat. § 26.5-4-204(4)(a)(II)-(IV) (2024)................................32

Colo. Rev. Stat. § 26.5-4-205(1) (2024)...................................................33

Colo. Rev. Stat. § 26.5-4-205(1)(a) (2024) .................................................4

Colo. Rev. Stat. § 26.5-4-205(1)(b) (2024) ..............................................31

Colo. Rev. Stat. § 26.5-4-205(1)(b)(II) (2024) ..................................26, 30

Colo. Rev. Stat. § 26.5-4-205(2) (2024)..............................................32, 45

Colo. Rev. Stat. § 26.5-4-205(2)(b) (2024) ........................ 4, 19, 27, 31, 53

Colo. Rev. Stat. § 26.5-4-206 (2024) .......................................................33

Colo. Rev. Stat. § 26.5-4-206(1) (2024)...................................................32

Equal Credit Opportunity Act ...............................................................34

H.B. 21-1304, 73rd Gen. Assemb. (Colo. 2021) ........................................2

## OTHER AUTHORITIES

Colo. Sec'y of State, Notice of Proposed Rulemaking 2024-00528
(Oct. 11, 2024), available at

https://www.sos.state.co.us/CCR/eDocketDetails.do?trackingNum=2024-00528.................................................................. 7

*Darren Patterson Christian Acad. v. Roy,*
   No. 1:23-cv-1557 (D. Colo. June 21, 2024).................................... 16, 42

SAMUEL R. BAGENSTOS, DISABILITY RIGHTS LAW 15 (3rd ed. 2021)......... 34

## REGULATIONS

8 Colo. Code Reg. 1404-1 § 4.103(L)..................................................... 6, 21

8 Colo. Code Reg. 1404-1 § 4.110 ............................................................ 8

8 Colo. Code Reg. 1404-1 § 4.110(A)(10) ................................................ 8

8 Colo. Code Reg. 1404-1 § 4.110(B) ....................................... 6, 8, 24, 36

## STATEMENT OF RELATED CASES

CDEC identifies no related cases.

## GLOSSARY

Defendants provide the Court with the following definitions of various acronyms and terms commonly used by the Colorado Department of Early Childhood.

- ACEs – Adverse Childhood Experiences or experiences that have the potential to cause significant detriment to a child's emotional or physical well-being, and are often traumatic.

- CDEC – Colorado Department of Early Childhood.

- Cisgender – of, relating to, or being a person whose gender identity corresponds with the sex the person was assigned at birth.

- Gender diverse – the extent to which a person's gender, identity, role, or expression differs from the cultural norms prescribed for people of a particular sex.

- Gender identity – a person's internal sense of being male, female, some combination of male and female, or neither male nor female.

- Head Start Program – federally-funded preschool providers that prioritize young children and their families who are living in poverty, low-income, or have children with disabilities.

- IEP – Individualized Education Plan.

- LGBT – Lesbian, gay, bisexual, transgender. Dr. Goldberg used LGBT in her testimony with an "implicit asterisk or plus sign" that includes queer or other identifiers. *See* 4.App.0871.

- LGBTQ – Lesbian, gay, bisexual, transgender, and questioning or queer.

- LGBTQ+ – An umbrella term, broadly referring to all sexualities, romantic orientations, and gender identities which are not heterosexual or cisgender, including sex-trait variant people.

- LGBTQ+ Family/Families - This brief uses the term "LGBTQ+ Family/Families" to mean a family where any child and/or one or more of the parents are LGBTQ+.

- LGBTQ+ Parent – A biological parent, adoptive parent, stepparent, or guardian who identifies as LGBTQ+.

- Mixed Delivery System – a system for delivering preschool

services through a combination of both public and private providers that include school- and community-based preschool providers, family care homes, child care centers, faith-based providers, and Head Start agencies. C.R.S. § 26.5-4-203 (2024).

- RAC – Rules Advisory Council.

- Sexual Orientation – an often-enduring pattern of emotional, romantic, and/or sexual attraction to a person of a particular sex or gender.  It also refers to an individual's sense of personal and social identity based on those attractions, related behaviors, and membership in a community of others who share those attractions and behaviors.

- Transgender – of, relating to, or being a person whose gender identity differs from the sex the person was assigned at birth.

- UPK – Universal Preschool Program, the "Program."

# INTRODUCTION

In 2022, Colorado became a national leader by providing universal preschool access to every four-year-old Coloradan through a voluntary, mixed-delivery system that welcomes faith-based providers. To ensure every preschooler has access to a safe, healthy, and high-quality learning environment, Colorado's Universal Preschool Program ("UPK") requires participating providers to serve all eligible children regardless of their (or their family members') gender identity and sexual orientation.

Plaintiffs seek permission to expel and exclude gender-diverse children, and children of LGBTQ+ parents, while being paid by the State with public funding as a UPK provider. The district court correctly held that CDEC did not violate Plaintiffs' First Amendment rights by denying permission to so discriminate.

# QUESTIONS PRESENTED

1. Do UPK's equal-opportunity requirements violate Plaintiffs' free exercise rights by prohibiting Plaintiffs from excluding or expelling gender-diverse four-year-olds, and the four-year-old children of LGBTQ+ parents, from publicly-funded preschools?

2. Do UPK's equal-opportunity requirements violate Plaintiffs' expressive association rights by prohibiting Plaintiffs from excluding or expelling gender-diverse four-year-olds, and the four-year-old children of LGBTQ+ parents, from publicly-funded preschools?

3. Did the Archdiocese establish standing?

# STATEMENT OF THE CASE

## A.    UPK's Creation and Objectives.

In 2020, the Colorado electorate voted overwhelmingly to offer free preschool to all four-year-old Coloradans. Colo. Rev. Stat. ("C.R.S.") § 26.5-4-202(1)(a)(V). The General Assembly then passed the "Early Childhood Act," and created the Colorado Department of Early Childhood (CDEC) to implement this ground-breaking program. H.B. 21-1304, 73rd Gen. Assemb. (Colo. 2021) (enacted); 3.App.0712-13.

The Act seeks to expand access to high-quality preschool that ensures the health and safety of the "whole child," and requires CDEC to implement a "mixed-delivery" program that includes public, private,

faith-based, and in-home preschool providers. C.R.S. §§ 26.5-4-202(1)(b); 26.5-4-203(12); 26.5-4-204(2); A036-38[1]; 4.App.0770-73.

The "very robust stakeholder process" that informed UPK's development emphasized that ensuring children's health and safety requires a "safe, nurturing, inclusive, nondiscriminatory environment." 3.App.0712,0724; *see also* A0037-38; 4.App.0770, 0824-25. Trial testimony underscored that process's attention to the importance of quality standards—and not just licensure requirements—to ensure that publicly-funded learning environments set children up for success. 2.Supp.App.0441-43; 441:12-17; 444-46; A065-66; 3.App.0719-20; 4.App.0770; 2.Supp.App.0444:15-18.

The General Assembly determined that safeguarding children's health and safety requires protecting them from adverse experiences that could affect their physical, emotional, cognitive, and behavioral health. *See* C.R.S. §§ 26.5-1-113(1)(a); 26.5-1-109(1)(a); 4.App.0770, 0824-25. The statute thus directs CDEC to establish quality standards

---

[1] References to AXXX are to the Orders attached to Plaintiffs' Opening Brief ("OB").

that reflect "national and community-informed best practices with regard to school readiness, academic and cognitive development, healthy environments, social-emotional learning, and child and family outcomes." C.R.S. § 26.5-4-205(1)(a). These standards include requirements that publicly-funded providers ensure all eligible children receive "an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family[.]" C.R.S. § 26.5-4-205(2)(b).

## B.    UPK's Ambitious Timeline.

CDEC was created on July 1, 2022. Dawn Odean started as UPK Director on August 15, 2022. 1.App.0077-78; 4.App.0759. The statute directed CDEC to immediately begin administering UPK for its inaugural year in 2023-24. C.R.S. § 26.5-4-204(2); A039. Providers began signing up in the online portal in November 2022, and CDEC matched students with providers over the spring and summer of 2023. 3.App.0725-26.

UPK's first year was a resounding success, recruiting nearly 2,000 providers and serving about 40,000 children—more than doubling the number of children served by its predecessor program. 1.App.0079; A043; 4.App.0786-87.

Plaintiffs filed this lawsuit on August 16, 2023, shortly after UPK's inaugural school year began.

## C. UPK's Preferences Cure the Matching Algorithm's Unintended Consequences.

Families choosing to participate in UPK select and rank up to five providers on an online application. 1.App.0079; A045. The UPK matching software then uses an algorithm to match a family with one of their choices (and permits the family to select additional providers if none of their initial choices are available). *Id*; 3.App.0732.

Because this algorithm couldn't account for providers' pre-existing relationships and commitments, providers expressed concern that this matching process wouldn't permit them to serve the families and communities they had been serving. A045-46; 3.App.0729-30; 4.App.0787-92. In response, CDEC developed a series of specific matching "preferences" to enable providers to maintain ongoing

relationships with their communities and maintain specialized areas of focus—so long as they do not violate the equal-opportunity requirements or any other statutory provision. A045-46; 3.App.0729-33; 4.App.0787-92, 96; 8 Colo. Code Reg. ("C.C.R.") 1404-1 § 4.110(B).

The first of these "specific preferences" is the "congregation preference," which enables all faith-based providers to save seats for their congregation members. CDEC developed this preference to facilitate faith-based providers' participation in UPK, and didn't intend to create an exception to the equal-opportunity requirements. The final rule defines "congregation" to mean "members of the community that the faith-based provider serves as the faith-based provider defines that community," 8 C.C.R. 1404-1 § 4.103(L), and CDEC consistently made clear that it would investigate allegations that a provider was using any preference, including the congregation preference, to violate any of the equal-opportunity requirements. A049; 4.App.0852. The district court found, however, that the congregation preference created an exception to the provision requiring equal opportunity regardless of religious affiliation by "permit[ting] faith-based providers to prioritize access to

their services for members of their congregation, however they choose to define that term." A102-03. As explained in II.B-C, the congregation preference remains the equal-opportunity requirements' only exception, and one available only to religious providers.[2]

CDEC also created specific preferences for providers to save seats for children with disabilities and children of low-income families; for cooperative preschools to save seats for children of families participating in the cooperative; for school districts to save seats for children residing within district boundaries; for providers to save seats for their employees' children; for providers to save seats for continuing students (and siblings of those students) to ensure continuity-of-care; and for dual-language providers to save seats for children with the

_____

[2] As explained above, the district court determined the congregation preference is an exception from the religious-affiliation provision. The district court also determined the statute does not authorize CDEC to create exceptions from the equal-opportunity requirements. A034-35, A101, A105-06. Because CDEC is committed to complying with all statutory requirements, it initiated a Notice of Proposed Rulemaking to repeal the congregation preference. *See* Colo. Sec'y of State, Notice of Proposed Rulemaking 2024-00528 (Oct. 11, 2024), available at https://www.sos.state.co.us/CCR/eDocketDetails.do?trackingNum=2024-00528.

requisite language abilities. 4.App.0788-89; 7.App.1499; 8 C.C.R. 1404-1
§ 4.110.

CDEC created an additional "programmatic preference" to permit
providers with needs not encompassed by the specific preferences to
request a preference that addressed their programmatic needs (because
nearly 2,000 providers participate in UPK, CDEC couldn't anticipate
each provider's individualized needs). 4.App.0804-05; 8 C.C.R. 1404-1 §
4.110(A)(10). CDEC approved 17 providers' requests to utilize this
preference in UPK's inaugural year—permitting, for example, providers
to save seats for families within a specific neighborhood, or families
interested in STEM curriculum. 7.App.1648-1700. The programmatic
preference, again, permits departures from the algorithm—but <u>does not</u>
permit exceptions to the equal-opportunity requirements. 4.App.0853; 8
C.C.R. 1404-1 § 4.110(B).

### D.    Procedural Background.

Plaintiffs requested exemptions from UPK's equal-opportunity
requirements, seeking permission to discriminate based on gender
identity, sexual orientation, and religious affiliation while providing

publicly-funded preschool services. Because the equal-opportunity requirements permit no exceptions, CDEC denied Plaintiffs' requests.

Plaintiffs filed suit challenging CDEC's denial, and later filed motions for preliminary injunction and summary judgment, while CDEC filed a motion to dismiss. 1.App.0018; 1.Supp.App.0022-53; 1.Supp.App.0054-106; 1.App.0055.

The district court denied Plaintiffs' motion for summary judgment, granted CDEC's motion to dismiss the Archdiocese for lack of standing, and denied CDEC's motion to dismiss the individual Plaintiffs on ripeness and standing grounds. 2.App.0324-32; 0341. After an expedited discovery period, the district court held a three-day bench trial, hearing testimony from ten witnesses.

The district court's June 2024 decision held that:

- UPK doesn't categorically bar religious providers (A079-80);

- UPK doesn't seek to suppress religious practice and is thus neutral towards religion (A081; A126);

- UPK's statute doesn't permit exceptions from its equal-opportunity requirements (A034-35, A101, A105-06);

- CDEC has granted no secular exceptions from these requirements (A102, A110);

- Strict scrutiny doesn't apply to CDEC's denial of Plaintiffs' request for exemptions from the sexual-orientation and gender-identity provisions because those provisions are generally applicable, and CDEC's denial satisfied rational basis and even strict scrutiny (A104-05);

- CDEC's congregation preference created an exception from the religious-affiliation provision, thus triggering strict scrutiny of CDEC's denial of Plaintiffs' request for an exemption from that provision, and its denial failed strict scrutiny (A104, A115-16);

- UPK's equal-opportunity requirements do not violate Plaintiffs' expressive association rights (A127); and

- The court then enjoined CDEC from enforcing the religious-affiliation provision against the Plaintiffs for as long as the congregation preference remains in place (A132-33).

Plaintiffs appealed the decision upholding CDEC's denial of their requested exemptions from UPK's sexual-orientation and gender-identity provisions. Neither party appealed the conditional injunction, which exempts Plaintiffs from the religious-affiliation provision for as long as the congregation preference remains in place.[3]

---

[3] Plaintiffs have abandoned their employment-related claims (parts of Count I, IV, and VI, and all of Counts II and III); their compelled speech claim (part of Count VI); and their denominational favoritism claim (Count VII). *See Tran v. Trs. of State Coll. in Colo.*, 355 F.3d 1263, 1266

## SUMMARY OF THE ARGUMENT

Plaintiffs allege they have been excluded from UPK—yet in the same breath they demand a constitutional right to exclude and expel gender-diverse four-year-olds, and the four-year-old children of LGBTQ+ parents, from their preschools while receiving public funding.[4] The First Amendment, however, does not preclude Colorado from ensuring every four-year-old Coloradan has an equal opportunity, free from statutorily-prohibited discrimination, to enroll in and receive the high-quality, publicly-funded preschool services that contribute to lifelong learning.

UPK does not categorically exclude religious providers. To the contrary, it actively includes them. Nor does anything in UPK's enactment or implementation indicate hostility to religion. CDEC affirmatively sought to include and accommodate religious providers by convening a working group for faith-based providers and developing a

---

(10th Cir. 2004) (issues not raised in the opening brief are abandoned or waived).

[4] Although a young person's sexual orientation doesn't start to develop until later, some children can and do start understanding their gender identity as early as age three.  4.App.0937:21-938:6.

preference permitting them to save seats for their congregation members.

And lacking any evidence that UPK is not generally applicable, Plaintiffs struggle, without success, to imagine possible exceptions from UPK's equal-opportunity requirements. They mischaracterize the preferences as exceptions, when those preferences instead cure the matching algorithm's unintended consequences. And they ask this Court to interpret the statute in ways that ignore its text and undermine its objectives.

The statute permits no exceptions from its equal-opportunity requirements and CDEC has granted no secular exceptions from those requirements. And although CDEC's ambitions to respond to faith-based providers' feedback through the congregation preference (inadvertently) drew distinctions based on religious affiliation, that preference doesn't trigger Free Exercise Clause suspicion because it *favors* religious entities over secular entities (not vice versa), and because it doesn't undermine the interests underlying the other equal-opportunity requirements.

CDEC's denial of Plaintiffs' requests for permission to discriminate triggers, and satisfies, rational-basis review—indeed, any level of scrutiny. CDEC's robust evidentiary record established that LGBTQ+ families experience a variety of distinct barriers to preschool access that limit their available preschool options. Moreover, adverse experiences in early childhood—including discrimination based on LGBTQ+ status—can negatively affect children's development with lifelong consequences. Denying permission to exclude and expel gender-diverse children, and children of LGBTQ+ parents, from publicly-funded preschools is rationally related (indeed, narrowly tailored) to achieving Colorado's legitimate (indeed, compelling) interests in ensuring children have equal access to enroll in and continue to receive high-quality publicly-funded preschool services that are safe, healthy, and free from discrimination.

Nor do the equal-opportunity requirements violate Plaintiffs' expressive-association rights. First, the presence of gender-diverse four-year-olds, and the four-year-olds of LGBTQ+ parents, in preschool classrooms doesn't impermissibly interfere with preschools' ability to

communicate their views. Second, conditioning public funding on providers' adherence to equal-opportunity requirements doesn't significantly burden those providers' expression. Third, the equal-opportunity requirements don't regulate expression; rather, they regulate discriminatory conduct toward students. Because the equal-opportunity requirements don't significantly burden preschools' expression, heightened scrutiny doesn't apply.

Cisgender preschoolers and preschoolers whose parents are cisgender and straight need not worry they will be turned away from any UPK preschool because of their gender identity or sexual orientation. Colorado seeks to provide the same guarantee to LGBTQ+ preschoolers and families, ensuring they can choose from the same range of publicly-funded preschools.

Finally, the Archdiocese does not have standing.

## STANDARD OF REVIEW

Ordinarily, appellate courts review factual findings for clear error and legal conclusions *de novo*. But with First Amendment claims, appellate courts "review the district court's findings of constitutional

fact and its ultimate conclusions of constitutional law de novo." *Revo v. Disciplinary Bd. of the Sup. Ct. for N.M.,* 106 F.3d 929, 932 (10th Cir. 1997). The review of the record with regard to "constitutional facts" does not, however, alter the ordinary, clearly-erroneous review of a district court's other factual findings, where "due regard" must be given to the trial judge's opportunity to observe the demeanor of witnesses. *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784,795-96 (10th Cir. 2009).

## ARGUMENT

### I.   Because UPK includes religious providers, it doesn't categorically exclude religious actors in violation of the Free Exercise Clause.

More than 40 faith-based providers currently participate in UPK. A043; 1.App.0079, 0135-36. Because UPK actively includes faith-based providers, it is nothing like the public-funding programs that categorically excluded religious actors in *Carson v. Makin*, 596 U.S. 767 (2022), *Espinoza v. Mont. Dep't of Revenue.* 591 U.S. 464 (2020), or *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017). That trio of decisions considered only public-funding programs that "specifically carved out private religious schools from those eligible to receive such funds." *See Carson,* 596 U.S. at 780.

15

Despite faith-based providers' inclusion in UPK, Plaintiffs nevertheless claim they are "categorically" excluded because they do not agree, for religious reasons, to comply with UPK's equal-opportunity requirements. In other words, Plaintiffs object to complying with equal-opportunity requirements that apply to all other UPK providers. Plaintiffs thus incorrectly conflate *Carson's* analysis of government's categorical exclusion of religion with the analysis for government action that incidentally burdens religion.[5] Indeed, if accepted, Plaintiffs' sprawling reading of *Carson* would treat a law prohibiting publicly-funded preschools from engaging in corporal punishment as

---

[5] Lacking any evidence that UPK categorically excludes religious actors, Plaintiffs strain to manufacture some by mischaracterizing Ms. Odean's testimony in separate litigation (three months after the close of the trial record and without requesting record supplementation or explaining why this material couldn't have been elicited at trial). *See* OB 23-24 and n.3. There Ms. Odean testified accurately that the providers who had requested exemption from the equal-opportunity requirements were faith-based providers. Plaintiffs recast this testimony as somehow showing that faith-based providers were "barred" from UPK. *See* Ex. 66 to Pls.' Mot. Summ. J. at 77:5-19 (ECF No. 78-21), *Darren Patterson Christian Acad. v. Roy*, No. 1:23-cv-1557 (D. Colo. June 21, 2024); *see also* 1.Supp.App.0016-18; 1.Supp.App.0020, (determining that *DPCA* is not a related case and is distinguishable).

categorically excluding any providers with religious beliefs that "to spare the rod is to spoil the child."

The government's neutral and generally applicable actions don't trigger strict scrutiny even if they have the effect of burdening religious exercise. *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith* 494 U.S. 872, 886 n.3 (1990). *Smith* upheld a state law denying unemployment compensation to claimants dismissed from their jobs for illegal drug use even though that burdened the religious exercise of claimants who used illegal drugs for religious purposes. The Court held the challengers were denied benefits not because they were religious, but instead because they had used illegal drugs. *Id*. at 890. Here, too, UPK requires publicly-funded preschools—both secular and religious—to ensure protected-class members' equal opportunity to enroll and receive preschool services.

Plaintiffs ask this Court to treat the *Carson* trio as eviscerating *Smith,* when those cases do nothing of the sort.[6] They are instead

---

[6] Plaintiffs' reliance on *Sherbert v. Verner,* 374 U.S. 398 (1963) and *Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.,* 450 U.S. 707 (1981) is

applications of *Smith,* as they applied strict scrutiny to laws that *directly* target religion, rather than *incidentally* burden it. *Carson,* 596 U.S. at 781 ("[T]here is nothing neutral about Maine's program."). As the district court correctly held, because UPK includes religious providers, *Carson* does not apply. A079-80; *see also Crosspoint Church v. Makin*, No. 1:23-cv-00146-JAW, 2024 WL 810033, at *15-18 (D. Me. Feb. 27, 2024) (appeal pending) (applying *Smith*, not *Carson*, to law prohibiting publicly-funded schools from discriminating).

## II.    Because UPK's gender-identity and sexual-orientation provisions are neutral and generally applicable, they trigger only rational-basis scrutiny—and they satisfy this (and any other level of) review.

Because Plaintiffs have failed to prove CDEC's actions are not neutral or not generally applicable, rational-basis review applies. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (burden on movant). CDEC's denial of Plaintiffs' requests for permission to exclude

---

similarly inapposite. The unemployment laws in those cases permitted individualized exemptions from the general rule denying benefits to those refusing suitable work. In contrast, the law at issue in *Smith*, like UPK, was generally applicable because it offered no individualized exemptions from the general rule denying benefits to those dismissed for illegal drug use. *Smith,* 494 U.S. at 884-85.

and expel gender-diverse children, and children of LGBTQ+ parents, satisfies rational-basis scrutiny, and indeed any level of scrutiny.

### A. Because their object isn't to suppress religious practice, UPK's equal-opportunity requirements are neutral towards religion.

A "law is neutral so long as its object is something other than the infringement or restriction of religious practices." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649-50 (10th Cir. 2006). UPK requires all participating providers—both secular and religious—to ensure children's equal opportunity to enroll in and receive publicly-funded services. C.R.S. § 26.5-4-205(2)(b). Nothing about the requirements' text, legislative history, or implementation suggests their object is to suppress religious conduct.

Indeed, CDEC sought to include religious providers from UPK's outset, convening an interfaith working group that included a representative from Plaintiff St. Mary. A024, A041; 3.App.0727-29; 3.App.0736:16-17; 19-22; 4.App.0762-63. Six Catholic Charities providers—part of the Archdiocese of Denver—participate in UPK, as do 40 other faith-based providers. 1.App.0135-36; 3.App.0612-13;

3.App.0641:18-19; 3.App.0643:21-22; 4.App.0810:9-13; 4.App.0811:1-4.

The district court found no evidence of religious hostility, refusing to

"infer the existence of hostility where there is none." A081-82.

### 1. Changes in the congregation preference's definition during rulemaking reflect CDEC's good-faith efforts to welcome faith-based providers.

In response to faith-based providers' input, CDEC developed the

"congregation preference" to enable them to save seats for members of

their communities. A102; 3.App.0730:21-0731:5; 3.App.0753:20-25;

4.App.0801. This preference, like all the other preferences, sought to

permit providers to save seats for members of the communities they had

been serving—*not* create an exception from the equal-opportunity

requirements. 4.App.0853:13-14.

Lacking any evidence of religious hostility, Plaintiffs

mischaracterize CDEC's development of the congregation preference as

"repeatedly tweaking the scope of the congregation preference in

response to Plaintiff's legal arguments[.]" OB 37. But changes over the

course of the rulemaking process instead reflect CDEC's good-faith

efforts to thread the needle to accommodate faith-based providers'

concerns while remaining consistent with UPK's equal-opportunity requirements.

Throughout this process, CDEC worked with faith-based providers to define "congregation" broadly to be "inclusive of faith-based providers as they define themselves and as families engage with them." 4.App.0803-04; *see also* 1.App.0136-37; 3.App.0730:19-0731:5; 3.App.0733:3-10, 17-24; 4.App.0851. As Ms. Odean testified, the draft rule introduced at trial remained subject to stakeholder feedback and change through the rulemaking process. The final rule, effective in summer 2024, defines "congregation" broadly to mean "members of the community that the faith-based provider serves as the faith-based provider defines that community." 1.App.0136-37; 4.App.0802-03; 4.App.0850; 8 C.C.R. 1404-1 § 4.103(L).

Plaintiffs complain that a rulemaking process designed to facilitate revision after feedback resulted in revision after feedback. The district court found Plaintiffs' efforts to recast CDEC's development of the congregation preference as religious hostility to be "hyperbole, based on assumptions that are not supported by the record. If anything,

by broadening the definition of congregation, Defendants have worked to include more faith-based providers." A085-86.

### 2. CDEC's discussion of relevant precedent reflects responsible lawyering, not religious hostility.

Still lacking any evidence of CDEC's religious hostility, Plaintiffs then strain to suggest the agency's attorneys signaled religious hostility by discussing relevant Supreme Court precedent that undermines one of Plaintiffs' central claims. OB 36.[7] In *Runyon v. McCrary,* the Court held that a law prohibiting a preschool from excluding Black children didn't interfere with the school's ability to teach what it wanted to teach, and thus didn't violate the First Amendment. 427 U.S. 160, 175-78 (1976). This principle applies regardless of the protected-class status (Black, LGBTQ+, or any other) of the excluded students. As the district

---

[7] Plaintiffs also quote selectively from the Supreme Court's dictum in *Obergefell v. Hodges*, 576 U.S. 644 (2015). OB 36. The passage in full reads: "Many who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises, and neither they nor their beliefs are disparaged here. *But when that sincere, personal opposition becomes enacted law and public policy, the necessary consequence is to put the imprimatur of the State itself on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied.*" *Id.* at 672 (emphasis added).

court observed when rejecting Plaintiffs' claim that reliance on this precedent equates to religious hostility, "Defendants have pursued only fair and reasonable legal arguments." A083; *see also id.* n.27 ("Plaintiffs' citations to Ms. Odean's testimony for these contentions are entirely misleading.").

## B. UPK's equal-opportunity requirements permit no individualized exceptions.

Plaintiffs argue the equal-opportunity requirements aren't generally applicable for Free Exercise Clause purposes because they target religious groups for special burdens. OB 24. Although governments can do that subtly when they provide a mechanism for discretionary case-by-case exemptions that could work to exclude religious entities, *Fulton v. City of Phila.*, 593 U.S. 522, 523 (2021), UPK creates no mechanism for individualized exceptions and is thus generally applicable.

### 1. UPK's programmatic preference doesn't permit individualized exemptions from the equal-opportunity requirements.

The programmatic preference enables providers to maintain their relationships with certain communities and maintain specialized areas

of focus—so long as these relationships and specialties are not defined by characteristics protected by the statute. A045-46; 3.App.0729-34; 4.App.0787-93, 96; 8 C.C.R. 1404-1 § 4.110(B). Absent this preference, UPK's algorithm would match children with providers randomly or on a first-come, first-served basis. CDEC approved 17 provider requests for this preference in UPK's inaugural year, which enabled providers to, for example, save seats for children in their neighborhood, for families seeking STEM curriculum, and for families employed by a specific employer, like a hospital or college. 7.App.1648-1700. None of these involve exceptions from the equal-opportunity requirements.

Plaintiffs strain to imagine exceptions from the equal-opportunity requirements by pointing to this preference's use to allow an in-home provider to serve only "fully vaccinated children" or for another provider to serve only "Fort Lewis College student families and staff/faculty." OB 33. But neither vaccination status nor college affiliation are protected characteristics under the statute, so those preferences are not exceptions to the equal-opportunity provisions. Plaintiffs also cite the application form's exemplar of a hypothetical provider's request for a

preference to "serve[] children with specific disabilities" as inviting an exception from the equal-opportunity requirements when, as discussed in detail in II.C.1, prioritizing children with disabilities is consistent with—not an exception to—those requirements.

As the district court concluded, Plaintiffs point to no instance where the programmatic preference enables exceptions to UPK's equal-opportunity requirements, which remain generally applicable. A099; A091-93; *see also Church v. Polis*, 2022 WL 200661 at *9 (10th Cir. Jan. 24, 2022) (unpublished) (law neutral and generally applicable because "the so-called" exemptions didn't "actually operate" as exemptions) (citations omitted).

## 2. UPK's temporary-waiver provision doesn't permit individualized exceptions from the equal-opportunity requirements.

The UPK Act permits CDEC to "allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the

quality standards[.]"[8] C.R.S. § 26.5-4-205(1)(b)(II). That provision, however, forbids the use of temporary waivers to suspend any quality standard relating to health and safety. *Id*. Because CDEC sensibly interprets the equal-opportunity requirements (that protect children from discrimination that can cause mental, physical, and emotional harm) to be among UPK's health and safety standards, the temporary-waiver provision doesn't permit exceptions from those requirements. A088-91; 4.App.0786:5-12.

As Colorado's General Assembly found, stressful experiences early in life have destructive impacts on the brain's architecture—while responsive, nurturing relationships between young children and their caregivers can lead to more secure attachment. C.R.S. § 26.5-1-113(1)(a); *see also* A068; 4.App.0914-20. And at trial, CDEC explained how the Act's legislative history and implementation reflect a "whole child" approach, emphasizing the importance of safe, healthy, and nurturing learning environments free from discrimination. C.R.S. §§

---

[8] To illustrate, an in-home provider might need time for training on documenting observations of children, as the statute requires. 4.App.0784:6-14.

26.5-4-202(1)(b); 26.5-4-203(12); 26.5-4-204(2); A041; 1.App.0078; 3.App.0717-18; 4.App.0765; 4.App.0770; 4.App.0772-73. Expert testimony further demonstrated how discrimination in school settings harms children; and how supportive environments free from discrimination contribute to children's health. A066-69. By ensuring children in publicly-funded preschools have access to learning environments free from discrimination, the equal-opportunity requirements are logically included among UPK's health and safety standards. C.R.S. § 26.5-4-205(2)(b).

Plaintiffs nevertheless selectively quote from the UPK Act to misstate the scope of its protections: "the suggestion that a provision primarily regulating *admissions* to a preschool is a 'health and safety' regulation strains credulity well past the breaking point." OB 35. But the statute requires participating providers to ensure eligible children equal opportunity "to enroll *and receiv*e" quality publicly-funded preschool services, thus protecting preschoolers' health and safety in the classroom as well as in admissions. C.R.S.§ 26.5-4-205(2)(b) (emphasis added); A042.

Plaintiffs then mischaracterize CDEC's interpretation of the temporary-waiver provision as an impermissible "post hoc justification," alleging the UPK Agreement's listing of the equal-opportunity requirements separately from other health and safety standards suggests that CDEC did not consider the former to be among the latter. OB 35. This fails for two reasons. First, as the district court found based on CDEC's trial testimony, CDEC separately listed the equal-opportunity requirements because they are specifically required by statute. A089-91. Second, although the Agreement lists "health and safety" as a bullet separate from the equal-opportunity requirements, it also lists childcare licensing requirements and teacher-child ratios— also health and safety standards—separately from the "health and safety" bullet. 5.App.1166. As Ms. Odean testified, the equal-opportunity provision "was always contemplated [as] a part of health and safety." 4.App.0823-24; *see also* 3.App.0723-24.[9]

---

[9] Lacking any evidence of post hoc justifications, Plaintiffs point to a readily distinguishable Ninth Circuit decision: *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2024) (en banc). Two years into that litigation, the defendant

As the district court recognized, UPK's temporary waiver-provision provides no mechanism for individualized exemptions from the equal-opportunity requirements, which remain generally applicable. A089-91; *see also* A089 ("[I]t is clear the General Assembly did not intend to allow [CDEC] to waive any standard that would have potentially caused physical or mental harm to preschool children.").

And even if the provision was understood to permit temporary waivers to the equal-opportunity requirements, the statute would constrain CDECs' decisions—unlike the exemption in *Fulton* that permitted a commissioner to grant exceptions from contractual nondiscrimination requirements in his/her *"sole discretion."* 593 U.S. at 535 (emphasis added). UPK's temporary-waiver provision doesn't give CDEC discretionary power, but instead makes temporary waivers available only when "necessary to ensure the availability of a mixed

_____

changed its longstanding policy identifying specific categories protected from discrimination to an "All-Comers Policy" requiring decisions to be based on unspecified "non-discriminatory" criteria. *Id.* at 676. Here, CDEC is a brand-new department, implementing a brand-new program, and has never altered its interpretation of the temporary-waiver provision.

delivery system within a community" and only so long as the provider
meets "all quality standards relating to health and safety as a condition
of participating in the preschool program" and is "working toward
compliance" with *all* of the quality standards. C.R.S. § 26.5-4-
205(1)(b)(II). A requested exception from the equal-opportunity
requirements wouldn't satisfy these requirements.

C. **UPK's equal-opportunity requirements are generally
applicable because they don't prohibit religious
conduct while permitting secular conduct that
undermines the government's interest in a similar
way.**

The statute doesn't permit any exceptions to the equal-
opportunity requirements, and CDEC has granted no secular
exceptions. Although the congregation preference creates an exception
from the religious-affiliation requirement available to all faith-based
providers, it doesn't render any of the other equal-opportunity
requirements generally inapplicable for two reasons: it favors religious
conduct over secular conduct, and it doesn't undermine the other
requirements' underlying interests.

1. **UPK permits no exceptions to the provisions ensuring equal opportunity regardless of disability or income.**

Plaintiffs allege that permitting specialized providers to prioritize children with disabilities or children in low-income families allows discrimination based on disability and income in violation of the statute. OB 26. But this ignores the statute's text and undermines its express objectives.

The Act expressly directs the prioritization of children with disabilities and children in low-income families. C.R.S. §§ 26.5-4-202(3)(a); 26.5-4-203(3); 26.5-4-204(1). Because low-income families and children with disabilities have long experienced barriers to preschool access, the Act specifically identifies low-income families and children with disabilities among those to be served by the program. C.R.S. §§ 26.5-4-202; 26.5-4-205(1)(b); (2)(b); 4.App.0766:8-23; A039-40. Consistent with these statutory directives, CDEC interprets the equal-opportunity provisions as a one-way ratchet, protecting children with disabilities (but not children without disabilities) from disability-based discrimination, and protecting children of low-income families (but not

children of higher-income families) from income-based discrimination. CDEC's interpretation thus appropriately harmonizes all of the statute's provisions. C.R.S. § 2-4-201(1)(b) (declaring legislature's presumption that "entire statute is intended to be effective").

More specifically, the Act's objectives expressly include expanding preschool access for children with disabilities through the inclusion of providers that serve those children because "historically, they haven't had equitable access or aligned care that meets their needs." 4.App.0796; *see also* C.R.S. §§ 26.5-4-204(1), (3)(a)(III), (4)(a)(II)-(IV); 26.5-4-205(2); 26.5-4-202(4), 26.5-4-206(1). CDEC thus created a preference to ensure providers could save seats for children with Individualized Education Plans ("IEPs" support specific services for children with disabilities) after receiving feedback that school districts and their contracted partners needed to do so to comply with state and federal law. 3.App.0714; 4.App.0795. Consider, for example, schools specifically designed and resourced to serve children with vision or hearing impairments.

Likewise, to dismantle longstanding barriers to their preschool access, the Act expressly prioritizes low-income families by, for example, requiring UPK to include Head Start providers. C.R.S. §§ 26.5-4-202; 26.5-4-203(14)(e); 26.5-4-204(1)(b) and (3)(a); 26.5-4-205(1); 26.5-4-206; A049-50; 4.App.0796-97. CDEC thus developed a preference to permit Head Start providers to save seats for Head Start-eligible (*i.e.*, low-income) children. 3.App.0747; 4.App.0797; 4.App.0813.

CDEC's interpretation is the only sensible way of ensuring all the statute's directives have meaning. *See United States v. Brown*, 974 F.3d 1137, 1143 (10th Cir. 2020); *McBride v. People*, 2022 CO 30, ¶ 23 ("[W]e read the scheme as a whole, giving consistent, harmonious, and sensible effect to all of its parts, and we avoid constructions that would render any words or phrases superfluous or lead to illogical or absurd results." (citation omitted)). It makes no sense, for instance, to understand a statute dedicated to expanding options for children with disabilities as barring providers from prioritizing children with disabilities. Do Plaintiffs really mean to suggest that placing a child with a disability in a school that can accommodate that child's special needs *discriminates*

*against* a child without a disability who does not need that accommodation? If so, Plaintiffs not only advance an interpretation contrary to the statute, but one lacking in the most basic empathy for the challenges experienced by children with disabilities to find appropriate educational opportunities.

Moreover, CDEC's interpretation is consistent with the approach taken by "[t]he major disability rights statutes—the Americans with Disabilities Act, the Rehabilitation Act, the Fair Housing Act, Section 1557 of the Affordable Care Act, and the Individuals with Disabilities Act—[that] generally limit their protections to individuals who have a 'disability.' In that respect, the disability rights laws are very different from the laws that prohibit race and sex discrimination." SAMUEL R. BAGENSTOS, DISABILITY RIGHTS LAW 15 (3rd ed. 2021).

Other statutes similarly protect low-income (and not higher-income) individuals from income-based discrimination. For instance, the Equal Credit Opportunity Act prohibits creditors from discriminating against any applicant "because all or part of the applicant's income derives from any public assistance program[,]" programs available only

to low-income individuals. 15 U.S.C. § 1691(a)(2). And governments frequently designate certain public benefits as available only to low-income recipients. *E.g.,* 7 U.S.C. § 2011 et seq. (Food Stamp program).

That disability and income aren't like other characteristics protected by equal-opportunity laws explains why Plaintiffs' reliance on *FCA* is again misplaced. OB 27-28. There the school district prohibited student organizations seeking official recognition from discriminating based on sex and ethnicity, only to permit one group to prefer women and another to prefer those of South Asian ancestry. *FCA,* 82 F.4th at 688. But recall that laws prohibiting discrimination based on sex or ethnicity protect individuals of all ethnicities and sexes (working as two-way ratchets) because the Equal Protection Clause treats with suspicion any governmental distinctions on those bases. *E.g., Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 209 (2023) ("*SFFA*"); *Craig v. Boren,* 429 U.S. 190, 197-98 (1976). In contrast, the government's disability- or income-based distinctions don't trigger Equal Protection Clause suspicion. *E.g., Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440-42 (1985)

(government's disability-based distinctions don't trigger heightened scrutiny); *Harris v. McRae,* 448 U.S. 297, 323 (1980) (government's income-based distinctions don't trigger heightened scrutiny). Thus, disability- and income-based statutes like UPK's permissibly work as one-way ratchets—protecting only individuals with disabilities from disability-based discrimination and only low-income individuals from income-based discrimination.

As the district court thus concluded, the "allowance for special programming to serve the identified children with disabilities and those in low-income families does not violate the equal-opportunity requirement." A099 n.37.

### 2. UPK permits no exceptions from the provisions requiring equal opportunity regardless of race, sexual orientation, and gender identity.

As explained above, the matching preferences enable providers to maintain their relationships with certain individuals or communities and maintain specialized areas of focus—so long as these relationships and specialties are not defined by characteristics protected by the statute. 8 C.C.R. 1404-1 § 4.110.B; *see also* II.B.2.

Plaintiffs nevertheless allege CDEC would create exceptions to the equal-opportunity requirements by allowing preschools to serve only gender-nonconforming children, children of color, or the LGBTQ community. OB 26-27. Plaintiffs rely, however, on cherry-picked portions of Ms. Odean's trial testimony when she was asked to speculate on-the-fly about hypothetical requests that neither she nor CDEC had ever contemplated. 4.App.0820:15-25; 4.App.0821:13-24; 4.App.0822:4-8.

Ms. Odean made clear, however, that CDEC has never considered, much less received or approved, requests for those hypothetical preferences and wouldn't approve requests that violate any of the equal-opportunity requirements. 4.App.0821; 4.App.0853-56. Ms. Odean, whose career has been devoted to early childhood education, also made clear she does not have sole authority to approve preference requests and would consult with others (including the senior leadership team and legal counsel) to ensure that any requested preference complies with the law. 4.App.0759-64; 4.App.0821; 4.App.0854-55. *See also,* 3.Supp.App.0658-59.

37

The district court credited Ms. Odean's testimony. A101 ("Ms. Odean's testimony confirms that [CDEC] does not have the authority to grant any exemption from the equal-opportunity requirement….I cannot conclude that Defendants have the discretion to grant such exemptions based merely on hypotheticals and speculation when nothing in the UPK Statute or official documents from [CDEC] supports that it does."). The district court's "credibility determinations remain subject to clear error review[.]" *United States v. Quaintance,* 608 F.3d 717, 721 n.3 (10th Cir. 2010).

>        3.     **Because it favors religious providers over secular providers, the congregation preference doesn't trigger strict scrutiny of any of the other equal-opportunity requirements.**

CDEC's ambitions to address faith-based providers' concerns through the congregation preference (inadvertently) drew distinctions based on religious affiliation because that preference is available only to religious providers. Plaintiffs allege that because this preference—available to all faith-based providers—is an exception from the religious-affiliation provision, it triggers strict scrutiny of CDEC's

denial of Plaintiffs' request for exemptions from the gender-identity and sexual-orientation provisions. OB 26. Not so.

As the Court has made clear, "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. But the congregation preference creates an exception available only to religious, not secular, providers. And it's an exception from a requirement different from the gender-identity and sexual-orientation provisions at issue: permitting faith-based providers to prefer members of their religious community doesn't undermine the interests underlying UPK's other equal-opportunity provisions. For these reasons, it doesn't trigger Free Exercise Clause suspicion.

> **a.    The congregation preference doesn't trigger Free Exercise Clause suspicion because it treats religious entities more favorably than secular entities.**

The Court's general-applicability analysis screens for situations where governments "treat *any* comparable *secular* activity more favorably than religious exercise[]" and thus de-value religion compared

39

to secular activities. Not vice versa. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (emphasis added). As Plaintiffs themselves explain: "All that matters for the strict-scrutiny *trigger* is whether the government has favored other interests over religious interests, thus "devalu[ing] religious reasons … by judging them to be of lesser import than nonreligious reasons." OB 30 (quoting *Does 1-11 v. Bd. of Regents of Univ. of Colo.,* 100 F.4th 1251, 1277 (10th Cir. 2024). But CDEC has granted no secular exemptions from UPK's equal-opportunity requirements.[10]

By treating religious actors more favorably than secular actors, the congregation preference doesn't devalue religion. Far from it, as it reflects CDEC's efforts to facilitate religious providers' UPK participation. Indeed, to hold the congregation preference—available to all faith-based providers—triggers suspicion would perversely discourage government from accommodating religion. *See Cath.*

---

[10] Plaintiffs' reliance on *Does 1-11,* 100 F.4th at 1277 (having a "lower bar" for secular over religious exceptions makes a "value judgment in favor of secular motivations") is thus inapposite. OB 25. As explained above, CDEC has exempted no secular conduct from the equal-opportunity requirements.

*Charities of Diocese of Albany v. Serio,* 7 N.Y.3d 510, 522 (2006) ("To

hold that any religious exemption that is not all-inclusive renders a

statute non-neutral would be to discourage the enactment of any such

exemptions—and thus to restrict, rather than promote, freedom of

religion.").

      **b.**    **The congregation preference doesn't
trigger Free Exercise Clause suspicion
because it doesn't undermine the
interests underlying UPK's other
equal-opportunity provisions.**

Permitting faith-based providers to save seats for those affiliated

with their religious communities doesn't undermine the interests

underlying any of the other equal-opportunity requirements, including

the gender-identity and sexual-orientation provisions. For this reason,

too, the congregation preference doesn't render discriminatory CDEC's

evenhanded enforcement of the sexual-orientation and gender-identity

provisions. *See Fulton*, 593 U.S. at 534 ("A law also lacks general

applicability if it prohibits religious conduct while permitting secular

conduct that undermines the government's asserted interests in a

similar way."); *Tandon,* 593 U.S. at 62 ("whether two activities are

comparable" for Free Exercise purposes "must be judged against the asserted government interest that justifies the regulation at issue.").

Each of the eight equal-opportunity requirements seeks to remove barriers to access experienced by children with different protected characteristics.[11] Because children with different protected characteristics experience different barriers to preschool access and to safe and healthy learning environments, an exception from one equal-opportunity provision need not undermine governmental efforts to address barriers faced by other protected classes. The expert testimony, for example, confirmed the barriers specifically experienced by LGBTQ+

---

[11] Plaintiffs claim the "interest" underlying all eight protected characteristics is "the same" by mischaracterizing another out-of-context snippet from Ms. Odean's deposition testimony in separate litigation (three months after the close of the trial record and without requesting record supplementation or explaining why this material couldn't have been elicited at trial). *See* OB 31. There Ms. Odean explained that CDEC would follow the same procedures when evaluating discrimination complaints under any of the eight classes. *See* Ex. 66 to Pls.' Mot. Summ. J. at 15:5-16:8 (ECF No. 78-21), *Darren Patterson Christian Acad. v. Roy*, No. 1:23-cv-1557 (D. Colo. June 21, 2024). She was not asked whether members of each of the eight classes experience the same barriers to enrolling and receiving preschool services nor whether an exception from one requirement would undermine the interests underlying other requirements. *Id.* at 15:5-17:19.

children and families. A096-97. And, as discussed above, the barriers experienced by children with disabilities and the children of low-income families are different still. II.C.1. [12] As the district court summarized, "the specific State interests in eliminating discriminatory barriers for children and families and protecting children from discrimination are distinct depending on the basis for the discrimination." A096.

Indeed, Plaintiffs effectively concede that the equal-opportunity provisions comprise separate and distinct protections when they seek exemptions only from the requirements regarding religious affiliation, sexual orientation, and gender identity—and not from those regarding race, ethnicity, lack of housing, income level, or disability. 1.App.0052. As the district court recognized, "it would be illogical to find that, if Defendants violate Plaintiffs' constitutional rights with the implementation of a single aspect of the equal-opportunity requirement,

_____

[12] Plaintiffs' reliance on *FCA*, OB 28-29, is again misplaced. 82 F.4th at 689; *see also Youth 71Five Ministries v. Williams,* No. 24-4101, 2024 WL 3749842, at *4 (9th Cir. Aug. 8, 2024). Not only did those decisions involve secular exceptions not present here, the record included no evidence of the unique barriers to access experienced by members of distinct protected-classes.

then Plaintiffs automatically should not be bound by any aspect of the requirement, leaving children and families with the other characteristics less protected." A097 n.34. The congregation preference creates an exception from the provision requiring equal opportunity regardless of religious affiliation, and no more. Strict scrutiny thus applies only to CDECs' denial of Plaintiffs' request for an exemption from the religious-affiliation provision. A104-05.

**D.    CDEC satisfied rational-basis—indeed, any level of scrutiny—in denying permission to exclude and expel gender-diverse children, and the children of LGBTQ+ parents, from publicly-funded preschool services.**

Because CDEC's gender-identity and sexual-orientation requirements are neutral and generally applicable, rational-basis scrutiny applies. In rejecting Plaintiffs' request for permission to exclude and expel gender-diverse children, and the children of LGBTQ+ parents, CDEC satisfies this—and indeed any—level of scrutiny. CDEC's denial is rationally related, indeed narrowly tailored, to achieve Colorado's legitimate, indeed compelling, interests in ensuring (1) that each child has equal access, free from discriminatory barriers, to enroll in publicly-funded preschools; and (2) that, once enrolled, every child

44

has an equal opportunity to receive publicly-funded preschool services that are safe, healthy, and free from discrimination. *See Fulton,* 593 U.S. at 542 (government has "weighty" interest in ensuring equal treatment); *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528 (3d Cir. 2018) (government has compelling interest in preventing discrimination against transgender students); *St. Dominic Acad. v. Makin,* No. 2:23-cv-00246-JAW, 2024 WL 3718386 at *27 (D. Me. Aug. 8, 2024) (state has compelling interest in not creating exceptions that would "free in-state schools from complying with state antidiscrimination law").

1. **Colorado has a compelling interest in ensuring children have equal access—free from discriminatory barriers—to publicly-funded preschools.**

UPK's statutory text, as well as the circumstances surrounding its enactment, expressly identify Colorado's interest in removing discriminatory barriers so that all eligible children have equal opportunity, regardless of protected-class status, to enroll in the publicly-funded preschools that best meet their needs. C.R.S. §§ 26.5-4-204(1); 26.5-4-205(2); 4.App.0761-62; 4.App.0766; 4.App.0775.

Expert testimony at trial supported Colorado's interest in sweeping away barriers to preschool access experienced by LGBTQ+ families—barriers that limit the preschool options available to those families. The district court found this testimony "reliable and persuasive," A069, a finding subject to clearly-erroneous review.

For example, Dr. Abbie Goldberg, long-time researcher of LGBT families, explained that LGBT parents are nearly twice as likely to live in poverty compared to heterosexual parents, and a disproportionate number of LGBT parents live in rural areas with few preschool providers. These families' access to preschool services may thus turn on whether a provider that will accept them is located close to their home, work, or public transportation. A066-67. For these families, the only meaningfully accessible option for early childhood education may be a religious provider. A067. Even in metropolitan areas, LGBT parents experience significant discrimination. 4.App.0881. This discrimination harms both children and parents, as children are adversely affected when their LGBT parents experience discrimination. A067; 4.App.0867-70.

The evidence further demonstrated that different preschool environments best meet families' needs for different reasons. For example, an LGBT family, like any family, may prefer a particular preschool because of its small class size, strong reputation, curricular focus, or location close to their home or work. A067; 4.App.0863:10-25; 4.App.0899:16-900:24; 5.App.0958:15-959:10. The district court so found: "removing discriminatory barriers prevents the burden of discrimination from continuing to be placed on those children and families by, for example, requiring them to find another preschool provider or to travel a greater distance to receive preschool services." A111.

In response, Plaintiffs pivot to repeatedly mischaracterize Colorado's interest as simply maximizing the number of publicly-funded preschools.[13] OB 40. But if numerosity had been the goal, Colorado wouldn't have imposed quality standards reflecting equal-opportunity

---

[13] Unable to refute the evidence establishing Colorado's compelling interests, Plaintiffs cite a news article outside the record that profiled only a single county (in which none of the Plaintiffs reside), to allege a shortage of UPK providers. OB 10. Nothing in the record indicates this, or any shortage.

requirements. As the district court recognized, "simply adding to the list of UPK providers" does not address Colorado's interests in ensuring the "best fit for a family's needs" and avoiding the "risk for inadequate outcomes." A109; *see also* A110 (distinguishing Colorado's interest from that asserted in *Fulton* of "maximizing the number of foster parents").

> **2.    Colorado also has a compelling interest in ensuring that, once enrolled, children have an equal opportunity to receive publicly-funded preschool services that are safe, healthy, and free from discrimination.**

UPK's statutory text, as well as the circumstances surrounding its enactment demonstrate Colorado's interest in protecting children enrolled in publicly-funded preschools from the harms inflicted by discrimination. The General Assembly determined that ensuring the physical, emotional, cognitive, mental, and behavioral health of the "whole child" requires a "safe, nurturing, inclusive, nondiscriminatory environment." 3.App.0723:21-724:2; *see also* C.R.S.§§ 26.5-1-113(1)(a); 26.5-1-109(1)(a); A038; 4.App.0770:1-771:17.

The expert testimony at trial confirmed the strength of this interest, describing harms experienced by children (or their parents)

subject to discrimination in school settings based on LGBTQ+ status. For example, clinical and research psychologist Dr. Amy Tishelman explained how certain adverse experiences in early childhood, which can include discrimination based on LGBTQ+ status, negatively affect children's health and development. A068. "Early childhood is a time of very rapid change for children," a time when they develop foundational skills like secure attachments, trust, and the ability to function in a more regulated way. 4.App.0914:10-11; 4.App.0914-15. Early adverse childhood experiences ("ACEs")—including a child's experience of discrimination, maltreatment, unaccepting environments, or significant bullying (either in single or recurring incidents)—can undermine that child's sense of safety and stability. A068-69; 4.App.0915:16-916:13; 4.App.0924:6-18. *See also,* 3.Supp.App.0753-67. Gender-diverse children experience higher incidences of such adversity, including discrimination, than do cisgender children. 4.App.0933. *See also* 3.Supp.App.0768-78. As Dr. Tishelman testified, "if [children] are treated poorly because of that difference, it can create a lot of anxiety and low self-esteem…; the way it works for other children is the way

that it works for gender-diverse and transgender children in the sense that if they're rejected for something that they can't change about themselves, that can be very hard…." 4.App.0924.

ACEs, including discrimination, can result in a "propensity for addiction, propensity for employment disruption…" hormonal differences, structural differences in the developing brain, higher likelihood of diseases as adults, heart diseases and cancers, PTSD in adulthood, higher suicidality, and a higher likelihood of "see[ing] the world as hostile." 4.App.0916-19; 918:3-8; *see also* A069. Children exposed to ACEs also suffer a higher incidence of anxiety, chronic stress, negative effects on neurodevelopment, and negative self-views. A068-69; 4.App.0873:11-13; 4.App.0918:15-920:1; 4.App.0944:3-6.

LGBTQ+ people "often draw on religion and faith as a source of…solace to them…their religious beliefs help sustain them, and some families may want to seek out religious institutions for that reason…." 5.App.0958-59. In Dr. Tishelman's clinical experience, those excluded from religious communities based on their LGBTQ+ status may experience "a terrible loss of community and faith that's important to

them." 5.App.0958. For children who enroll at a school as cisgender and later identify as gender-diverse, being then forced to switch schools because of their identity can be "a significant adversity and loss." 5.App.0967; 5.App.0958-59.

Plaintiffs offered nothing to refute this evidence.

### 3. Plaintiffs' arguments to the contrary are unavailing.

Plaintiffs' various shots at CDEC's demonstrably compelling interests all miss their mark.

### a. Colorado's interests are meaningfully reviewable.

Plaintiffs assert that Colorado's interests are not compelling because they are not "meaningfully reviewable" and are "amorphous." *SFFA,* 600 U.S. at 214. But the *SFFA* Court objected to the universities' "standardless" interests in producing engaged and productive citizens; enhancing appreciation, respect, and empathy; and effectively training future leaders. *Id.* at 215-16. In contrast, whether publicly-funded preschools provide equal opportunity to students regardless of their—or their parents'—LGBTQ+ status is readily measurable. Indeed, antidiscrimination laws regularly require exactly these assessments

when determining whether an actor impermissibly treats individuals differently based on their protected-class status, and when measuring the physical, emotional, and economic harms caused by this denial. *Id.* at 215 (explaining how courts commonly assess whether discrimination victims have been made whole for the injuries they've suffered).

UPK requires that LGBTQ+ children and families have access to the same publicly-funded preschools as non-LGBTQ+ children and families, and that publicly-funded preschools treat gender-diverse children and children of LGBTQ+ parents the same as cisgender children and the children of straight or cisgender parents. The denial of equal opportunity to enroll in and receive publicly-funded preschool, and the harms thereby inflicted, are readily measurable.

> **b. Colorado's compelling interests are not post hoc justifications.**

The statute's text and structure—confirmed by trial testimony from those who helped develop the statute—make clear that these interests have driven UPK's enactment and implementation from the start. Specifically, the General Assembly determined that safeguarding children's health and safety requires protecting them from adverse

experiences that could affect their physical, emotional, cognitive, mental, and behavioral health for years to come. *See* C.R.S. §§ 26.5-1-113(1)(a); 26.5-1-109(1)(a). The Act thus directed the use of quality standards to ensure safe and healthy learning environments—quality standards that include the equal-opportunity provisions. C.R.S. §§ 26.5-4-204(3); 26.5-4-205(2)(b) 3.App.0718:20-719:3; 4.App.0773:17-774:9; 4.App.0775:15-25. As the district court concluded, the "[u]ncontroverted testimony at trial" confirmed Colorado's interests as bona fide and "not factitious, hypothesized, or invented post hoc." A106.

> ### c. The expert witnesses' testimony and Plaintiffs' own testimony confirm that Colorado's compelling interests seek to solve actual problems.

Plaintiffs presented no rebuttal to the trial evidence demonstrating the barriers to preschool access experienced by LGBTQ+ families and the harms inflicted by discrimination in early childhood. Plaintiffs instead argue that the absence of discrimination complaints against them in other settings means there's no reason to anticipate any problem if they participate in UPK. OB 41. The district court properly dispensed with this argument: the availability of free preschool

through UPK means that some LGBTQ+ families may seek out what are now free religious preschools when economic barriers might have earlier prevented them from doing so. A108; *see also id.* ("It cannot be assumed that a lack of formal complaints in the past equates to discrimination not having occurred or evinces it is unlikely to occur in the future.").[14]

Indeed, Plaintiffs themselves testified how they would deny enrollment to an LGBTQ+ family or child seeking to enroll in their preschool. A055; 3.App.0627:16-22; 3.App.0628:4-629:2; 5.App.1057-59. And how they would expel a child enrolled at Plaintiffs' preschools who later identified as gender-diverse themselves (or where a parent newly identified as LGBTQ+). A054-55; 3.App.0629-30; 5.App.1052-53; 5.App.1058-59. This is not mere speculation: the director of one of the Plaintiff Preschools testified that she turned away a fifth-grader

---

[14] Plaintiffs wishfully aver that Defendants concede that future harm to LGBTQ *families* is "speculative." *See* 1.App.0065. But CDEC's Motion to Dismiss merely posited that Plaintiffs lack standing because any harm *to the preschools* is speculative. 1.App.0062-69. If, as Plaintiffs now claim, the chance that they would exclude or expel children in violation of the equal-opportunity requirements is only "speculative," this dispute is nonjusticiable, as argued below.

because of their family's LGBTQ+ status. 3.App.0690:2-691:4; 3.App.0689:5-11; 690:2-13.

Plaintiffs also claim they "mitigate" any harms of discrimination by simply refusing to enroll LGBTQ+ children or the children of LGBTQ+ parents altogether. But this compounds barriers to preschool access, and fails to address the trauma experienced by children who do not identify as gender-diverse at enrollment (or when their parents do not identify as LGBTQ+ at enrollment), later to be expelled because of LGBTQ+ status.

Plaintiffs then pivot once more, asserting that CDEC's interest in protecting gender-diverse children from harm is not compelling absent evidence that any "significant number of four-year-olds" decide to socially transition. OB 42. Again, this claim entirely ignores the barrier to equal opportunity created by Plaintiffs' plans to exclude children in violation of the equal-opportunity requirements in the first place, and would forgive planned discrimination whenever one could argue the absence of a likely victim. In any event, as Dr. Tishelman explained, such four-year-olds do exist. 4.App.0942:16-24; 5.App.0954. Recall, too,

Plaintiffs seek permission to exclude already-enrolled children if Plaintiffs learn the child's parents are LGBTQ+, further enlarging the number of children at risk of expulsion. And, as Ms. Odean testified, ensuring continuity-of-care by limiting a child's moves between schools helps improve growth and positive outcomes. 4.App.0789.

Plaintiffs tack once more, arguing that Colorado's compelling interests are speculative, pointing to the district court's statement that no expert testimony "spoke directly" to whether Plaintiff Preschools' participation in the UPK Program "would increase or decrease the ability of LGBTQ+ families to access preschool services in Denver and the surrounding area." A069. But Plaintiffs omit that the district court then found those experts' testimony—informed by nationwide research on the barriers to preschool access experienced by LGBTQ+ families— "reliable and persuasive" in supporting Colorado's compelling interest in addressing those barriers as experienced by Coloradans. A069, A109-10.

### d. Colorado has consistently treated its interests as compelling.

Plaintiffs shift again, arguing that CDEC has somehow failed to treat these interests as compelling, citing "countless exceptions…for all sorts of secular reasons," OB 44. But, as explained above, CDEC has granted *zero* secular exceptions from the equal-opportunity requirements.

Plaintiffs double down to claim that CDEC has undermined its asserted interests by *under-regulating* religion because it declines to regulate religious curriculum that is not gender-affirming. OB 44. But, as explained above, Colorado's interests center on preventing the harms experienced by LGBTQ+ children and families when preschools deny them equal opportunity to enroll in and receive publicly-funded preschool services, not on the consequences of any particular curriculum. 4.App.0808-09. Regardless, any regulation of religious instruction would raise heightened constitutional concerns that Plaintiffs would be quick to raise. Plaintiffs strain to mischaracterize CDEC's unwillingness to regulate the content of religious instruction as casting doubt on Colorado's compelling interests, when it instead

provides further evidence of CDEC's efforts to facilitate religious providers' participation.[15]

### 4. Denying permission to discriminate against four-year-olds and their families is narrowly tailored to achieve Colorado's compelling interests.

Plaintiffs insist that families who want to go to *their* preschools should receive public funding even though there are other publicly-funded schools available to them—while simultaneously insisting their exclusion of LGBTQ+ families poses no harm to those families because other publicly-funded schools are available to them. But just as religious families are not monolithic in their preferences, neither are LGBTQ+ families. To illustrate, imagine a child raised in a deeply religious household who chooses to attend a secular private high school with a STEM or arts curriculum rather than a religious school. Or consider the women who sought to attend the Virginia Military Institute because of its extensive alumni network and other unique

---

[15] Moreover, "the First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015) (quoting *R.A.V. v. City of St. Paul,* 505 U.S. 377, 387 (1992)).

opportunities. *United States v. Virginia,* 518 U.S. 515, 519-20 (1996).

That those women had many other options did not negate their right to

choose, free from discrimination, the option they felt best met their

needs. *See id.* at 540, 557.

Whatever a child's publicly-funded preschool options—however

many or few—Colorado seeks to ensure those options are not further

limited by that child's protected-class status. Permitting Plaintiffs to

exclude and expel children on these bases would frustrate Colorado's

interests in ensuring their equal access to the available publicly-funded

preschool programs that best fit their needs, whether based on location,

hours, size, curricula, or other criteria.[16]

Nor can Colorado achieve its compelling interests by, as Plaintiffs

propose, listing publicly-funded providers that welcome gender-diverse

---

[16] Granting Plaintiffs' requested exemptions would also likely require exemptions for other providers, further undermining Colorado's compelling interests. The Archdiocese seeks exemptions for several dozen other providers, as does an unrelated faith-based provider in Buena Vista. 1.App.0021-22; 1.App.0031-32, 1.App.0053.; Complaint (ECF No. 1) *Darren Patterson Christian Acad. v. Roy*, No. 1:23-cv-1557 (D. Colo. June 21, 2024). The more publicly-funded providers permitted to discriminate based on LGBTQ+ status, the less equal the publicly-funded opportunities for LGBTQ+ children and families.

children and the children of LGBTQ+ parents alongside lists of publicly-funded preschools that spurn them. OB 47. Nor can Colorado achieve its regulatory interest through disclaimers communicating to the public that the beliefs of private preschool providers "aren't attributable to the State," or by notices that faith-based providers are allowed to exclude certain children or families consistent with their faith. OB 47. Consider how Plaintiffs' proposal would deny equal opportunity: some providers' online portal profiles would state something like "Serves all children and families regardless of sexual orientation or gender identity," while others would state "Serves only cisgender children and the children of straight, opposite-sex parents."

The record is undisputed that cisgender preschoolers, and preschoolers whose parents are cisgender and straight, need not worry whether they will be turned away from *any* UPK preschool because of their gender identity or sexual orientation. Colorado seeks to provide that same guarantee to LGBTQ+ preschoolers and families—a guarantee thwarted if any publicly-funded provider is allowed to

exclude or expel children based on their, or their parents', LGBTQ+

status.

### III. Because the equal-opportunity requirements don't significantly burden Plaintiffs' expressive association, they trigger only rational-basis review—and they satisfy this and any other level of scrutiny.

Governmental action doesn't trigger heightened review for

expressive association purposes unless it "significantly affects" the

challengers' ability to express their views. *See Boy Scouts of Am. v.*

*Dale,* 530 U.S. 640, 650 (2000).[17] The equal-opportunity requirements

do not significantly burden Plaintiffs' expressive association, for three

reasons. First, the presence of gender-diverse four-year-olds or the four-

year-olds of LGBTQ+ parents in Plaintiffs' classrooms wouldn't

---

[17] Plaintiffs repeatedly misstate the expressive association question at issue, asserting "Defendants' expert *agreed* that the Plaintiffs' religiously-informed policies send a 'consequential' message," and claiming "[u]nder *Dale*, this is more than enough to show a violation of the right to expressive association." OB 49; *see also* OB 48 (citing district court's statement that Plaintiffs' association is "likely expressive" without citing the district court's next sentence: "But my agreement ends there."). The key question here is *not* whether Plaintiffs seek to communicate any message—but instead whether UPK's equal-opportunity provisions significantly burden Plaintiffs' ability to deliver that message. As explained above, the answer is no.

significantly interfere with Plaintiffs' ability to communicate their chosen messages. Second, conditioning public funding on providers' adherence to equal-opportunity requirements doesn't significantly burden those providers' expression. Third, the Supreme Court has long understood that the government regulates conduct, not protected expression, when it prohibits schools' discriminatory conduct towards their students without regulating schools' instructional content. Because Plaintiffs have established no significant burden on their expression, rational-basis review applies.

### A. The presence of LGBTQ+ children in publicly-funded preschools doesn't significantly burden those schools' ability to communicate their views.

Four-year-olds—regardless of who they or their parents are—don't speak for their preschools. Four-year-olds' presence in publicly-funded preschools thus doesn't significantly interfere with Plaintiffs' ability to communicate their views.

Contrast the adult volunteer leaders at issue in *Dale*, whose duties included speaking for and representing their organization: the Boy Scouts required "its adult leaders [to] spend time with the youth

members, instructing and engaging them in activities like camping, archery, and fishing. During the time spent with the youth members, the scoutmasters and assistant scoutmasters inculcate them with the Boy Scouts' values—both expressly and by example." *Dale*, 530 U.S. at 649-50.

Four-year-olds do nothing of the sort.

As *Dale* emphasized, an expressive association cannot "erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Id.* at 653. The Court later applied this principle in *Rumsfeld v. F. for Acad. and Institutional Rts., Inc.*, 547 U.S. 47 (2006). There it rejected universities' claims that their expression was impermissibly burdened by federal law requiring them to provide military recruiters with the same access to campus facilities as other recruiters*:* "Students and faculty are free to associate to voice their disapproval of the military's message;...[a] military recruiter's mere presence on campus does not violate a law school's right to associate, regardless of how

repugnant the law school considers the recruiter's message." *Id.* at 69-70.

On-campus interviewers don't speak for the universities they visit. Neither do four-year-olds speak for the preschools they attend. Complying with the equal-opportunity requirements necessary to receive public funding sends no message other than that provider agrees to these conditions to receive public funding. Those children's presence—regardless of their, or their parents', gender identity or sexual orientation—doesn't significantly affect preschools' ability to communicate their views. *See Dale,* 530 U.S. at 648. The equal-opportunity requirements thus trigger no heightened scrutiny.

**B.     UPK doesn't significantly burden expression when it conditions public funding on recipients' adherence to equal-opportunity requirements.**

Withholding public funding from recipients who seek to use those funds to discriminate doesn't impermissibly burden those entities' ability to express themselves, again not triggering heightened First Amendment review. *See Evans v. City of Berkeley,* 38 Cal.4th 1, 14 (2006) (city didn't burden expressive association when it denied public

subsidies to recipients that did not comply with city's equal-opportunity requirement).

Plaintiffs nevertheless allege that requiring them to include gender-diverse children and children of LGBTQ+ parents while receiving public funding would significantly interfere with their religious messaging. Plaintiffs again rely on *Dale,* which held that the application of public accommodations law to an organization's selection of its volunteer adult leaders significantly burdened that organization's ability to advocate its views. 530 U.S. at 659.

But *Dale* is, again, readily distinguishable. For example, there the Boy Scouts' decisions about its volunteer adult scoutmasters were subject to civil punishment. Here, in contrast, UPK doesn't regulate discriminatory conduct outside of publicly-funded services, and Plaintiffs' refusal to comply with the equal-opportunity requirements means only that they don't receive UPK funding.

Indeed, the Supreme Court has made clear that requiring public-funding recipients to comply with certain conditions as a condition of receiving those subsidies does not impermissibly burden expression

when the conditions apply only to publicly-funded activities. As the Court emphasized when distinguishing *Dale* from the facts before it in *Christian Legal Soc'y [CLS] v. Martinez*:

> [I]n seeking what is effectively a state subsidy, CLS faces only indirect pressure to modify its membership policies; CLS may exclude any person for any reason if it forgoes the benefits of official recognition. The expressive-association precedents on which CLS relies, in contrast, involved regulations that *compelled* a group to include unwanted members, with no choice to opt out. *See, e.g., Dale,* 530 U.S. at 648 (regulation "forc[ed] [the Boy Scouts] to accept members it [did] not desire")….In diverse contexts, our decisions have distinguished between policies that require action and those that withhold benefits.

561 U.S. 661, 682 (2010) (emphasis in original).

Plaintiffs thus mischaracterize the nature of conditional public funding when they claim that requiring participating preschools not to discriminate "effectively impos[es] a special tax on Catholic preschools." OB 17. As the Supreme Court has made clear, government has the constitutional power to ensure public funds go to the activities the government has chosen to fund—as in this case, where Colorado seeks to fund preschools free from discrimination. *See Agency for Int'l Dev. v. All. for Open Soc'y*, 570 U.S. 205 (2013) (distinguishing the

66

government's permissible requirement that recipients of federal HIV-prevention funding agree not to use that funding to promote prostitution from the government's impermissible requirement that recipients expressly state they oppose prostitution); *Regan v. Tax'n With Representation of Wash.,* 461 U.S. 540, 546 (1983) (distinguishing the government's regulation of certain activity from the government's decision not to fund certain activity). In other words, Colorado can choose to fund private preschools—or not. That it chooses not to fund preschools that discriminate on protected bases doesn't convert its decision into a tax on those schools.

Unable to point to any expressive-association precedent to the contrary, Plaintiffs instead cite decisions that have nothing to do with expressive association. OB 49. *Fulton* simply points out the First Amendment doesn't permit government to discriminate against publicly-funded religious providers because they are religious, 593 U.S. at 536. And *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr* holds only that government may not retaliate against its contractors for speech critical of the government. 518 U.S. 668, 674 (1996). UPK's

equal-opportunity provisions, in contrast, apply to all publicly-funded providers regardless of their religious or secular nature, and this case involves no allegation of retaliation against any publicly-funded provider for their speech.

Because UPK's equal-opportunity provisions don't significantly burden preschools' expression, they don't trigger heightened First Amendment review.

## C. Prohibiting preschools' discriminatory exclusion of students regulates conduct, not expression.

UPK's equal-opportunity requirements regulate discriminatory conduct—not expression—by prohibiting publicly-funded preschools from excluding and expelling children based on protected-class status. Indeed, the Supreme Court has consistently rejected expressive-association challenges to the regulation of discriminatory conduct in education settings. Plaintiffs' unprecedented and unworkable approach, if adopted, would undermine these longstanding antidiscrimination laws that have never been thought to trigger First Amendment scrutiny when ensuring students' equal opportunity.

For example, in *Runyon,* the Court rejected a commercially-operated preschool's claim that it had an expressive association right to exclude Black students, notwithstanding federal law prohibiting race discrimination in contracting. 427 U.S. at 173. Concluding that the law prohibited discriminatory "conduct" in the form of a "discriminatory admissions policy," *id.* at 178, the Court held the law didn't interfere with the school's ability to control its instructional content because "'there is no showing that discontinuance of (the) discriminatory admission practices would inhibit in any way the teaching in these schools of any ideas or dogma.'" *id.* at 176 (quoting *McCrary v. Runyon,* 515 F.2d 1082, 1087 (4th Cir. 1975)).

Similarly, the Court denied universities' expressive association claim to federal law requiring them to provide the military with access equal to that provided other recruiters, rejecting the concern that the military's mere presence interfered with universities' expression opposing the military's "don't ask, don't tell" policy. *Rumsfeld*, 547 U.S. at 70. The Court explained that the law "regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military

recruiters—not what they may or may not *say*." *Id*. at 60 (emphasis in original); *see also id*. at 70 ("[Although the challengers] object to having to treat military recruiters like other recruiters…that regulation of conduct does not violate the First Amendment.").

Preschools engage in conduct when they exclude or expel students. UPK's equal-opportunity requirements thus regulate conduct, not expression, when they prohibit publicly-funded preschools' discriminatory exclusion of children based on those children's (or their parents') gender identity or sexual orientation. *See Crosspoint*, 2024 WL 810033 at *19 (law prohibiting publicly-funded high schools from discriminating regulated "conduct, not speech"). And here too Plaintiffs remain free, under UPK's equal-opportunity requirements, to teach what they want, as CDEC doesn't review or regulate faith-based providers' curriculum. 4.App.0808-09. Again, these requirements don't significantly burden preschools' expression and thus trigger no heightened First Amendment review.

### D. Plaintiffs invoke distinguishable precedent to propose an unworkable new rule with no limiting principle.

Each of the three reasons described above independently explain why UPK's equal-opportunity requirements don't impermissibly burden Plaintiffs' expression, and thus trigger no heightened First Amendment review. Each supports the district court's conclusion that "Plaintiffs ignore applicable doctrines and attempt to stretch precedent beyond recognizability." A035.

Notably, nearly a quarter century has passed since *Dale* was decided and Plaintiffs cannot point to a single decision holding that government impermissibly burdens expressive association when it conditions public funding on recipients' compliance with equal-opportunity requirements, nor when it prohibits schools' discriminatory treatment of their students.

Plaintiffs instead point to readily distinguishable precedent. For instance, *303 Creative, LLC v. Elenis* was a compelled-speech decision and thus does not apply to Plaintiffs' expressive-association claim. 600 U.S. 570, 589-90 (2023). Nor did the law at issue there condition public

funding upon recipients' agreement not to discriminate against children; it instead involved the potential enforcement of public accommodations law against a website designer who wanted to make and sell wedding websites for opposite-sex, but not same-sex, couples. *Id.* at 579-80.

Importantly, the Court's decision in *303 Creative* expressly relied on stipulations involving the nature and expressive content of the relevant products and services, the process for creating them, and the challenger's willingness to make other products for LGBTQ+ customers—stipulations absent from this case. *Id.* at 587, 588, 593, 594-95, 597, 598 & n.5, 599; *see also Carpenter v. James,* 107 F.4th 92 (2nd Cir. 2024) (limiting *303 Creative* to disputes involving the stipulations in that case). Taken together, these stipulations led the *303 Creative* Court to conclude that the government sought to compel "pure speech"—a dynamic plainly not the case here. *See 303 Creative,* 600 U.S. at 587. Those stipulations also led the *303 Creative* Court to issue—atypically—a categorical ruling for the challenger without applying scrutiny of any type, *id.* at 588-89, much less scrutiny that

required it to consider the government's interest in ensuring children's equal opportunity to enroll and receive quality publicly-funded preschool services.

Nor does *Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Bos.*, 515 U.S. 557 (1995), support Plaintiffs' claim. Like *303 Creative*, *Hurley* involved the application of public accommodations law and not a condition on public funding. So too did *Hurley* decide the claim on compelled-speech, not expressive-association, grounds. *Id.* at 572-75. Moreover, *Hurley* took care to distinguish between parade organizers' protected decision to exclude marchers who sought to carry a banner displaying "Irish-American Gay, Lesbian, and Bisexual Group of Boston" (a permissible exclusion based on the banner's express message) from what would have been the very different decision to exclude LGBTQ+ individuals simply because of their protected-class status. *Id.* at 572. Here, Plaintiffs seek a blanket exclusion of all gender-diverse four-year-olds and all four-year-old children of LGBTQ+ parents from their preschools while receiving public funding.

Moreover, since expressive-association protections don't turn on associations' religious motivation, Plaintiffs' position, if accepted, would apply to those who have any sort of objection to admitting students. For instance, Plaintiffs' position would foreclose the government from conditioning public funding on a university's agreement not to discriminate based on sex if the university sought permission to exclude women because it believed—based on political or personal beliefs, paternalism, or any other reason—that women should remain in the home. Indeed, the First Amendment does not permit courts to privilege views that it finds worthier or more longstanding than others. *E.g., R.A.V.,* 505 U.S. at 391 (First Amendment doesn't permit government to punish disfavored views); *Thomas v. Rev. Bd.,* 450 U.S. at 714 ("religious beliefs need not be acceptable, logical, consistent, or comprehensible" to merit First Amendment protection).

### E. UPK's equal-opportunity requirements satisfy rational-basis and, indeed, any level of scrutiny.

Because Plaintiffs have established no significant expressive burden, rational-basis scrutiny applies. UPK's equal-opportunity requirements trigger, and satisfy, any level of review by prohibiting

preschools' discriminatory exclusion of children as a condition of receiving public funding for those preschool services. Even if the equal-opportunity requirements incidentally burdened expression and required intermediate scrutiny, *see United States v. O'Brien,* 391 U.S. 367, 377 (1968), they readily satisfy that standard. These requirements regulate discriminatory conduct; they don't regulate the instructional content or the policy positions of publicly-funded preschools; and they don't regulate activities that are not publicly-funded. They thus "promote[] a substantial government interest that would be achieved less effectively absent the regulation." *United States v. Albertini,* 472 U.S. 675, 689 (1985). And as explained in II.D, they also satisfy strict scrutiny.

## IV.    The Archdiocese does not have standing.

An association may have standing in its own right or it may have standing as a representative of its members. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). The district court correctly ruled that the Archdiocese lacks standing under either theory. A019-22.

### A. The Archdiocese doesn't have standing in its own right.

The Archdiocese didn't show that it—rather than the preschools it oversees—suffered a concrete and particularized injury-in-fact sufficient to confer standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The Archdiocese doesn't operate preschools and never sought to participate in UPK. Instead, as the Archdiocese consistently emphasized, each Catholic preschool is a separate and distinct legal entity, with its own policies, pastor, and admissions decisions. 1.App.0149-51. Any purported injuries are thus experienced by the schools, not the Archdiocese.

Plaintiffs' cited cases don't support its assertion that an association has suffered an injury of its own based on its members' injury. For example, the plaintiff company in *Aptive Env't, LLC v. Town of Castle Rock, Colo.* suffered a financial injury to its business interests when it could no longer solicit customers after town curfew. 959 F.3d 961, 976 (10th Cir. 2020). And in *Colo. Right to Life Comm., Inc. v. Coffman*, the plaintiff corporation alleged its own free speech rights were harmed, not those of associated members, by a law limiting

corporate campaign expenditures. 498 F.3d 1137, 1145 n.6 (10th Cir. 2007). Here, by contrast, UPK provides funding to individual preschools, not umbrella organizations like the Archdiocese. And individual preschools, not the Archdiocese, must comply with the equal-opportunity provisions.

Because it failed to show it suffered an injury-in-fact, the Archdiocese lacks standing in its own right.

## B. The Archdiocese doesn't have associational standing.

An organization has standing to sue on behalf of its members only upon three conditions: (1) its members have standing to sue in their own right; and (2) the interests the organization seeks to protect are germane to its purpose; and (3) neither the asserted claim nor the relief requested requires its members' participation. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Kan. Healthcare Ass'n, Inc. v. Kan. Dep't of Soc. and Rehab. Servs.*, 958 F.2d 1018, 1022 (10th Cir. 1992) (no standing because members' participation was necessary to evaluate asserted claim even though it sought injunctive relief). The Archdiocese cannot establish the third element.

The district court correctly concluded the Archdiocese couldn't establish that the lawsuit could proceed without the participation of its preschool members. A020.[18] As discussed above, each individual preschool is run by a pastor, who makes decisions about the school's day-to-day operations. A021; 3.App.0649 (principal and pastor responsible for St. Mary's functioning); 3.App.0681 (Wellspring follows Archdiocese guidance on "faith and morals" but creates its own operational policies). The record contains information only as to the two Plaintiff preschools' operation and policies—and lacks information about any of the 34 preschools that didn't participate in this lawsuit. At least one didn't even want to participate in UPK. 1.App.0204.

The cases Plaintiffs cite on this point are inapplicable. The parties in *SFFA* didn't contest that the plaintiff had standing on behalf of its members where the members didn't participate in the lawsuit themselves. 600 U.S. at 199. And *Speech First, Inc. v. Shrum* addresses only the narrow question of whether an organization can represent the

---

[18] Factual findings underlying the district court's standing determination are reviewed for clear error. *Fish v. Schwab*, 957 F.3d 1105, 1118 (10th Cir. 2020).

interests of parties without naming them in the complaint. 92 F.4th 947, 949-50 (10th Cir. 2024) (parties conceded second and third prongs of associational standing were met). The Archdiocese seeks to represent the interests of all 36 preschools while providing no information about the vast majority of them. 1.App.0150-51. As the district court determined when concluding the Archdiocese didn't establish associational standing, "the individual facts of the injured parties are significant." A021.

## CONCLUSION

The First Amendment does not require Colorado to fund preschools' discriminatory exclusion and expulsion of four-year-olds. The district court's judgment should be affirmed.

## STATEMENT CONCERNING ORAL ARGUMENT

CDEC believes that oral argument is appropriate and will assist the Court in reaching a decision.

Respectfully submitted this 16th day of October, 2024.

<div style="margin-left: 40%;">

PHILIP J. WEISER
Attorney General

/s/ *Helen Norton*
HELEN NORTON*
Deputy Solicitor General
VIRGINIA R. CARRENO*
Second Assistant Attorney General
JANNA K. FISCHER*
Senior Assistant Attorney General II
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720-508-6374
Email: helen.norton@coag.gov
Email: virginia.carreno@coag.gov
Email: janna.fischer@coag.gov
*Counsel of Record for Defendants-
  Appellees

</div>

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and this Court's briefing order because it contains 12,991 words, excluding the parts exempted under Fed. R. App. P. 32(f) and Tenth Circuit R. 32(B).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Tenth Circuit R. 32 because it uses 14-point Century Schoolbook font, a proportionally spaced typeface.

Dated: October 16, 2024

/s/ *Helen Norton*

HELEN NORTON*
Deputy Solicitor General
VIRGINIA R. CARRENO*
Second Assistant Attorney General
JANNA K. FISCHER*
Senior Assistant Attorney General II
Colorado Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720-508-6374
Email: helen.norton@coag.gov
Email: virginia.carreno@coag.gov
Email: janna.fischer@coag.gov
*Counsel of Record for Defendants Appellees