No. 24-1267

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

ST. MARY CATHOLIC PARISH IN LITTLETON;
ST. BERNADETTE CATHOLIC PARISH IN LAKEWOOD;
DANIEL SHELEY; LISA SHELEY;
THE ARCHDIOCESE OF DENVER,

*Plaintiffs-Appellants,*

v.

LISA ROY, in her official capacity as Executive Director
of the Colorado Department of Early Childhood;
DAWN ODEAN, in her official capacity as Director
of Colorado's Universal Preschool Program,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Colorado
Case No. 1:23-cv-2079-JLK – Hon. John L. Kane

## APPELLANTS' REPLY BRIEF

Eric C. Rassbach
Mark L. Rienzi
Joseph C. Davis
Nicholas R. Reaves
Jordan T. Varberg
Amanda G. Dixon
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. N.W., Ste. 400
Washington, DC 20006
(202) 955-0095
nreaves@becketlaw.org

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................... ii

INTRODUCTION ................................................................................ 1

ARGUMENT ..................................................................................... 4

   I.   The Mandate violates the Free Exercise Clause. .......................... 4

      A. The Mandate violates *Carson*. .................................................... 4

      B. The Mandate lacks general applicability and
         neutrality. .......................................................................... 7

         1.  Colorado allows categorical exceptions from
            the Mandate. .............................................................. 7

         2.  Colorado has discretion to grant individualized
            exceptions from the Mandate. ................................... 17

         3.  Colorado's application of the Mandate is not
            neutral. ...................................................................... 18

      C. Colorado's implementation of the Mandate cannot
         withstand strict scrutiny. .................................................... 20

   II.  The Mandate violates Plaintiffs' freedom of
       expressive association. ........................................................... 25

   III. The Archdiocese has standing. .............................................. 28

CONCLUSION ................................................................................ 30

CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATION ........................................................ 32

CERTIFICATE OF DIGITAL SUBMISSION ...................................... 33

CERTIFICATE OF SERVICE ............................................................ 34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aptive Env't, LLC v. Town of Castle Rock,*
959 F.3d 961 (10th Cir. 2020) ................................................................. 30

*Agency for Int'l Dev. v. AOSI, Inc.,*
570 U.S. 205 (2013) ................................................................................. 27

*Bella Health & Wellness v. Weiser,*
699 F. Supp. 3d 1189 (D. Colo. 2023) .......................................... 15, 19

*Blackhawk v. Pennsylvania,*
381 F.3d 202 (3d Cir. 2004) ...................................................... 14-15, 17

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ................................................................................. 27

*Boy Scouts of Am. v. Dale,*
530 U.S. 640 (2000) ................................................................................. 25

*Carson v. Makin,*
596 U.S. 767 (2022) ........................................................................... 4, 5-6

*Central Rabbinical Cong. of U.S. & Can. v. N.Y. City*
*Dep't of Health & Mental Hygiene,*
763 F.3d 183 (2d Cir. 2014) .................................................................. 19

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) .......................................... 8, 9, 13, 14, 15, 18, 19, 21

*Citizens for Const. Integrity v. United States,*
57 F.4th 750 (10th Cir. 2023) ......................................................... 28, 29

*CLS v. Martinez,*
561 U.S. 661 (2010) ................................................................................. 27

*Colo. Right to Life Comm., Inc. v. Coffman,*
498 F.3d 1137 (10th Cir. 2007) ............................................................ 30

*Democratic Party of U.S. v. Wisconsin*,
450 U.S. 107 (1981)................................................................25

*Does 1-11 v. Bd. of Regents of Univ. of Colo.*,
100 F.4th 1251 (10th Cir. 2024) .......................................13

*Espinoza v. Montana Dep't of Revenue*,
591 U.S. 464 (2020)...........................................................6, 7

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021)................................... 14, 17, 20, 21, 24

*Hobby Lobby Stores v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013).........................................13

*Hosanna-Tabor Evangelical Lutheran Church
and Sch. v. EEOC*,
565 U.S. 171 (2012) ...........................................................28

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)............................................................29

*Loffman v. California Dep't of Educ.*,
--- F. 4th ---, No. 23-55714, 2024 WL 4586970
(9th Cir. Oct. 28, 2024) ......................................................26

*Monclova Christian Acad. v. Toledo-Lucas Cnty.
Health Dep't*,
984 F.3d 477 (6th Cir. 2020).......................................14, 15

*NCAA v. Califano*,
622 F.2d 1382 (10th Cir. 1980)..........................................29

*Obergefell v. Hodges*,
576 U.S. 644 (2015)............................................................27

*Regan v. Tax'n With Representation*,
461 U.S. 540 (1983)............................................................27

*Rendell-Baker v. Kohn*,
457 U.S. 830 (1982)............................................................24

*Rumsfeld v. FAIR,*
    547 U.S. 47 (2006) ................................................................ 26

*Runyon v. McCrary,*
    427 U.S. 160 (1976) .............................................................. 27

*Sherbert v. Verner,*
    374 U.S. 398 (1963) ................................................................ 6

*Shrum v. City of Coweta,*
    449 F.3d 1132 (10th Cir. 2006) ............................................ 18

*Tandon v. Newsom,*
    593 U.S. 61 (2021) .................................................................. 7

*Tenafly Eruv Ass'n v. Borough of Tenafly,*
    309 F.3d 144 (3d Cir. 2002) ................................................. 13

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017) ................................................................ 6

*United States v. Hardman,*
    297 F.3d 1116 (10th Cir. 2002) ............................................ 24

*Werner v. McCotter,*
    49 F.3d 1476 (10th Cir. 1995) .............................................. 24

*Williams-Yulee v. Fla. Bar,*
    575 U.S. 433 (2015) .............................................................. 23

*Yellowbear v. Lampert,*
    741 F.3d 48 (10th Cir. 2014) ................................................ 18

**Statutes**

7 U.S.C. § 2014 ....................................................................... 10

8 Colo. Code Regs. § 1404-1-4.110 ........................................ 12

29 U.S.C. § 794 ....................................................................... 10

Colo. Rev. Stat. § 26.5-4-204 ................................................. 20

Colo. Rev. Stat. § 26.5-4-205 ..................................................... 10

**Other Authorities**

Pope Paul VI, *Gravissimum Educationis* (1965) ....................................26

## INTRODUCTION

On its face, the UPK Mandate requires "equal opportunity"—treating all families equally regardless of protected characteristics. But Colorado now admits that some UPK preschools can *deny* families this equal opportunity based on protected characteristics like disability, income level, and religious affiliation.

Colorado's concession makes this case easy. Under Supreme Court precedent, a law that permits exceptions is, by definition, not generally applicable. And these same exceptions demonstrate that the State is not pursuing compelling interests in the least restrictive way possible. That is more than enough to resolve this appeal.

But Colorado makes another crucial concession. It admits that UPK preschools can favor "historically … discriminated against" groups *despite* the Mandate's plain text because it considers such programs "only sensible." For instance, preschools that serve only kids with disabilities, low-income families, children of color, and the LGBTQ community can participate in UPK Colorado today. This admittedly value-laden judgment about the perceived importance of certain exceptions from the Mandate further confirms that Colorado's law is not generally applicable.

These exceptions also explain why the *only* preschools burdened by the Mandate are, as Colorado also concedes, religious preschools—other preschools that serve only "specific communities" already receive a pass.

1

Colorado thus inadvertently also concedes that the Mandate is not neutral toward religion.

The arguments Colorado doesn't concede fare no better. The State offers no alternative interpretation of *Carson* to support its novel argument that strict scrutiny is triggered only by a ban on *all* religious schools. And it ties its lead argument to a peculiar definition of the word "discrimination," without even acknowledging that this word never appears in the Mandate. Both Colorado and its *amici* also gesture at brand-new-on-appeal equal-protection arguments, even though Colorado has never once argued that Catholic preschools are state actors subject to the Constitution (nor could it under existing law).

Colorado's strict-scrutiny argument is just as flawed. At the outset, the State cannot even get its interest straight: first it claims that eight different government interests support the Mandate, but then later in its brief concedes that its interest (as revealed by the Mandate's plain text) is in equal access, *regardless* of protected characteristics. Next, Colorado ties itself in knots trying to explain how excluding Catholic preschools helps LGBTQ families, settling on the self-refuting thesis that Catholic preschools are both harmful to LGBTQ families and critically important to LGBTQ families.

Colorado also tries to distort the facts. It claims to be solving an "actual" problem despite conceding it has never received a single complaint of LGBTQ discrimination for any Archdiocesan preschool. That's because

the Archdiocese and its preschools do not discriminate based on LGBTQ status. Instead, the Archdiocese's religious policies are rooted in concern for the best interests of each child and in seeking to ensure that children do not receive conflicting messages at home and at school about family, sexuality, and faith.

While there is no shortage of gender-"affirming" UPK preschools, families who seek a Catholic education for their children (like Plaintiffs Dan and Lisa Sheley) are entirely excluded. As confirmed both at trial and by *amici*, this significantly burdens religious families.

It also harms Catholic preschools. While this harm was obvious from the start, recent events have vividly borne it out. In the time since Plaintiffs filed their opening brief, Plaintiff St. Bernadette announced the upcoming closure of its preschool due to funding shortfalls. And across the Archdiocese, preschool enrollment has markedly declined following the advent of UPK—unsurprisingly, since the State has made virtually all other preschool options *free*.[1]

The net effect is to let UPK preschools favor groups Colorado prefers while keeping the Archdiocese's Catholic preschools out. Indeed, Colorado admits to "thread[ing] the needle" to achieve this result. But the

---

[1]  *Compare* Colorado Children's Campaign, *Kids Count in Colorado* at 45, https://perma.cc/LF5A-9ZXX (UPK Colorado enrolling almost 45,000 students in 2024) *with* Archdiocese of Denver Catholic Schools, *Office of Catholic Schools*, https://perma.cc/6MBC-2ZBB (18% decline in Archdiocesan preschool enrollment since 2022).

First Amendment doesn't permit that kind of unequal treatment. Colorado cannot give exceptions for preschools it likes while denying Plaintiffs a religious exception.

## ARGUMENT

## I.    The Mandate violates the Free Exercise Clause.

As explained in Plaintiffs' opening brief, the Mandate violates the Free Exercise Clause several times over, violating not just *Carson*, but *Tandon*, *Lukumi*, and *Fulton* as well. Br.20-36. In response, Colorado offers a grab bag of often self-contradictory arguments, none availing.[2]

### A. The Mandate violates *Carson*.

Under *Carson v. Makin*, the government presumptively violates the Free Exercise Clause when it "exclude[s]" religious schools and families "from an otherwise generally available public benefit because of their religious exercise." 596 U.S. 767, 780-81, 786-88 (2022); Br.20-24. That is this case. Colorado doesn't dispute that Archdiocesan preschools would be free to participate in UPK Colorado but for their sincere religious exercise of asking families to support Catholic teachings. "A law that operates in that manner … must be subjected to 'the strictest scrutiny.'" *Carson*, 596 U.S. at 780.

---

[2]    *Contra* Resp.10 n.3, Plaintiffs have not "abandoned" any claims. Instead, Defendants disclaimed attempts to regulate Plaintiffs' employment policies, 2.App.0485-86, and the district court separately found it unnecessary to reach Plaintiffs' denominational discrimination claim after holding that the congregation exception undermined generally applicability, 2.App.0528-29.

Colorado's response mangles *Carson*. Colorado claims that "because UPK includes religious providers, *Carson* does not apply." Resp.15-18. But *Carson* doesn't turn on whether *all* religious schools are excluded; it turns on whether schools and families are excluded *because of their religious exercise*.

*Carson* itself demonstrates the point. Maine insisted that its exclusion applied not to all religious schools—*i.e.*, all schools "associated with a particular faith or belief system"—but rather only to those which engaged in a particular religious exercise: "present[ing] the material taught through the lens" of their faith. 596 U.S. at 775. The First Circuit found this distinction persuasive. *Id.* at 777. But the Supreme Court rejected it as equally "offensive to the Free Exercise Clause." *Id.* at 782, 787. Indeed, "[a]ny attempt to give effect to such a distinction by scrutinizing whether and how a religious school pursues its educational mission would also raise serious concerns about state entanglement with religion and denominational favoritism." *Id.* at 787. Just so here.

Strikingly, Colorado offers no alternate reading of this language in *Carson*, instead complaining merely that Plaintiffs' reading would "eviscerat[e] *Smith*." Resp.Br.17. But as Plaintiffs already explained, *Carson*'s rule is rooted in pre-*Smith* principles that (as *Carson* demonstrates) have survived *Smith*. Br.21. Citing *Sherbert v. Verner*, for example, *Carson* says "[a] state may not withhold unemployment benefits … on the ground that an individual lost his job for refusing to abandon the dictates of his

faith"—with no mention of *Smith*'s threshold inquiry into neutrality and general applicability. *Carson*, 596 U.S. at 778 (citing *Sherbert v. Verner*, 374 U.S. 398, 399-402 (1963)). Nor is it any surprise that the Court has declined to subject every corner of free-exercise doctrine to *Smith*'s rule, since five sitting Justices have vigorously criticized *Smith* as contrary to the First Amendment's text, structure, and original public meaning. Br.21-22 (citing *Fulton* opinions).[3]

Indeed, events since the opening brief have only made clearer *why Carson*'s rule must apply here. The reason *Carson* and its forerunners have so tightly policed benefits exclusions is that such exclusions put a governmental "thumb on the scale" against religion, *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 514 (2020) (Gorsuch, J., concurring), in-centivizing religious people and organizations to abandon their religious exercise in order to "compete with secular" counterparts, *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017). This case vividly illustrates the problem: In the two years since Colorado made it free to attend virtually any preschool but Catholic ones, enrollment at Catholic preschools has significantly declined, and one of the Plaintiff

---

[3] Of course, *Carson*'s rule demonstrates only that strict scrutiny applies, not that the religious claimant always wins. Thus, if a state had a compelling interest in excluding providers who "engag[e] in corporal punishment," Resp.16, that drastically different hypothetical very well might come out differently.

preschools has been forced to close. *Supra* 3; *see also* Conscience Project Br.15 (Catholic families harmed by exclusion).

The Constitution forbids such a "special tax" on religion. 2.App.0492. Colorado "need not subsidize private" preschools—but having done so, "it cannot disqualify some private schools solely because" of their religious exercise. *See Espinoza*, 591 U.S. at 487.

## B. The Mandate lacks general applicability and neutrality.

Colorado's actions also trigger strict scrutiny under *Smith*'s rubric because they lack both general applicability and neutrality.

### 1. Colorado allows categorical exceptions from the Mandate.

A law triggers strict scrutiny if it treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021); Br.25. Here, Colorado concedes it permits *disability* and *income* exceptions from the Mandate. The record confirms it would likewise permit *race*, *gender identity*, and *sexual orientation* exceptions. And, as the district court correctly found and the State now also concedes, Colorado permits certain *religious affiliation* exceptions. 2.App.0516; Resp.38-39. Each of these categorical exceptions from the Mandate is comparable to the religious exception sought by Plaintiffs and thus triggers strict scrutiny.

***Disability and Income Level.*** When a law on its face forbids both secular and religious conduct but the government grants secular

exceptions while denying religious ones, it has—by definition—"de-value[d] religious" concerns "by judging them to be of lesser import." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 537-38 (1993). Here, the Mandate's text requires an "equal opportunity" to enroll "regardless of" protected characteristics—no exceptions. Br.10. But Colorado now *concedes* it allows providers to deny families an "equal opportunity" based on two protected characteristics: disability and income level. Resp.31. The Mandate is therefore not generally applicable. Colorado seeks to evade this concession in two ways.

*First*, Colorado argues that it allows UPK providers to deny families an equal opportunity to enroll based on disability and income because those exceptions serve interests Defendants believe to be especially important. Resp.30-36. Specifically, Colorado claims providers can deny families an equal opportunity based on disability because "historically, [children with disabilities] haven't had equitable access or aligned care that meets their needs." Resp.32; Resp.33 (same for income level). According to Colorado, this is the "only sensible way" of interpreting the Mandate that has "basic empathy for the challenges experienced by children with disabilities." Resp.33-34.

But this argument simply reveals Colorado's value-laden judgments about the relative importance of complying with the Mandate's text for

different providers.[4] From Colorado's perspective, some (secular) exceptions are "sensible," while other (religious) exceptions are problematic. Hialeah made an identical argument in *Lukumi*: "According to the city, it is 'self-evident' that killing animals for food is 'important'; the eradication of insects and pests is 'obviously justified'; and the euthanasia of excess animals 'makes sense.'" 508 U.S. at 544. The Supreme Court held this missed the point: "These *ipse dixits* do not explain why religion alone must bear the burden of the ordinances, when many of these secular killings fall within the city's interest." *Id.* So too here. *Any* exceptions from the Mandate trigger strict scrutiny. Br.31-32. Whether those exceptions are justified while Plaintiffs' is not is precisely the question that strict scrutiny is meant to answer.

*Second*, Colorado argues that disability and income are unique "one-way ratchet[s]," claiming it's not "discrimination" to protect "only individuals with disabilities" or "only low-income individuals" and citing various federal statutes they say take the same approach. Resp.31-36. The problem is that unlike those other statutes, the Mandate says nothing about "discrimination" (much less specifies that these two particular characteristics are of the "one-way" variety). Rather, the Mandate

---

[4]  Tellingly, Colorado doesn't even argue that these exceptions are permitted by the text of the Mandate; instead, it gestures towards other parts of the statute. But the language cited by Defendants is consistent with the Mandate and fails to justify any departure from its plain text. *E.g.*, Resp.32.

requires "an equal opportunity to enroll" "*regardless of*" all these characteristics. Colo. Rev. Stat. § 26.5-4-205(2)(b) (emphasis added). Defendants never even attempt to reconcile their argument with the Mandate's actual text.[5]

The record also rebuts this argument. Colorado claims disability and income are "very different from the laws that prohibit race and sex discrimination." Resp.34. But at trial Defendants said the opposite. They justified exceptions for preschools that enroll only "gender-nonconforming children" and "children of color from historically underserved areas" because those preschools don't "discriminate[] against" children "who historically have been" discriminated against. 4.App.0820-22; *accord* 3.App.0600; ECF.109 at 24-25. In other words, Defendants made the very "one-way ratchet" argument about race, sexual orientation, and gender identity that they now say doesn't apply to those characteristics.

---

[5] Indeed, Colorado's comparator statutes *specify* that they are (so-called) "one-way ratchets." The "Food Stamp program" (Resp.35) for example, states that "[p]articipation … shall be limited to those households whose incomes" substantially limit them from maintaining a nutritious diet—*i.e.*, low-income households. 7 U.S.C. § 2014(a). And the "Rehabilitation Act" (Resp.34) provides that "[n]o otherwise qualified individual *with a disability* … shall, solely by reason of her or his disability, be excluded from" federally funded programs. 29 U.S.C. § 794(a) (emphasis added). Contrast that with the Mandate here, which requires an "*equal opportunity* to enroll and receive preschool services *regardless of*" "income level" or "disability." Colo. Rev. Stat. § 26.5-4-205(2)(b) (emphases added).

In short, Defendants might *wish* the Colorado Legislature had enacted a nondiscrimination provision like the one they point to in the ADA, but that's not this law. 2.App.0446 ("[T]his provision is more appropriately framed as an equal-opportunity requirement.").

***Sexual Orientation, Gender Identity, and Race.*** The record also shows that Defendants would permit UPK preschools to prioritize applicants from "historically … discriminated against" groups based on race, sexual orientation, or gender identity. Br.26-27.

In response, Colorado cites testimony from Odean stating that *if* an exception "were in violation of the law," she would not grant it. 4.App.0856. This, of course, merely begs the question: Which exceptions, in Odean's view, are "in violation of the law"? On this point, the record is clear. Defendants have never disclaimed Odean's sworn testimony that exceptions *favoring* "historically … discriminated against" communities (even if based on race, sexual orientation, and gender identity) would be consistent with Defendants' enforcement of the Mandate. 4.App.0796. *See also* 4.App.0821-22 ("Those preferences didn't negate the part of the law that ensures that children aren't discriminated against who historically have been."); 4.App.0773 ("My understanding of why it was included in the statute is to ensure that children who historically have been discriminated against aren't."); 4.App.0796, 98, 804 ("The [Mandate] prioritizes families who have historically been discriminated against."). Odean's undisputed testimony confirms Defendants would permit

exceptions for race, sexual orientation, and gender identity because those exceptions, in the Department's view, support historically disadvantaged groups.

Seeking to undermine Odean's concessions (without disavowing them), Defendants complain that Odean was asked to "speculate on-the-fly." Resp.37. But Odean is the director of UPK Colorado tasked with implementing and enforcing the Mandate—and therefore with knowing how the Department understands it. Indeed, to the extent Odean considered these hypotheticals *difficult*, that only underscores the Department's ample discretion in enforcing the Mandate. *See infra* Part I.B.2.

***Religious Affiliation.*** As the district court found, Defendants permit faith-based providers to consider religious affiliation in violation of the Mandate. Br.26. Defendants vigorously disputed this point below, ECF.109 at 46-49, but now concede it, Resp.38.

Rather than simply relent and permit Catholic families and preschools to join UPK Colorado, however, Defendants declare this "exception" "inadvertent[]" and seek to scrub it from their regulations. Resp.7 n.2, 38. But this doesn't solve the problem, because a separate exception—the "catch-all"—serves the same function.

The catch-all exception allows providers to prioritize a "child and/or family" if they are "part of a specific community" served by the provider. 8 Colo. Code Regs. § 1404-1-4.110; Br.12, 26. For faith-based providers, this typically means the *church* community. *Compare* Resp.20 ("CDEC

developed the 'congregation preference' to enable them to save seats for *members of their communities*." (emphasis added)); *and* 4.App.0852 (faith-based providers can "define their community") *with* 4.App.0805, 818-20, 852 (what it means to be part of a "specific community"). And church communities turn on religious affiliation. *See* 2.App.0515. A Muslim family, for example, would be denied an equal opportunity to enroll at a Lutheran preschool that defines its "community" as members of its church's congregation.

Stuck with their decision to permit unequal opportunities based on religious affiliation, Defendants next argue that granting preferences for some religious practices but not others doesn't trigger strict scrutiny. Resp.39-40. But the First Amendment is not so myopic. It still "devalues" Plaintiffs' religious practices to prefer *other* religious reasons for an accommodation over Plaintiffs' religious exercise. *Lukumi*, 508 U.S. at 537-38; *id.* at 536 (preference for Kosher slaughter over Santería sacrifice might be "an independent constitutional violation"); *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1272 (10th Cir. 2024) ("interdenominational discrimination" subject to strict scrutiny under *Smith*'s rubric); *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 167 (3d Cir. 2002) (exception for other religious groups triggers strict scrutiny); *Hobby Lobby Stores v. Sebelius*, 723 F.3d 1114, 1143 (10th Cir. 2013) (religious accommodation showed government did not treat interest as compelling,

13

requiring additional religious accommodations), *aff'd*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

Regardless, the district court also held that even a community-based preference for church communities "favor[s] secular activity over religious exercise" in its operation. 2.App.0516 ("Defendants allow discrimination on the basis of religious affiliation for secular reasons (e.g., maintaining community relationships) but not religious ones (e.g., sharing the same faith)."). Colorado offers no response.

***Comparability.*** Unable to dispute the evidence showing that Defendants permit exceptions from the Mandate, Colorado next argues that these exceptions are not "comparable" because each advances a unique government interest and thus must be considered in isolation. Resp.42. This argument fails for several reasons.

*First*, comparability is not assessed at such a granular level. "A myopic focus solely on the provision that regulates religious conduct would thus allow for easy evasion of the Free Exercise guarantee of equal treatment." *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 481-82 (6th Cir. 2020). Instead, comparability is assessed based on the underlying government interest regardless of the purpose or type of exception. Br.27-29 (citing *Tandon*, *FCA*, *Fulton*, *Darren Patterson*, *Youth 71Five Ministries*); *Lukumi*, 508 U.S. at 544-45 (exceptions for hunters and restaurants comparable); *Blackhawk v. Pennsylvania*, 381

F.3d 202, 211 (3d Cir. 2004) (Alito, J.) (exceptions for zoos and "nationally recognized circuses" comparable).

Courts cast this broad net to prevent gamesmanship. Otherwise, simply rearranging exceptions in the law code would allow easy free-exercise evasions. *Monclova*, 984 F.3d at 481 ("The Free Exercise Clause … guarantee transcends the bounds between particular ordinances, statutes, and decrees."). In *Lukumi*, for example, the Court looked for exceptions undermining the government's interests even outside the challenged statute. 508 U.S. at 543-44; *Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1213 (D. Colo. 2023) (applying *Lukumi*). So exceptions from the Mandate, wherever codified, undermine Colorado's interest in providing families with equal opportunity.

*Second*, the Colorado Legislature has already made a comparability determination by treating all protected characteristics *identically* in the *same* statutory provision. That legislative determination makes this an easy case: Any exceptions from the Mandate's equal opportunity requirement are *per se* comparable. In *Tandon* and *Lukumi*, the Court had to look across multiple statutory provisions to determine whether exceptions *elsewhere* undermined the government's interest in a similar way; Defendants, however, have granted exceptions from the same statutory provision they use to exclude Plaintiffs.

*Third*, Defendants' argument lacks evidentiary support. There is no record evidence of eight different government interests. *See, e.g.*,

15

4.App.0773, 3.App.0718 (same interest across characteristics). To the contrary, as explained earlier, the fact that all the Mandate's protected characteristics are treated identically in a single provision is strong proof that the government's interest across characteristics is identical.

This lack of support for Colorado's new-for-appeal theory is confirmed by the State's inability *even now* to identify eight different government interests. Colorado merely asserts that children "with different protected characteristics experience different barriers." Resp.42-43. But the fact that a child with a *disability* experiences a barrier based on his *disability* doesn't change the fact that the government interest for each protected characteristic is the same: ensuring an equal opportunity. And, indeed, Colorado concedes as much in its strict scrutiny analysis. Resp.45 (uniform interest in "equal access").

*Fourth*, Defendants' argument here directly contradicts Odean's representation in *Darren Patterson* that the "same" government interest underlies the entire Mandate. Defendants try desperately to reimagine Odean's concession, Resp.42 n.11, but the testimony speaks for itself:

> Q. Does the Department view some those characteristics as being more important than others?
> A. No.
> …
> Q. Is the interest the same?
> A. It is the same.

Ex. 21 to Pls.' MSJ at 15:10-16:16, *Darren Patterson Christian Acad. v. Roy*, No. 23-1557 (D. Colo. June 21, 2024), ECF.78-21.

\* \* \*

Defendants concede they have implemented the Mandate in a way that permits numerous categorical exceptions. These exceptions are comparable to the religious exception Plaintiffs seek and thus trigger strict scrutiny.

## 2. Colorado has discretion to grant individualized exceptions from the Mandate.

Actual exceptions aside, even *discretion* to grant exceptions triggers strict scrutiny "because it 'invite[s]' the government to decide which reasons for not complying with the [law] are worthy of solicitude." *Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021). Plaintiffs' brief identified multiple sources of such discretion—including the individualized-exception form and the UPK statutory provision expressly granting Defendants discretion to depart from the quality standards, Br.32-35—but Defendants fail to rebut them. To the contrary, by insisting they can apply the Mandate flexibly to favor groups who "historically … haven't had equitable access," Resp.32, Defendants themselves identify an additional source of discretion, since historical inequity is "hardly a self-defining concept" and Defendants "ha[ve] not explained" any objective criteria for determining which groups qualify. *Blackhawk*, 381 F.3d at 210 (Alito, J.). *See* EdChoice Br.16-19 (collecting history of anti-Catholic bigotry in education).

Defendants' response focuses primarily on their statutory discretion, arguing that because "discrimination" "can cause mental, physical, and emotional harm," the Mandate is a non-waivable "health and safety" requirement. Resp.25-29. But the fact that violating a quality standard *could* have *effects* on health and safety somewhere down the chain of causation can't suffice to make it a "health and safety" regulation; otherwise virtually any quality standard would qualify. "At some great height, after all, almost any state action might be said to touch on '… health and safety.'" *Yellowbear v. Lampert*, 741 F.3d 48, 57 (10th Cir. 2014) (Gorsuch, J.). Defendants' view would render the statutory grant of discretion meaningless—presumably explaining why they never took it until this litigation began, Br.35.

### 3. Colorado's application of the Mandate is not neutral.

"[T]he Free Exercise Clause is not confined to actions based on animus." *Shrum v. City of Coweta*, 449 F.3d 1132, 1145 (10th Cir. 2006). Instead, lack of neutrality can be shown by evidence that the law in its "real operation" primarily burdens religious exercise. *Lukumi*, 508 U.S. at 535.

Defendants' response confirms this standard is met. Defendants concede the accuracy of Odean's testimony that the only providers that requested and were denied exceptions from the Mandate are religious providers. Resp.16 n.5 ("Odean testified accurately"); Br.23-24.

When a law is admittedly implemented in a way that burdens only religious people, it is not neutral. Defendants' concession thus triggers strict scrutiny. *Lukumi*, 508 U.S. at 535 ("[A]lmost the only conduct subject to Ordinances 87-40, 87-52, and 87-71 is the religious exercise of Santería Church members."); *Central Rabbinical Cong. of U.S. & Can. v. N.Y. City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 196 (2d Cir. 2014) ("[T]he burdens of the Regulation fall on only a particular religious group—and in fact *exclusively* on members of one particular subset of that religious group."); *Bella*, 699 F. Supp. 3d at 1215 (no neutrality when "the 'burden' of the law or its 'effect ... in its real operation' will fall predominantly on religious adherents").

Separately, Defendants' repeated fine-tuning of their regulations, Br.37, also demonstrates their objective to suppress Plaintiffs' religious exercise. Defendants acknowledge their attempts to "thread the needle" to accommodate only providers whose religious beliefs about sexual orientation and gender identity are consistent with their bespoke interpretation of the Mandate. Resp.20-21. And Defendants' willingness to eliminate the congregation exception in a misguided attempt to shore up their position on appeal is only further confirmation of their intent. *See* Odean Dep. at 101, ECF.61-4 (testifying a year ago that this exception was intended to "assure" faith-based providers "that they could be included in universal preschool").

**C. Colorado's implementation of the Mandate cannot withstand strict scrutiny.**

Defendants cannot carry their strict-scrutiny burden, failing to prove (1) a compelling interest in excluding Catholic preschools and families from UPK Colorado; (2) that they are advancing their interests by least restrictive means; or (3) that the means they have used furthers their stated interests. Br.37-48.

The point of UPK Colorado is to increase access to quality preschool programs for families. Colo. Rev. Stat. § 26.5-4-204(1); Resp.1 ("universal preschool access"); 4.App.0766, 4.App.0775; *see also* Jewish Coalition Br.4-12; EdChoice Br.27-29. But, as the district court agreed, Colorado's exclusion of Catholic preschools does nothing to increase access for any-one. Br.40-41. If anything, excluding Catholic preschools *decreases* access (including for LGBTQ families) because families are now competing for fewer UPK spots. *See Fulton*, 593 U.S. at 542 ("including CSS in the pro-gram seems likely to increase" access). Instead of increasing access, Col-orado is depriving countless Catholic families of UPK providers that might be the "best fit[]" for their child. 4.App.0775; Conscience Project Br.1-15. *See* 4.App.0790 (purpose of "mixed delivery" to be "inclusive of a variety of providers.").

Because Defendants' actions undermine the central purpose of the UPK program, Colorado is certainly not advancing a compelling

government interest in the least restrictive way possible. Its counterarguments fall flat.

**Compelling Interest.** Lacking evidence that its actions increase access, Colorado alleges an interest specifically in "equal" access regardless of how many UPK providers are in the program. Resp.47-48. Tellingly, Defendants don't cite any evidence supporting this defense.[6] But even more importantly, this argument, too, has been rejected by the Supreme Court. In *Fulton*, Philadelphia similarly asserted an interest in requiring religious foster care providers to serve *all* prospective families "equal[ly]." 593 U.S. at 542. But this argument failed strict scrutiny because Philadelphia's "creation of a system of exceptions … undermine[d] the City's contention that its non-discrimination policies can brook no departures." *Id.* So too here. Br.43-44. The Mandate's exceptions "leave[] appreciable damage to that supposedly vital interest [in *equal* access] unprohibited." *Lukumi*, 508 U.S. at 547; *supra* Section I.B.1 & I.B.2 (describing exceptions). Defendants have never acted like their "equal" access interest is compelling—indeed, they couldn't even be bothered to appeal the preliminary injunction entered against them in *Darren Patterson*. Br.15-16.

Colorado next piles hyperbole on top of speculation, claiming that Catholic preschools seek to "expel[]" "gender-diverse" preschoolers, and

---

[6] Defendants instead cite testimony about the importance of *access* to affirming UPK preschools for LGBTQ families, Resp.45-47; but, as explained above, Colorado's actions don't advance that interest.

that Catholic schools might not provide a "safe" preschool environment. Resp.53, 55. The record confirms the opposite. All Archdiocesan schools have strict anti-bullying policies and foster a safe environment for all students. 6.App.1242, 1395-96. And no Plaintiff preschool has ever had to "expel" a preschooler based on the child's gender or claimed that it would. *See* 3.App.0656; 3.App.0691. Instead, the record shows that the Archdiocese's policies are rooted in concern for the best interest of each child and his family, and focus on "enrollment or re-enrollment," (not expulsion), giving schools "discretion" to "address concerns about any student's safety or privacy" during the school year while avoiding situations in which a preschooler would be forced to change preschools midyear. 5.App.1050, 5.App.1053; 5.App.1046 ("individuals should be addressed with pastoral care that is rooted in love and concern for the person").

Defendants' other arguments are equally unavailing. Colorado apocalyptically argues that the Catholic Church's millennia-old religious teachings are so harmful that they are equivalent to invidious race discrimination and can have "destructive impacts on the brain's architecture." Resp.26, 69; Child Scholars Br.15-16, 27-28. Yet Colorado also asserts that it has a compelling interest in ensuring LGBTQ families can attend Catholic preschools because these preschools might be the "best fit." Resp.46-48, 50-51. Both cannot be true.

Colorado's inability to point to any actual harm is further highlighted by the fact that the Department has permitted Darren Patterson

Christian Academy to participate in UPK Colorado for the past two years. Br.15-16. Despite there being a preschool with policies similar to Plaintiffs' participating in UPK Colorado right now, Colorado and its *amici* remain unable to muster evidence that this religious accommodation hampers LGBTQ families' preschool access.

Worse still, Defendants are unable to explain why it doesn't undermine their alleged interests to permit religious preschools to teach the religious beliefs Defendants' experts claim are harmful to LGBTQ children. Br.44. All Defendants muster in response is that "the First Amendment imposes no freestanding 'underinclusiveness limitation.'" Resp.58 (quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015)). But Plaintiffs never said there was; the point is that—as *Williams-Yulee* itself explains—"[u]nderinclusiveness can … reveal that a law does not actually advance a compelling interest." 575 U.S. at 449. And the only reason underinclusiveness was not "fatal" in *Williams-Yulee* was because the law covered the conduct "most likely" to undermine the state's interest, contained "zero exceptions," and did so in an "evenhanded[]" way. *Id.* Not so here.

Finally, Defendants and *amici* (for the first time on appeal) speculate about how Catholic preschools' religious exercise might violate the Equal Protection Clause. Resp.58-59; Child Scholars Br.13-33. But these arguments fail to recognize the difference between private conduct and government action, applying constitutional requirements to private religious

23

schools. *Fulton* easily dispatched this argument, rejecting the assertion that Catholic Social Services was a state actor because it accepted a government contract and took government funding. *See* 593 U.S. at 536; *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) (education not an exclusive public function).

***Narrow tailoring***. Even if it had a compelling interest, Colorado must *prove* it is advancing this interest in the way least restrictive of religious exercise. Br.46. But Colorado offers no proof other than to emphatically insist—without evidence or caselaw—that no narrower option is feasible. Resp.60. Colorado's speculations and hypotheticals are insufficient. *United States v. Hardman*, 297 F.3d 1116, 1130 (10th Cir. 2002) ("Mere speculation is not enough to carry this burden."); *Werner v. McCotter*, 49 F.3d 1476, 1480 (10th Cir. 1995) ("[T]he state must do more than simply offer conclusory statements that a limitation on religious freedom is required."). This is reason alone to hold that Defendants have failed strict scrutiny.

The few points Defendants do make serve them no better. For example, Defendants provide no principled or evidence-based justification for permitting other preschools to note on the UPK website that they only serve certain groups, Br.46, while claiming that an identical notice for Plaintiffs' preschool would "deny equal opportunity." Resp.60. And while Defendants assert that "cisgender and straight" parents "need not worry" about being turned away from "*any* UPK preschool," Resp.60, that is not

only unresponsive but also untrue, given Odean's testimony that UPK preschools could, under the catch-all provision, serve only the "LGBTQ community," 4.App.0822.

In short, Colorado's strict-scrutiny defense fails at every turn.

## II. The Mandate violates Plaintiffs' freedom of expressive association.

Colorado doesn't dispute that Plaintiffs' association is expressive. Resp.61 & n.17. Instead, it focuses on whether admitting families who disagree with Church teaching undermines Plaintiffs' association. In doing so, Colorado wrongly second-guesses Plaintiffs' determination of what associations matter, misstates precedent, again compares Catholic beliefs to racism, and asks this Court to ignore on-point precedent based on policy considerations.

*First*, Colorado argues that Plaintiffs don't understand what burdens their expression. Resp.61-64. But "a [s]tate, or a court, may not constitutionally substitute its own judgment for that of" the plaintiff on what would burden its expression. *Democratic Party of U.S. v. Wisconsin*, 450 U.S. 107, 123-24 (1981). Rather, the court must "give deference to [the] association's view of what would impair its expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000). Here, undisputed trial testimony confirms the Archdiocese has long believed that enrolling families who fundamentally reject the Church's beliefs about, *inter alia*, the nature of family and the human person will undermine the clarity and effectiveness of

its witness (*i.e.*, its religious message). *See, e.g.*, 5.App.1049-50; 2.App.0465-66; 5.App.1012, 1046. *See also* Protect the First Amicus Br.6-8. This is because—as both the record and Catholic doctrine reflect—schools are not just admitting students to teach but taking on partners in their educational mission. 3.App.631; *see also* 3.App.0617; 3.App.0623; 2.App.0465; Pope Paul VI, *Gravissimum Educationis* ¶¶ 3, 5 (1965), https://perma.cc/7EUG-646F (Catholic schools "aid parents," who are "the primary and principal educators" of their children.).

Defendants' lead case on this point is *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), which held that law schools could be required to permit military recruiters on campus. But the "critical" point there was that recruiters were, "by definition, outsiders" seeking to "come onto campus for" a "limited purpose[]"—not to become "part of the law school." *Id.* at 69. This case is precisely about whether families who reject Plaintiffs' beliefs are entitled to become part of their schools.

*Second*, Defendants argue that Plaintiffs' expressive-association rights disappear in the public-funding context. Resp.64-67. But the Supreme Court has repeatedly "reaffirmed … that 'the liberties of religion *and expression* may be infringed by the denial of or placing of conditions upon a benefit or privilege.'" *Loffman v. California Dep't of Educ.*, --- F. 4th ---, No. 23-55714, 2024 WL 4586970, at *14 (9th Cir. Oct. 28, 2024) (emphasis added) (citation omitted); *see also* Br.49. *Martinez* did not carve out an expressive-association exception from that longstanding

principle; rather, it held that the student group's expressive-association and free-speech arguments "merge[d]" in the context of a "limited public forum"—which has nothing to do with this case. *CLS v. Martinez*, 561 U.S. 661, 678-83 (2010). And Defendants' other two cases (Resp.66-67) help *Plaintiffs*. *Regan* affirms that "the government may not deny a benefit to a person because he exercises a constitutional right." *Regan v. Tax'n With Representation*, 461 U.S. 540, 545 (1983). And *AOSI* explains that while funding conditions can "defin[e] the limits of" a program, they can't "defin[e] the recipient" by regulating expression "outside [the program's] scope"—as the Mandate (applicable to *all* a participant's activities) does here. *Agency for Int'l Dev. v. AOSI, Inc.*, 570 U.S. 205, 218-19 (2013).

*Third*, Defendants cite *Runyon*, again analogizing Plaintiffs' sincere religious beliefs to invidious race discrimination. Resp.69. But *Runyon*'s analysis turned on the unique harm of race discrimination given this country's deplorable history of slavery, and specifically put to one side private school admissions decisions in all other contexts. *Runyon v. McCrary*, 427 U.S. 160, 167 (1976). Meanwhile, since *Runyon*, the Supreme Court has repeatedly refused to treat religious objections to same-sex marriage as equivalent. *Obergefell v. Hodges*, 576 U.S. 644, 679 (2015) (First Amendment offers "proper protection" for those who advocate that "same-sex marriage should not be condoned."); *Bostock v. Clayton County*, 590 U.S. 644, 682 (2020) (similar).

*Finally*, Colorado retreats to pure policy doomsaying, arguing that this Court should dodge straightforward application of Supreme Court precedent based on a string of slippery-slope hypotheticals. Resp.74. But *Dale* and *Hurley* have been the law for decades and no horribles have paraded. Indeed, expressive association has operated to preserve "critical buffers between the individual and the power of the State" for associations of all types. *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 199 (2012) (Alito, J., joined by Kagan, J., concurring).

Since the Mandate burdens Plaintiffs' expressive association, strict scrutiny is separately triggered, and Defendants fail it. *Supra* Section I.C.

## III.   The Archdiocese has standing.

Defendants' halfhearted response all but concedes that the Archdiocese has standing.

***Associational Standing.*** Associational standing requires (1) at least one member with standing, (2) an interest in the case "germane to the organization's purpose," and (3) a determination that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Citizens for Const. Integrity v. United States*, 57 F.4th 750, 759 (10th Cir. 2023) (cleaned up). Colorado disputes only the third requirement, Resp.77-79, but never explains why individual participation of all the Archdiocese's Catholic preschools would be necessary here.

Instead, Colorado merely notes that each preschool has its own leaders and can make its own day-to-day operational decisions. But that is par-for-the-course in associational standing cases and says nothing about whether individual participation is necessary. Br.53-56; *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) (members were apple growers and dealers). Meanwhile, Defendants never dispute what matters—that the religious policies barring Archdiocesan preschools' participation are uniform and are set by the Archdiocese. *See* Resp.44, 54-55; *see also* 2.App.0382; 2.App.0469; ECF.109 at 30-31. Indeed, it is solely these Archdiocesan policies that Colorado engages with throughout its brief.

Nor must every single preschool in the Archdiocese commit *ex ante* to participate in UPK for the Archdiocese to have standing. Resp.78. Associational standing requires only that "at least one" member has standing. *Citizens for Const. Integrity*, 57 F.4th at 759. Even *assuming* a few Archdiocesan preschools wouldn't participate in UPK, this falls squarely within this Court's binding precedent. *See*, *e.g.*, *NCAA v. Califano*, 622 F.2d 1382, 1391-92 (10th Cir. 1980) (permitting associational standing when "one or more of the members" support the litigation even though other members are on the other side of the case).

***Standing in its own right.*** To have standing in its own right, the Archdiocese must show an injury in fact that is fairly traceable to Defendants' challenged conduct and likely redressable by a favorable

29

decision. Br.57. Defendants dispute only the Archdiocese's injury. Resp.76-77. But, as the record shows, the Mandate restricts the Archdiocese's religious exercise and undermines its core mission because it is the Archdiocese that promulgates religious teachings for its schools and it is the Archdiocese that has had to direct its preschools to forgo a benefit that would help advance the Archdiocese's own mission of religious education. Br.57-58; *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 976-77 (10th Cir. 2020); *Colo. Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137, 1145 n.6 (10th Cir. 2007).

## CONCLUSION

This Court should reverse the decision below and direct the district court to enter a permanent injunction ensuring that all Plaintiffs can benefit from UPK Colorado without having to compromise their religious beliefs.

Respectfully submitted,

/s/ Nicholas R. Reaves
Eric C. Rassbach
Mark L. Rienzi
Joseph C. Davis
Nicholas R. Reaves
Jordan T. Varberg
Amanda G. Dixon
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
  Suite 400
Washington, D.C. 20006

(202) 955-0095
nreaves@becketlaw.org

*Counsel for Plaintiffs-Appellants*

November 7, 2024

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,491 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), 10th Cir. R. 32(A), and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2021 in 14-point font.

Dated: November 7, 2024        /s/ Nicholas R. Reaves
                               Nicholas R. Reaves

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

1. All required privacy redactions have been made;

2. The hard copies submitted to the clerk are exact copies of the ECF submission;

3. The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender Antivirus, and according to the program is free of viruses.


Dated: November 7, 2024    /s/ Nicholas R. Reaves
                            Nicholas R. Reaves

**CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: November 7, 2024      /s/ Nicholas R. Reaves
                             Nicholas R. Reaves